# IN THE UNITED STATES DISTRICT COURT

FILED

MAR 2 2 2024

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ MLB _____ DEP CLK

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### Greenville DIVISION

| | |
|---|---|
| Cynthia B. Avens<br>(Plaintiff)<br><br>V.<br><br>Faris C. Dixon, Jr., District Attorney<br>Vidant/ECU Health Medical Center<br>Dr. Karen Kelly, Medical Examiner<br>John/Jane Doe<br>John/Jane Doe<br>John/Jane Doe<br>(Defendants) | COMPLAINT NO.<br><br>4:24-cv-00051-M |

## I. INTRODUCTION

This is an action brought by Cynthia B. Avens, Plaintiff, pursuant to 42 U.S.C. § 1981,

1983, 1985, 1988, 2000d, and 18 U.S.C. § 241, seeking redress for violations of

constitutional rights.

## II. PARTIES

1. Plaintiff resides at 303 Riverside Trl., Roanoke Rapids, NC 27870.

2. Defendant, Faris C. Dixon, Jr., public official, is a DA (district attorney) at the Pitt

   County Courthouse located at 100 W 3rd St., Greenville, NC 27834.

3. Defendant, Dr. Karen Kelly is a medical examiner closely affiliated with Vidant/ECU Health Medical Center and the ECU Brody School of Medicine located at 2100 Stantonsburg Rd., Greenville, NC 27834 and 600 Moye Blvd., Greenville, NC 27834, respectively.

4. Defendant, Vidant/ECU Health Medical Center was formerly known as Vidant Medical Center before acquiring or merging with ECU Brody School of Medicine, thus changing their name to ECU Health Medical Center. It is located at 2100 Stantonsburg Rd., Greenville, NC 27834. However, its Office of General Counsel is located at 690 Medical Dr. Greenville, NC 27834.

5. Defendants, John/Jane Doe are placeholders to add any other defendants, if necessary, during or after discovery and/or upon discovering new information up to the point of settlement or judgement.


## III. COLOR OF LAW

1. Faris C. Dixon, Jr. an elected public official, did act under color of law.

2. Dr. Karen Kelly, a government employee, did act under color of law.

3. Vidant/ECU Health Medical Center, being a public facility bound by federal rules and receiving federal funds, it and/or its employees did act under color of law.

## IV. JURISDICTION

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343, as the claims herein arise under the Constitution and laws of the United States.

## V. LEGAL DOCTRINES AND CONCEPTS

1. Negligence Per Se: This is invoked due to the crimes of obstruction of justice and the conspiracy to obstruct justice committed by the defendants, thereby violating my civil rights protections granted by the U.S. Constitution.

2. The Continuing Wrong Doctrine: This is invoked because the obstruction of justice and the conspiracy to obstruct justice commenced in 2014 and persist through 2024.

## VI. BACKGROUND

1. Keisha Marie White, a 26-year-old female, was admitted to Vidant/ECU Health Medical Center on April 16, 2014. She was placed in the intermediate cardiac monitored care unit with a diagnosis of acute on chronic renal failure — a complication of systemic lupus erythematosus (SLE).

2. While under the care of Linda Leathers Brixon, Miss White died while in restraints, and according to the death certificate, from anoxic brain injury (lack of oxygen to the brain) and cardiopulmonary (cardiac) arrest on May 10, 2014.

3. No arrests have been made and no charges have been filed in this incident.

4. I, the plaintiff, am the mother of Miss White.

5. On 04/17/2014, physicians ordered continuous cardiac monitoring and continuous pulse oximeter monitoring "until specified." The pulse oximeter measures the patient's pulse (heart rate) and oxygen saturation levels.

6. On April 20, 2014, Miss White was moved to 3 South (3rd floor, south tower) Room 211. This area of the hospital was a general medical cardiac-monitored unit designed to provide service for stable patients requiring continuous cardiac monitoring.

7. Miss White developed pulmonary edema from fluid overload and experienced difficulty breathing, prompting the hospital physician to prescribe continued oxygen therapy.

8. On May 3, 2014, the physician issued another order for continued cardiac monitoring.

9. On May 9, 2014, Linda Brixon, RN (registered nurse) with 22 years of experience, was the primary nurse assigned to Miss White on the 19:00 to 07:00 (7pm to 7am) shift. Throughout this shift, Ms. Brixon neither requested reassignment nor handed off Miss White to another RN, establishing her legal duty to provide proper care to this patient.

10. On May 9, 2014, Miss White reported difficulty breathing to the primary RN, Ms. Brixon, and a care partner (a certified nursing assistant / CNA). As per the NCDHHS (North Carolina Department of Human Services) and NCBON (North

Carolina Board of Nursing) reports, the care partner conveyed the complaint to Ms. Brixon.

11. In the NCBON report, Ms. Brixon initially denied that Miss White complained of difficulty breathing. However, in a subsequent interview, she acknowledged the complaint.

12. Miss White exhibited restlessness, anxiety, confusion, agitation, delusions, and a sensation of feeling hot. Additionally, she engaged in behaviors such as getting out of bed, falling, attempting to lay/sleep on the cool floor, pulling at her cardiac leads, being unable to follow safety instructions, and pulling out her urinary catheter with the inflated bulb intact. According to reports from NCDHHS and NCBON, these symptoms and actions were identified as signs of hypoxia (lack of oxygen to the brain).

13. Despite the prescribed orders for oxygen, Ms. Brixon neglected to administer the oxygen to Miss White, and the medical records indicated that she was receiving room air instead.

14. In response to the signs and symptoms of hypoxia, Ms. Brixon requested an order for restraints (Posey vest and bilateral wrist) from Elliotte Pearson, NP (nurse practitioner).

15. Ms. Brixon subsequently applied the restraints to a non-violent Miss White between midnight and 00:11 on May 10, 2014.

16. The action of applying restraints to a patient who was clearly in need of her physician-prescribed oxygen constitute acts of assault and battery, as well as false imprisonment.

17. Ms. Brixon neglected to reapply the cardiac leads when the restraints were installed on Miss White. This omission occurred despite the MD's order for continued cardiac monitoring and the designation of 3 South as an area for patients requiring cardiac monitoring.

18. Despite receiving a subsequent order for 2 liters of oxygen for this patient at 01:51 on May 10, 2014, Ms. Brixon once again failed to supply the prescribed oxygen to Miss White.

19. At 02:00 on May 10, 2014, Ms. Brixon recorded Miss White's oxygen levels as critically low at 62%, still she failed to provide the physician-prescribed oxygen to this patient.

20. The NCBON questioned Ms. Brixon regarding her actions in response to the dangerously low oxygen reading. She claimed she did not believe the reading was correct and did not know how to correct it in the records, which was a direct contradiction to her training.

21. The NCBON obtained and revealed documentation that Ms. Brixon had been trained on how to validate bedside equipment if she believed the readings to be inaccurate, as well as the fact that Ms. Brixon had received training on how to enter correct readings into the patient's chart. The documentation obtained and revealed by the NCBON disclosed that in 2010, Ms. Brixon reviewed a 9-page document, "Data Validation of Bedside Monitors," which explains how to validate vital signs obtained from bedside monitors into the medical records.

22. The 02:00 May 10, 2014, oxygen reading of 62% was the final validated oxygen reading obtained for this patient. Ms. Brixon failed to take any further readings to

see if Miss White's oxygen saturation levels increased to normal limits or decreased further, which demonstrated her lack of concern and disregard for human life.

23. When Ms. Brixon documented the 62% oxygen reading, she neglected to inform the charge nurse, the MD, the NP, the ERT (emergency response team), the rapid response team, or utilize any other available resources. This further underscores her lack of concern and disregard for human life.

24. At 02:00 on May 10, 2014, Ms. Brixon also failed to record other vitals including temperature and blood pressure.

25. Despite physician's orders for continued pulse-ox monitoring, the last pulse reading was at 02:13. Ms. Brixon failed to record any vitals after this time on May 10, 2014, thus failing to follow physician's orders for vital sign monitoring every 4 hours.

26. Between midnight and 6:00 AM, the monitor technician notified Ms. Brixon at least 10 times that Miss White was not on the cardiac monitor and/or was off the cardiac leads. Ms. Brixon repeatedly responded that Miss White refused to be reconnected even though she had been described by Ms. Brixon as being confused and delusional.

27. Ms. Brixon neglected to inform the charge nurse, the NP, the MD, and myself, the patient's mother, regarding her assertion that the patient declined reconnection.

28. During my presence at the facility, I can confirm that I was unaware of my daughter not being connected to the cardiac leads, as the monitor did not trigger

any alarms. Ms. Brixon neither attempted to reconnect the cardiac leads nor reported any issues to me before I left the facility for a break between 03:15 and 03:30, indicating no refusal on my daughter's part to connect to the leads.

29. When interviewed by the NCBON, Ms. Brixon either stated or implied that she did put the cardiac leads back on Miss White after the restraints were applied. In the interviews she was either unable to explain how Miss White pulled off the leads despite wearing a vest and wrist restraints, or Ms. Brixon claimed the patient removed the cardiac leads by wiggling out of them.

30. In the above situation, cardiac leads are affixed to electrodes with an adhesive backing that adheres to the skin. The components involved include the skin, electrodes attached to the skin, cardiac leads purportedly connected to the electrodes, a hospital gown covering the cardiac leads (or lead wires), a Posey vest positioned over the hospital gown and secured around the patient's chest, fastened to either side of the bed, and wrist restraints on both wrists linked to two bed rails on opposing sides. If we were to assume that Miss White could somehow free herself from the cardiac leads, it implies that Ms. Brixon would have had to stand idly by for a considerable period of time without offering any intervention.

31. Ms. Brixon failed to follow the physician's orders to notify him or the NP of any changes in Miss White's condition, behavior, or vital signs.

32. Ms. Brixon withheld crucial information regarding this patient from everyone in her chain of command, highlighting her lack of concern for Miss White.

33. Ms. Brixon failed to assess this patient as required before, during, and after administering sedative opioid medications for possible reactions to said medications.

34. Ms. Brixon failed to attempt lesser forms of control prior to installing restraints for a non-violent patient, which was a violation of hospital and CMS (Center for Medicare and Medicaid Services) protocol.

35. Ms. Brixon had been tested on restraint device application competency on July 19, 2013.

36. According to NCDHHS, the nursing staff failed to release restraints at the earliest possible time by failing to release restraints when Miss White was resting quietly with a cardiac arrest. This is a violation of federal law 482.13(e)(9).

37. Ms. Brixon failed to release the restraints at the earliest possible time, which was at approximately 00:57, less than one hour after applying the restraints, when the ABG (arterial blood gas) test, which measures oxygen and carbon dioxide levels in the blood, was cancelled.

38. The NP ordered several blood tests, including an ABG test at 00:27. Reports revealed that Ms. Brixon played a role in the cancellation of the ABG test by informing the NP that Miss White was "calm" and "asleep." The ABG test was the only test, out of those ordered, that could have indicated the patient's inadequate oxygen intake, thus alert the NP and MD to take further action. This test was the only test cancelled. Again, Ms. Brixon had more than 22 years of experience.

She knew, or should have known the importance of this test, especially regarding the circumstances of this patient.

39. According to restraint protocol, when a patient no longer exhibits the behaviors that initially warranted the use of restraints, they should be promptly removed. If Miss White was indeed "calm" and "asleep," as reported by Ms. Brixon, the restraints should have been taken off.

40. I contend that Ms. Brixon manipulated the situation by conveying whichever version of symptoms suited her agenda, contributing to the deliberate mistreatment and tragic death of Miss White.

41. When NCDHHS investigated on October 01, 2014, the department identified an immediate jeopardy to Miss White's health and safety beginning on May 9, 2014, related to the failure of the hospital's nursing staff to evaluate and supervise the care of a patient by failing to monitor a patient's cardiac and respiratory status as ordered by the physician.

42. Monitoring Miss White's cardiac and respiratory status was imperative, not only because of her pulmonary edema and breathing difficulties, but also due to the opioid medications. Opioids can potentially slow a patient's breathing, creating a deceptive appearance of sleep that might mask a critical situation, including the possibility of death.

43. A Vidant/ECU Health Medical Center administrative assistant, identified as administrative assistant #1 in the report, revealed to NCDHHS that Ms. Brixon "chose to ignore all the warnings for this patient."

44. In interviews with, both, NCDHHS and the NCBON, two of Ms. Brixon's co-workers (a charge monitor technician and a care partner) revealed that she verbally told them that she would not put the cardiac leads/monitor back on Miss White.

45. Before leaving the hospital for a break, I inquired about my daughter's next dose of pain medication. At 03:17 on May 10, 2014, Ms. Brixon administered Dilaudid, an opioid prescribed as needed (prn), despite the patient being "asleep," "calm," and "resting quietly" while still restrained to the bed. While I may not have fully comprehended the conditions under which the medication should be administered, the nurse did. Providing the medication without the patient's request or consent constitutes a subsequent act of assault and battery by Ms. Brixon. This information is included in the NCDHHS and the NCBON reports.

46. At 05:51 on May 10, 2014, Miss White was discovered in cardiac arrest without a pulse by a care partner. The care partner promptly initiated a Code Blue and began removing the wrist restraints while awaiting assistance.

47. Because the cardiac monitor was not connected, no one knew when or what time Miss White stopped breathing, and thus did not know how long she laid there, still strapped to the bed via 4-point restraints, lifeless.

48. Ms. Brixon was issued an American Heart Association (AHA) Basic Life Support (BLS) card in July 2012.

49. Ms. Brixon revealed to the NCBON that she did not feel panicked and confirmed that she had CPR training every 2 years, approximately eleven times in her 22-year career.

50. However, when Ms. Brixon went to the room upon notification that Miss White was without a pulse, she failed to remove the Posey vest restraint, perform chest compressions, or administer the Ambu bag (a handheld ventilator with a mask that is placed over the patient's mouth and nose and a bag to squeeze to provide positive air pressure to the patient).

51. While waiting for the ERT to arrive, two other nurses entered the room and initiated life-saving procedures; one who performed chest compressions, the other applying the Ambu bag.

52. Ms. Brixon 's failure to take immediate action in the patient's room after Code Blue was called, once again highlights her blatant lack of concern and urgency, as well as her appalling and blatant disregard for human life.

53. The Emergency Response Team (ERT) wasted valuable time, as E. Everett, RN cut off the Posey vest because the restraint had not been promptly removed earlier. This delay occurred before they could initiate CPR, which lasted for 15-16 minutes before achieving a heartbeat.

54. Miss White was immediately transferred to ICU (intensive care unit) upon the ERT obtaining a heartbeat.

55. While in ICU Miss White's head CT showed global hypoxic ischemic injury, had zero brain activity, pupils were fixed and dilated, and there was zero response to stimuli; all consistent with a brain death diagnosis.

56. Miss White, who had previously been resuscitated, succumbed to her massive brain injury, and died at 13:02 (1:02pm) on May 10, 2014.

57. Miss White's death was unexpected. The NP and MD expected her health conditions to improve, had not given up on treatment options, had not placed her on hospice, and thus, had not discussed end of life care with the family.

58. Along with the inconsistencies mentioned, during the first interview with the NCBON, Ms. Brixon denied Miss White had complained of shortness of breath. In a subsequent interview, she revealed that the patient did report shortness of breath.

59. On June 9, 2014, Ms. Brixon reported to the NCBON that she had worked at Vidant/ECU Health Medical Center for 14 years without incident. However, it was revealed in a subsequent complaint to the agency that Ms. Brixon had been disciplined/counselled on at least two previous occasions:

   a. September 03, 2010, for giving valium to the wrong patient

   b. March 21, 2011, for failure to participate in bedside shift report, failure to round, failure to respond, and for inaccurate or false documentation.

60. Other than the laboratory tests ordered by the NP, the NCBON could only find two treatments for Miss White's hypoxia – restraints and sedating medications.

61. The NCBON discovered in their investigation that the cardiac monitor had been silenced in Miss White's room, thus preventing anyone in or near the room from hearing audible alerts that the patient was in trouble.

62. Moreover, the NCBON investigation revealed that the cardiac monitor in Miss White's room was intentionally silenced from the device in Ms. White's room to the cardiac monitor technician, inhibiting communication from the room to the cardiac monitor technician. This deliberate act not only disabled the technician's

capacity to print cardiac rhythm strips but also prevented audible alerts from reaching the nurse's station. NCDHHS also discovered the same information. Their investigator, Ms. L. Etheridge, asserted that she forgot to include this particular info in the report. However, there is evidence to support this startling fact via the medical records, the NCBON report, and an email conversation with NCBON investigator, Ms. R. A. Go

63. The actions described in VI (61) and (62) entail a deliberate and premeditated choice, constituting criminal intent.

64. There is evidence in this case to support every degree of homicide from involuntary manslaughter to first-degree murder, including NCGS 14-32.2 whereby if patient abuse and neglect is the proximate cause of death it shall be punished as a Class C felony.

65. Despite compelling evidence from multiple reports, including those from NCDHHS, the NCBON, and a recent report dated January 15, 2024, obtained from independent medical examiner, Dr. Donald Jason, MD, JD, who concluded that Miss White's manner of death is homicide due to criminal negligence, still, no arrests have been made, and no charges have been filed. In fact, after Mr. Dixon received the new evidence from Dr. Jason, Mr. Dixon decided to close the case.

66. The Greenville Police Department (GPD), the NC SBI, the former Chief Medical Examiner, Deborah Radisch, assistant district attorney (ADA) Anthony Futrell, and two district attorneys, Kimberly Robb (former DA) and Faris C. Dixon, Jr.

(current DA), have consistently asserted that no crime had/has taken place in the death of Miss White, nor in the treatment of Miss White.

67. I assert that what happened to Miss White is not only criminal, but is nothing less than a hate crime, a medical lynching, which should be investigated by the proper authority due to:

   a. Ms. Brixon is White.

   b. To the best of my recollection, Miss White was the only person of color under the care of Ms. Brixon during the shift spanning from May 9 through May 10, 2014.

   c. Miss White was the only patient who did not survive the shift.

   d. Miss White was assaulted and battered at least on two occasions.

   e. Miss White was falsely imprisoned.

   f. Miss White was abused and neglected, tortured, for eleven hours of a twelve-hour shift.

   g. It is wicked to subject a patient who has reported difficulty breathing, been prescribed oxygen, and exhibits numerous symptoms of oxygen deprivation to the inhumane act of withholding the oxygen and needlessly shackling them to a bed with 4-point restraints. Further exacerbating the situation by manipulating the cancellation of a crucial blood test, disregarding the patient's low oxygen levels, concealing essential patient information, intentionally denying necessary care, and deliberately neglecting to provide assistance during a code blue—the most critical medical emergency—resulting in the prolonged suffering and eventual

death of Miss White, is a string of malicious acts and is totally unacceptable of a person employed as a nurse. I contend that Ms. Brixon would not have subjected a White person to such malevolent treatment.

h. An instantaneous killing may be impulsive, but a prolonged act of cruelty over eleven hours is a deliberate and heartless crime. There is nothing accidental about it. It is pure torture. I contend that Ms. Brixon harbored hatred towards my daughter due to the color of her skin.

68. Additionally, it is unjust that I am still fighting for justice a decade later, while individuals have been arrested, charged, and convicted for lesser offenses involving animals. The death of my daughter has received less attention and respect in the justice system than the case of a man charged for abandoning his pet fish in Wilmington, NC. The way that this case has been handled, not only highlights the racial disparity within our justice system, but it is also a stark illustration of systemic disparity that in cases of animal cruelty, justice is consistently served. Yet in the case of my Black daughter, justice has been elusive. This disparity underscores deep-rooted issues of racial inequality within our legal system, where the lives of marginalized individuals are often undervalued and their quest for justice is met with indifference. The fact that perpetrators of crimes against animals receive more expeditious and effective legal recourse than those responsible for the death of my daughter speaks volumes about the systemic inequities that persist in our society.

## VII. CAUSE OF ACTION

1. Due to Miss White's death occurring while restrained and with a cardiac arrest, her unexpected death, and the abuse and neglect by her nurse (or any one or a combination of these events), her case warranted referral to a medical examiner on 05/10/2014. Despite this, the ICU physician (who knew or should have known such details upon reviewing her chart) failed to take necessary steps to ensure such a referral, instead leaving the decision to perform an autopsy to the family to decide when the family was not privileged to the full information of what actually occurred. The failure of the ICU physician thus created an obstruction of justice. Furthermore, Dr. Christopher Patrick Craig prematurely signed the death certificate on 05/14/2014, attributing the manner of death to 'natural' causes, despite circumstances suggesting otherwise.

2. Following the death of Miss White, Vidant/ECU Health Medical Center's risk management department initiated an investigation. As a result, these actions were taken:

   a. Ms. Brixon's employment was terminated.

   b. I was contacted by the current risk manager at the time, Vicki Haddock, to schedule a meeting at my former home.

   c. The hospital filed a complaint with the NCBON on June 02, 2014, and reported the cause of death had been reported as "not clear," despite the death certificate completion on May 14, 2014, indicating otherwise.

   d. The hospital notified law enforcement.

However, all actions, except the termination of Ms. Brixon, were undertaken in bad faith, impeding the justice process. Further details supporting this claim will be provided in subsequent statements.

3.  Two complaints were lodged with the NCBON concerning Ms. Brixon 's conduct – one by the hospital on June 02, 2014, and the other by me on September 29, 2014. Both complaints prompted NCBON investigations.

4.  In their complaint to the NCBON, Vidant/ECU Health Medical Center associates intentionally withheld crucial information regarding Ms. Brixon 's conduct, amounting to a deliberate attempt to deceive a government agency. Notably, they failed to disclose several key details, including but not limited to:

    a.  Explicitly identifying all physician's orders neglected by Ms. Brixon, with many explained in Section VI. BACKGROUND of this pleading.

    b.  The multiple opportunities that Ms. Brixon had, but failed, to provide oxygen to the patient.

    c.  The patient was on room air.

    d.  The patient's oxygen was recorded to be 62%.

    e.  Violation of restraints protocol.

    f.  Failure to act when Miss White was found PEA (without a pulse) while waiting for ERT staff to respond.

    Instead, Vidant/ECU Health Medical Center gave vague descriptions such as, "Ms. Brixon failed to intervene or act to rescue or facilitate obtaining physicians orders for a patient with acute changes in vital signs, oxygenation, oxygen saturation levels, and levels of consciousness changes." The main

allegations listed according to Vidant/ECU Health Medical Center or as a result of their complaint was:

1. "Neglect Failure to assess/evaluate – Primary"
2. "Withholding crucial healthcare information"

5. When the NCBON asked "Has the nurse been counseled or disciplined for any prior practice issues," the facility in question reported "N" for No.

6. The information provided by Vidant/ECU Health Medical Center to the NCBON led to a three-month investigation by the agency. This investigation culminated in a non-disciplinary action against the nurse and a non-published consent order, effectively diminishing the gravity of the abuse, neglect, and assault and battery inflicted upon Miss White.

7. The effect of the NCBON's non-disciplinary action was that Ms. Brixon retained her nursing license, allowing her to potentially harm patients in future employment over an indefinite period of time.

8. Vidant/ECU Health Medical Center representatives, including Vicki Haddock and two others (whose names I do not recall), visited my former home for a disclosure meeting on Friday, June 13, 2014.

9. During the above meeting, Vicki Haddock revealed that the hospital did not do everything within their capacity for my daughter. However, she disclosed very little information compared to what was subsequently revealed by NCDHHS later in 2014 and by the NCBON in 2016.

10. The meeting, characterized as an effort to "help" me via the disclosure, was, in reality, a smokescreen. The representatives visited my house with the intention of defrauding me and closing the case by:

    a. Revealing a minimum account of the events surrounding my daughter's care, as well as delivering false or misleading information.

    b. Indicating that, "in cases like this," the hospital typically tries to do something for the families, before suggesting an offer related to little league uniforms or church pews.

11. The conduct outlined above constitutes attempted fraud, as any acceptance on that day would have been founded on the incomplete and unreliable information they disclosed. This action aimed to save the hospital from potential legal expenses and a considerable sum of money that might be awarded in a settlement or by a jury in a medical malpractice or wrongful death claim.

12. In a telephone conversation during the week of June 16, 2014, I inquired with Ms. Haddock about the possibility of an external investigation conducted by the Greenville Police Department (GPD). She asserted that "in cases like this," the hospital was "required to report to the SBI." This statement is inaccurate. The obligation is to report "cases like this" to law enforcement, not specifically to the SBI. There is no rule, statute, regulation, or provision explicitly mandating the reporting of crimes or suspected crimes to the SBI, especially since the SBI is not typically involved based on reports or complaints from the general public. This report was made in bad faith, intentionally or negligently obstructing the

initiation of a criminal investigation by the appropriate law enforcement authorities.

13. I contacted the SBI office in Greenville, NC in June 2014. I spoke to an Agent Brown who informed me that his office knew nothing about my daughter or this case and had not spoken to anyone named Vicki Haddock. "So, she lied to me?" I questioned. Agent Brown responded, "And I would be very upset about that if I were you." He then suggested that I contact the district attorney's office.

14. In June 2014, I traveled to Greenville, NC to file reports with both the district attorney's office and the GPD. However, no one was available to speak with me at the DA's office. And despite Vidant/ECU Health Medical Center being located within the city limits, the GPD told me they did not have jurisdiction over the hospital, because the hospital had its own police, hindering my efforts to seek accountability.

15. When I went to file a report with Vidant's police (during the same trip mentioned in point 14 above), I was told by the desk clerk to wait in the lobby. About fifteen minutes later, a woman came through the entrance door to speak with me. I believe she was from the Office of General Counsel since that office is not located within the hospital. She told me I could not talk to their police unless I first speak to the risk manager. I asked surprisingly, "Is that Vicki Haddock?" The woman said, yes. Feeling disgusted, I left.

16. The above experience implies that GPD and Vidant/ECU Health Medical Center have an agreement (whether written, verbal, common practice, or otherwise) in place for GPD to deny jurisdiction and redirect complainants back

to the facility, giving full control of the matter, criminal or not, back to the hospital, thus engaging in a repulsive plan to cover up crimes that happen at that facility.

17. Soon after my failed attempt to meet with the DA, I called the office and spoke to ADA Anthony Futrell, who seemed genuinely interested in helping me. He told me he would look into my concerns and that I should hear from him in about a week, also reminding me that the 4th of July holiday was coming up. He said if I did not hear from him before, he would call me back after the holiday weekend.

18. I spent the next few days trying to figure out what Ms. Haddock might have been hiding from me. I had not been able to obtain medical records at this time, because I was required to open an estate for my daughter and become administrator of the estate before records could be released to me. Nonetheless, I speculated that individuals resort to deceit when they either stand to lose significantly or stand to gain substantially.

19. In my research I ran across a website that contained information regarding restraints and seclusion protocol by CMS. After being sure that federal regulations were violated and realizing that Ms. Haddock did not disclose any information to me regarding the restraints, I immediately called ADA Futrell to share the information prior to the upcoming holiday. His entire demeanor had changed. He went from being warm and concerning in our first conversation to being cold and short in this phone call. He insisted that no crime had been committed against my daughter and that his boss (DA Kimberly Robb) agreed.

His tone and reaction left me terribly confused and highly suspicious of Kimberly Robb.

20. When I next spoke to Ms. Haddock (July 2014), I called her a liar, because Agent Brown did not know anything about this case. She insisted that she did in fact speak to SBI agents. I demanded names. She named three agents whose names I am afraid to include in this (soon to be public) pleading, but their first name initials are, A., D., and J. The fact that I can provide the first and last names of three SBI agents whom Ms. Haddock spoke to, as well as the fact that one was being trained by another at that time, is evidence that Ms. Haddock reported to the SBI instead of to the GPD or FBI.

21. I communicated with the SBI agents in July 2014, each of whom informed me that they had no information about my daughter, had not engaged in conversations with Vicki Haddock, and were unaware of the details of this case.

22. Subsequently, during a meeting in Vicki Haddock's office (July or August 2014), I, again accused her of lying for claiming to have spoken to the SBI agents. In response, she asserted, "I spoke to them a few days ago, as a matter of fact. You wanna know what they told me?" She continued, "They told me that you told them you were gonna speak to the DA." While it is accurate that I conveyed this information to one of the agents, I did not disclose it to Vicki Haddock. The agents, whom I trusted, shared information obtained from me with the hospital, indicating a conspiracy to obstruct justice.

23. The hospital's report of Miss White's death to law enforcement at all, even the SBI, suggests awareness that her death may not have been natural or was suspicious at the least, or potentially criminal.

24. I decided to call the Pitt County Sheriff's office one night (July or August 2014) to report what I suspected was a crime against my daughter. In the call, I was informed that they did not have jurisdiction over the hospital, but that GPD did. The officer told me that I needed to talk to the police because the hospital can not investigate themselves via their own police.

25. On September 9, 2014, I gained the attention of former GPD Chief Hassan Aden via Twitter. Aden provided his email address and requested further details regarding my tweets.

26. On September 13, 2014, Chief Hassan Aden informed me via email that Assistant District Attorney (ADA) Anthony Futrell and the SBI had purportedly investigated. However, it appears that neither interviewed key witnesses, including myself and family members

27. Between July and September 2014, I filed complaints with CMS, NCDHHS, the Joint Commission, and the NCBON.

28. The Joint Commission investigated but did not disclose specific results. Instead, they addressed their findings with Vidant/ECU Health Medical Center.

29. My complaint was filed with the NCBON on September 29, 2014. In contrast to the investigation that ensued in June following Vidant/ECU Health Medical Center's report to the Board, the same question that the facility had previously answered with an "N" for No, "Has the nurse been counseled or disciplined for

any prior practice issues," was answered with a "Y" for Yes. [See Section VI. BACKGROUND (59) above]

30. This above-mentioned inconsistency, along with Vidant/ECU Health Medical Center's failure to report relevant information regarding Ms. Brixon's actions and failures to the NCBON constitutes an act of defrauding a government agency.

31. The complaint I filed with the NCBON initiated a year-long investigation by the agency. This investigation (in addition to the one led by NCDHHS) revealed a multitude of details not previously disclosed by the hospital; many of which were explained in section VI. BACKGROUND of this complaint. It led to a published consent order regarding Ms. Brixon's conduct as well as disciplinary actions, including the suspension of Ms. Brixon's nursing license.

32. This investigation by the NCBON also resulted in issuing a Published Letter of Concern to NP, Elliotte Pearson. Unlike Vidant/ECU Health Medical Center, I requested the Board to review actions of all involved who were under their authority.

33. The Published Consent Order Issued by the NCBON stated the following (along with other information) in its Conclusion of Law, Licensee (Ms. Brixon):

   a. Engages in conduct that endangers public health;

   b. Has willfully violated rules enacted by the Board;

   c. Failed to make available to another health care professional any client information crucial to the safety of the client's health care;

> d. Neglected a client who was in need of nursing care, without making reasonable arrangements for the continuation of such care;
>
> e. Failed to maintain an accurate record for each client which records all pertinent health care information as defined in RN Rule 36.0224(f)(2).

34. NCDHHS investigated on October 01, 2014, finding Miss White in immediate jeopardy and the hospital in violation of six federal healthcare laws. These violations pertained to patient rights, care in a safe setting, restraint protocol violations, and nursing standards, constituting an "immediate jeopardy" situation. An "immediate jeopardy" is defined by CMS as a situation in which the provider's non-compliance has caused or is likely to cause, serious injury, harm, impairment, or death.

35. Despite conducting an internal investigation in May 2014, Vidant/ECU Health Medical Center remained federally non-compliant in October 2014. They were given three weeks to comply or risk losing government funding for Medicare and Medicaid patients.

36. In November 2014, upon submitting NCDHHS's investigation results to the GPD, Chief Hassan Aden assigned Detective Alvaro Elias as the lead investigator to probe my daughter's death.

37. In December 2014, Detective Alvaro Elias forwarded Miss White's medical records to the former Chief Medical Examiner, Dr. Deborah Radisch.

38. Dr. Radisch released her decision about five months later in 2015, concluding that my daughter's manner of death was natural. However, prior to concluding her investigation, Dr. Radisch disclosed to me in a phone conversation that she

had spoken to former DA, Kimberly Robb. This revelation left me unsettled, as it raised questions about the independence of Dr. Radisch's conclusion.

39. In December 2015, I arranged a meeting with the late Sgt. Tim McInerney, the former Internal Affairs officer at the GPD. During the meeting, I provided details about my daughter's case, including the events surrounding her death, concerns about the police investigation, the behavior of SBI agents, and the lack of communication with the Pitt County District Attorney, Kimberly A. Robb, who held office at the time.

40. During the meeting with Mr. McInerney, I provided him with a copy of the NCBON's Published Consent Order that was recently released via their website and a copy of NCGS 14.32-2, which outlines the crimes and punishments related to patient abuse and neglect, whereby if patient abuse and neglect is the proximate cause of death, it shall be punished as a Class C felony. Additionally, the statute listed other classifications of punishments regarding culpable negligence proximately causing injury to a patient. While the statute has since been modified, the former version would still be applicable in this case.

41. Due to the way the case had been handled thus far, I was cautious about how to move forward. Explicitly, I was concerned about the relationship of the SBI agents with Vidant/ECU Health Medical Center; the fact that key witnesses still had not been interviewed; the fact that this case had been closed multiple times without anyone informing me that it would be closed; Dr. Deborah Radisch's communication with Kimberly Robb; being repeatedly told that no

crime had occurred in the death of my daughter; and being told that I did not understand the law, which would have been a Constitutional violation in itself considering that all laws are to be written in a manner such that common man can understand.

42. The GPD suggested I sue the hospital for malpractice as a means to seek justice. I found that to be as perplexing as, for example, advising a family of a murder victim to pursue compensation from homeowner's insurance instead of expecting criminal charges against the perpetrator. Such advice not only defies logic but also underscores the unequal treatment individuals face based on factors like race, social class, and political connections. As a Black mother fighting for her Black daughter posthumously, who allegedly died at the hands of a White nurse in a predominantly White institution, these disparities are painfully evident.

43. I was afraid to turn over the last piece of evidence I obtained in March 2016; a 194-page document from the NCBON that was a compilation of reports and included the previously released Published Consent Order. I knew that if the case was closed again after turning in the document, I would have little chance, if any, of the case being re-opened based on new evidence. When I did turn in this document, I did so via the Greenville city attorney, Donald K. Phillps, (who I hoped could assist with the matter) on April 24, 2018. He confirmed receipt and told me he would give the evidence to Ms. Robb.

44. I made several attempts to follow up with Ms. Robb, but she never returned any of my calls prior to leaving office at the end of 2018.

45. Due to Ms. Robb's failure, decision, or discretion to not file charges in this case, not for any degree of homicide including involuntary manslaughter, I asked Mr. Dixon, the newly elected district attorney, to review the case in February 2019.

46. A meeting was scheduled for October 24, 2019, at 2:00 p.m. with Mr. Dixon in his office, at the Pitt County Courthouse in Greenville, NC. Prior to the meeting, Mr. Dixon had already concluded that no crime had occurred in the death of Miss White and asserted that the case was not of a criminal nature. After driving an hour and a half to get there, the meeting only lasted about five minutes. Despite my efforts to provide additional details and express my perspective, Mr. Dixon declined to engage in further discussion on the matter.

47. Mr. Dixon failed to conduct a proper and fair investigation before deciding not to bring charges in 2019 and has failed to conduct a proper and fair investigation ever since.

48. In July 2021, I reached out to Mr. Dixon requesting a detailed list of the evidence he had examined before arriving at his decision in 2019. While he responded on July 26, 2021, providing insights into the conclusions of the previous administration, he did not specifically address my inquiry about the evidence.

49. Despite multiple attempts, Mr. Dixon did not respond to my requests for more than eighteen months regarding my request for the list of evidence he had reviewed.

50. Mr. Dixon finally responded when I created a Facebook post on February 9, 2022, tagging him and reiterating the contents of a letter I had previously faxed to his office that he finally responded.

51. I received a letter dated February 14, 2022, from Mr. Dixon in response to my request. He stated he would send me a list of evidence he was provided.

52. One month later, I received a letter dated March 14,2022, from Mr. Dixon's administrative assistant, Jennifer Corbitt. The letter contained the list of evidence he used to make his determination that no crime had been committed in the death of my daughter. The list included:

    a. The death certificate that stated manner of death was natural.

    b. The absence of a performed autopsy.

    c. The opinion of natural death by the former chief medical examiner, Dr. Radisch, MD, MPH.

    d. The conclusion of NC SBI Special Agent Matherly's investigative findings.

    e. The conclusion of the GPD's investigative findings.

    f. Various medical records from 2014.

    g. The 2014 report of findings from the NCDHHS investigation.

53. Here is what is wrong with Mr. Dixon's reliance on the evidence he reviewed in 2019 (and still relies on in 2024):

    a. The death certificate was prematurely completed on May 14, 2014, before any investigation had been conducted and/or completed. Therefore, Mr. Dixon should have realized that evidence that supported any manner of

death other than natural, subsequent to this date, invalidated the manner of death shown on the erroneous death certificate.

b. The absence of an autopsy was the fault of Vidant/ECU Health Medical Center, which led to a reliance on such absence by the district attorney.

c. The fact that Dr. Radisch communicated with Ms. Robb casts doubts that she reached her conclusion independently without influence from Ms. Robb. It is also imperative to point out that Dr. Radisch's opinion of natural death was released before the NCBON completed their investigation, subsequently releasing their report in March 2016, with results that did not support a natural death. Therefore, if Dr. Radisch did in fact reach her conclusion independently, it was based on incomplete data.

d. The 2014 investigation conducted by Special Agent Matherly was incomplete as it did not include interviews of all witnesses, in particularly, key witnesses. It also did not and could not have included the findings and conclusions drawn by the NCBON as their investigation was not completed.

e. The 2014 investigation by the GPD was also incomplete and did not include interviews of all witnesses, in particularly, key witnesses. The GPD also did not have access to the NCBON findings when they investigated.

f. Concerning the medical records, not only did Ms. Brixon apparently abuse and neglect Miss White until she was dead, Ms. Brixon also neglected to document vital information into the medical records.

54. Generally, members of law enforcement are not medical professionals. Yet, no one in law enforcement, including Mr. Dixon, has mentioned consulting a medical professional to help decipher the medical records. As the medical records seem to have been heavily relied on, proper interpretation is crucial when examining them for details that could support homicide charges. On the other hand, a number of medical professionals whose job requires them to examine medical records on a regular basis, who are accustomed to comparing job requirements of medical staff to the job actually performed, who are skilled at assessing missing data, and who are proficient at determining what went wrong, where it went wrong, when it went wrong, and by whom, have all been dismissed and disregarded as a whole except for Dr. Radisch, whose tainted opinion is based on incomplete data.

55. The Published Consent Order that had been given to GPD and the 194-page document from the NCBON were missing from the list of evidence that Mr. Dixon relied on to make his 2019 charging decision. These documents were vital pieces of evidence as they contained the conflicting information provided by Vidant/ECU Health Medical Center, conflicting information provided by Ms. Brixon, and co-worker interview revelations, as well as many damaging findings and conclusions by the NCBON.

56. The medical records and the NCDHHS report that Mr. Dixon definitely had access to in 2019, showed that Ms. Brixon had given two accounts for why Miss White was not connected to the cardiac leads.

a. The cardiac monitor technician had entered into the records that Ms. Brixon's response to his notifications that Miss White was not connected was that the patient "refused."

b. Two co-workers told NCDHHS that Ms. Brixon verbally told them she would not reconnect the leads, thus ignoring explicit physician's orders and the purpose for which the designated wing of the hospital served.

57. The NCBON report highlighted the conflicting accounts given by Ms. Brixon regarding her failure to ensure the connection of the cardiac leads, as well as the two co-worker's statements. However, the report introduced a third reason provided by Ms. Brixon, claiming she did reconnect the leads, but Miss White, restrained to the bed, allegedly pulled them off. The charge nurse, M. B. Wilson, RN, informed the NCBON that such occurrences were not common. All accounts cannot be true, thus proving Ms. Brixon to be untrustworthy. Moreover, if Faris Dixon did not know about these issues initially, he would have known about them if he had taken the time to discuss the case with me during the 2019 meeting, instead of dismissing my concerns.

58. In March 2022, following receipt of the letter detailing the evidence, I reached out to Mr. Dixon 's office. I highlighted the incomplete nature of the law enforcement investigations and the absence of crucial evidence from his provided list. He assured me that he would have someone review the contents of the late Tim McInerney's files and that he would contact Attorney Phillips to inquire about the whereabouts of the 194-page NCBON document.

59. In a subsequent phone conversation in March 2022, Mr. Dixon disclosed that he had successfully obtained the previously missing NCBON document from Attorney Donald Phillips via the same format I had submitted the document to him; four emails, each containing a part of the document due to file size limitations with my email provider. However, what Mr. McInerney did with the documents given to him remains a mystery.

60. Using the pen name Charla Brooks, I compiled a dossier on the death of Miss White, connecting the pieces of evidence with relevant statutes and submitted it to Mr. Dixon on 05/02/2022.

61. Within the dossier, I highlighted the elements of murder, providing corresponding evidence for each element, along with footnotes guiding him to the specific sections in the reports for confirmation.

62. In the dossier, I pointed out where he could find evidence to support every degree of homicide from 1st-degree murder to involuntary manslaughter. I reminded him of the NC statute 14-32.2 regarding patient abuse and neglect. I pointed out the assault and battery that occurred.

63. In a subsequent phone conversation with Mr. Dixon in June 2022, he had not completed his review of the newly obtained evidence and dossier but maintained, thus far, that he did not believe a crime had occurred. He requested an additional two weeks to conclude his examination, stating that if he found anything in the documents to change his perspective, he would submit the evidence to the local Pitt County Medical Examiner's Office. The latter is located within The ECU Brody School of Medicine, which Vidant

Medical Center acquired in 2021 or 2022 prompting the facility to change its name to ECU Health Medical Center.

64. In early July 2022, during our conversation, Mr. Dixon claimed to have completed the review of the newly obtained documents, including the 194-page report from the NCBON and the dossier. Despite this, he insisted that his stance on the matter had not changed, maintaining that this was not a criminal case. The discussion escalated into an argument. Dixon eventually asserted that he could not file criminal charges because he had received a report from the Pitt County medical examiner (ME) that did not support such charges. This statement contradicted his previous assurance, made about two weeks prior, that he would send the evidence to the ME if he saw something to make him believe a crime had occurred. This situation presented several inconsistencies:

   a. According to his previous statement, if he had observed something to change his mind (indicating a possible crime), there would have been no basis for our argument as our beliefs would have aligned. But he had not changed his mind as evident in recorded phone conversations in 2023.

   b. If he had not identified evidence of a crime, as per his earlier statement, he would not have sent the evidence to the ME since he suggested he would only do so if his belief had changed.

   c. If he indeed sent the evidence to the ME, it appeared implausible to me that he could have finished reading the last two documents (totaling approximately 235 pages), transmitted thousands of pages to the ME, and received an evaluation of the extensive information, resulting in a

determination, all within just two weeks. So, I asked him, "All in two weeks?" He said, yes. "Can I get a copy?" I asked. He said, no. "Can I come to your office and see yours?" He said, no. "Can you tell me who signed it?" "No, I can not," he responded. "Can you give me the date that's on it?" Again, he responded, "No I can not."

    d. Faris C. Dixon's conflicting statements contributed to intentional confusion in this case, further impeding the justice process.

65. In the aforementioned conversation, I inquired with Mr. Dixon about the possibility of hiring an independent medical examiner (IME). His response was that he could not use an IME because it might raise questions from jurors as to why he didn't utilize the services of the local ME, whom he typically utilized. This failed to make sense to me since jurors are randomly selected for each trial, rather than a static jury attending every trial, and remembering who the typically used ME is.

66. Immediately following the aforementioned phone conversation, I contacted the Pitt County ME's office and spoke with the office manager, Danene Lowery. She conveyed that there was no information in their system regarding my daughter, leading her to doubt the existence of any report from that office to the DA. At her suggestion, I spoke to a male co-worker who requested a few days to investigate the matter and asked me to call back after that period.

67. I contacted the Pitt County ME's office again two days later, and Danene Lowery informed me that her office had reached out to the DA's office inquiring about the report. However, according to her, they were told by the DA's office

that they had to "find" the report. Danene Lowery further maintained that there was nothing in their system on Miss White and reiterated her doubts about the existence of any report from that office regarding this matter.

68. Within a few days of the last phone call with Danene Lowery, and after Mr. Dixon had been caught in his lie and was aware of it, he called me, exclaiming, "I have good news. I'm going to submit the evidence to the medical examiner's office." I began to respond, "But you said...," when he abruptly interrupted me, saying, "Do you want me to send the evidence or not?!" This was a display of verbal abuse and an abuse of power. I felt disrespected and diminished, believing I had no alternative but to endure this treatment, given his authority in the situation. Consequently, I humbled myself and responded, "Yes, sir. I'd appreciate that."

69. On July 18th, 2022, Jennifer Corbitt sent me an email containing a medical release that I was instructed to sign in the presence of a notary and return to the DA's office. However, I was unaware of the email and only discovered it on August 01, 2022.

70. I sent the notarized medical release by USPS and a digital copy to Jennifer Corbitt's email on August 03, 2022.

71. I attempted to follow up with the ME's office in September 2022 to see if they had received the evidence from the DA's office. A female other than Danene Lowery answered the phone. She told me, that she was told, that if I called, to tell me, I needed to talk to ECU's risk manager. Someone acting under color of law had actually designed a messaged just for me. This action indicates

retaliation by Vidant/ECU Medical Center, a response to my previous revelations that exposed Mr. Dixon's dishonesty and was an infringement on my right to speak freely as I sought information.

72. I made a second attempt to follow up with the ME's office in October 2022. Again, someone other than Danene Lowery, the same person as the month before, answered the phone and said the same thing as before. She was told that if I called to tell me I needed to talk to the risk manager.

73. The instances described in the last two points, directly singled me out. I was specifically directed to the risk manager when attempting to follow up with the ME's office. These actions were targeted and aimed at curtailing my legal right to obtain information related to my daughter's death from a public office. Such deliberate attempts to silence me hindered my ability to seek justice in the death of my daughter, constituting both, an obstruction of justice and a conspiracy to obstruct justice, thus violating my first and fourteenth amendments.

74. In January or February 2023, I reached out to Mr. Dixon for an update. He informed me that Dr. Karen Kelly, the ME, was on FMLA (family and medical leave) and expected to return sometime in February.

75. Subsequently, in February 2023, when I called the ME's office, Danene Lowery answered and confirmed Dr. Kelly's FMLA status, assuring me that she would be back before the end of the month. During this call, I chose not to disclose my identity to ensure open communication with Danene Lowery.

76. I called the ME's office in March 2023. Ms. Lowery answered the phone, and I asked to speak with Dr. Kelly. Ms. Lowery told me that Dr. Kelly was working from home and had not returned to the office for work due to the FMLA. I proceeded to identify myself and asked had the office received the evidence that Mr. Dixon claimed to have sent in August 2022. Lowery explained that she was not supposed to be talking to me because I was supposed to be talking to risk management, but she proceeded to inform me that the office had nothing in their system on my daughter, Miss White.

77. Recognizing the need for evidence of the information I was receiving, and due to the unfair and unjust treatment I was experiencing, I made the decision to record subsequent conversations for documentation.

78. In March 2023, I left a message for the DA, seeking a return call. He responded within a few days, on March 28, 2023, confirming the submission of evidence in the previous August. Unfortunately, the phone reception during our conversation was poor, leading to a suboptimal recording.

79. Approximately a week after my previous conversation with Mr. Dixon, I contacted him again, leaving a message for him to return my call. On April 10, 2023, he responded. I conveyed the issue of poor reception during our previous talk and the need for clarification on certain points. Once more, he affirmed sending the evidence to Dr. Kelly and clarified that their communication is conducted through secure email.

80. Immediately after talking to Mr. Dixon, I called the ME's office and recorded the conversation. Ms. Lowery answered the phone and revealed the following information to me:

   a. They did not have any information on my daughter, Miss White.

   b. I was supposed to be talking to risk management.

   c. That office was not doing anything with this case.

   d. Information sent to that office would come to her, and she had not received anything.

   e. She reiterated that she did not have anything and the last time she spoke with the DA's office they had not sent her anything.

   f. She would be the "contact person" who would receive the information sent from or by the DA's office.

   g. Dr. Kelly would need to wait and talk to risk because they are not supposed to be doing anything with the case.

   h. Dr. Kelly would need to talk to the attorneys and see what she would be "allowed" to do.

81. I am invoking the hearsay exclusion under FRCP 803(1) to the aforementioned phone conversation with Ms. Lowery as she provided details about the ongoing situation of her office's position regarding this case.

82. This recording confirms the unrecorded conversations in September and October 2022 when I was given the message specifically tailored for me; that the people in that office are not to talk to me and to redirect me to ECU's risk

management, who by the way, did not return my calls when I attempted to contact them at a later date.

83.   During the recorded conversation with Ms. Lowery, she explicitly stated, "the last time I talked with his office they said they had not sent me anything." This suggests that she had previously followed up with the DA's office after initially being informed that they had to "find" the document that Mr. Dixon claimed to have had initially.

84.   The above-referenced statement by Ms. Lowery supports my claim that Mr. Dixon did not tell the truth when he initially told me he had already sent the evidence to the ME and that he already had a decision from that office. It also leads to the conclusion that when his office told the ME's office that they had to "find" the report that did not exist, the DA's office was again being deceptive. It adds further confusion to the situation because in the following recorded conversation with Mr. Dixon, he claimed to have sent the evidence directly to Dr. Kelly's email.

85.   In the next recorded conversation, which occurred on April 13, 2023, Mr. Dixon returned my call after I left him a message. In the presence of Jennifer Corbitt, he confirmed that he sent the evidence directly to Dr. Kelly via multiple emails on August 11, 2022. Moreover, during our conversation, he sent the evidence to Ms. Lowery's email address and cc'd it to Dr. Kelly's email

86.   I followed up with Ms. Lowery within a few business days, and she confirmed receipt of the emails.

87.   According to the abovementioned phone conversations:

a. Ms. Lowery, the office manager, who assumes that everything in the office passes through her due to her position, and due to her identifying herself as the "contact person," was unaware of Dr. Kelly receiving the emails from Mr. Dixon that Mr. Dixon claimed to have sent to Dr. Kelly on August 11, 2022, via secure email.

b. If the emails were indeed sent to Dr. Kelly via secure email on August 11, 2022, it suggests collusion between Mr. Dixon and Dr. Kelly to obstruct justice.

c. It also suggests that if there were a chance that the submitted emails to Dr. Kelly did not go through, that Mr. Dixon made no attempts to follow up with the ME to confirm receipt or converse with her about the estimated completion date of her report, seeing as it had been eight months since he said he sent the evidence.

d. The conversations suggests that information was deliberately withheld from Ms. Lowery who was willing to share information with me despite apparent instructions to redirect me to Vidant/ECU Health Medical Center's risk management, which in turn, deliberately withholds information from me regarding my pursuit of justice.

e. Because Dr. Karen Kelly was not "allowed" to work on this case without, presumably, obtaining permission from "risk" and the "attorneys" to determine what she would be "allowed" to do, another instance of obstruction of justice and conspiracy to obstruct justice has occurred involving Dr. Kelly and Vidant/ECU Health Medical Center, implicating its

risk management department, Office of General Counsel, and/or attorney(s).

   f.   Furthermore, Dr. Kelly's compromised independence poses a significant conflict of interest, which is deeply concerning. Such a scenario potentially allows Vidant/ECU Health Medical Center to manipulate events and information surrounding a patient's death, leaving families without recourse or transparency.

88.   On September 26 and twice on October 04, 2023, I attempted to contact Mr. Dixon by phone to inquire about any updates or decisions from Dr. Kelly. However, I received no response. It is my contention that Mr. Dixon's sudden lack of response, especially given his prior consistent communication over the past year, was retaliatory in nature. This belief stems from my exercise of First Amendment rights in August and September 2023, during which I created and shared videos detailing events related to this case on social media platforms. Mr. Dixon's failure to respond constitutes a further violation of my Constitutional rights. I possess screenshots documenting the calls made from my phone. Subpoenaed phone records would confirm his lack of response.

89.   On October 04, 2023, I also called the ME's office to ask for a copy of the report from Dr. Kelly's findings. Ms. Lowery answered the phone and proceeded to tell me she did not have any information regarding my request and that I would need to talk to Dr. Kelly, who was not available to talk to me at that time.

90. Ms. Lowery called me back on October 05, 2023. She explained that she had spoken to Dr. Kelly and Dr. Kelly told her that she had forgotten to look at the evidence in this case, but she would do so over the coming weekend. (Here again, I am invoking the hearsay exclusion rule, FRCP 803 [1], since the information revealed in the call was regarding a new event that was unknown the day before.)

91. Six months had elapsed between the point when Ms. Lowery acknowledged receipt of the evidence sent by Mr. Dixon in April, and the subsequent conversation with Ms. Lowery in October. Fourteen months had transpired from the time Mr. Dixon purportedly submitted the evidence to Dr. Kelly in August 2022. Dr. Kelly's oversight in addressing this case serves as evidence that Mr. Dixon failed to facilitate the acquisition of expert evidence that he deemed necessary before proceeding with charges in this case.

92. If Dr. Kelly indeed "forgot" to address this case, it constitutes negligence. However, if she refrained from doing so due to being prohibited by Vidant/ECU Health Medical Center, as indicated by Ms. Lowery, it amounts to withholding crucial information in an official investigation led by the district attorney, as well as actions furthering impeding the judicial process. The fact that Dr. Kelly has still failed to conduct a review of evidence, as of the date of this filing, indicates her willingness to continue on her path of obstructing justice in this case.

93. Mr. Dixon's failure to facilitate Dr. Karen Kelly's examination of the evidence, and his apparent lack of insistence on her adherence to his purported instructions, strongly suggests that he had no genuine intention of conducting a

comprehensive investigation into Miss White's death. This failure demonstrates a profound disinterest in pursuing justice and raises doubts about his commitment to holding accountable those responsible for any wrongdoing in this case.

94. After the above revelation, I published the recorded phone conversations on social media, filed a complaint with the NC Bar against Mr. Dixon, and attempted to have him removed from office using NCGS 7A-66; all of which are allowed under the First Amendment freedom of speech and right to petition the government for redress. Both attempts to have the DA removed were dismissed by the Pitt County Superior Court Judge. The NC Bar has not concluded its investigation that I am aware of.

95. On December 19, 2023, recognizing the need for an independent evaluation of the case, I reached out to Dr. Donald Jason, MD, JD, an esteemed medical examiner based in Winston Salem, North Carolina.

96. I immediately retained Dr. Jason's services after reviewing his remarkable curriculum vitae. I discovered that he holds both a Doctor of Medicine and a Juris Doctor degree. Notably, he earned the latter while teaching at NYU College of Medicine.

97. Dr. Jason pursued his studies at MIT (Massachusetts Institute of Technology) and served as Chief of Pathology during his tenure in the US Navy. His other experience in pathology spans eighteen years as a medical examiner in New York and New Jersey before he was appointed in 1992 as the Forsyth County ME in North Carolina, serving as a designated forensic pathologist.

98. Dr. Jason specializes in anatomic and forensic pathology, with a particular focus on analyzing cause and manner of death. To add to his credits, he has delivered over two dozen speeches and lectures, authored chapters in two books, and contributed articles to fourteen law journals.

99. In his report, dated January 15, 2024, Dr. Jason included a vast number of findings and failures by Ms. Brixon; many which are explained in the VI BACKGROUND section of this pleading.

100. Dr. Jason concluded, within reasonable medical probability, that Miss White's cause of death was the failure to properly maintain medically ordered cardiopulmonary monitoring. He posited that had Miss White received the care owed to her by a nurse, she would not have died when she did.

101. Dr. Jason determined that the manner of Miss White's death is homicide.

102. In his assessment of the manner of death, Dr. Jason concluded that if the licensee (Ms. Brixon) had adequately maintained the prescribed cardiopulmonary monitoring, Miss White's cardiac arrest would have been detected in time to administer CPR promptly, thereby potentially saving her life.

103. Dr. Jason further clarified that, considering the circumstances he observed in the evidence, the most appropriate classification for the manner of death on the death certificate is homicide. This determination stems from the finding that the licensee's (Ms. Brixon 's) failure to provide proper care constituted criminal negligence.

104. On January 24, 2024, I emailed a copy of Dr. Jason's report to Det. Elias, GPD Chief of Police Ted Sauls, District Attorney Mr. Dixon, and his administrative

assistant, Ms. Corbitt. In response, Mr. Dixon sent a letter to me, dated March 6, 2024. In it, he acknowledged receiving Dr. Jason's report. Additionally, he disclosed that the former DA, Kimberly Robb, had spoken with the former Chief Medical Examiner, Dr. Radisch, which confirms my claims stating so earlier in this pleading. However, several other points raised in this letter are troubling:

a. Mr. Dixon referred to an investigation led by ADA Futrell in 2014, which concluded that charges should not be pursued at that time. However, Mr. Dixon's reliance on a decision made almost a decade ago overlooks subsequent evidence, including the comprehensive 194-page document from the NCBON that he obtained in 2022 and Dr. Jason's report that was submitted to him in 2024. This demonstrates Mr. Dixon's failure to acknowledge crucial developments in the case highlighted by medical professionals, indicating a reluctance to engage with the full scope of facts.

b. Mr. Dixon discussed reviews of information conducted by himself and others in 2019, acknowledging that ADA Futrell reviewed all of the information "available to him," which underscores that all of the evidence was not reviewed at that time since, again, the NCBON documents and Dr. Jason's report were not "available" to the DA in 2019.

c. Mr. Dixon's assertion in the letter that filing criminal charges is "inappropriate" due to "insufficient evidence" is unfounded and unacceptable. This claim lacks merit, potentially stemming from his disregard for the most incriminating evidence, effectively diminishing its

significance. Mr. Dixon's dismissal of Dr. Jason's findings suggests a lack of intent to pursue charges in this case. Instead of actively seeking grounds for filing charges, he appeared to be more interested in finding excuses not to proceed, as evidenced by his reliance on investigations supposedly conducted between 2014 and 2019 when making his decision in 2024.

d. Mr. Dixon concluded his letter with the dismissive phrase "This concludes our review," as if to silence me, yet again. Now that he has been provided with the evidence that he said was necessary before he could file charges, he concludes his review and closes the case. This isn't about prosecutorial discretion; it's a blatant and utterly reprehensible abuse of power! The prolonged charade of sending evidence back and forth to Dr. Kelly was nothing but a farce. With all the unnecessary back-and-forth regarding the submission of evidence to Dr. Kelly, it has become apparent that the last two years have been squandered on meaningless bureaucratic maneuvers. This revelation suggests that they have shamefully wasted not just the last two years of my time, but the entire decade.

105. In assessing the elements required for a homicide charge, it becomes evident that all prerequisites are unequivocally fulfilled in this case.

a. Establishing intent (mens rea): Ms. Brixon's actions, her conscious decision to deprive Ms. White of vital oxygen despite understanding its critical necessity, reflect a clear intent. This intentionality is further underscored by her deliberate interference with medical procedures,

repeated defiance of physician's directives, and the systematic suppression of crucial patient information. It is not difficult to conclude that, not only did Ms. Brixon "intend" for Miss. White to die, but she also set the stage to appear to be performing her job duties while methodically and secretively, ensuring the eventual outcome of Miss White.

b. Demonstrating conduct (actus reus): The pattern of conduct exhibited by Ms. Brixon, marked by a consistent failure to uphold professional standards and a duty of care, serves as the concrete manifestation of her culpability.

c. Establishing concurrence: The alignment of Ms. Brixon's intent with her actions, occurring simultaneously and persistently over the course of eleven critical hours, solidifies the legal concept of concurrence in this tragic case.

d. Proving causation: Ms. White's untimely demise is undeniably attributed to Ms. Brixon's egregious neglect and deliberate actions, which directly resulted in the deprivation of vital medical care and subsequent fatal consequences.

e. Resulting harm: The convergence of these elements paints a compelling picture of culpability, warranting a proper investigation and appropriate legal action against those responsible for the unjust and avoidable loss of Ms. White's life.

106. Mr. Dixon has engaged in selective prosecution by failing to file charges in a case involving a crime or crimes committed at his local hospital, Vidant/ECU Health Medical Center

## VIII. CONCLUSIONS

1. Mr. Dixon engaged in conduct that goes beyond the scope of his official duties by obstructing justice and conspiring to obstruct justice, thus violating and conspiring to violate my 1st and 14th amendments. Mr. Dixon's conduct from 2019 to 2024 has created a continuing wrong.

2. Mr. Dixon has used his prosecutorial discretion as a tool to enable his abuse of power and authority. As a result, he has undermined justice and manipulated the legal process. Once Mr. Dixon abused his power of discretion with deceitful acts, prosecutorial discretion after the fact is not a defense.

3. Absolute immunity is not a defense in this case because:

   a. The prosecutor was acting in an investigative and/or administrative capacity.

   b. Absolute immunity does not apply when the prosecutor engages in criminal conduct or conduct that clearly violates a Constitutional right.

4. The Pitt County medical examiner, Dr. Kelly, has obstructed justice by failing to review the evidence in this case and by failing to give an opinion regarding the death of Miss White.

5. Dr. Kelly, through her complicity in the obstruction of justice, has violated both the 14th Amendment and the 1st Amendment rights of myself and my daughter. By failing to act independently and succumbing to external pressures, she has undermined the integrity of her profession and perpetuated systemic injustices.

6. Because Dr. Kelly has apparently been directed to avoid working on this case by Vidant/ECU Health Medical Center, this serves as an indicator of the influence and control that Vidant/ECU Health Medical Center has had on the investigation of this case, seriously undermining the criminal justice system

7. I and my daughter have been racially discriminated against by Vidant/ECU Health Medical Center by their protection of the White nurse, Ms. Brixon, by:

   a. Enabling Ms. Brixon's actions by failing to subject her to adequate discipline of the NCBON for nursing violations before and including 2014, by failing to disclose all relevant information to the NCBON in addition to reporting deceptive information to the NCBON.

   b. Protecting Ms. Brixon's criminal behavior by failing to subject her to criminal prosecution.

   c. Failing to do a single action for the benefit of accountability in the death of Miss White, a Black patient who died as a result of criminal homicide amounting to a hate crime in their facility. Instead, they chose to manipulate the judicial process thereby suppressing my ability to seek and obtain criminal justice for the death of my daughter.

d. Interfering with a criminal investigation by restricting the Pitt County ME's ability to work on this case independently and without undue influence, thus creating a severe conflict of interest.

e. Withholding vital information from me for the purpose of prohibiting civil and criminal justice.

f. Suggesting church pews in exchange for my daughter's life was racially biased due to the history behind the reason that Black people became church-going folk in this country.

g. Racially profiling me when Ms. Haddock attempted to make me believe that my daughter's heart stopped beating around 2a.m. even though the ERT detected a heartbeat at 6a.m. Because Ms. Haddock is an RN, she knew that was not a medical possibility. But she looked at my Black skin, my moderate clothing, and the Black neighborhood I lived in when she came to my house and assumed that I was uneducated and underserved, therefore I would accept her statements as true due to her perceived authority as an educated White woman.

h. I assert that had the nurse been a Black woman and the victimized patient was White, Vidant/ECU Health Medical Center's staff members would have reported what happened to the proper law enforcement authorities so charges could have been filed immediately. As a result, I contend that the hospital would have proceeded to conduct a press conference, explaining to the public that their facility will not tolerate such behavior.

8. Vidant/ECU Health Medical Center's actions from 2014 to 2024 has created a continuing wrong that has severely impacted my ability to seek justice in the death of my daughter, thus resulting in the violations of my Constitutional rights of freedom of speech, equal access to the law, and equal protection under the law, as well as discrimination due to the color of my skin.

## IX. INJURIES

1. Financial Losses:
   a. Equipment Expenses: I have invested significant funds in acquiring equipment essential for research, studies, and correspondence related to my pursuit of justice for my daughter. This includes but is not limited to computers, software, printing materials, and other necessary tools.
   b. Resources Usage: I have dedicated a portion of my available resources to this plight. This has resulted in usage expenses comparable to what the government allows as deductions for others who work from their homes.
   c. Medical Expenses: I have incurred expenses for medications, devices, and therapy to address the physical, emotional, and psychological toll of navigating the complexities of seeking justice over an extended period of time, unnecessarily.
   d. Legal Costs: I have expended significant financial resources on legal fees, including retaining an independent medical examiner and covering expenses associated with related legal proceedings.

e. Employment Impact: In the pursuit of justice for my daughter, I have undertaken responsibilities typically associated with legal professionals, including conducting legal research, drafting pleadings, and managing case-related tasks.

f. Website Maintenance: I have invested financial resources in maintaining a website dedicated to documenting and raising awareness about my daughter's case. This includes domain registration fees, web hosting charges, and expenses related to website design and updates.

2. Pain and Suffering:

a. I have suffered more mental trauma than any parent should ever have to bear. Losing my only biological daughter the day before Mother's Day was devastating enough. Then I was deprived of the opportunity to properly grieve, because on Friday, June 13, 2014, four weeks after her passing, Vicki Haddock and her associates sat in my living room, lied to me, and proceeded to withhold information from me about what happened.

b. The memory of my daughter is plagued by this ten-year ordeal, as well as the suffering she endured at the hands of Ms. Brixon. I am constantly forced to think about the horrors of her final moments, endlessly reliving the events of May 9th and 10th, 2014, as I tirelessly pursue the justice she deserves. Even now, tears are streaming down my face as I struggle to complete the necessary components of this pleading.

c. My sleep patterns have been disrupted. Once a sound sleeper, I now battle insomnia. Many of my days and nights have blurred together as I

work on this case; learning applicable laws, rules, doctrines, principals, and strategies, as well as how to apply the same to this case. I am subject to nightmares of my daughter's final moments; some with such vivid and terrifying imagery, that I've awakened out of my sleep into full emotional turmoil that causes me to leap from my bed and quickly involve myself in some sort of activity to escape the thoughts of her. I also have nightmares of me running from someone who is trying to kill me, because I don't know if one of the defendants will try to cause me harm as a result of exposing them in this fashion.

d. My physical health has deteriorated under the weight of this relentless battle. Once active, vibrant, and excited to do things that bring me joy, I now lead a sedentary lifestyle, chained to my computer screen in pursuit of justice. This prolonged inactivity has contributed to the onset of diabetes, a condition I now have to contend with on a daily basis as there is no cure.

e. I suffer from frequent headaches under the stress of everything I am going through.

f. I used to trust people due to the job they performed, but my faith in the legal and healthcare systems has been destroyed. Adding to that is the fact that ECU Health Medical Center has purchased my local hospital and most of the clinics in my area. I no longer find safety and comfort in seeking medical attention, especially at my local emergency room. This fear would have been eased had the facility properly handled my

daughter's situation, as it would have served as a deterrent for other healthcare workers.

g. Being told for ten years that no crime happened to my daughter has added tremendous insult to my grief. This pleading is a testament that I am far from ignorant.

h. I have been subjected to the stigmatization attached to being the "grieving mother." Grieving mothers who are forced to fight the system are often treated as attention-seekers and exaggerators. I am treated by those in power as if I am the one being unreasonable when in fact, it is some of those same people with power who has unreasonably kept my fight going for ten long years.

i. This case has affected my social life and my marriage. It has literally consumed half of the time my husband and I have been married. Because of the frustration of fighting as hard as I possibly can and still getting nowhere, I have been grouchy, sad, depressed, and at times, unloving. He did not deserve that. We did not deserve that. Time that we could have spent loving on each other has been devoted to my work on this case, and we can never get that time back.

j. I don't think those responsible for the way this case has been handled have actually considered the total impact of their decisions. They all have looked out for their best interest without considering how I and my family would be affected. Like Ms. Brixon, they did not care about the

devastation they have caused. They do not care that I cry every day as a result.

k. The thought of filing a lawsuit of this magnitude, without legal representation, against powerful people and an extremely powerful highly influential organization, has, at times, literally upset my stomach, sending waves of trembling anxiety through my entire body. This is a huge undertaking, and I know it. But my daughter is worth it. I am prepared to stand up and face my adversaries in federal court and show to the court, by the preponderance of evidence, why I deserve a just award.

## X. I SEEK THE FOLLOWING RELIEF

1. I demand the initiation of a comprehensive and impartial criminal investigation into the circumstances surrounding the tragic death of my daughter, Keisha Marie White.

2. I demand the appointment of a special prosecutor or independent counsel to oversee the above investigation to help ensure the case is handled objectively and without any conflicts of interest.

3. I humbly request the U.S. Court to launch a full unbiased and fair investigation into the claims made against the defendants.

4. I request a public symbol honoring Keisha Marie White to serve as a reminder of what this case should mean to everybody; safe and efficient

healthcare, transparency in the healthcare and justice system, and a

reminder that no one is above the law

5. I seek total damages in the amount of $156,654,559.04, comprising economic damages, pain and suffering, and punitive damages. It also includes an allowance for negotiation purposes.

6. The pain and suffering, as well as expenses incurred, persist beyond the filing of this suit. To address these damages and to discourage unnecessary delays in the resolution of this matter, I request an additional daily per diem until the case is fully adjudicated, calculated by dividing the total settlement or award by the number of days from May 10, 2014, until the date damages are paid in full.

XI. Jury trial requested:    **X** YES    _____ NO

March 20, 2024
DATE

SIGNATURE OF PLAINTIFF

303 Riverside Trl
Roanoke Rapids, NC 27870
252-203-7107
252-327-7676
avens 1 @charter.net
ADDRESS AND PHONE NUMBER OF PLAINTIFF