# IN THE UNITED STATES DISTRICT COURT

*FILED*
*JUN 18 2024*
PETER A. MOORE, JR. CLERK
BY US DISTRICT COURT, EDNC
DEP CLK

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

## EASTERN DIVISION

| | |
|---|---|
| Cynthia B. Avens<br>(Plaintiff)<br><br>V.<br><br>Faris C. Dixon, Jr., District Attorney<br>Pitt County Memorial Hospital, Inc.<br>Dr. Karen Kelly, Medical Examiner<br>John/Jane Doe<br>John/Jane Doe<br>(Defendants) | COMPLAINT NO.<br><br><u>4:24-CV-00051-M-RN</u><br><br><br><br>AMENDED PLEADING |

## **INTRODUCTION**

The Plaintiff, Cynthia B. Avens (Plaintiff or Avens) submits this amended complaint in accordance with Federal Rule of Civil Procedure (FRCP) 15(a)(1). The purpose of this amended pleading is to effectively address issues raised by the defendants' motions to dismiss the original pleading and to include information omitted in the original pleading. Additionally, the Plaintiff includes new information discovered on May 30, 2024.

The Plaintiff continues to allege violations of her constitutional rights under 42 U.S.C. §§ 1981, 1983, 1985, and 1988, as well as Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d). These claims arise from actions taken by the Defendants, individually and collectively, which the Plaintiff contends are actionable under federal law.

## JURISDICTION AND VENUE

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights), as the allegations contained herein involve significant violations of the United States Constitution and federal statutes. Venue is proper in this district under 28 U.S.C. § 1391 because the events giving rise to these claims occurred within this district, and all Defendants reside or are employed within this district.

## PARTIES

1. Plaintiff, Cynthia B. Avens, is a resident of 303 Riverside Trl, Roanoke Rapids, NC 27870, and the mother and personal representative of the estate of Keisha Marie White, deceased.

2. Defendant Faris C. Dixon Jr. is sued in his official and personal capacities as the District Attorney for Pitt County, with an office at 100 W 3rd St., Greenville, NC 27834.

3. Defendant Pitt County Memorial Hospital Inc. (operating as ECU Health Medical Center, formerly known as Vidant Medical Center), is a medical facility where critical events related to the claims occurred, located at 2100 Stantonsburg Rd., Greenville, NC 27834. However, its Office of General Counsel is located at 690 Medical Dr. Greenville, NC 27834.

4. Defendant Dr. Karen Kelly is sued in her official and personal capacities as the Medical Examiner associated with Pitt County Memorial Hospital and the ECU Brody School of Medicine, located at 690 Medical Dr., Greenville, NC 27834.

5. Defendants John Doe(s) and Jane Doe(s) are included as placeholders for additional responsible parties whose identities and roles may be further identified through discovery.

## COLOR OF LAW

6. **Faris C. Dixon, Jr. (Dixon)**: As an elected District Attorney, Dixon acted under color of state law in all actions taken in his official capacity, directly relating to the investigation and administrative handling of the case concerning the Plaintiff's daughter.

7. **Dr. Karen Kelly, (Kelly)**: Employed by the state as a medical examiner, Kelly's official actions or omissions, including her failure to evaluate evidence or alleged submission to external pressures, are considered actions under color of state law due to her role as a state official.

8. **Pitt County Memorial Hospital (PCMH or ECU Health)**: Being a private entity, bound by federal rules and receiving federal funds, it and/or its employees did act under color of federal law. Additionally, according to the Fourth Circuit, a state becomes responsible for a private party's act if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest. According to these stipulations, ECU Health did act under color of state law.

## JURISDICTION

9. **Federal Question Jurisdiction**: This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims herein arise under the Constitution and laws of the United States, including but not limited to alleged violations under 42 U.S.C. § 1983, which provides a remedy for the deprivation of rights secured by the Constitution and federal law.

10. **Civil Rights Jurisdiction**: Additionally, this Court has jurisdiction under 28 U.S.C. § 1343(a), which grants jurisdiction to federal courts in civil actions to redress the deprivation, under color of state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

# LEGAL DOCTRINES AND CONCEPTS

11. **Negligence Per Se**: Negligence Per Se: This doctrine is applied because the defendants' actions can be considered automatically negligent due to their violation of statutes specifically designed to protect the public's safety, namely those governing the conduct of public officials and entities in handling death investigations and public disclosures. These violations are presumed to have caused harm by obstructing justice, thereby infringing upon the Plaintiff's rights as protected under the U.S. Constitution and applicable civil rights laws.

12. **Continuing Wrong Doctrine**: This doctrine is relevant because the actions constituting obstruction of justice and conspiracy to obstruct justice commenced in 2014 and have persisted through 2024. This ongoing nature of the violations allows for the tolling of the statute of limitations and supports the claim that each continuation of the wrongful acts renews the cycle of violation and harm, thereby making recent acts within the statute of limitations and relevant to ongoing legal redress.

# BACKGROUND: KEISHA MARIE WHITE

13. Keisha Marie White (White), a twenty-six-year-old female, was admitted to ECU Health on April 16, 2014. She was placed in the intermediate cardiac monitored care unit with a diagnosis of acute on chronic renal failure — a complication of systemic lupus erythematosus (SLE).

14. While under the care of former Registered Nurse (RN) Linda Leathers Brixon (Brixon), White died while in restraints, and according to the death certificate, from anoxic brain injury (lack of oxygen to the brain) and cardiopulmonary (cardiac) arrest on May 10, 2014.

15. No arrests have been made and no charges have been filed in this incident.

16. Cynthia B. Avens (Avens or Plaintiff) is White's mother.

17. On April 17, 2014, physicians ordered continuous cardiac monitoring and continuous pulse oximeter monitoring "until specified." The pulse oximeter measures the patient's pulse (heart rate) and oxygen saturation levels.

18. On April 20, 2014, White was moved to 3 South (third floor, south tower) Room 211. This area of the hospital was a general medical cardiac-monitored unit designed to provide service for stable patients requiring continuous cardiac monitoring.

19. White developed pulmonary edema from fluid overload and experienced difficulty breathing, prompting the hospital physician to prescribe continued oxygen therapy.

20. On May 3, 2014, the physician issued another order for continued cardiac monitoring.

21. On May 9, 2014, White reported difficulty breathing to Brixon, and to a care partner (a certified nursing assistant / CNA). As per the North Carolina Department of Human Services (DHHS) and the North Carolina Board of Nursing (BON) reports, the care partner conveyed the complaint to Brixon.

22. White exhibited restlessness, anxiety, confusion, agitation, delusions, and a sensation of feeling hot. Additionally, she engaged in behaviors such as getting out

of bed, falling, attempting to lay/sleep on the cool floor, pulling at her cardiac leads, being unable to follow safety instructions, and pulling out her urinary catheter with the inflated bulb intact. According to reports from DHHS and BON, these symptoms and actions were identified as signs of hypoxia (lack of oxygen to the brain).

23. Despite the prescribed orders for oxygen, Brixon neglected to administer the oxygen to White, and the medical records indicated that she was receiving room air instead.

24. In response to the signs and symptoms of hypoxia, Brixon requested an order for restraints (Posey vest and bilateral wrist) from Nurse Practitioner (NP) Elliotte Pearson (Pearson).

25. The action of applying restraints to a patient who was clearly in need of her physician-prescribed oxygen constitute acts of assault and battery, as well as false imprisonment.

26. Brixon neglected to reapply the cardiac leads when the restraints were installed on White. This omission occurred despite the MD's order for continued cardiac monitoring and the designation of 3 South as an area for patients requiring cardiac monitoring.

27. Despite receiving a subsequent order for two liters of oxygen for this patient at 1:51 a.m. on May 10, 2014, Brixon again failed to supply the prescribed oxygen to White.

28. At 2:00 a.m. on May 10, 2014, Brixon recorded White's oxygen levels as critically low at 62%. Still, Brixon failed to provide the physician-prescribed oxygen to this patient.

29. The BON questioned Brixon regarding her actions in response to the dangerously low oxygen reading. She claimed she did not believe the reading was correct and did not know how to correct it in the records, which was a direct contradiction to her training.

30. The BON obtained and revealed documentation that Brixon had been trained on how to validate bedside equipment if she believed the readings to be inaccurate, as well as the fact that Brixon had received training on how to enter correct readings into the patient's chart. The documentation obtained and revealed by the BON disclosed that in 2010, Brixon reviewed a 9-page document, "Data Validation of Bedside Monitors," which explains how to validate vital signs obtained from bedside monitors into the medical records.

31. When Brixon documented the 62% oxygen reading, she neglected to inform the charge nurse, the MD, the NP, the ERT (emergency response team), the rapid response team, or utilize any other available resources. This further underscores her lack of concern and disregard for human life.

32. Despite physician's orders for continued pulse-ox monitoring, the last pulse reading was at 2:13 a.m. Brixon failed to record any vitals after this time on May 10, 2014, thus failing to follow physician's orders for vital sign monitoring every four hours.

33. Between midnight and 6:00 a.m., the monitor technician notified Brixon at least ten times that White was not on the cardiac monitor and/or was off the cardiac leads. Brixon repeatedly responded that White refused to be reconnected even though she had been described by Brixon as being confused and delusional.

34. Brixon neglected to inform the charge nurse, the NP, the MD, and the Plaintiff of any claims that White purportedly refused to be reconnected to the cardiac leads.

35. When interviewed by the BON, Brixon either stated or implied that she did put the cardiac leads back on White after the restraints were applied. In the interviews she was either unable to explain how White pulled off the leads despite wearing a vest and wrist restraints, or Brixon claimed White removed the cardiac leads by wiggling out of them.

36. In the above situation, cardiac leads are affixed to electrodes with an adhesive backing that adheres to the skin. The components involved include the skin, electrodes attached to the skin, cardiac leads purportedly connected to the electrodes, a hospital gown covering the cardiac leads (or lead wires), a Posey vest positioned over the hospital gown and secured around the patient's chest, fastened to either side of the bed, a bed sheet covering the Posey vest, a blanket covering the sheet, and wrist restraints on both wrists linked to two bed rails on opposing sides. If we were to assume that White could somehow free herself from the cardiac leads, it implies that Brixon would have had to stand idly by for a considerable period of time, watching the miracle happen, without offering any intervention.

37. Brixon failed to follow the physician's orders to notify him or the NP of any changes in White's condition, behavior, or vital signs.

38. Brixon withheld crucial information regarding this patient from everyone in her chain of command, highlighting her lack of concern for White.

39. Brixon failed to assess White as required before, during, and after administering sedative opioid medications for possible reactions to said medications.

40. Brixon failed to attempt lesser forms of control prior to installing restraints for a non-violent patient, which was a violation of hospital and CMS (Center for Medicare and Medicaid Services) protocol. Brixon had been tested on restraint device application competency on July 19, 2013.

41. Brixon failed to release the restraints at the earliest possible time, which was at approximately 12:57 a.m., less than one hour after applying the restraints, when the ABG (arterial blood gas) test, which measures oxygen and carbon dioxide levels in the blood, was canceled.

42. The NP ordered several blood tests, including an ABG test at 12:27 a.m. Reports revealed that Brixon played a role in the cancellation of the ABG test by informing the NP that White was "calm" and "asleep." The ABG test was the only test, out of those ordered, that could have indicated the patient's inadequate oxygen intake, thus alerting the NP and MD to take further action. This test was the only test canceled.

43. When DHHS investigated on October 01, 2014, the department identified an immediate jeopardy to White's health and safety beginning on May 9, 2014, related to the failure of the hospital's nursing staff to evaluate and supervise the care of a

patient by failing to monitor a patient's cardiac and respiratory status as ordered by the physician.

44. Monitoring White's cardiac and respiratory status was imperative, not only because of her pulmonary edema and breathing difficulties, but also due to the opioid medications. According to the BON, opioids can potentially slow a patient's breathing, creating a deceptive appearance of sleep that might mask a critical situation, including the possibility of death.

45. An ECU Health administrative assistant, identified as administrative assistant #1 in the report, revealed to DHHS that Brixon "chose to ignore all the warnings for this patient."

46. In interviews with, both, DHHS and the BON, two of Brixon's co-workers (a charge monitor technician and a care partner) revealed that she verbally told them that she would not put the cardiac leads/monitor back on White.

47. At 3:17 a.m. on May 10, 2014, Brixon administered Dilaudid, an opioid prescribed as needed (prn), despite the patient being "asleep," "calm," and "resting quietly" while still restrained to the bed. Providing the medication without White's request or consent constitutes a subsequent act of assault and battery by Brixon.

48. At 5:51 a.m. on May 10, 2014, White was discovered in cardiac arrest without a pulse by a care partner. The care partner promptly initiated a Code Blue and began removing the wrist restraints while awaiting assistance.

49. Because the cardiac monitor was not connected, no one was aware that White had stopped breathing; nor does anyone know what time White's breathing stopped.

Therefore, no one knew how long White laid there, still strapped to the bed via four-point restraints, lifeless.

50. Brixon was issued an American Heart Association (AHA) Basic Life Support (BLS) card in July 2012. Brixon revealed to the NCBON that she did not feel panicked and confirmed that she had CPR training every two years, approximately eleven times in her twenty-two-year career.

51. However, when Ms. Brixon went to the room upon notification that White was without a pulse, she failed to remove the Posey vest restraint, perform chest compressions, or administer the Ambu bag (a handheld ventilator with a mask that is placed over the patient's mouth and nose and a bag to squeeze to provide positive air pressure to the patient).

52. While waiting for the ERT to arrive, two other nurses entered the room and initiated life-saving procedures; one who performed chest compressions, the other applying the Ambu bag.

53. Brixon's failure to take immediate action in the patient's room after Code Blue was called, once again highlights her blatant lack of concern and urgency, as well as her appalling and blatant disregard for human life.

54. The ERT wasted valuable time as Elizabeth Everette (Everette), RN cut off the Posey vest because the restraint had not been promptly removed earlier. This delay occurred before they could initiate CPR, which lasted for 15-16 minutes before detecting a heartbeat.

55. White was immediately transferred to ICU (intensive care unit) upon the ERT obtaining a heartbeat.

56. Though not related directly to White's care, Everette, who responded to the Code Blue, later, entered White's medical records and uploaded dozens of invalid oxygen readings after White's transfer to ICU. Everette continued to upload dozens more invalid oxygen readings into White's chart on May 11, 2014, the day after White died. DHHS confirmed in their report that any oxygen readings from 3:27 a.m. and forward, were not valid.

57. While in ICU White's computed tomography (CT) scan showed global hypoxic ischemic injury of the brain, had zero brain activity, pupils were fixed and dilated, and there was zero response to stimuli: all consistent with a brain death diagnosis.

58. White, who had previously been resuscitated, succumbed to her massive brain injury, and died at 1:02 p.m. on May 10, 2014.

59. White's death was unexpected. The NP and MD expected her health condition to improve, had not given up on treatment options, had not placed her on hospice, and thus, had not discussed end of life care with the family.

60. Along with the inconsistencies mentioned, during the first interview with the NCBON, Brixon denied White had complained of shortness of breath. In a subsequent interview, she revealed that the patient did report shortness of breath.

61. On June 9, 2014, Brixon reported to the BON that she had worked at ECU Health for fourteen years without incident. However, it was revealed in a subsequent complaint to the agency that Brixon had been disciplined/counselled on at least two previous occasions:

   a. September 03, 2010, for giving valium to the wrong patient.

b. March 21, 2011, for failure to participate in bedside shift report, failure to round, failure to respond, and for inaccurate or false documentation.

62. Other than the laboratory tests ordered by the NP, the BON could only find two treatments for White's hypoxia – restraints and sedating medications.

63. The BON discovered in their investigation that the cardiac monitor had been silenced in White's room, thus preventing anyone in or near the room from hearing audible alerts that the patient was in trouble.

64. Moreover, the BON investigation revealed that the cardiac monitor in White 's room was intentionally silenced from the device in White's room to the cardiac monitor technician, inhibiting communication from the room to the cardiac monitor technician. This deliberate act not only disabled the technician's capacity to print cardiac rhythm strips but also prevented audible alerts from reaching the nurse's station.

65. The actions described above entail a deliberate and premeditated choice, constituting criminal intent.

66. Despite compelling evidence from multiple reports, including those from DHHS, the BON, and a recent report dated January 15, 2024, obtained from independent medical examiner, Dr. Donald Jason, MD., JD., (Jason) who concluded that White's manner of death is homicide due to criminal negligence, still, no arrests have been made, and no charges have been filed. In fact, after District Attorney Faris C. Dixon, Jr. (Dixon) received the new evidence from Jason, Dixon decided to close the case, citing insufficient evidence.

## BACKGROUND INFORMATION INVOLVING DEFENDANTS' ACTIONS

67. Due to White's death occurring while restrained and with a cardiac arrest, her unexpected death, and the abuse and neglect by her nurse (or any one or a combination of these events indicating a suspicious, unusual, or unnatural death outlined in North Carolina General Statutes (NCGS) § 130A-383, her case warranted referral to a medical examiner on May 10, 2014.[1] The ICU physician (who knew or should have known such details upon reviewing White's chart) failed to take necessary steps to ensure such a referral, instead leaving the decision to perform an autopsy to the family when the family was not privileged to the full information of what actually occurred. This failure by the ICU physician created an obstruction of justice.

68. Furthermore, Dr. Christopher Patrick Craig, a physician formerly employed by ECU Health, prematurely signed the death certificate on 05/14/2014, attributing the manner of death to 'natural' causes, despite circumstances suggesting otherwise.[2]

69. Following the death of White, ECU Health's risk management department initiated an investigation. As a result, these actions were taken:

    a. Brixon's employment was terminated.

    b. The Plaintiff was contacted by the risk manager, Vicki Haddock, to schedule a disclosure meeting at the Plaintiff's home.

---

[1] See EXHIBIT 1: NCGS 130A-383 Medical Examiner Jurisdiction.
[2] See EXHIBIT 2: Death Certificate.

    c. The hospital filed a complaint with the BON on June 02, 2014, and reported the cause of death had been reported as "not clear,"[3] despite the death certificate completion on May 10, 2014,[4] indicating otherwise.

    d. The hospital notified law enforcement.

70. However, all actions, except the termination of Brixon, were undertaken in bad faith, impeding the justice process.

71. Two complaints were lodged with the BON concerning Brixon's conduct – one by the hospital on June 02, 2014, and the other by the Plaintiff on September 22, 2014. Both complaints prompted BON investigations.

72. In their complaint to the BON, ECU Health associates intentionally withheld crucial information regarding Brixon 's conduct, amounting to a deliberate attempt to deceive a government agency. Notably, they failed to disclose several key details, including but not limited to:

    a. Explicit identification of all physician's orders neglected by Brixon;

    b. The multiple opportunities that Ms. Brixon had, but failed, to provide oxygen to the patient;

    c. The patient was on room air;

    d. The patient's oxygen was recorded to be 62%;

    e. Violation of restraints protocol; and

    f. Failure to act when White was found PEA (without a pulse) while waiting for ERT staff to respond.

---

[3] See Exhibit 3-A BON Report. Note: Exhibit 3 is the full 194 pages. Due to its length, the Plaintiff will submit it during Discovery.
[4] See EXHIBIT 2: Death Certificate.

73. ECU Health also withheld information to the BON by failing to report the conduct of Everette, who entered a multitude invalid oxygen, blood pressure, and pulse readings into White medical records after White was moved to ICU on May 10, 2014, and continued to enter false vital sign readings on May 11, 2014; the day after White died.[5] This failure of ECU Health is one of several ways it has protected its white employees, rather than holding them accountable for their egregious actions. Nowhere is it legal or justified to falsify official records, and it is one of the first things taught in nursing school. Everette's activity suggests an attempt to coverup Brixon's failure to properly document White's oxygen levels and other vital signs because all of the false readings were entered to look like they were entered between after 2:00 a.m., thereby giving the appearance that White's oxygen and vitals were checked after the 2:00 a.m. reading of 62%.

74. In the BON's initial investigation, they asked "Has the nurse been counseled or disciplined for any prior practice issues," ECU Health responded "N" for No.[6]

75. The information provided by ECU Health to the NCBON led to a three-month investigation by the agency. This investigation culminated in a non-disciplinary action against the nurse and a non-published consent order, effectively diminishing the gravity of the abuse, neglect, and assault and battery inflicted upon White. The effect of the BON's non-disciplinary action was that Brixon retained her nursing license, allowing her to potentially harm patients in future employment over an indefinite period of time.[7]

---

[5] See EXHIBIT 4: Falsified Records
[6] See EXHIBIT 3-B: BON Report
[7] See EXHIBIT 3-C: BON Report; Non-Disciplinary

76. ECU Health representatives, including Vicki Haddock (Haddock), ECU Health's risk manager, visited Avens's home on June 13, 2014, for s disclosure meeting. During the meeting, Vicki Haddock revealed that the hospital did not do everything within their capacity for White. However, she disclosed very little information, as well as deceptive information compared to what was subsequently revealed by DHHS later in 2014 and by the BON in 2016. The meeting, characterized as an effort to "help" the Plaintiff via the disclosure, was, in reality, a smokescreen attempting to defraud Avens by suggesting little league uniforms or church pews, effectively closing the case upon Avens' acceptance of these or similar items. Being that it is unusual for a hospital to admit fault, in particularly in a visit to the victim's home, it is plausible that ECU attempted to put a lid on what happened before the Plaintiff learned the true facts.

77. In a telephone conversation during the week of June 16, 2014, Avens questioned Haddock about the possibility of an external investigation conducted by the Greenville Police Department (GPD). She asserted that "in cases like this," the hospital was "required to report to the SBI." This statement is inaccurate. The obligation is to report "cases like this" to law enforcement, not specifically to the SBI. The SBI are not involved in cases outside of their original jurisdiction unless requested by a state agency or official. This report was made in bad faith, intentionally or negligently obstructing the initiation of a criminal investigation by the appropriate law enforcement authorities.[8]

---

[8] See EXHIBIT 5: NC SBI Contact Page revealing subjects of original jurisdiction and instructions for reporting other crimes.

78. The Plaintiff proceeded to contact the SBI office in Greenville, NC in June 2014 and learned from an Agent Brown that his office knew nothing about White or the case and had not spoken to anyone named Vicki Haddock. "So, she lied to me?" Avens questioned. Agent Brown responded, "And I would be very upset about that if I were you." He then suggested that Avens contact the district attorney's office.

79. In June 2014, the Plaintiff traveled to Greenville, NC to file reports with both the district attorney's office and the GPD. However, no one was available to speak with Avens at the DA's office. And despite ECU Health being located within the city limits, the GPD told replied that they did not have jurisdiction over the hospital because the hospital had its own police.[9]

80. When Avens went to file a report with ECU Health's police, she was prevented from doing so unless, first, addressing her concerns with the risk manager, Haddock.

81. Soon after her failed attempt to meet with the DA, Avens called the office and spoke to ADA Anthony Futrell (Futrell), who seemed to Avens, to be genuinely interested in helping. With the July 4th holiday approaching, he told her he would look into her concerns and would follow up before or after the holiday weekend.

82. In the meantime, Avens conducted her own research in her attempt to figure out what ECU Health might have been hiding from her. Avens discovered the CMS website with information regarding restraint and seclusion. After being sure that federal regulations were violated and realizing that Haddock did not disclose any

_____

[9] See EXHIBIT 6: Email the Plaintiff sent to Former GPD Chief, Hassan Aden September 9, 2014. It is not direct proof, but this 2014 email supports several of the Plaintiff's claims.

information regarding the restraints, Avens immediately called ADA Futrell to share the information prior to the upcoming holiday. His entire demeanor had changed. He went from being warm and concerning in their first conversation to being cold and short in this phone call. He insisted that no crime had been committed against White and that his boss, former DA, Kimberly Robb (Robb) agreed, which left Avens confused and highly suspicious of Robb.[10]

83. In the next conversation with Haddock (July 2014), Avens called her a liar, because Agent Brown denied knowing anything about White or the case and denied having spoken to Haddock. Haddock insisted that she did speak to SBI agents. Avens demanded names. Three agents whose first names are Anthony, Donnie, and Joe, were identified by Haddock.[11]

84. The Plaintiff communicated with the SBI agents in July 2014, each of whom also denied knowledge of White and the case, as well as denied any engagements with anyone named Vicki Haddock.[12]

85. Subsequently, during a meeting in Haddock's office (July or August 2014), Avens, believing she could trust the SBI, especially since she believed they were neutral to the case, along with all four agents saying the same thing, again accused Haddock of lying for claiming to have spoken to the SBI agents. In response, Haddock asserted, "I spoke to them a few days ago, as a matter of fact. You wanna know what they told me?" She continued, "They told me that you told them you were gonna speak to the DA." While it is accurate that I conveyed this

---

[10] See EXHIBIT 6.
[11] See EXHIBIT 6.
[12] See EXHIBIT 6.

information to one of the agents, I did not disclose it to Haddock. The three agents, who proved to be untrustworthy, provided ECU Health with information obtained from the Plaintiff, indicating a conspiracy to obstruct justice.[13] Avens did not know that recording these communications would be necessary, and as such, the only evidence she can provide regarding these facts is her knowledge of the agents first and last names and her knowledge that Joe was being trained by Donnie at the time.

86. The hospital's report of White 's death to law enforcement at all, even the SBI, suggests awareness that her death may not have been natural or was at least suspicious and potentially criminal. However, reporting to the SBI still went against proper protocol and procedure. The SBI website clearly states which type of cases are within their original jurisdiction and the reporting of other information is to be done so by contacting local law enforcement.[14]

87. In July or August 2014, the Plaintiff contacted the Pitt County Sheriff's office to report what she suspected was a crime against White. This is when she learned that the GPD did in fact have jurisdiction over ECU Health and explained that the hospital cannot investigate themselves via their own police.

88. On September 9, 2014, the Plaintiff gained the attention of former GPD Chief Hassan Aden via Twitter. Aden provided his email address and requested further details.[15]

---

[13] See EXHIBITS 5 and 6.
[14] See EXHIBIT 5.
[15] See EXHIBIT 6.

89. On September 13, 2014, Chief Hassan Aden informed the Plaintiff via email that Futrell and the SBI had purportedly completed an investigation of White's death at the direction of Robb. However, Avens was unaware of that investigation. She was not informed that any such investigation would take place and was not included in their investigation process, including interviews.[16] Avens, along with other family members were key witnesses who had visited ECU Health on May 9, who had received phone calls from the facility on the night of May 9, and who were present at the facility the morning of May 10, 2014.

90. Between July and September 2014, Avens filed complaints with CMS, DHHS, the Joint Commission (JC), and the BON.

91. The JC investigated but did not disclose specific results. Instead, they addressed their findings with ECU Health.

92. Avens's complaint was filed with the BON on September 22, 2014. In contrast to the investigation that ensued in June following ECU Health's report to the Board, the same question that the facility had previously answered with an "N" for No, "Has the nurse been counseled or disciplined for any prior practice issues," was answered with a "Y" for Yes. Additionally, ECU Health disclosed in this subsequent investigation that Brixon had been disciplined and/or counselled on at least two previous occasions:[17]

    a. September 03, 2010, for giving valium to the wrong patient; and

_____

[16] See EXHIBIT 6.
[17] See EXHIBIT 3-B.

b. March 21, 2011, for failure to participate in bedside shift report, failure to round, failure to respond, and for inaccurate or false documentation.

93. Avens's complaint filed with the NCBON initiated a year-long investigation by the agency. This investigation (in addition to the one led by NCDHHS) revealed a multitude of details not previously disclosed by the hospital. It led to the BON issuing published consent order to Brixon, as well as disciplinary actions, including the suspension of Brixon's nursing license. This investigation by the NCBON also resulted in issuing a Published Letter of Concern to Pearson.

94. NCDHHS investigated on October 01, 2014, finding White in immediate jeopardy and the hospital in violation of six federal healthcare laws. These violations pertained to patient rights, care in a safe setting, restraint protocol violations, and nursing standards, constituting an "immediate jeopardy" situation. An "immediate jeopardy" is defined by CMS as a situation in which the provider's non-compliance has caused or is likely to cause, serious injury, harm, impairment, or death.[18]

95. Despite conducting an internal investigation in May 2014, ECU Health remained federally non-compliant in October 2014 and threatened with losing funding for Medicare and Medicaid patients.[19]

96. In November 2014, upon submitting DHHS's investigation results to the GPD, Aden assigned Detective Alvaro Elias (Elias) as the lead investigator to probe

---

[18] PCMH, d/b/a Vidant Medical Center & ECU Health has violated the same six federal healthcare laws on multiple occasions; October 1, 2014; July 16, 2015; September 17, 2020. See EXHIBIT 7.
[19] See EXHIBIT 7.

White's death. Retired SBI Agent, Jennifer Matherly (Matherly) was invited to assist Elias with the investigation.[20]

97. It was recently revealed in a recorded phone conversation with Matherly on May 30, 2024, that she and Elias did go to ECU Health to investigate. However, according to Matherly, ECU Health failed to make personnel available for interview.[21]

98. Mattherly asserted that when her assessment was completed, she turned her report over to Robb. However, Avens was not made aware when their investigation was purportedly completed, because again, Avens and certain family members were never interviewed by Elias, nor Matherly.

99. In December 2014, Elias informed Avens that he would forward White's medical records to the former Chief Medical Examiner (ME), Dr. Deborah Radisch (Radisch). Other reports claim Robb submitted the records to Radisch.

100. Radisch released her decision about five months later in 2015, concluding that my White's manner of death was natural. However, prior to concluding her investigation, she disclosed to Avens that she had spoken to Robb. This raised questions about the independence of Radisch's conclusion.

101. In December 2015, Avens arranged a meeting with the late Sgt. Tim McInerney (McInerney), the former Internal Affairs (IA) officer at the GPD. During the meeting, details were provided about my White's case, including a copy of the BON's Published Consent Order that was recently released via their website, and a copy

_____

[20] See EXHIBIT 6.
[21] Plaintiff has not had time to transcribe this phone call. Transcription will be available during discovery.

of NCGS 14.32-2, which outlines the crimes and punishments related to patient abuse and neglect, whereby if patient abuse and neglect is the proximate cause of death, it shall be punished as a Class C felony.

102. Due to the way the case had been handled thus far, Avens was cautious about how to move forward. Explicitly, she was concerned about the relationship of the SBI agents with ECU Health; the fact that key witnesses still had not been interviewed; the fact that this case had been closed multiple times without being informed; Radisch's communication with Robb; being repeatedly told that no crime had occurred in the death of White; and being told that she did not understand the law.

103. Avens was apprehensive about turning over the last piece of evidence obtained in March 2016; a 194-page document from the BON that was a compilation of reports and included the previously released Published Consent Order. Thinking it would be safer, she submitted it Greenville city attorney, Donald K. Phillps on April 24, 2018. He confirmed receipt said he would give the evidence to Robb.

104. Avens made several attempts to follow up with Robb following the submission, but she never returned any calls prior to leaving office at the end of 2018.

105. Due to Robb's failure, decision, or discretion to not file charges in this case, Avens asked Dixon, the newly elected district attorney, to review the case in February 2019.

106. A meeting was scheduled for October 24, 2019, at 2:00 p.m. with Mr. Dixon in his office, at the Pitt County Courthouse in Greenville, NC. Prior to the meeting, Mr. Dixon had already concluded that no crime had occurred in the death of White and

asserted that the case was not of a criminal nature. Within minutes of the meeting beginning, Dixon declined to engage in further discussion on the matter.

107. Mr. Dixon failed to conduct a proper and fair investigation before deciding not to bring charges in 2019 and has failed to conduct a proper and fair investigation ever since.

108. In July 2021, the Plaintiff reached out to Dixon, requesting a detailed list of the evidence he had examined before arriving at his decision in 2019. While he responded on July 26, 2021, providing insights into the conclusions of the previous administration, he did not specifically address the Plaintiff's inquiry and failed to respond to further requests until after Avens created a Facebook post on February 9, 2022, tagging him and reiterating the contents of a letter previously faxed to his office that he finally responded in a letter dated February 14, 2022. In it he stated he would send the list of evidence he was provided.[22]

109. A letter dated March 14,2022, was received from Dixon containing the list of evidence he used to make his determination that no crime had been committed in the death of White. The list included:

 a. The death certificate that stated manner of death was natural.

 b. The absence of a performed autopsy.

 c. The opinion of natural death by the former chief medical examiner, Dr. Radisch, MD, MPH.

 d. The conclusion of Matherly's investigative findings.

 e. The conclusion of the GPD's investigative findings.

---

[22] See EXHIBIT 8: Correspondences with Faris Dixon.

f. Various medical records from 2014.

g. The 2014 report of findings from the NCDHHS investigation.

What is missing from the list of evidence is the Published Consent Order previously given to McInerney, the 194-page document from the BON that had previously been given to Philips, and the mention of any investigative reports received from the SBI from their purported investigation prior to September 13, 2014, the report from GPD's subsequent investigation in November 2014, and the report from former Matherly, who submitted her report to the DA's office following her investigation with Elias.[23]

110. Other discrepancies noticed with Dixon's reliance on the evidence he reviewed in 2019 (and still relies on in 2024) are:

    a. The death certificate was prematurely completed on May 14, 2014, before any investigation had been conducted and/or complete that invalidates the information on White's death certificate.

    b. The absence of an autopsy was the fault of ECU Health, which led to a reliance on such absence by the district attorney. However, since there was not an autopsy, Dixon failed to consider other possibilities regarding manner of death.

    c. The fact that Radisch communicated with Ms. Robb casts doubts that she reached her conclusion independently without influence from Ms. Robb. It is also imperative to point out that Radisch's opinion of natural death in 2015 preceded the completion of the BON's findings released in 2016,

---

[23] See EXHIBIT 8: Correspondences with Faris Dixon.

showing results inconsistent with natural death. Therefore, if Radisch did in fact reach her conclusion independently, it was based on incomplete data.

    d.   The 2014 investigation conducted by Matherly was incomplete as it did not include interviews of all witnesses, in particularly, key witnesses. According to Matherly, her investigation did not include interviewing witnesses at the hospital because she claimed that ECU Health did not make personnel available for interview. It also did not and could not have included the findings and conclusions drawn by the BON as their investigation was not yet completed. The conversation with Matherly on May 30, 2024, revealed that no one submitted any new information to her for review.

    e.   The 2014 investigation by the GPD was also incomplete and did not include interviews of all witnesses, in particularly, key witnesses. The GPD also did not have access to the NCBON findings when they investigated.

    f.   Concerning the medical records, not only did Brixon apparently abuse and neglect White until she was dead, but she also neglected to document vital information into the medical records.

With these inconsistencies and failures, the Plaintiff is confused as to how anyone, Dixon, Futrell, Robb, the GPD, and the SBI, can claim they conducted a fair or a complete investigation when no one was ever interviewed, not even Brixon. Yet, witness testimony is typically part of a homicide investigation. Additionally, there is documented testimony by ECU Health personnel, including Brixon, whom the

DHHS and the BON interviewed, and their reports detail some conflicting information between Brixon's account of what happened compared to the accounts of some of her coworkers.

111. Generally, members of law enforcement are not medical professionals. Yet, no one in law enforcement, including Dixon, has mentioned consulting a medical professional to help decipher the medical records. As the medical records seem to have been heavily relied on, proper interpretation is crucial when examining them for details that could support homicide charges. On the other hand, a number of medical professionals whose job requires them to examine medical records on a regular basis, who are accustomed to comparing job requirements of medical staff to the job actually performed, who are skilled at assessing missing data, and who are proficient at determining what went wrong, where it went wrong, when it went wrong, and by whom, have all been dismissed and disregarded as a whole except for Radisch, whose tainted opinion is based on incomplete data.

112. The medical records and the DHHS report that Dixon had access to in 2019, showed that Brixon had given two accounts for why White was not connected to the cardiac leads:

    a. White was not connected to the cardiac because the patient "refused," according to the monitor technician.

    b. Brixon verbally refused to reconnect the leads, according to two coworkers.

    c. Brixon's reasons to the BON were, in the first investigation, White pulled them off, though Brixon could not explain how. In the subsequent

investigations, White wiggled out of them. The former charge nurse, Monica Baker Wilson, RN, informed the BON that such occurrences were not common.

113. The medical records that were a part of Dixon's evidence also showed numerous entries of fake pulse and oxygen readings that were entered by Everette after White was moved to ICU on May 10, 2014, as well as numerous more fake vital sign readings that were entered into the records on May 11, 2014, the day after White was already deceased. This is a crime within itself that should have indicated a potential coverup of Brixon's negligence, thus possibly implicating herself as an accessory after the fact. Yet Dixon and others have maintained that no crime has happened in this case.[24]

114. In March 2022, following receipt of the letter detailing the evidence, Avens reached out to Dixon 's office again, highlighting the incomplete nature of the law enforcement investigations and the absence of crucial evidence from his provided list.[25] Dixon said that he would have someone review the contents of McInerney's files and that he would contact Phillips to inquire about the BON document.

115. In a subsequent phone conversation in March 2022, Dixon disclosed that he had successfully obtained the previously missing BON document from Phillips via the same format Phillips had received them himself; in four emails, each containing a

---

[24] See EXHIBIT 4.
[25] The plaintiff did not know to mention reports from law enforcement as she did not understand how the process of law enforcement relaying information to the district attorney worked until 2024.

part of the document due to file size limitations. However, what McInerney did with the documents given to him remains a mystery.

116. Using the pen name Charla Brooks, Avens compiled a dossier on the death of White and submitted it to Dixon on May 2, 2022.

117. In a subsequent phone conversation with Dixon in June 2022, he had not completed his review of the newly obtained evidence and dossier but maintained, thus far, that he did not believe a crime had occurred. He requested an additional two weeks to conclude his examination, stating that if he found anything in the documents to change his perspective, he would submit the evidence to the local Pitt County ME's Office. The Plaintiff reasserts that Dixon's agreement to submit the evidence to the ME was conditional, based on whether or not his perception changed. He did not say he would submit the evidence definitely.

118. In early July 2022, Dixon claimed to have completed the review of the newly obtained documents and maintained his stance that White's death was not a criminal case. The discussion escalated into an argument. Dixon eventually asserted that he could not file criminal charges because he had received a report from the ME, and that report did not support such charges.[26] This statement contradicted his previous assurance, made about two weeks prior, that he would send the evidence to the ME if he saw something to make him believe a crime had occurred. This situation presented several inconsistencies:

---

[26] While the Plaintiff did not know to record this phone call, the deception is addressed in the recorded phone call on April 10, 2023. See EXHIBIT 9: Transcribed Recordings.

a. According to his previous statement, if he had observed something to change his mind (indicating a possible crime), there would have been no basis for our argument as our beliefs would have aligned. But he had not changed his mind as evident in recorded phone conversations in 2023.

b. If he had not identified evidence of a crime, as per his earlier statement, he would not have sent the evidence to the ME since he suggested he would only do so if his belief had changed.

c. If he indeed sent the evidence to the ME, it appeared implausible that he could have finished reading the last two documents (totaling approximately 235 pages), transmitted thousands of pages to the ME, and received an evaluation of the extensive information, resulting in a determination, all within just two weeks. So, I asked him, "All in two weeks?" He said, yes. "Can I get a copy?" I asked. He said, no. "Can I come to your office and see yours?" He said, no. "Can you tell me who signed it?" "No, I can not," he responded. "Can you give me the date that's on it?" Again, he responded, "No I can not."

d. Dixon's conflicting statements contributed to intentional confusion in this case, further impeding the justice process.

119. In the aforementioned conversation, Avens inquired with Dixon about the possibility of hiring an independent medical examiner (IME). His response was that he could not use an IME because it might raise questions from jurors as to why he did not utilize the services of the local ME, whom he typically utilized. This failed to

make sense due to jurors being randomly selected for each trial, rather than a static jury attending every trial, and remembering who the typically used ME is.

120. Immediately following the aforementioned phone conversation, Avens contacted the ME's office and spoke with the office manager, Danene Lowery (Lowery). She conveyed that there was no information in their system regarding White, leading her to doubt the existence of any report from that office to the Dixon's office.[27] At her suggestion, Avens spoke to a male co-worker who requested a few days to investigate the matter and asked Avens to call back after that period.

121. Avens contacted the ME's office again two days later, and Lowery informed Avens that her office had reached out to the DA's office inquiring about the report. However, according to her, they were told by the DA's office that they had to "find" the report. Lowery further maintained that there was nothing in their system on White and reiterated her doubts about the existence of any report from that office regarding this matter.

122. Within a few days of the last phone call with Lowery, and after Dixon had been caught in his lie and was aware of it, he called Avens, exclaiming, "I have good news. I am going to submit the evidence to the medical examiner's office." Avens began to respond, "But you said…," when he abruptly interrupted her, saying, "Do you want me to send the evidence or not?!" This was a display of verbal abuse and an abuse of power as Avens felt disrespected and diminished, believing she had no alternative but to endure this treatment, given his authority in the situation.

---

[27] See EXHIBIT 9: Transcribed Recordings. (The Plaintiff reminded Lowery of this conversation in the 2023 phone recording.)

Consequently, Avens humbled herself and responded, "Yes, sir. I'd appreciate that."

123. On July 18th, 2022, Dixon's administrative assistant, Jennifer Corbitt (Corbitt) sent Avens an email containing a medical release to sign in the presence of a notary and was returned to the DA's office on August 3, 2022.

124. The Plaintiff attempted to follow up with the ME's office in September 2022 to see if they had received the evidence from the DA's office. A female other than Lowery answered the phone. She told Avens, that she was told, that if she called, to tell her she needed to talk to ECU's risk manager.[28]

125. Avens, believing this redirection was retaliation for having discovered Dixon's deception through the last phone call to the ME's office, contacted Dixon to ask why she was being redirected. Dixon denied knowledge of what was going on.

126. Avens made a second attempt to follow up with the ME's office in October 2022. Again, someone other than Lowery, the same person as the month before, answered the phone and said the same thing as before. She was told that if she called to tell her she needed to talk to the risk manager.

127. The instances described regarding Avens's attempt to gather information from the ME's office directly singled her out. These actions were targeted and aimed at curtailing Avens's legal right to obtain information related to my daughter's death from a public office, as guaranteed by the First Amendment's reciprocal of gathering information from a government office. Such deliberate attempts to

---

[28] Lowery made the same reference in the recorded phone conversation. See EXHIBIT 9: Transcribed Recordings.

silence Avens hindered her ability to seek justice in the death of her daughter, constituting both, an obstruction of justice and a conspiracy to obstruct justice, thus violating her Fourteenth amendment to due process and equal protection, as well.

128. In January or February 2023, Avens reached out to Dixon for an update. He informed that Kelly was on FMLA (family and medical leave) and expected to return sometime in February.

129. Subsequently, in February 2023, Avens called the ME's office. Lowery answered and confirmed Kelly's FMLA status, reasserting that Kelly would be back before the end of the month. During this call, Avens chose not to disclose her identity to ensure open communication with Lowery.

130. The Plaintiff called the ME's office in March 2023. Lowery answered the phone. After asking to speak to Kelly, Lowery replied that Kelly was working from home and had not returned to the office for work due to the FMLA. Avens proceeded to identify herself and asked had the office received the evidence that Dixon claimed to have sent in August 2022. Lowery explained that she was not supposed to be talking to Avens because Avens was supposed to be talking to risk management. However, Lowery continued to maintain that the office had nothing in their system on White.

131. Recognizing the need for evidence of the information she was receiving, and due to the unfair and unjust treatment she was experiencing, The Plaintiff made the decision to record subsequent conversations for documentation.

132. The Plaintiff asserts the following:

a. Her attempt to gather information was not for the purpose of pursuing medical malpractice, was not for the purpose of pursuing wrongful death, and was not for the purpose of pursing any civil action.

b. The Plaintiff's attempt to gather information was for the sole purpose of hoping that the individual responsible for her daughter's death would justifiably be held accountable; nothing more than any other reasonable parent would hope for under the same or similar circumstances. Attempting to gain confirmation that the ME finally received the evidence regarding White's death was an indicator of a mother's love and a mother's hope.

133. However, the Plaintiff also asserts:

a. From the point of Dixon's dishonesty in 2022 and forward, is the result of Dixon claiming to have a report from the ME, Kelly, when he did not.

b. Dixon's lie set everything else into motion from the moment he lied until this moment of the Plaintiff amending her pleading.

c. Prior to Dixon's lie, Kelly was not a party to the events in this situation.

d. Prior to Dixon's lie, the Plaintiff did not have evidence to support a claim against ECU Health that was not already time-barred.

e. Even after Dixon's initial lie in July 2022, the Plaintiff still tried to work with him as she hoped something would change. However, things did change in March 2023, though it was not the change Avens had hoped for. Lowery informed the Plaintiff, once again, that the ME's office still had nothing in their system regarding White's death. It was at that moment that the

Plaintiff began collecting evidence of what was going on, though at the time, she still had no idea what she was going to do with it.

    f.  The Plaintiff explains the above for clarity.

134. In March 2023, the Plaintiff left a message for the DA, seeking a return call. He responded within a few days, on March 28, 2023, confirming the submission of evidence in the previous August. Unfortunately, the phone reception during this conversation was poor, leading to a suboptimal recording.

135. Approximately a week later, the Plaintiff contacted Dixon again, leaving a message for him to return her call. On April 10, 2023, he responded. The Plaintiff conveyed the issue of poor reception during our previous talk and the need for clarification on certain points. Once more, Dixon affirmed sending the evidence to Kelly and clarified that their communication is conducted through secure email.[29]

136. Immediately after talking to Dixon, the Plaintiff called the ME's office and recorded the conversation. Lowery answered the phone and revealed the following information:[30]

    a.  They did not have any information on White.

    b.  Avens was supposed to be talking to risk management.

    c.  That office was not doing anything with this case.

    d.  Information sent to that office would come to her, and she had not received anything.

---

[29] See EXHIBIT 9: Transcribed Recordings.
[30] See EXHIBIT 9: Transcribed Recordings.

e. She reiterated that she did not have anything and the last time she spoke with the DA's office they had not sent her anything.

f. She would be the "contact person" who would receive the information sent from or by the DA's office.

g. Kelly would need to wait and talk to risk because they are not supposed to be doing anything with the case.

h. Kelly would need to talk to the attorneys and see what she would be "allowed" to do.

137. During the recorded conversation with Lowery, she explicitly stated, "the last time I talked with his office they said they had not sent me anything." This suggests that she had previously followed up with the DA's office after initially being informed that they had to "find" the document that Dixon claimed to have had initially. This statement by Lowery supports the Plaintiff's claim that Dixon did not tell the truth when he initially he already had a decision from that office in 2022. It also leads to the conclusion that when his office told the ME's office that they had to "find" the report that did not exist, the DA's office was again being deceptive. It adds further confusion to the situation.[31]

138. In the next recorded conversation, which occurred on April 13, 2023, Dixon, in the presence of Corbitt, confirmed that he sent the evidence directly to Kelly via multiple emails on August 11, 2022. Moreover, during the conversation, he sent the evidence to Lowery's email address and cc'd it to Kelly's email.[32]

---

[31] See EXHIBIT 9: Transcribed Recordings.
[32] See EXHIBIT 9: Transcribed Recordings.

139. Avens followed up with Lowery within a few business days, and she confirmed receipt of the emails.

140. According to the abovementioned phone conversations:

    a. Ms. Lowery, the office manager, who assumes that everything in the office passes through her due to her position, and due to her identifying herself as the "contact person," was unaware of Kelly receiving the emails from Dixon that Dixon claimed to have sent to Kelly on August 11, 2022, via secure email.

    b. If the emails were indeed sent to Kelly via secure email on August 11, 2022, it suggests collusion between Dixon and Kelly to obstruct justice since Lowery, the contact person, did not receive information that she assumed would come to her.

    c. It also suggests that if there were a chance that the submitted emails to Kelly did not go through, that Dixon made no attempts to follow up with the ME to confirm receipt or converse with her about the estimated completion date of her report, seeing as it had been eight months since he said he sent the evidence.

    d. The conversations suggests that information was deliberately withheld from Lowery who was willing to share information with Avens despite apparent instructions to redirect Avens to ECU Health's risk management, which in turn, deliberately withholds information from Avens regarding her daughter's manner of death.

e. Because Kelly was not "allowed" to work on this case without, presumably, obtaining permission from "risk" and the "attorneys" to determine what she would be "allowed" to do, another instance of obstruction of justice and conspiracy to obstruct justice has occurred involving Kelly and ECU Health, implicating its risk management department, Office of General Counsel, and/or attorney(s).

f. Furthermore, Kelly's compromised independence poses a significant conflict of interest, which is deeply concerning. Such a scenario potentially allows ECU Health to manipulate events and information surrounding a patient's death, leaving families without recourse or transparency.[33]

141. On September 26 and twice on October 04, 2023, the Plaintiff attempted to contact Dixon by phone to inquire about any updates or decisions from the ME. However, Avens received no response. The Plaintiff believes Dixon's sudden lack of response, especially given his prior consistent communication since 2022, was retaliatory in nature.

142. On October 04, 2023, the Plaintiff called the ME's office to ask for a copy of the report from Kelly's findings. Lowery answered the phone and proceeded to tell me she did not have any information regarding the request and instructed Avens to talk to Kelly, who was not available at that time.

143. Ms. Lowery called the Plaintiff on October 05, 2023. She explained that she had spoken to Kelly and that Kelly told her she had forgotten to look at the evidence in this case, but she would do so over the coming weekend.

---

[33] See EXHIBIT 9: Transcribed Recordings.

144. Six months had elapsed between the point when Ms. Lowery acknowledged receipt of the evidence sent by Mr. Dixon in April, and the subsequent conversation with Lowery in October. Fourteen months had transpired from the time Mr. Dixon purportedly submitted the evidence to Kelly in August 2022. Dr. Kelly's oversight in addressing this case serves as evidence that Dixon failed to facilitate the acquisition of expert evidence that he deemed necessary before proceeding with charges in this case.

145. Mr. Dixon's failure to facilitate Dr. Karen Kelly's examination of the evidence, and his apparent lack of insistence on her adherence to his purported instructions, strongly suggests that he had no genuine intention of conducting a comprehensive investigation into White's death. This failure demonstrates a profound disinterest in pursuing justice and raises doubts about his commitment to holding accountable those responsible for any wrongdoing.

146. On December 19, 2023, recognizing the need for an independent evaluation of the case, Avens contacted Dr. Donald Jason, MD, JD, (Jason) an esteemed medical examiner based in Winston Salem, North Carolina.

147. In his report, dated January 15, 2024, Jason included a vast number of findings and failures by Brixon. He concluded, within reasonable medical probability, that White's cause of death was the failure to properly maintain medically ordered cardiopulmonary monitoring. He posited that had Brixon adequately maintained the prescribed cardiopulmonary monitoring, White 's cardiac arrest would have been detected in time to promptly administer CPR, thereby saving her life.[34]

---

[34] See EXHIBIT 10: Report from Dr. Donald Jason, Md., JD.

148. Jason determined that the manner of White's death is homicide. His determination stems from the finding that the Brixon 's failure to provide proper care constituted criminal negligence.[35]

149. The Plaintiff emailed Jason's report to Elias, GPD Chief of Police, Ted Sauls (Sauls), Dixon, Corbitt on January 24, 2024.

150. In response, Dixon sent a letter to the Plaintiff, dated March 6, 2024.[36] In it, he acknowledged receiving Jason's report. Additionally, he disclosed that the former DA, Kimberly Robb, had spoken with the former Chief Medical Examiner, Dr. Radisch, which confirms my claims stating so. However, several other points raised in this letter are troubling:

    a. Mr. Dixon discussed reviews of information conducted by himself and others in 2019, acknowledging that ADA Futrell reviewed all of the information "available to him," which underscores that all of the evidence was not reviewed at that time since, again, the NCBON documents and Dr. Jason's report were not "available" to the DA in 2019. It also highlights that the information "available" did not include witness interviews that are typically part of homicide investigations but were excluded as part of any investigation by the GPD, SBI, and DA's office.

    b. Dixon's assertion in the letter that filing criminal charges is "inappropriate" due to "insufficient evidence" is unfounded and unacceptable. This claim lacks merit, potentially stemming from his disregard for the most

---

[35] See EXHIBIT 10: Report from Dr. Donald Jason, Md., JD.

[36] See EXHIBIT 8.

incriminating evidence, effectively diminishing its significance. His dismissal of Jason's findings suggests a lack of intent to pursue charges in this case. Instead of actively seeking grounds for filing charges, he appeared to be more interested in finding excuses not to proceed, as evidenced by his reliance on investigations supposedly conducted between 2014 and 2019 when making his decision in 2024.

c. Now that Dixon has been provided with the evidence that he said was necessary before he could file charges, he concluded his review and closed the case. This is not about prosecutorial discretion; it is a blatant and utterly reprehensible abuse of power! The prolonged charade of sending evidence to Kelly was nothing but a farce. With all the unnecessary back-and-forth regarding the submission of evidence to Kelly, it has become apparent that the last two years have been squandered on meaningless bureaucratic maneuvers, shamefully wasting not just the last two years, but the entire decade.

151. Mr. Dixon has engaged in selective prosecution by failing to file charges in a case involving a crime or crimes committed at his local hospital, ECU Health.

# CAUSE OF ACTION

# ECU HEALTH

**A. U.S.C. 42 Section 1981:**

**Introduction**:

Plaintiff brings this action under 42 U.S.C. § 1981, which guarantees all persons within the jurisdiction of the United States the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and to be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other

**Intentional Discrimination**: ECU Health intentionally discriminated against the Plaintiff, a Black woman, by taking measures to ensure she could not effectively pursue justice for the death of her Black daughter, Keisha Marie White, who died in their predominantly white facility under the care of a white nurse, Linda Leathers Brixon.

**Acts of Discrimination**:

- Failure to Refer to Medical Examiner: ECU Health failed to refer White's death to a medical examiner, a necessary step in investigating suspicious deaths.

- Inaccurate Death Certificate: The facility inaccurately completed White's death certificate, citing natural causes despite the circumstances indicating otherwise.

- <u>Failure to Report to Appropriate Law Enforcement</u>: ECU Health failed to report White's death to local law enforcement, instead reporting to the SBI, which typically only accepts cases within its original jurisdiction unless invited by a state agency or official.

- <u>Withholding Information</u>: The facility withheld information and provided deceptive information to the Plaintiff and regulatory boards.

- <u>Interference with Investigation</u>: ECU Health interfered with the official investigation by failing to make personnel available for interview during Elias's and Matherly's investigation and by preventing the ME, Kelly, from reviewing evidence submitted by the DA.

**Economic Motivations**:

<u>Non-Compliance with Federal Healthcare Laws</u>: Following the internal investigation conducted by the hospital as a result of White's death, the facility failed to acknowledge and correct its internal issues. When DHHS investigated in October, five months later, ECU Health was cited for non-compliance of six federal healthcare laws that they were non-compliant with May, and still non-compliant with in October. They only corrected their compliance issues when they were threatened with losing funding for Medicare and Medicaid patients.[37]

<u>Financial Decisions Over Patient Safety</u>: One of the issues, for example, was their failure to provide a nursing manager on the night shift. Staff members revealed to DHHS that they had no one to call to report Brixon's actions to. Since a nursing manager was not provided for the night shift for at least five months, this oversight

---

[37] See EXHIBIT 7: ECU Health's Non-Compliance Issues.

indicates a financial decision, rather than a scheduling conflict. It is unclear for how long prior to May 10, 2014, or between May and October 2014, the number of patients endangered, nor how many patients were needlessly affected.[38]

Support for the Plaintiff's claims that ECU Health has and continues to prioritize finances over patient safety can be found in their hospital safety grades, available via Leapfrog on hospitalsafetygrade.org/h/ecu-health-medical-center. This platform shows grades from the previous three years. ECU Health consistently scored a "C" in the spring and fall grading periods for 2021, 2022, 2023, and the current season, Spring 2024. In 2014, ECU Health's grade was a "D." The website also evaluates other areas including infections, problems with surgery, practices to prevent errors, and doctors & staff. The exhibits focus on the "Safety Problems" tab, showing metered graphs for the evaluated safety areas. For comparison, the exhibits also include grades for ECU Health North, located in Roanoke Rapids, NC, near the Plaintiff's residence, and grades for a competing hospital, Nash Hospitals, Inc., located in Rocky Mount, NC. ECU Health North, like its parent facility, consistently scored a "C" for each year between 2021 and 2024, including Spring 2024. Nash Hospitals, Inc., on the other hand, scored "A's" and "B's." It is notable that Nash Hospitals, Inc. has maintained a higher level of patient safety than ECU Health, which is a teaching facility.

Another indicator that ECU Health has focused on finances over patient safety is in its growth over the past five to six years. According to their System of Care page in their 2018 PCMH Vendor Policy Handbook, ECU Health owned eight hospitals,

---

[38] See EXHIBIT 7: ECU Health's Non-Compliance Issues.

owned 85+ physician practices, employed 12,000+ employees, and had $1.6 billion in net patient revenue. In contrast, according to ECU Health's System of Care on their website, by 2023 they owned nine hospitals (with the purchase of the Roanoke Rapids hospital, ECU North), owned 185 physician practices and/or clinics in 110 locations, employed 14,000+ employees, integrated with the Brody School of Medicine, and had a net operating revenue of $2,514,916,000 ($2.5 billion).

ECU Health boasts its accomplishments and claims to achieve zero harm to patients and taking responsibility for what they do by doing the right thing, which are the kind of words to draw in business, be it patients who want to be treated there or investors. However, their consistent "C" grades and previous "D" grade in patient safety, alongside their significant financial growth, demonstrate a prioritization of financial interests over patient safety.

**Risk Management Inefficiencies**: ECU Health's risk management has proven to be ineffective as they were cited for non-compliance issues on multiple occasions, some being the same non-compliant issues as in 2014.[39]

**Reputation and Financial Protection**:

- Concealment of White's Death: The hospital maintained the concealment of White's death to protect its reputation and financial interests, preventing a potentially high-profile homicide case from gaining public attention.

- National Impact: White's death had the potential to become a national headline due to its egregious nature and the racial dynamics involved, similar to other

---

[39] See EXHIBIT 7: ECU Health's Non-Compliance Issues.

Case 4:24-cv-00051-M-RN    Document 33    Filed 06/18/24    Page 47 of 86

high-profile cases in 2014 like those of Eric Garner, Michael Brown, and Tamir Rice.

**Discrimination as Policy**: As explained under the "Economic Motivations" section above, ECU Health's actions demonstrate a policy of placing financial interests over patient safety. Their actions in this case show that their priority was to protect their reputation and finances at all costs. Obstructing justice and violating the Plaintiff's rights failed to deter ECU Health's conduct.

**Implied-in-Fact Contract**: An implied-in-fact contract is formed through the parties' conduct and requires offer, acceptance, and consideration. The parties' mutual assent must be objectively manifest or shown. It is enforceable as if it were an express contract.

**Discrimination Impact on Contracts**: The discrimination by the hospital prevented the Plaintiff from entering agreements, contractual in nature, with the GPD, the district attorney, and the medical examiner. The Plaintiff believed she had entered into these agreements with the understanding that these actors would investigate White's death using the same or similar practices typically involved in other homicide investigations. The failure of these state actors to handle this case as they do other homicide investigations, due to their allegiance to ECU Health, violated the Plaintiff's rights to due process, equal protection, and freedom of speech.

**The Wrongful Death Settlement**: Though this case filed in the U.S. District Court is based on clear violations of the Plaintiff's civil rights and is not a continuation of the former wrongful death case, information regarding the handling of that case is not precluded from being used in this case. The BON's compilation of reports was not

released prior to mediation held on March 1, 2016. ECU Health, their representing attorney, the Plaintiff's representing counsel, and the Plaintiff were all aware of this. However, unlike ECU Health and their attorney, the Plaintiff was unaware of certain details contained in the report, such as Brixon's failure to act when Code Blue was initiated. ECU Health threatened to use unrelated healthcare information if the case was not settled that day, and counsel for the Plaintiff allowed this coercion to happen without intervention. Therefore, any resulting contract with ECU Health was fraudulent, coerced, and based on incomplete disclosure. ECU Health's withholding of additional information prevented the Plaintiff from making an informed decision. Thus, the settlement agreement does not constitute a binding contract, as ECU Health's discriminatory policies and actions directly interfered with the Plaintiff's ability to engage in a fair and informed negotiation process.

## B. U.S.C. 42 Section 1983:

**Introduction:**

Plaintiff brings this action under 42 U.S.C. § 1983, which provides a remedy for the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States by any person acting under color of state law.

**Defendant's Actions Under Color of State Law**:

- ECU Health acted as a medical examiner in their failure to refer White to the county medical examiner upon death as mandated by state regulations. Because the ICU physician withheld information available in White's chart from the Plaintiff and other family members, ECU Health breached its fiduciary duty to White's

family depriving them the ability to make an informed decision about whether they felt an autopsy was necessary. The failure to refer White to a medical examiner based on state policy is akin to an official medical examiner deciding whether an autopsy will be performed, thereby placing ECU Health in the position of state authority. The same can be said about the facility's decision to determine White's manner of death, attributing it natural causes when they were aware of information that indicated otherwise.

- ECU Health acted under color of state law by engaging in joint action with state officials and entities, thereby becoming a willful participant in state action. ECU Health's report of White's death aligned with actors of the state who are authorized to report to the agency regarding crimes that are not within the scope of the SBI's original jurisdiction. Because the SBI instructs complaints out of their original jurisdiction to be reported to local law enforcement, ECU Health's failure to do so implies that they acted as a state official or entity. Furthermore, ECU Health continued to engage in communications with the SBI as information was exchanged. Part of this exchange in communication involved agents relaying information obtained from the Plaintiff to ECU Health via its risk manager, Haddock. The continued communications implies that ECU Health acted as a state official or as a state agency. It also indicates a conspiracy between ECU Health and SBI agents, Donnie, Sam, and Anthony to deny the Plaintiff's rights of due process and equal protection, as well as the right to receive information that was suppressed when the Plaintiff interacted with the state agents.

- ECU Health's policy of intercepting reports of potential criminal activity to their police by requiring complaints to go to their risk manager, places the hospital, via its risk management, in the role of chief of police as they directed the flow of information and determined which cases the department would work on.

- ECU Health's deliberate withholding of information and misrepresentation of facts to the BON, in essence, allocated how state resources were used. Given that the BON spent three months investigating their complaint based on partial information and untruths, that did not result in any disciplinary action by the BON, as compared to the nearly year-long investigation and disciplinary actions resulting from the Plaintiff's complaint to the BON, ECU is responsible for the misdirection of state resources, further placing them in a state-sanctioned role.

- The conduct of ECU Health and its employees was intertwined with state officials, notably the ME, in further attempts to cover up the circumstances of White's death. The requirement imposed on the ME, to receive ECU Health's permission before being "allowed" to investigate White's death, and plausibly the death of others, places ECU Health as a state actor in two ways: (1) as the head of the ME and the ME's office as they determined which case or cases should be reviewed in the ME's office; and (2) as the direct recipient of Kelly's relinquished authority.

- ECU Health's actions were conducted in concert with state actors, making its conduct attributable to the state. These actions were clear obstructions of justice.

**Violation of Constitutional Rights**:

- ECU Health's actions deprived the Plaintiff of her constitutional rights to due process and equal protection under the Fourteenth Amendment and protections guaranteed by the First Amendment.

- The Plaintiff was denied due process as ECU Health actively interfered with a proper investigation into her daughter's death, preventing the Plaintiff from obtaining crucial information, hindering her pursuit of justice.

- The Plaintiff was denied equal protection as ECU Health's discriminatory policies and practices were motivated by racial animus and a desire to protect its reputation and financial interests over providing equal treatment and justice.

- The Plaintiff has been denied the right to use her faculties in any lawful way she desires as guaranteed by the Fourteenth Amendment. Having to relentlessly fight a system under the influence of ECU Health has prevented the Plaintiff from full enjoyment of married life, social interactions, and personal endeavors for over a decade.

- The Plaintiff was denied freedom of speech and its reciprocal or obtaining information to and from state agencies as protected by the First Amendment.

**Specific Instances of Violations**:

- ECU Health failed to refer Keisha Marie White's death to the Medical Examiner, a necessary step for a thorough investigation.

- ECU Health inaccurately completed White's death certificate, falsely citing natural causes despite circumstances indicating otherwise.

- ECU Health failed to report White's death to local law enforcement, instead reporting to the SBI, which typically does not accept cases outside its jurisdiction unless invited by a state agency or official.

- ECU Health withheld crucial information from and provided deceptive information to the Plaintiff and regulatory boards, obstructing justice.

- ECU Health interfered with an official investigation by preventing the county Medical Examiner, from reviewing evidence submitted by the District Attorney.

**Resulting Harm**:

The Plaintiff has suffered significant harm due to ECU Health's actions, including emotional distress, financial burdens, physical illness, and the ongoing trauma of having to persistently relive the events of her daughter's death as she retells what happened to, but not limited to, attorneys, politicians, regulating authorities, and through this civil course of action. The Plaintiff has been denied the opportunity to properly grieve and move on. The actions of ECU Health have caused the Plaintiff to endure prolonged litigation, public outcry, and a deep sense of injustice, significantly impacting her quality of life.

C. **42 U.S.C. § 1985:**

**Introduction:**

Plaintiff brings forth claims against ECU Health under 42 U.S.C. § 1985, alleging a conspiracy to interfere with her civil rights. The actions of ECU Health, in concert with other defendants, were aimed at obstructing justice, preventing the transfer of information, and preventing Plaintiff from obtaining equal protection under the law.

**Allegations:**

Existence of a Conspiracy:

ECU Health, along with other defendants, conspired to obstruct the investigation into the death of Keisha Marie White. This conspiracy was aimed at preventing Plaintiff from seeking justice and ensuring that the circumstances of White's death remained concealed.

Intent to Deprive of Equal Protection:

The conspiracy was motivated by discriminatory animus against Plaintiff, a Black woman, and her daughter, White. The defendants intended to deprive Plaintiff of equal protection of the laws by obstructing the investigation and covering up the "criminal negligence" surrounding White's death. ECU Health's conduct was motivated by their financial interests by seeking to protect their reputation from a potentially high-profile homicide case.

Acts in Furtherance of the Conspiracy:

ECU Health engaged in several acts to further the conspiracy, including:

- Withholding critical information from Plaintiff and regulatory boards.
- Preventing the county medical examiner, Dr. Karen Kelly, from reviewing evidence submitted by the district attorney.
- Providing deceptive information to law enforcement and other regulatory bodies.
- Failing to refer White's death to a medical examiner and inaccurately completing the death certificate.
- Reporting to and engaging in further communications with the SBI, while receiving information from the SBI for their own benefit.

- Targeting the Plaintiff by redirecting her phone calls to the ME's office with specific instructions referring the Plaintiff to ECU Health's risk manager, Haddock.

Specific Acts and Omissions:

- Obstruction of Medical Examiner's Duties: ECU Health actively interfered with Dr. Karen Kelly's duties by requiring her to obtain permission from ECU Health's risk management and attorneys before proceeding with any investigation into White's death.

- Deceptive Reporting: ECU Health provided deceptive information to Plaintiff, regulatory boards, and law enforcement to conceal the true circumstances surrounding White's death and to prevent a thorough investigation.

- Continued Communications with SBI Agents: Prior to any official investigation by the agency, ECU Health engaged in repeated improper communications, enabled and condoned by Agents Joe, Donnie, and Anthony. Information the agents obtained from the Plaintiff was inappropriately transferred to ECU Health's risk manager, indicating conspiracy to deprive Plaintiff of her constitutional rights, as well as corruption between the individuals. The transfer of information directly benefitted ECU Health by enabling ECU Health to strategize activities aimed at obstructing the Plaintiff's course of action. For example, when Donnie provided Haddock with intel regarding the Plaintiff's intentions to talk to the district attorney's office, Futrell, who had previously regarded White's death as non-criminal as agreed between himself and DA Robb, reported to former GPD Chief, Aden, that the SBI had already

conducted and completed an investigation, which was prior to the September 13, 2014, email Aden sent to the Plaintiff, which is concerning because the "official" investigation by the SBI did not commence until November 2014 with Matherly working with GPD detective, Elias. No one has since mentioned the investigation that was purportedly conducted prior to September 13; nor have the agents been identified who took part in the mystery investigation. The letter from Dixon in 2024, mentions the concurrent investigation between the SBI and the GPD, but as stated, this investigation was initiated in November 2014.

Failure to Act: ECU Health failed to take necessary actions, such as referring the case to a medical examiner, and reporting to local law enforcement, which would have facilitated a proper investigation and ensured accountability. ECU Health's failure to make personnel available when GPD did investigate, indicates that they never intended for the GPD (nor the SBI) to have knowledge of the criminal activity that took place regarding White's treatment and resulting death. Res ipsa loquitur! This explains why ECU Health chose not to report to local law enforcement.

**Impact of the Conspiracy:**

Deprivation of Rights: The conspiracy deprived Plaintiff of her right to due process and equal protection under the law. The actions of ECU Health and other defendants obstructed Plaintiff's ability to seek justice and obtain closure for the death of her daughter.

**Emotional and Financial Harm:**

As a result of the conspiracy, Plaintiff has suffered significant emotional distress and financial harm, including the costs associated with hiring an independent medical examiner and the ongoing pursuit of justice.

### D. Title VI

**Introduction**

Plaintiff brings forth claims against ECU Health under Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance. Plaintiff alleges that ECU Health engaged in discriminatory practices that violated her rights under Title VI.

**Allegations**

Discriminatory Practices:

ECU Health, a recipient of federal financial assistance, engaged in discriminatory practices that adversely affected the Plaintiff. These practices were motivated by racial animus to protect its reputational and financial interests, while aimed at denying Plaintiff equal access to the benefits and services provided by ECU Health. Such services include, but are not limited to:

- Truthful disclosure regarding the care provided to Plaintiff's daughter that directly caused the daughter's death. The Plaintiff had a right to receive complete information due to her being the decedent's next of kin, as well as the administrator of the decedent's estate. ECU Health breached a fiduciary duty owed to the Plaintiff.

- Referral of patient deaths that meet state-governed criteria for referrals to the ME.

- Proper reporting of such deaths to local law enforcement. Since the SBI provides information of where to report incidents that are outside of their jurisdiction, the state requirement to report certain deaths to law enforcement should not have to explicitly instruct hospitals to not report to the SBI agency. It is the Plaintiff's understanding that anyone who would report cases to the SBI that are out of their original jurisdiction would be redirected to local law enforcement without the need of a state statute explicitly stating so.

- Truthful and complete reporting to regulating agencies such as the BON to promote accountability when a member of the healthcare staff's conduct caused the death of a family member; in particularly one's child regardless of whether the child is an adult or a juvenile.

- Being that there was a wrongful death action commenced by the Plaintiff, ECU Health owed the administrator of the decedent's estate, the Plaintiff, a fiduciary duty to full disclosure and a fair mediation process.

- Being that there was, at least somewhat of, an investigation conducted by the GPD in conjunction with the SBI (Elias and Matherly), ECU Health had an obligation to provide truthful information to the investigators, as well as cooperation with the investigation, by making relevant personnel available for interview, or at the least assist the investigators with contacting relevant personnel.

- The reciprocal of reporting adequate information to proper investigators, is to refrain from interference when an investigator has the authority to conduct an independent and unbiased investigation. Therefore, refraining from such

interference is also a service to be provided by federally funded entity when conduct of its employees requires such investigations to take place.

**Obstruction of Justice:**

ECU Health obstructed the investigation into White's death by providing false and misleading information and/or withheld information (including access to personnel) during their communications with law enforcement and regulatory bodies. ECU Health also obstructed justice by preventing the medical examiner from performing a thorough and unbiased investigation. This obstruction was part of a broader pattern of discriminatory practices aimed at protecting the hospital's reputation at the expense of White's family and the Plaintiff's rights to fair and equal treatment. Specific acts and omissions:

- <u>Falsification of Records</u>: ECU Health staff falsified White's medical records, concealing the true circumstances of her death in an effort to protect the hospital from liability, as well as to protect Brixon from accountability. This falsification included the entry of incorrect oxygen saturation levels and the omission of critical information about White's condition and treatment. ECU Health condoned this conduct when they failed to hold workers accountable.

- <u>Interference with Medical Examiner:</u> ECU Health interfered with the duties of the medical examiner by requiring Kelly to consult with the hospital's risk management and attorneys before proceeding with any investigation. This interference was aimed at obstructing justice and preventing a thorough investigation into White's death.

**Impact of Discriminatory Practices:**

<u>Violation of Civil Rights:</u>

The discriminatory practices of ECU Health violated the Plaintiff's civil rights under Title VI. These violations include the denial of the Plaintiff's First Amendment right to give and receive information to and from various state agencies, entities, and officials regarding the death of her daughter.

Furthermore, ECU Health was endowed with state authority through its interactions with the SBI, effectively clothing the facility with state power. Similarly, when Kelly surrendered her authority to the hospital by allowing ECU Health's risk management to dictate her actions and those of her office, ECU Health acted as a state actor. This state action by ECU Health was a direct violation of the Plaintiff's Fourteenth Amendment right to equal protection, as its policy abridged the Plaintiff's right to be treated similarly to other family members seeking information about the death of a loved one. The office of medical examiners routinely provides information to families regarding deceased loved ones, yet the Plaintiff was denied access to such information through deliberate obstruction. This denial constituted a violation of the Plaintiff's Fourteenth Amendment right to equal treatment, which guarantees that every citizen of the United States is treated impartially. Additionally, this obstruction of justice resulted in significant emotional and financial harm to the Plaintiff.

**Emotional and Financial Harm:**

As a result of ECU Health's discriminatory practices, the Plaintiff has suffered significant emotional distress and financial harm. This includes the costs associated with hiring an independent medical examiner, the ongoing pursuit of justice, and the emotional toll of

knowing that her daughter's death was not properly investigated, which adds insult to injury.

### E. Continued Wrong

The discriminatory actions and obstruction of justice by ECU Health represent a continuous violation of the Plaintiff's civil rights. This pattern of misconduct began with the initial handling of the Plaintiff's daughter's death in 2014 and has persisted through at least 2023 via various forms of obstruction, misrepresentation, and failure to comply with legal and ethical standards. The continued attempts to conceal the truth about White's death have caused prolonged emotional distress, financial inconveniences, and a denial of the Plaintiff's constitutional rights. The ongoing nature of these violations exemplifies a "Continued Wrong," extending the impact of the initial misconduct and compounding the harm suffered by the Plaintiff over the years.

### F. Negligence Per Se

The actions of ECU Health constitute negligence per se due to their violation of specific legal and regulatory standards intended to protect individuals in situations like the Plaintiff's. North Carolina recognizes the doctrine of negligence per se, which applies when a defendant violates a statute that is designed to protect a particular class of persons from a specific type of harm. In this case, the relevant standards and laws include:

- North Carolina Common Law on Obstruction of Justice: Under North Carolina common law, obstruction of justice is defined as any act that corruptly impedes, hinders, or obstructs the administration of justice. This includes actions that prevent the discovery of truth, tamper with evidence, or interfere with official investigations.

ECU Health's actions in withholding information, falsifying records, and influencing the medical examiner's office to impede a thorough investigation into White's death clearly fall within this definition.

- Common Law on Conspiracy: North Carolina common law also recognizes conspiracy as an agreement between two or more parties to commit an unlawful act or a lawful act by unlawful means. In this case, the conspiracy between ECU Health, its risk management team, and potentially other defendants to obstruct justice and prevent a proper investigation into White's death constitutes a violation of this doctrine.

- Negligence *Per Se through* Regulatory Violations: North Carolina General Statutes and federal healthcare regulations impose duties on healthcare providers to ensure patient safety, maintain accurate medical records, and report suspicious or unnatural deaths to the appropriate authorities. ECU Health's failure to comply with these duties—by not referring the death to a medical examiner, inaccurately completing the death certificate, and failing to report the death to local law enforcement—constitutes a breach of their legal obligations. This breach directly resulted in harm to the Plaintiff, fulfilling the criteria for negligence per se.

By violating these common law principles and regulatory standards, ECU Health's actions have caused significant harm to the Plaintiff, including emotional distress, financial inconveniences, and the denial of her constitutional rights. These violations substantiate the Plaintiff's claims and highlight the need for legal redress.

**G. Conclusion Regarding ECU Health**

The actions of ECU Health in the handling of the death of Keisha Marie White demonstrate a clear and egregious violation of the Plaintiff's civil rights under federal law. The discriminatory practices of ECU Health, including their intentional obstruction of justice, conspiracy to conceal the true circumstances surrounding White's death, and the deliberate misinformation provided to various state agencies and the Plaintiff, directly infringe upon the Plaintiff's rights under 42 U.S.C. § 1981, § 1983, § 1985, and Title VI.

These violations are further compounded by ECU Health's failure to adhere to their legal and ethical obligations, as evidenced by their obstruction of justice under North Carolina common law and their disregard for regulatory standards designed to ensure patient safety and the integrity of medical investigations. The hospital's actions have caused the Plaintiff significant emotional distress, financial inconveniences, and have obstructed her pursuit of justice for her daughter.

The continued wrongs perpetrated by ECU Health from 2014 through at least 2023, including their failure to make personnel available for interviews during official investigations, their influence over the actions of the medical examiner, and their overall conspiracy to obstruct justice, establish a pattern of misconduct that underscores the necessity for this Court to grant the Plaintiff the relief sought.

The Plaintiff respectfully requests that this Court recognize the severe impact of ECU Health's actions, not only on her pursuit of justice but also on her constitutional rights to due process, equal protection, and freedom of speech. The Plaintiff seeks compensatory and punitive damages for the violations suffered, an injunction to prevent further obstruction, and any other relief the Court deems just and proper.

# FARIS C. DIXON, JR.

## H. Introduction To Claims Against Faris Dixon

The Plaintiff brings forth claims against Faris C. Dixon, Jr. (Dixon), the elected District Attorney of Pitt County, North Carolina. The allegations involve Dixon's actions and inactions, which violated the Plaintiff's civil rights, including her rights under the First and Fourteenth Amendments of the United States Constitution. These claims are brought pursuant to 42 U.S.C. § 1983, and the Plaintiff seeks to hold Dixon accountable in both his official and personal capacities for the harm caused.

## I. Capacity

Dixon is sued in both his official capacity as the District Attorney of Pitt County and in his personal capacity. While Eleventh Amendment immunity may shield him in his official capacity from certain claims, it does not extend to his personal capacity. The Plaintiff alleges that Dixon, acting under color of state law, engaged in conduct that violated her constitutional rights, thus rendering him liable under 42 U.S.C. § 1983.

## J. Absolute, Qualified, and Sovereign Immunities

Dixon may seek to invoke absolute, qualified, and sovereign immunities in defense of his actions. The Plaintiff asserts that:

- **Absolute Immunity**: Dixon's actions were administrative and investigative, rather than prosecutorial, which disqualifies him from absolute immunity.

- **Qualified Immunity**: Dixon's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. Given his role

and responsibilities, Dixon should have been aware that his actions and inactions were unlawful.

- **Sovereign Immunity**: Dixon is not entitled to sovereign immunity in his personal capacity. Any claims against him in his official capacity that might invoke sovereign immunity do not protect him from liability for violating federal constitutional rights.

### K. 42 U.S.C. § 1983

Under 42 U.S.C. § 1983, any person acting under color of state law who deprives another of their constitutional rights is liable for damages. The Plaintiff alleges that Dixon, while acting under color of state law, violated her constitutional rights by:

- Failing to conduct a thorough and impartial investigation;
- Obstructing justice and conspiring to conceal information;
- Violating the Plaintiff's First Amendment rights; and
- Violating the Plaintiff's Fourteenth Amendment rights.

**Failing to Conduct a Thorough and Impartial Investigation**:

Though the Plaintiff understands that she does not have a constitutional right to compel an investigation, the fact remains that Dixon did choose to investigate. With that choice comes the responsibility to conduct a thorough, unbiased, and diligent investigation in accordance with legal and ethical standards. By failing to properly interview witnesses, review all available evidence, and follow standard investigative procedures, Dixon not only neglected his official duties but also obstructed justice. These were Dixon's choices. With his position, he had the power to ensure that White's death investigation was as comprehensive as other homicide investigations, including but not limited to witness interviews, interrogation of suspects, and medical examiner assessments based

on complete data. Dixon chose to use his power to align his decisions with the goals of ECU Health, rather than represent the people through seeking the truth no matter how ugly it may be. This neglect of duty endangers the public by failing to deter misconduct in the healthcare system. Without accountability, other nurses like Brixon may feel emboldened to commit egregious acts without consequence. Meanwhile, patients like White remain vulnerable to harm from unethical healthcare providers, and further victimized by facilities that try to hide the truth and again by the justice system when it fails to uphold its duty, thus perpetuating a cycle of injustice. Dixon's failure to conduct a proper investigation in this case, influenced by external pressures, resulted in the violation of the Plaintiff's rights to due process and equal protection under the law.

**Obstructing justice and conspiring to conceal information:**

- Dixon failed to ensure a complete and unbiased investigation into the death of White. This includes such actions as accepting incomplete law enforcement reports that were obviously missing integral parts of an investigation including, but not limited to witness interviews and interrogation of suspect; failing to require the ME to review evidence he submitted to her and provide her professional assessment of that evidence; failure to pursue all available leads, for instance, the inconsistencies of Brixon's statements to the BON.

- Dixon failed to protect the integrity of the case by lying about having evidence that he did not have.

- Dixon relied on outdated data and failed to require the cooperation of ECU Health in his investigation. This statement is drawn from Matherly's statement that ECU Health failed to assist her investigation by making personnel available

to interview. Having turned her report over to the DA's office, it is safely assumed that her report includes a statement in reference to ECU Health's lack of cooperation.

- Despite being aware of medical records that indicated falsification of oxygen readings, Dixon, who has more than fifteen years of experience as a prosecutor, did not pursue this lead and failed to recognize the criminal implications, such as tampering with evidence. Neither did he recognize the assault and battery that was indicated in the evidence he possessed.

- Dixon conspired to conceal evidence. This conclusion is drawn from his act of submitting evidence directly to the ME for review, his failure to ensure the ME's receipt of evidence, his failure to follow up with the ME during the prolonged period of time between submitting the evidence in August 2022 and her at least through October 2023 when it was revealed that Kelly had forgotten to review the evidence, and his failure to require the ME to adhere to his purported expectation of her expert opinion based on the submitted evidence. Dixon's failures do not align with the duties expected of a prosecutor. ECU Health, through its policies and actions, made it clear that they intended for evidence in White's case to be suppressed indefinitely. The ME clearly made her intent to suppress evidence when she complied with the requirement to consult with ECU Health before she would be "allowed" to work on the case, thus forsaking her independence. Based on these factors, Dixon's actions, or lack thereof, indicate a complicit agreement to suppress evidence.

**Violating the Plaintiff's First Amendment rights**:

Dixon violated the Plaintiff's First Amendment right to information by providing misleading and deceptive information to the Plaintiff regarding his investigation. Freedom of speech to give information, and its reciprocal, receiving information are protected by the Constitution. Lying about evidence he possessed and, through a recorded phone conversation when Dixon verbally demonstrated heavy reliance on the ME's opinion, added intentional confusion to the case considering his refusal to obtain the ME report that he relied on so heavily upon. In this light, Dixon misrepresented his intentions, by pretending he awaited the ME's opinion, when he failed to require her to respond with her opinion.

**Violating the Plaintiff's Fourteenth Amendment rights:**

The Plaintiff is entitled to due process, equal protection, and the freedom to use her faculties in whatever legal way desired without government interference, as protected by the Fourteenth Amendment. Because Dixon made the decision to investigate the death of the Plaintiff's daughter, the Plaintiff by default, was entitled to a fair and thorough investigation process. Avens was denied that right when Dixon failed to adhere to ethical standards and legal principles. In Dixon's choice to align his investigation process, or lack thereof, with ECU's goals, he failed to treat Avens's reports of criminal activity the same as other reports of criminal activity where the focus was on seeking the truth and acting on that truth.

The Plaintiff may not have a constitutional standing to require a district attorney to investigate a case, but she does have constitutional standing to require the district attorney to follow proper procedures, ethical policies, and legal standards when he does agree to investigate. It is part of the First Amendment right to the exchange of

information and part of the Fourth Amendment of due process and equal protection;
neither of which allow for the abuse of power that Dixon has demonstrated through
deceit and shady tactics.

Additionally, Dixon's actions have repulsively violated the Plaintiff's right, guaranteed
by the Fourteenth Amendment, to live her life in any lawful way she chooses. Under this
amendment, the Plaintiff, Avens, has the legal and constitutional right to pursue justice
for the death of her daughter. Dixon, however, does not have the right to infringe upon
this right by deliberately wasting years of the Plaintiff's efforts through meaningless
bureaucratic maneuvers. His actions, which include pretending to actively investigate
while simultaneously sabotaging the investigation with repeated failures, constitute a
breach of the contractual agreement he made when he chose to investigate. Dixon has
a duty to uphold the law and ensure that justice is served. By neglecting these duties,
he has not only obstructed justice but also violated the Plaintiff's rights, causing her
significant harm.


**L. Continued Wrong:**

Dixon's actions and inactions represent a continuous wrong that has persisted since
2019 and continues through 2024. Despite entering into an implied contract with the
Plaintiff in 2019, agreeing to investigate the death of her daughter, and reaffirming this
agreement in 2022 after the Plaintiff discovered that evidence was missing from his
office, Dixon has repeatedly failed to conduct a thorough and unbiased investigation.
Each instance of neglect, failure to interview witnesses, and misrepresentations of facts

has compounded the harm to the Plaintiff. This ongoing pattern of negligence demonstrates a blatant disregard for the Plaintiff's rights and has perpetuated her emotional and psychological distress. By continually obstructing justice and failing to uphold his duties, Dixon has maintained a state of ongoing harm that extends beyond a single incident, violating the Plaintiff's constitutional rights on a continual basis.

## M. Negligence Per Se

Dixon's conduct constitutes negligence per se as it violates established legal standards and ethical obligations inherent in his role as a District Attorney. The legal duty to conduct a thorough, unbiased investigation into potential criminal matters is clearly defined by the standards governing his profession. By failing to interview critical witnesses, review substantial evidence, and ensure a diligent investigative process, Dixon breached his duty of care. His actions, which fall significantly below the standard expected of a District Attorney, directly resulted in the obstruction of justice and infringement of the Plaintiff's rights, thereby meeting the criteria for negligence per se.

## N. Conclusion:

The Plaintiff respectfully requests that this Court recognize the severe impact of Dixon's actions on her pursuit of justice and her constitutional rights. The Plaintiff seeks compensatory and punitive damages for the violations suffered, an injunction to prevent further obstruction, and any other relief the Court deems just and proper. The Plaintiff asserts that Dixon's conduct, both in his official and personal capacities, directly

contributed to the violation of her civil rights, and thus, he should be held accountable under 42 U.S.C. § 1983.

# KAREN KELLY

**O. Introduction:**

Dr. Karen Kelly, in her role as a Medical Examiner for the state, holds a position of significant responsibility and authority. She is entrusted with the critical task of investigating deaths under various circumstances to ensure justice and provide closure for affected families. However, in the case of Keisha Marie White, Dr. Kelly failed to fulfill her duties, leading to a series of violations of the Plaintiff's constitutional rights. This section outlines the capacity in which Dr. Kelly is sued, the immunities she may claim, the legal standing of the Plaintiff, and the specific claims under 42 U.S.C. § 1983, as well as violations of the First and Fourteenth Amendments.

**P. Capacity:**

Kelly is sued in both her official and individual capacities. In her role as a Medical Examiner for the state, she performed duties under color of state law. Her actions and inactions that are the basis of this lawsuit were performed in both her official capacity as a state employee and in her individual capacity.

**Q. Immunities:**

Dr. Kelly may claim various forms of immunity, including qualified immunity and potentially sovereign immunity in her official capacity. However, the actions detailed in this complaint demonstrate that she acted beyond the scope of her duties, relinquishing

her authority to external influences, which nullifies such immunities. Additionally, qualified immunity does not apply where a reasonable person in her position would have known that her conduct violated clearly established constitutional rights.

**R. Legal Standing:**

The Plaintiff has legal standing to bring this action against Dr. Kelly as she is directly affected by Kelly's failure to fulfill her statutory duties, leading to the violation of the Plaintiff's constitutional rights. As a mother seeking justice for her daughter, the Plaintiff's efforts were obstructed by Dr. Kelly's actions and inactions, giving rise to this claim.

**S. 42 U.S.C. § 1983:**

Under 42 U.S.C. § 1983, Dr. Kelly, acting under color of state law, engaged in conduct that deprived the Plaintiff of her constitutional rights. Specifically, Dr. Kelly's failure to perform her duties as a Medical Examiner and her collaboration with ECU Health in obstructing the investigation into Keisha White's death constitute a violation of the Plaintiff's rights under the First and Fourteenth Amendments.

**Constitutional Violations:**

Dr. Kelly's actions violated the Plaintiff's Fourteenth Amendment rights to due process and equal protection. By failing to conduct a thorough and unbiased post-mortem examination and by allowing external influences to dictate her actions, Dr. Kelly obstructed the Plaintiff's access to crucial information regarding her daughter's death. This conduct resulted in a denial of the Plaintiff's right to equal protection under the law,

as she was not treated with the same impartiality and diligence that other similarly situated individuals would receive.

**Fourteenth Amendment:**

Dr. Kelly's actions violated the Plaintiff's Fourteenth Amendment rights to due process and equal protection. By failing to conduct a thorough and unbiased post-mortem examination and by allowing external influences to dictate her actions, Dr. Kelly obstructed the Plaintiff's access to crucial information regarding her daughter's death. This conduct resulted in a denial of the Plaintiff's right to equal protection under the law, as she was not treated with the same impartiality and diligence that other similarly situated individuals would receive.

**First Amendment:**

The Plaintiff's First Amendment rights were violated due to Dr. Kelly's failure to provide her expert opinion based on the evidence she received in the investigation of the Plaintiff's daughter. In *Martin v. U.S. E.P.A*, the court decided "[b]ecause the right to receive information is derivative of the First Amendment rights of the speaker, a cause of action exists under the First Amendment which allows a recipient to allege that government conduct has chilled the speech of a willing speaker. *Martin v. U.S. E.P.A.*, 271 F. Supp. 2d 38 (D.D.C. 2002). Dr. Kelly, through the nature of her job function, is ordinarily a willing speaker. However, her failure to perform her governmental or state-mandated duties, demonstrated her subservience to ECU Health by allowing the facility to dictate which case(s) she was to work on without first requiring their approval, thereby chilling the speech of an otherwise willing speaker.

**R. Negligence Per Se:**

Kelly's conduct in the investigation of White's death demonstrates a clear breach of her statutory obligations under North Carolina law, as well as common law obstruction of justice, constituting negligence per se. Despite the responsibility as a Medical Examiner to ensure a thorough and unbiased investigation of suspicious deaths, Dr. Kelly allowed undue influence from external entities, notably ECU Health, to compromise her professional duties. Specifically, her failure to independently and promptly examine the evidence provided, while instead awaiting permissions from ECU Health's risk management and legal team, obstructed the judicial process and the plaintiff's pursuit of justice. This neglect and subordination directly violated the legal standards set forth to protect the rights of individuals seeking truth and accountability in the aftermath of potential criminal homicides.

**S. Conclusion:**

Dr. Kelly's actions and inactions, as detailed in this complaint, represent a grave dereliction of duty and a violation of the Plaintiff's constitutional rights. By failing to conduct a thorough and unbiased investigation, and by allowing external influences to dictate her professional responsibilities, Dr. Kelly has obstructed justice and denied the Plaintiff due process and equal protection under the law. Furthermore, her failure to act as a willing speaker in her capacity as a state official has infringed upon the Plaintiff's First Amendment rights. The Plaintiff seeks redress for these violations and holds Dr. Kelly accountable for her contributions to the continued obstruction of justice and the resultant harm suffered.

# LIST OF EXHIBITS

**EXHIBIT 1**:

NCGS 130A-383. Medical Examiner Jurisdiction


**EXHIBIT 2**:

Death Certificate:

- Cause of death block 23

- No autopsy performed block 24a

- Manner of death block 25

- Was not referred to medical examiner block 26a

- Signed on May 10 2014 block 33c

- Filed on May 14 2014 block 35


**EXHIBIT 3-A**:

- BON Report Page(s)

- Brixon interfered with cancellation of ABG test

- ECU reported White's death as "not clear."


**EXHIBIT 3-B**:

- BON Report Page(s)

- Showing ECU's discrepancy in reporting Brixon's previous

  counseling/discipline

**EXHIBIT 3-C**:

BON Report Non-Disciplinary


**EXHIBIT 4**:

Falsified Records


**EXHIBIT 5**:

NC SBI Contact Us Page

> Reveals areas of original jurisdiction and instructions for reporting other types of cases


**EXHIBIT 6**:

Emails to/from Former GPD Chief Hassan Aden

- These emails support the Plaintiff's claims regarding:
- The Twitter tweet to former GPD Chief Hassan Aden
- GPD's refusal of jurisdiction
- ECU Health's refusal to allow Plaintiff to speak to their police
- Communications between Vicki Haddock and SBI agents
- The SBI mystery investigation prior to September 13 2014
- The GPD/SBI Official Investigation November 2014

**EXHIBIT 7**:

ECU Health Non-Compliance Issues

**EXHIBIT 8**:

Correspondences with Faris Dixon

**EXHIBIT 9**:

Transcribed Phone Calls

- Avens/Dixon April 10 2023

- Avens/Lowery April 10 2023

- Avens/Dixon/Corbitt April 13 2023

**EXHIBIT 10**:

Report from Dr. Donald Jason MD. JD.

**EXHIBIT 11**:

- ECU Health Finances Over Safety

- ECU Health Medical Center Safety Grades

- ECU Health North Safety Grades

- Nash Hospital Inc. Safety Grades

- System of Care Page from PCMH 2018 Vendor Policy Handbook

- System of Care Pages from ECU Health's Website as of 2023

# INJURIES

**Financial Losses:**

- Equipment Expenses: The Plaintiff has invested significant funds in acquiring equipment essential for research, studies, and correspondence related to the pursuit of justice for her daughter. This includes but is not limited to computers, software, printing materials, and other necessary tools.

- Resources Usage: The Plaintiff has dedicated a portion of her available resources to this effort, resulting in usage expenses comparable to what the government allows as deductions for others who work from their homes.

- Medical Expenses: The Plaintiff has incurred expenses for medications, devices, and therapy to address the physical, emotional, and psychological toll of navigating the complexities of seeking justice over an extended period of time, unnecessarily.

- Legal Costs: The Plaintiff has expended significant financial resources on legal fees, including retaining an independent medical examiner and covering expenses associated with related legal proceedings.

- Employment Impact: In the pursuit of justice for her daughter, the Plaintiff has undertaken responsibilities typically associated with legal professionals, including conducting legal research, drafting pleadings, and managing case-related tasks.

- Website Maintenance: The Plaintiff has invested financial resources in maintaining a website dedicated to documenting and raising awareness about

her daughter's case. This includes domain registration fees, web hosting charges, and expenses related to website design and updates.

**Pain and Suffering:**

- Mental Trauma: The Plaintiff has suffered more mental trauma than any parent should ever have to bear. Losing her only biological daughter the day before Mother's Day was devastating enough. Then, on June 13, 2014, four weeks after her passing, Vicki Haddock and her associates sat in the Plaintiff's living room, lied to her, and proceeded to withhold information about what happened.[40]

- Memory of Daughter: The memory of her daughter is plagued by this ten-year ordeal, as well as the suffering she endured at the hands of Ms. Brixon. The Plaintiff is constantly forced to think about the horrors of her daughter's final moments, endlessly reliving the events of May 9th and 10th, 2014, as she tirelessly pursues the justice her daughter deserves. Even now, tears stream down her face as she struggles to complete the necessary components of this pleading. The Plaintiff does not attribute this grief directly to the harm that Brixon and ECU Health caused as it relates to the wrongful death action. The grief described here is the result of not being able to move forward due to the defendants' intentional conduct that has kept her in a perpetual state of seeking criminal justice. As the defendants have denied the Plaintiff closure, her battle for justice is akin to running on a treadmill.

---

[40] This paragraph is only to say that this emotional turmoil was bad enough without having to endure ten years of fruitless effort due to the defendants' conduct. This paragraph is not included in the damages sought seek.

- Sleep Disruption: The Plaintiff's sleep patterns have been disrupted. Once a sound sleeper, she now battles insomnia. Many of her days and nights have blurred together as she works on this case; learning applicable laws, rules, doctrines, principles, and strategies, as well as how to apply the same to this case. She is subject to nightmares of her daughter's final moments; some with such vivid and terrifying imagery that she awakens in full emotional turmoil, causing her to leap from her bed and quickly involve herself in some sort of activity to escape the thoughts of her daughter. She also has nightmares of running from someone trying to kill her, fearing that one of the defendants may try to cause her harm as a result of exposing them in this fashion.

- Physical Health Deterioration: The Plaintiff's physical health has deteriorated under the weight of this relentless battle. Once active, vibrant, and excited to do things that brought her joy, she now leads a sedentary lifestyle, chained to her computer screen in pursuit of justice. This prolonged inactivity has contributed to the onset of diabetes, a condition she now has to contend with on a daily basis as there is no cure.

- Headaches: The Plaintiff suffers from frequent headaches under the stress of everything she is going through.

- Loss of Trust: The Plaintiff used to trust people due to their professional roles, but her faith in the legal and healthcare systems has been destroyed. Adding to that is the fact that ECU Health Medical Center has purchased her local hospital and most of the clinics in her area. She no longer finds safety and comfort in seeking medical attention, especially at her local emergency room.

This is due to the fact that emergency treatment often involves admission into the facility for further care. Patients are most vulnerable in such circumstances, often unable to speak up and defend themselves. Adequate care in a safe setting can no longer be assumed in a PCMH facility. This fear would have been eased had the facility properly handled her daughter's situation, as it would have served as a deterrent for other healthcare workers.

- Insult to Grief: Being told for ten years that no crime happened to her daughter has added tremendous insult to her grief. This pleading is a testament that the Plaintiff is far from ignorant.

- Stigmatization: The Plaintiff has been subjected to the stigmatization attached to being the "grieving mother." Grieving mothers who are forced to fight the system are often treated as attention-seekers and exaggerators. The Plaintiff is treated by those in power as if she is the one being unreasonable when in fact, it is some of those same people with power who have unreasonably kept her fight going for ten long years.

- Impact on Social Life and Marriage: This case has affected the Plaintiff's social life and her marriage. It has literally consumed half of the time she and her husband have been married. Because of the frustration of fighting as hard as she possibly can and still getting nowhere, she has been grouchy, sad, depressed, and at times, unloving. Her husband did not deserve that. They did not deserve that. Time that they could have spent loving each other has been devoted to her work on this case, and they can never get that time back.

- Consideration of Impact: The Plaintiff believes that those responsible for the way this case has been handled have not considered the total impact of their decisions. They have looked out for their best interest without considering how she and her family would be affected. Like Ms. Brixon, they did not care about the devastation they have caused. They do not care that she cries every day as a result.

- Anxiety and Stress: The thought of filing a lawsuit of this magnitude, without legal representation, against powerful people and an extremely powerful highly influential organization, has, at times, literally upset the Plaintiff's stomach, sending waves of trembling anxiety through her entire body. This is a huge undertaking, and she knows it. But her daughter is worth it. The Plaintiff is prepared to stand up and face her adversaries in federal court and show the court, by the preponderance of evidence, why she deserves a just award.

## RELIEF SOUGHT

- Initiation of Criminal Investigation: The Plaintiff demands the initiation of a comprehensive and impartial criminal investigation into the circumstances surrounding the tragic death of her daughter, Keisha Marie White.

- Appointment of Special Prosecutor: The Plaintiff demands the appointment of a special prosecutor or independent counsel to oversee the above investigation to ensure the case is handled objectively and without any conflicts of interest.

- Injunctive Relief: The Plaintiff seeks injunctive relief requiring the defendants' cooperation if any investigation is initiated as a result of this case.

- Death Certificate: The Plaintiff requests that Dr. Kelly assists with updating White's death certificate, changing the manner of death from "Natural" to "Homicide," and any other amendments made as dictated by an unbiased review of evidence.

- Public Memorial: The Plaintiff requests a public symbol honoring Keisha Marie White to serve as a reminder of what this case should mean to everyone: safe and efficient healthcare, transparency in the healthcare and justice system, and a reminder that no one is above the law.

- Declaration of Constitutional Violations: The Plaintiff seeks a declaration that the Defendants' actions violated her constitutional rights under the First and Fourteenth Amendments.

- Compensatory Damages: The Plaintiff seeks compensatory damages for emotional distress, mental anguish, psychological trauma, and financial burdens suffered as a result of the Defendants' actions.

- Punitive Damages: The Plaintiff seeks punitive damages to deter future misconduct by the Defendants and to punish their willful and malicious disregard for the Plaintiff's constitutional rights.

- Total Financial Damages: The Plaintiff seeks total damages in the amount of $156,654,559.04, comprising economic damages, pain and suffering, and punitive damages. This amount includes an allowance for negotiation purposes.

- Additional Daily Per Diem: The pain and suffering, as well as expenses incurred, persist beyond the filing of this suit. To address these damages and to discourage unnecessary delays in the resolution of this matter, the Plaintiff requests an additional daily per diem until the case is fully adjudicated. This per diem should be calculated by dividing the total settlement or award by the number of days from May 10, 2014, until the date damages are paid in full. The daily per diem would apply to each day from March 22, 2024, when the case was filed, until the date that any settlement or award is disbursed.

- Consideration of Defendants' Financial Capabilities: The Plaintiff requests that the Court consider the financial capabilities of each Defendant in determining the appropriate amount of damages to be awarded, ensuring that the compensation reflects the severity of the harm suffered and serves as a deterrent against future misconduct.

- Other Relief: The Plaintiff seeks any other relief that the Court deems just and proper to remedy the violations of her constitutional rights and to compensate for the harm suffered.

Jury trial requested: __X__ YES          _____ NO

_____          _____
DATE                                              SIGNATURE OF PLAINTIFF

                                              _____

                                              _____

                                              _____

_____

_____

ADDRESS AND PHONE NUMBER OF PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2024, I mailed by FedEx, the Plaintiff's Amended

Pleading to the Clerk of the U.S. District Court. Upon docketing, the CM/ECF

system will send electronic notification of such filing to the defendants' counsel:


Respectfully submitted,
/s/ Cynthia B. Avens
Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
Avens1@charter.net
252-203-7107
*Pro Se Litigant*


Chris D. Agosto Carreiro                      State Bar No. 45356

Special Deputy Attorney General               *Counsel for DA Dixon*

N.C. Department of Justice

P.O. Box 629

Raleigh, NC 27602

ccarreiro@ncdoj.gov

Telephone: (919) 716-6874                      Jeremy D. Lindsley

Facsimile: (919) 716-6755                      Assistant Attorney General

N.C. Department of Justice

P.O. Box 629

Raleigh, NC 27602

jlindsley@ncdoj.gov

Tel: 919-716-6920

Fax: 919-716-6764

NC State Bar No. 26235

*Counsel for Dr. Karen Kelly*

Daniel D. McClurg

K&L Gates LLP

300 South Tryon Street, Suite 1000

Charlotte, North Carolina 28202

daniel.mcclurg@klgates.com

(704) 331-7400

(704) 353-3114

NC Bar #53768

*Counsel for Defendant Pitt County*

*Memorial Hospital, Inc.*

Terrence M. McKelvey

K&L Gates LLP

501 Commerce Street, Suite 1500

Nashville, Tennessee 37203

terrence.mckelvey@klgates.com

(615) 780-6700

(615) 780-6799

NC Bar #47940

*Counsel for Defendant Pitt County*

*Memorial Hospital, Inc.*