# EXHIBIT 9

## Transcribed Phone Calls

- Avens/Dixon April 10, 2023
- Avens/Lowery April 10, 2023
- Avens/Dixon/Corbitt April 13, 2023



**Transcribed Phone Call Between Avens and Dixon on April 10, 2023**

**Cynthia Avens**

00:00  Hello? Hello?

**Faris Dixon**

00:05  Miss Avens, can you hear me?

**Cynthia Avens**

00:06  Yes. Yes. I can hear you.

**Faris Dixon**

00:09  Um, yes, ma'am. I got your message and we have not gotten a response back from the medical center's office. (Unclear but sounds like) It was not in our email, and we checked our email.

**Cynthia Avens**

00:20  Okay. So, you said you haven't heard back from the medical examiner. Oh, and thank you, by the way, for calling me back.

**Faris Dixon**

00:30  Um, yes, ma'am.

**Cynthia Avens**

00:32  How does the medical examiner typically respond?

**Faris Dixon**

00:39  Well, since, with this, since we've asked directly, then she would probably send us a notice that would come through to me and then a copy to Jennifer, um, as part of the invest, as part of an investigation and we would look at it. Jennifer checks, checks (inaudible) make a match against any pending cases. And if not, she would then realize that this is not one of the pending cases we have. And then she would just draw it to my attention.

**Cynthia Avens**

01:10  Okay. I'm kind of lost. Can you explain that part again?

**Faris Dixon**

01:13  Yes, ma'am. Typically, these are for cases that we already have pending.

**Cynthia Avens**

01:17  Okay.

**Faris Dixon**

01:18  So they're sent to myself and my administrative assistant. And she goes through the ones we get to match them to the cases that we have to the particular DA. And so, when she would see this, eventually, she would find, she would realize that this is not, this is not one assigned to anybody and then we would take a look at it. So, it's we get an email sent back to us from the medical examiner's office, is the short answer.

**Cynthia Avens**

01:43  Okay. So, um, I was looking back at my email where the release, the medical release was sent and, that was at the end of July, near the end of July. When did you say that you gave everything to the medical examiner?

**Faris Dixon**

02:01  I could not tell you off the top of my head. It would have been soon after that because we had interns that scanned it. And then once it was scanned, it was emailed off. So…

**Cynthia Avens**

02:12  Okay. So, it, it was given to the medical examiner by email, Dr. Kelly?

**Faris Dixon**

02:17  (Almost inaudible) Yes, ma'am.

**Cynthia Avens**

02:18  So, I know my daughter had a lot of records, medical records and such. Is this the largest file that you sent to Dr. Kelly to review?

**Faris Dixon**

02:29  You said, "Is this the largest one we've ever sent?"

**Cynthia Avens**

02:31  The largest one. Yes.

**Faris Dixon**

02:33 I couldn't say that. Um... (silence) Yeah. (Inaudible) 'Cause I've never thought to compare it to any other, any other cases.

**Cynthia Avens**

02:45 Right.

**Faris Dixon**

02:45 So, I couldn't say that one way or the other.

**Cynthia Avens**

02:48 Okay. So, can you tell me a little bit, how the investigation process works as far as what steps?

**Faris Dixon**

02:57 Well, the for the most part, most of that's already been done. I know the detectives when it, the allegations were originally made, came out, did their investigation, and typically at that point we would ask the of course the medical examiner would come out to the scene and picked up the body and done the autopsy at that point, normally.

**Cynthia Avens**

03:25 Okay. Well, I didn't request an autopsy because I didn't know anything had gone wrong until the hospital sent their, their risk manager, Vicky Haddock, to my house

about a month after. And that's when I found out that some things were not done the way they were supposed to.

**Faris Dixon**

03:42  Oh, I was I'm sorry. I wasn't saying I wasn't …

**Cynthia Avens**

03:44  Oh, okay.

**Faris Dixon**

03:46  (Inaudible) I was just saying, normally, that's, that's what happens. Uh, the detectives call the medical examiner out to the scene, or if the or if medical examiner does not come out there it's not (inaudible), but they go and pick up the body and then do the medical examination. And depending on the medical examiner, some will want the officer in there to talk to him about what happened or what he believed to happen. Some medical examiners don't want an officer in there and just wanna make their own findings.

**Cynthia Avens**

04:16  Right. Okay. I'm, I'm asking because like I told you before, different people were never investigated. Do you plan to formally investigate witnesses or family members who were at the hospital?

**Faris Dixon**

04:31  We would go by what the medical examiner said to us and whether she thought that was something criminal or not.

**Cynthia Avens**

04:37  Because…

**Faris Dixon**

04:37  And then…

**Cynthia Avens**

04:38  I know Green-…

**Faris Dixon**

04:38  Based on that

**Cynthia Avens**

04:39  I'm sorry.

**Faris Dixon**

04:40  Yeah. It would be based on what the medical examiner told us. If she, if medical examiner said that she thinks there wasn't anything criminal, then we, we stop. And if she says there was, based on what she sends us or what they send us, then we would talk to GPD, and they would go back out and talk to someone.

**Cynthia Avens**

04:57  I know they closed the case without investigating any of us, um and we were witnesses. We were never asked what we saw, what we heard, what was, you know, this the state of mind of anybody or anything. And we're almost 9 years in, and none of us have been questioned about anything.

**Faris Dixon**

05:19  Well, that's because that would have been because at the time, no one thought that it was, it was criminal.

**Cynthia Avens**

05:26  Well, with the evidence that was submitted, there had to be, um, I, I, I don't remember the legal term, but, some type of question about whether it might have been something criminal. Like I said, we were never in investigated for them to come to their conclusions. You know, we have different statements from different people that's in the DHHS report where coworkers stated that the nurse verbally told them she would not reconnect my daughter to the cardiac leads. You know, just things like that, and we were never questioned about it.

**Faris Dixon**

06:13  That's really gonna come down to what the medical examiner looking at it finds and makes a determination as to what will be proper in that kind of setting. (Silence)

**Cynthia Avens**

06:26  Okay. So right now, the medical examiner has the medical records. Um, do they have the copy of the police report or anything that the police, any part of the police investigation?

**Faris Dixon**

06:44  I would have to go back and look through individually to see, but I know that we sent most of the, the rec the records that we had from you and the records that we had

involving the hospital records we sent off to the medical examiner. But I have to go back and scan, look individually. (Silence)

**Cynthia Avens**

07:05 Okay. So…

**Faris Dixon**

07:07 But the medical examiner would know that there were no criminal findings previously. (Silence)

**Cynthia Avens**

07:14 Okay. (Silence)

**Faris Dixon**

07:18 Because we have to give a, we have to let her know why we're sending it to her.

**Cynthia Avens**

07:22 Right. Okay. So, you said she would normally respond by email and then a paper copy, I believe you said, a hard copy would be sent?

**Faris Dixon**

07:35 No, ma'am. No, ma'am. She would just email it to us.

**Cynthia Avens**

07:39 So, there wouldn't be a hard copy?

**Faris Dixon**

07:42  Not typically. (Silence) Because it's sent to us through a secured email. (Silence) And if it was a criminal case, then we would send it out to our, to the defendants.

**Cynthia Avens**

07:59  Okay. So, because it's electronic, will I get a copy? I know last year, um, when we talked about this last summer, and you claimed you already had a copy and, that you had already sent the, the documents there, and then I found out otherwise when I spoke with the office, and then you, um, even in our conversation, you told me that I would not be able to see the decision that you said you already had back. So, then we start all over, you know, when you called me and told me that you would forward everything to the medical examiner. Will I be able to see the results this time?

**Faris Dixon**

08:35  Well, you would have to ask her directly. What we get is part of our investigation, and we don't usually get, hand that out unless there's a criminal ch- case charge, and then we only hand that to the defendant. We will let you know what she, what findings she makes and then you have to ask her directly for a copy of it, (Silence) which, in this case, would be as the executor of her estate.

**Cynthia Avens**

08:58  Right. Well, I am the executor of her estate, of Keisha White's estate. Okay. (Silence) And right now, you just have no idea how much longer it will take to get a response back?

**Faris Dixon**

09:14  No, ma'am.

**Cynthia Avens**

09:16  Okay. Alrighty. Well, I guess that's all of my questions for now. Some of them I crossed off because you answered. You already answered some of the questions that I already had wrote down just in some of your explanations. I appreciate that. And I appreciate your time and you calling me back today. So, I was a little bit nervous because I missed your call this morning.

**Faris Dixon**

09:40  Oh, that's alright. We, we don't get a chance to come back and be in our office a lot.

**Cynthia Avens**

09:46  Okay. Well, like I said, I appreciate your time and everything, and, uh, I'll try to follow-up again soon if I don't hear from you.

**Faris Dixon**

09:54  Yes, ma'am.

**Cynthia Avens**

09:55  Okay. Thank you.

**Faris Dixon**

09:56  You have a good day.

**Cynthia Avens**

09:57  Bye-bye.

**Transcribed Phone Call Between Avens and Danene Lowery on April 10, 2023**

**Danene**

00:00 Medical examiner's office. This is Danene.

**Cynthia**

00:03 Hello. Miss Danene?

**Danene**

00:05 Yes.

**Cynthia**

00:06 Um, I was calling to find out if you have any information in your system on my daughter, Keisha White.

**Danene**

00:14 No, ma'am. We don't have any information on her. I, I believe you're supposed to be, you're supposed to speak with risk management because we don't have any information here in the medical examiner's office. We're not doing anything with her case.

**Cynthia**

00:31 So, have you received anything?

**Danene**

00:33  No. No, ma'am. I have not received anything. It would come to me, and I haven't received anything.

**Cynthia**

00:39  No record, be-, uh, Farris Dixon is saying that he sent everything last summer, um, the release he had me sign was sent to me towards the end of July. And I sent it back early in August. And so, it was after that that he claims that everything was sent to that office, the medical records and, uh, reports from DHHS and the Board of Nursing and so forth.

**Danene**

01:08  I don't have anything, and the last time I talked with his office, they said they had not sent me anything. So, I'm sorry, but, no, I have not received anything. And I would be the contact person that would receive that information.

**Cynthia**

01:23  Okay. Well, if, if he does send the information over, how would, how would Dr. Kelly typically respond? Would, I mean, would I get a copy, or is it just between, a decision that would be just between that office and the DA, like an email or something?

**Danene**

01:40  I don't know what she would do with it. You know, she'd have to wait, and she'd have to talk with risk, because we're not supposed to be doing anything with the case. Um, and so, she would have to talk with the attorneys and then see what she would be allowed to do.

**Cynthia**

01:56  Okay.

**Danene**

01:57  Okay? But, no, we have not, I have not received anything.

**Cynthia**

02:02  Wow. So, this is two times because last summer, around June or July, he claimed that he already had a report back from Dr. Kelly. And then when I spoke with this office, um, it was you who told me that you didn't have anything in the system on my daughter. And then he called me back after he was caught in the lie, he called me back a few days later and told me, "I have good news. I'm gonna send everything over to the medical examiner's office," and then they followed up by sending me a release to have notarized. And then I tried to follow-up with this office last, I believe in September or October, but the person that I spoke with wouldn't talk to me. So, and then I didn't try anymore until this year.

**Danene**

02:50 Yeah. Doctor Kelly was out of the office from November through April and just came back to work last week.

**Cynthia**

02:58 Right. I remember.

**Danene**

02:59 And we haven't received anything. Um, you know, they might wanna FedEx it to us or, or I don't know. Just bring it over to us. I don't know, but I have not received anything. Okay.

**Cynthia**

03:13 Okay.

**Danene**

03:15 Okay?

**Cynthia**

03:16 I appreciate your time so much, Miss Danene.

**Danene**

03:19 You're welcome.

**Cynthia**

03:20  Bye-bye.

**Danene**

03:20  Okay. Bye-bye.

**Transcribed Phone Call Between Avens and Dixon on April 13, 2023**

00:00 **Mrs. Avens:** Hello?

00:01 **Mr. Dixon:** Miss Avens?

00:03 **Mrs. Avens:** Yes?

00:04 **Mr. Dixon:** Yes, ma'am. I'll call from the DA's office. You left a message for me?

00:08 **Mrs. Avens:** Yes, sir. Thank you for…

00:09 **Mr. Dixon:** Yes, ma'am.

00:11 **Mrs. Avens:** Thank you for returning my call.

00:13 **Mr. Dixon:** Yes, ma'am.

00:15 **Mrs. Avens:** I'm calling because, um, I got other information (Silence) regarding the sending of records to the medical examiner's office.

00:28 **Mr. Dixon:** Other information you're…

00:29 (Inaudible as Mrs. Avens and Mr. Dixon attempt to speak at the same time)

00:30 **Mrs. Avens:** Didn't you didn't you run on a platform of cleaning up the corruption in the courthouse?

00:37 **Mr. Dixon:** Ma'am, what is it you're talking about?

00:39 **Mrs. Avens:** They don't have anything.

00:42 **Mr. Dixon:**    Ma'am, we scanned it, and we sent it.

00:45 **Mrs. Avens:**  They don't have anything.

00:48 **Mr. Dixon to his administrative assistant, Jennifer Corbitt:**    Jennifer, can you go back and look?

00:51 **Mrs. Avens:**  Excuse me?

00:52 **Ms. Corbitt in the background:**  I can

00:53 **Mr. Dixon:**    We're looking back through our emails?

01:06 **Mr. Dixon to his administrative assistant, Ms. Corbitt:**    Um, could you open it for us?

01:09 **Ms. Corbitt:** Certainly. (Silence) August 11th.

01:14 **Mr. Dixon To Ms. Corbitt:** How many pages is it? Six hundred ninety, two thousand…

01:19 **Ms. Corbitt:** Uh, that's 3,000 pages.

01:22 **Mr. Dixon:**    August 11th, we, of last year, we sent in one, one document, 2,361 pages. And in the second one, 693 pages. Now what happened once they got it? We don't know. But it was sent… last summer.

01:45 **Mrs. Avens:**  Miss Danene is saying that she doesn't have it, they don't have anything in their system.

01:50  (Unclear as Mr. Dixon and Ms. Corbitt speak at the same time)

01:52 **Ms. Corbitt:**  It went to Dr. Kelly

01:53 **Mr. Dixon:**     It went to Dr. Kelly; to her email.

01:56 **Mrs. Avens:**  Miss Danene said that everything has to go through her. She would know all of it.

02:01 **Mr. Dixon:**     Okay, uh. And who is this, who is this lady?

02:06 **Mrs. Avens:**  She's the office manager.

02:08 **Mr. Dixon:**     Alright. We'll send it to her. Uh, previously, we sent it to where Dr. Kelly wanted us to send it to.

02:14 **Mrs. Avens:**  So, you're gonna send it to her today?

02:17 **Mr. Dixon:**     Yes, ma'am. We're typing now. (Silence)

02:21 **Mrs. Avens:**  Okay. (Sounds of keystrokes in Dixon's office)

02:28 **Mr. Dixon:**     How do you spell her name, her name?

02:30 **Mrs. Avens:**  Who's her name? Danene?

02:33 **Ms. Corbitt:** I have her email.

02:35 **Mrs. Avens:**  I have the spelling of her name, but I don't have her email.

02:36 **Ms. Corbitt:**  Yeah. Got it.

02:40 **Mr. Dixon:**     Alright. We spelled it correctly and are about to send it to her as soon as we finish up.

02:46 **Mrs. Avens:**  I'd appreciate it. (Inaudible words and keystrokes)

03:12 **Mr. Dixon to Ms. Corbitt:** You wanna copy Dr. Kelly in that?

03:13 **Ms. Corbitt:** Yeah.

03:13 **Mr. Dixon to Ms. Corbitt:** Okay.

03:14 **Ms. Corbitt:** Done.

03:16 **Mrs. Avens**: Can your office please follow-up with them just for receipt (pause) to confirm that they actually have it this time? (Silence)

03:32 **(Ms. Corbitt answering)** Certainly.

03:33 **Mrs. Avens:** I'd appreciate that. Thank you.

03:37 **(Ms. Corbitt responding)** You're welcome.

03:38 **Mr. Dixon:**      Bye-bye

03:38 **Miss Avens**: Bye bye.

# EXHIBIT 10

# Report from Dr. Donald Jason, MD., JD.



EXHIBIT
10
Report from
Dr. Donald Jason
MD, JD

# Donald Jason, MD, JD

*Practice Limited to Forensic Medicine & Pathology*



825 Ellington Drive
Winston-Salem, NC 27104

*[cell] (336) 414-8226*
*[fax] (336) 285-0311*

January 15, 2024

**Mrs. Cynthia B. Avens**
**303 Riverside Trail**
**Roanoke Rapids, NC 27870**

Re:    State *v.* **Linda Leathers Brixon, RN**
       **Estate of Keisha White**

Dear Mrs. Avens:

At your request, I have reviewed the following material pertaining to the death of Keisha White (Keisha):

1. Published consent order re Linda Leathers Brixon, RN
2. Death Certificate for Keisha
3. Vidant Medical Center records for Keisha, medical record #741644
4. Nurse Flow Sheets Pages 1-405

## History

According to the Vidant Medical Center records, Keisha, a 26-year-old African-American woman, was transferred from Halifax Regional Medical Center and admitted to Vidant Medical Center on April 16, 2014, with complaint of systemic lupus erythematosus flare, anemia, acute-on-chronic kidney injury and principal diagnosis of anoxic brain injury secondary to pulseless electrical activity cardiac arrest. Keisha began to develop pulmonary edema on May 2, 2014, likely secondary to fluid overload in setting of acute kidney injury on chronic kidney deficiency. Nephrology was consulted for oliguria and likely lupus nephritis and Keisha was started on Cellcept® and was also started on hydralazine for afterload reduction.

According to the Published consent order re Linda Leathers Brixon, RN (Licensee), on or about May 9, 2014, while employed at Vidant Medical Center in Greenville, North Carolina, Licensee was assigned as the primary nurse on the 7:00 p.m. to seven 7:00 a.m. shift for Keisha, a twenty-six-year old patient who began experiencing a change in condition. On May 9, 2014, at 10:41 p.m., Licensee documented Keisha was polling off her cardiac leads. There was an order for continuous cardiac monitoring, but there is no documentation that the Nurse Practitioner was notified Keisha was pulling off the cardiac leads until May 10, 2014 at 12:11 a.m. On May 10, 2014, at midnight, Licensee documented Keisha was agitated, anxious, confused, and restless, pulling at equipment and attempting to get out of bed. On May 10, 2014, at 12:11 a.m. Licensee documented Keisha crawling out of bed between the rails, stating she was hot and wanted to sleep on the floor. Licensee contacted the Nurse Practitioner by telephone with concerns about patient safety and obtained a verbal order for vest and bilateral wrist restraints. The cardiac monitoring technician documented contacting Licensee multiple times between May 9, 2014, at 7:20 p.m. and May 10, 2014, at 5:37 a.m. to make her aware Keisha was not on the cardiac monitor. The last cardiac monitor strip was recorded on May 9, 2014, at 11:32 p.m. The Nurse Practitioner stated he observed sinus rhythm on the monitor when he was examining Keisha around 12:30 a.m. on May 10, 2014. Licensee did not maintain the placement of the telemetry monitor leads; even after Keisha was placed in vest and bilateral wrist restraints on May 10, 2014, at 12:11 a.m. When interviewed, Licensee reported when the cardiac leads were reapplied or adjusted, Keisha would either pull off the leads or wiggle and loosen the leads. However, Licensee failed to notify the Nurse Practitioner or document that these events had occurred. On May 10, 2014, at 1:51 a.m., Licensee obtained a verbal order for oxygen two liters. There is no documentation the oxygen was placed on Keisha. On May 10, 2014, at 2:00 a.m., Licensee documented an oxygen

● Page 1 of 2

saturation of 62%. but did not document the patient's respiratory rate or temperature. Licensee acknowledged she did not call the Nurse Practitioner or notify the charge nurse of this oxygen saturation. Licensee stated after observing Keisha she thought the reading was not accurate. Licensee did not provide adequate reassessment of Keisha's hemodynamic status given the various sedating medications Keisha was administered during the shift including two doses of intravenous Lorazepam and two doses of intravenous Hydromorphone. No further vital signs were obtained after May 10, 2014, at 2:00 a.m. On May 10, 2014, at 5:51 a.m.. Keisha was found in cardiac arrest by a certified nursing assistant (CNA) care partner. Code Blue was called and Keisha was found to be in pulseless electrical activity cardiac arrest. She received cardiopulmonary resuscitation. epinephrine three times and was intubated with return of spontaneous circulation after 15 minutes. She was transferred to the medical intensive care unit (MICU) for further management. On presentation to the MICU. Keisha was started on multiple pressers. Keisha's pupils were fixed and dilated, no respiratory effort and pH of 6.9. Computed tomography (CT) of her head was obtained which showed changes consistent with global hypoxic ischemic injury. After several conversations with the family. they decided to make Keisha do not resuscitate (DNR). discontinue life saving devices and transition to comfort care measures only. Licensee stipulated that such allegations. if proven. are legally sufficient to support findings of fact and conclusions of law that Licensee has violated N.C. Gen. Stat. 90-171.37 and the Board of Nursing Regulations.

## Cause of Death

It is my opinion, within reasonable medical probability, that the cause of death of Keisha was failure to properly maintain medically ordered cardiopulmonary monitoring; but for that failure to render to Keisha the care owed to her by a nurse, Keisha would not have died when she did.

It is therefore my opinion, within reasonable medical probability, that the Keisha's death certification should have been as follows:

Part 1
Failure to properly maintain medically ordered cardiopulmonary monitoring

Part 2
Acute-on-chronic kidney injury
due to Systemic lupus erythematosus

Manner of Death:  Homicide

## Basis for Opinion on Cause of Death

Had Licensee properly maintained the ordered cardiopulmonary monitoring. Keisha's cardiac arrest. which apparently occurred between 2:00 a.m. and 5:51 a.m. would have been detected in time to initiate CPR immediately. saving Keisha's life. The manner of death is best certified as Homicide because the lack of proper care by Licensee was criminally negligent.

I reserve the right to amend or supplement this report upon receipt of additional information.
Sincerely.

*Donald Jason, M. d*

Donald Jason. MD. JD
Diplomate in Anatomic and Forensic Pathology

# EXHIBIT 11

## ECU Health Finances Over Safety

- ECU Health Medical Center Safety Grades
- ECU Health North Safety Grades
- Nash Hospital, Inc. Safety Grades
- System of Care Page from PCMH 2018 Vendor Policy Handbook
- System of Care Pages from ECU Health's Website as of 2023