FILED

JUN 18 2024

PETER A. MOORE, JR. CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### EASTERN DIVISION

Civil Action Number 4:24-CV-00051-M-RN

| | | |
|---|---|---|
| Cynthia B. Avens | ) | |
| | ) | |
| (Plaintiff) | ) | PLAINTIFF'S RESPONSE IN |
| | ) | OPPOSITION TO |
| | ) | FARIS C. DIXON, JR.'S |
| | ) | MOTION TO DISMISS AND |
| Faris C. Dixon, Jr., District Attorney | ) | MEMORANDUM OF LAW |
| Pitt County Memorial Hospital, Inc. | ) | SUPPORTING THE MOTION |
| Dr. Karen Kelly, Medical Examiner | ) | TO DISMISS |
| John/Jane Doe | ) | |
| John/Jane Doe | ) | |
| John/Jane Doe | ) | |
| (Defendants) | ) | |

## I. Introduction

Plaintiff Cynthia B. Avens (Avens or Plaintiff), proceeding pro se, respectfully submits this response in opposition to Defendant, Faris C. Dixon, Jr.'s (Dixon or Defendant) Motion to Dismiss and Memorandum Supporting his Motion to Dismiss. The Plaintiff argues that the complaint adequately alleges facts that, if proven, would entitle her to relief against Dixon in both his official and personal capacities for violations of statutory and constitutional rights.

1

## II. Standards of Review

**Rule 12(b)(6) - Motion to Dismiss for Failure to State a Claim:**

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss for failure to state a claim tests the legal sufficiency of a plaintiff's complaint. To survive a Rule 12(b)(6) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. T*ellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## II. Legal Basis for Claims

**Plaintiff seeks remedies under the following statutes**:

42 U.S.C. § 1983 - This statute provides a remedy for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by any

2

person acting under color of state law. The Plaintiff claims that Dixon, acting under color of state law, violated her constitutional rights to due process and equal protection by failing to properly investigate the death of her daughter, misleading the Plaintiff, and obstructing justice.

42 U.S.C. § 1988 - This statute allows for the recovery of attorney's fees in civil rights cases. Although the Plaintiff is currently proceeding pro se, she reserves the right to seek attorney's fees should she retain counsel in the future.

By citing these statutes, the Plaintiff clearly establishes the legal grounds for her claims against Dixon, demonstrating that his actions violated her federally protected rights and entitle her to seek appropriate remedies.

### III. Legal Arguments

**Right to Compel Prosecution:**

In response to the Defendant's claim that the Plaintiff lacks a judicially cognizable right to compel prosecution, the Plaintiff clarifies that her Complaint does not address this issue. The Plaintiff's accusations revolve around the Defendant's handling of the investigation into the death of her daughter, Keisha Marie White (White). While there are references to the fact that no charges have been filed in

3

White's death, the core of the allegations centers on Dixon's failures to properly and thoroughly investigate White's death, resulting in violations of her civil rights.

There is a significant difference between conducting a complete investigation before concluding that no crime has occurred and failing to conduct a complete investigation. Dixon accepted and relied on incomplete investigative reports from the GPD and SBI, and blatantly lied to the Plaintiff by stating that no crime had occurred. At the very least, conclusions of assault and battery could be drawn from reports provided by the Department of Health and Human Services (DHHS) and the North Carolina Board of Nursing (BON), as well as documented evidence in the medical records revealing falsified oxygen readings, which are distinct crimes in themselves.

Additionally, Dixon misled the Plaintiff by claiming to have a report from the medical examiner (ME) and relied heavily on the opinion of the ME. After the ME failed to provide such a report, Dixon closed the case upon receiving a report from an independent ME. This series of actions demonstrates a failure to conduct a proper investigation and a pattern of deception that directly impacted the Plaintiff's civil rights. The two sides of this scenario are not comparable.

**Standing:**

When the Plaintiff requested Dixon to reopen the case in 2019, and Dixon agreed, then proceeded to review the evidence in his possession as part of an investigation, the implied-in-fact contract was commenced. This contract was reaffirmed in 2022 upon the realization that the DA's office was missing evidence. In both instances of the legally binding contract between Dixon and the Plaintiff, Dixon had a duty to handle the investigation with the zeal invested into other investigations. He had a duty to ensure that:

- All law enforcement investigations were complete and thorough, including evidence of witness interviews that included interviews conducted with the Plaintiff, the Plaintiff's family members, and ECU Health personnel who were on duty the night of May 9 and morning of May 10, 2014. Personnel includes:
  - Workers on the 3 South unit,
  - Emergency Response Team respondents, and
  - ICU staff who provided care for White.
- All law enforcement investigations included evidence of suspect and/or potential suspect interviews, including the former RN in charge of White's care, Linda Brixon (Brixon) and the RN, Elizabeth Everette (Everette) who falsified the medical records, potentially to conceal Brixon's wrongdoing.

5

- All leads were followed, including, but not limited to:

  o Questioning the variety of excuses given for why White's cardiac leads were not connected;

  o Questioning why Brixon's statements to the North Carolina Board of Nursing (BON) contradicted other statements given, as well as why her statements did not match her training;

  o Questioning the ECU Health administrative assistant who asserted that Brixon "chose to ignore all the warnings" for this patient, when she was questioned by the NC Department of Health and Himan Servies (DHHS); and

  o Considering that the former Chief Medical Examiner's opinion may be flawed due to new evidence emerging after she gave her opinion.

- Information he provided to the Plaintiff was truthful and accurate to the best of his knowledge; and

- Dr. Kelly adhered to his directives and/or expectations when he submitted evidence to her on August 11, 2022.

The Plaintiff expected Dixon to conduct a fair assessment and a full investigation into the death of her daughter. That is nothing more than what should be expected when a prosecutor initiates and conducts an investigation into a potential homicide case.

6

True, the Plaintiff may not have a judicially cognizant right to compel an investigation into her daughter's death. But when the district attorney agrees to conduct such an investigation, the Plaintiff has every right to expect the investigation to be fair and complete; rather than full of excuses, deception, and bureaucratic maneuvers meant to hinder her pursuit of justice and prevent accountability, under the guise of performing his duties. Dixon, nor any other prosecutor has the right to behave in such a manner.

The Plaintiff has rights in this matter, and Dixon abused them all. He violated her First Amendment right to receive information when he lied about the investigation and lied about the evidence. Dixon violated the Plaintiff's Fourteenth Amendment right to due process and equal protection by failing to conduct a thorough investigation and failed to treat the investigation into White's death with the integrity that he puts into other homicide investigations.

Through his power to investigate and the implied-in-fact contract that he entered with the Plaintiff, Dixon gave her legal standing to seek redress if he failed to honor the ethical, legal, and professional standards put in place by the U.S. Constitution, the State Constitution, and the NC Bar.

7

## IV. Prosecutorial Immunity:

**Absolute Immunity:**

Defendant's defense of absolute and qualified immunity is inapplicable here due to the nature of the actions taken by Defendant Dixon, which fall outside the bounds of lawful prosecutorial discretion. The actions detailed in the complaint were not advocacy but administrative and investigative, making absolute immunity inapplicable.

The Supreme Court in *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), clarified that absolute immunity does not extend to a prosecutor's actions that are administrative or investigative in nature. The Court stated, "The actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." In *Buckley*, the Supreme Court drew a distinction between actions intimately associated with the judicial phase of the criminal process and those that are investigative or administrative. The Court determined that "some" acts in preparing for prosecution would be absolutely immune but also noted that "his acts of investigation or 'administration,' which would not." Id., at 431, and n. 33, 96 S.Ct., at 995, and n. 33.

8

Similarly, "(t)he Supreme Court has emphasized that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274, 113 S.Ct. 2606. *Kyles v. Cnty. of Oakland*, No. 222CV12973TGBAPP, 2023 WL 6388977, at *5 (E.D. Mich. Sept. 30, 2023)

Dixon, in his own words, as recorded in a phone call that occurred on April 10, 2023, stated that the medical examiner (ME) would probably send him and his administrative assistant, Jennifer Corbitt, a notice as part of an investigation at time stamp 00:39. At time stamp 08:35, Dixon explained that whatever information he would receive from the ME would be part of his investigation. Therefore, absolute immunity should be denied.

Dixon's activities, such as failing to conduct a thorough investigation, lying about the existence of an ME report, and not properly reviewing available evidence, fall squarely within the latter category. These actions are analogous to the investigative functions discussed in *Buckley*, where the Court denied absolute immunity.

During the same phone call, Dixon admitted that the investigation relied solely on the medical examiner's findings without interviewing key witnesses. Specifically,

9

when asked if he planned to formally investigate witnesses or family members

who were at the hospital:

> Cynthia Avens: "Right. Okay. I'm asking because like I told you
> before, different people were never investigated. Do you plan to
> formally, investigate witnesses or family members who were at the
> hospital?"[1]

> Faris Dixon: "We would go by what the medical examiner said to
> us and whether she thought that was something criminal or not...
> It would be based on what the medical examiner told us. If she, if
> the medical examiner said that she thinks there wasn't anything
> criminal, then we, we stop. And if she says there was, based on
> what she sends us or what they send us, then we would talk to
> GPD, and they would go back out and talk to someone." (Time
> Stamp 04:16-04:40)

When further pressed about the lack of witness interviews:

> Cynthia Avens: "I know they closed the case without investigating
> any of us and we were witnesses. We were never asked what we
> saw, what we heard, what was, you know, the state of mind of
> anybody or anything. And we're almost nine years in, and none of
> us have been questioned about anything."

> Faris Dixon: "Well, that's because that would have been because
> at the time, no one thought that it was, it was criminal." (Time
> Stamp 04:57-05:19)

---

[1] The Plaintiff incorrectly used the word "investigate" instead of "interview." She did use the term "questioned" later in the conversation.

This admission shows a significant lapse in the investigation process, as questioning witnesses is a fundamental technique used by law enforcement and prosecutors to determine if a crime has occurred and to gather evidence. Dixon's reliance on the ME's findings without conducting further investigation or questioning witnesses indicates a lack of candor, as he failed to disclose the inadequacy of the investigation under the circumstances, which should have been disclosed to make his statements accurate and complete. *Ludlum v. Department of Justice*, 278 F.3d 1280, 1284 (Fed. Cir. 2002).

Moreover, the Plaintiff pointed out the inconsistency of not questioning coworkers who provided statements to the DHHS about the nurse's actions:

> Cynthia Avens: "Well, with the evidence that was submitted, there had to be, um, I don't remember the legal term, but, um, some type of question about whether it might have been something criminal. Like I said, we were never investigated for them to, you know, come to their conclusions. You know, we have different statements from different people that's in the DHHS report where coworkers stated that the nurse verbally told them she would not reconnect my daughter to the, um, to the cardiac leads. You know, just things like that, and we were never questioned about it."

> Faris Dixon: "That's, that's really gonna come down to what the medical examiner looking at it finds and makes a determination as to what will be proper in that kind of setting." (Time Stamp 05:26-06:13)

11

An agency alleging lack of candor must prove that the employee gave incorrect or incomplete information knowingly. *Fargnoli v. Department of Commerce*, 123 M.S.P.R. 330, ¶ 17 (2016). Dixon knowingly provided incomplete information and failed to disclose critical evidence, thereby engaging in deceptive practices that undermine his claim to absolute immunity.

The actions described above clearly fall within the realm of investigative and administrative duties, not prosecutorial advocacy. As such, Dixon's claim to absolute immunity is untenable. The courts have established that administrative and investigative actions are not covered by absolute immunity (*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993); *Burns v. Reed*, 500 U.S. 478, 496 (1991)).

**Qualified Immunity**:

Furthermore, the clearly established law regarding the right to due process and the duty of a prosecutor to not willfully mislead or withhold key evidence in an investigation provide grounds that qualified immunity does not protect Dixon's actions. This duty is well-established in cases such as *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), which collectively mandate that the suppression of exculpatory evidence or failure to correct false testimony violates due process.

12

As established by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), "qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Similarly, the Eighth Circuit has articulated in *Thurmond v. Andrews*, 972 F.3d 1007, 1011 (2020), that "Qualified immunity shields public officials from liability for civil damages if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

Qualified immunity protects officials only if their conduct does not show clear incompetence or a knowing violation of the law, as established in *Malley v. Briggs*, 475 U.S. 335, 341 (1986) and reiterated in *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), where the Supreme Court stated that qualified immunity is not available to those who are plainly incompetent or who knowingly violate the law.

Moreover, in *Wilson v. Lawrence County*, 260 F.3d 946, 955–57 (8th Cir. 2001), the court decided, "If Wilson's evidence proves credible at trial, a failure to investigate these other leads could easily be described as reckless or intentional. We affirm the denial of qualified immunity." This principle is particularly relevant here, where the allegations suggest that Dixon failed to conduct a necessary and

13

thorough investigation before deciding not to pursue criminal charges, despite the availability of substantial evidence suggesting wrongdoing.

**Ethics Violations:**

While it may be true that Dixon, as a district attorney (DA), has immensely broad power and discretion within his prosecutorial discretion, this discretion is not without limitations. A DA is still an attorney, and as such, professional standards are to govern his appliance of discretion through the rules of professional ethics.

Rule 8.4 Misconduct specifies that it is professional misconduct for a lawyer to:

- (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation that reflects adversely on the lawyer's fitness as a lawyer;
- (d) engage in conduct that is prejudicial to the administration of justice.

Dixon's actions of relying on incomplete investigative reports, misleading the Plaintiff, and failing to properly investigate the death of White, align with violations of Rule 8.4 Misconduct. His conduct involved dishonesty and deceit, reflecting adversely on his fitness as a lawyer, and was prejudicial to the administration of justice.

14

**NC Bar:**

Under Rule 8.4 Misconduct, the Comment section ¶ 2 explains, "[a]lthough a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation." Further, in Comment ¶ 3, "[t]he purpose of professional discipline for misconduct is not punishment, but to protect the public, the courts, and the legal profession."

Though the Plaintiff cannot directly discipline an attorney, it does not mean that the attorney should not be held accountable for his actions, especially when there is evidence supporting alleged ethical violations. The Plaintiff seeks to hold Dixon accountable due to the harm caused by his violations of her civil rights to information guaranteed by the First Amendment, as well as due process and equal protection under the law.

Dixon's actions, including the reliance on incomplete investigative reports, misleading statements to the Plaintiff, and failure to properly investigate White's death, align with violations of Rule 8.4 Misconduct. These actions demonstrate

15

dishonesty and a serious interference with the administration of justice, thus warranting accountability and addressing the harm caused to the Plaintiff.

**Eleventh Amendment Defense:**

For clarification, the Plaintiff is suing Dixon in both his official capacity and his personal capacity.

To establish liability in his official capacity, it must be shown that the prosecutorial office itself, through its policies or lack of policies, was a moving force behind the deprivation of rights, specifically the right to a fair and just legal process. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The Defendant correctly notes that the Eleventh Amendment bars suits against state officials for monetary damages in their official capacities. However, the Plaintiff seeks injunctive relief aimed at preventing ongoing violations of federal law, which falls under the *Ex Parte Young* exception to Eleventh Amendment immunity. The Plaintiff requests that the court mandate specific procedural safeguards and policy reforms within the DA's office to ensure thorough and unbiased investigations in the future. This form of relief does not compel prosecution but ensures that the Plaintiff's constitutional rights to due process and equal protection are upheld.

16

**Court Authority and Requested Relief:**

While acknowledging the court's limitations in directing prosecutorial actions, the Plaintiff seeks alternative forms of relief that are within the court's power. These include requiring transparency and accountability measures within the DA's office to prevent future misconduct and to ensure that proper investigative procedures are followed. Additionally, the Plaintiff reserves the right to negotiate for the appointment of a special prosecutor and cooperation from Dixon in the event that there is a mediated settlement, addressing both systemic issues and providing a path for justice in her daughter's case.

**Personal Capacity Claims:**

The Plaintiff also brings claims against DA Dixon in his personal capacity, where Eleventh Amendment immunity does not apply. The Plaintiff argues that Dixon's actions, including but not limited to the reliance on incomplete investigative reports, resting the case on an ME opinion that he failed to facilitate acquisition of for nearly two years, misleading statements, and failure to properly investigate the death of Keisha Marie White, constitute violations of her constitutional rights. Dixon's actions were taken in bad faith and with intentional disregard for seeking the truth and upholding justice. Because this Defendant demonstrated deliberate

17

indifference to the Plaintiff's rights, Dixon is personally liable for the resulting harm.

## V. Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant Dixon's Motion to Dismiss and allow this case to proceed to discovery.

Respectfully submitted,

/s/*Cynthia B. Avens*

Cynthia B. Avens

303 Riverside Trl.

Roanoke Rapids, NC 2787

Avens1@charter.net

252-203-7107

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2024, the Plaintiff's Response in Opposition to Faris C. Dixon Jr.'s Motion to Dismiss and Memorandum of Law Supporting the Motion to Dismiss, was hand-delivered to the Clerk of the U.S. District Court in Greenville, NC. Upon docketing, the CM/ECF system will send electronic notification of such filing to the defendants' counsel:

Respectfully submitted,
/s/ Cynthia B. Avens
Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
Avens1@charter.net
252-203-7107
*Pro Se Litigant*

Chris D. Agosto Carreiro
Special Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
ccarreiro@ncdoj.gov
Telephone: (919) 716-6874
Facsimile: (919) 716-6755
State Bar No. 45356
*Counsel for DA Dixon*

Jerermy D. Lindsley
Assistant Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
jlindsley@ncdoj.gov
Tel: 919-716-6920
Fax: 919-716-6764
NC State Bar No. 26235
*Counsel for Dr. Karen Kelly*

19

Daniel D. McClurg
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202
daniel.mcclurg@klgates.com
(704) 331-7400
(704) 353-3114
NC Bar #53768
*Counsel for Defendant Pitt County
Memorial Hospital, Inc.*

Terrence M. McKelvey
K&L Gates LLP
501 Commerce Street, Suite 1500
Nashville, Tennessee 37203
terrence.mckelvey@klgates.com
(615) 780-6700
(615) 780-6799
NC Bar #47940
*Counsel for Defendant Pitt County
Memorial Hospital, Inc.*