FILED
JUN 18 2024
PETER A. MOORE, JR., CLERK
BY US DISTRICT COURT, EDNC
_____ DEP CLK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### EASTERN DIVISION

### Civil Action Number 4:24-CV-00051-M-RN

| | |
|---|---|
| Cynthia B. Avens | ) |
| | ) |
| (Plaintiff) | ) |
| | ) PLAINTIFF'S RESPONSE IN |
| | ) OPPOSITION TO |
| V. | ) PITT COUNTY MEMORIAL |
| | ) HOSPITAL'S MOTION TO |
| Faris C. Dixon, Jr., District Attorney | ) DISMISS AND |
| Pitt County Memorial Hospital, Inc. | ) MEMORANDUM |
| Dr. Karen Kelly, Medical Examiner | ) OF LAW SUPPORTING |
| John/Jane Doe | ) THEIR MOTION TO |
| John/Jane Doe | ) DISMISS |
| John/Jane Doe | ) |
| (Defendants) | ) |

## I. Introduction

Plaintiff, Cynthia B. Avens ("Plaintiff" or "Avens"), respectfully submits this

Response in Opposition to Defendant Pitt County Memorial Hospital, Inc. d/b/a

Vidant Medical Center's ("Defendant" or "ECU Health") Motion to Dismiss and

supporting Memorandum. Plaintiff's Complaint does not seek to hold ECU Health

liable for the wrongful death of Keisha Marie White ("White"), but rather for

ongoing obstruction of justice, conspiracy, and racial discrimination that have

resulted in violations of the Plaintiff's civil rights. Plaintiff has clearly stated claims

regarding conduct that extends beyond the medical treatment provided to White. These claims assert violations under 42 U.S.C. §§ 1981, 1983, 1985, 1988, and Title VI of the Civil Rights Act of 1964.

## II. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. A motion to dismiss should only be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. The Supreme Court has held that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Id. Thus, if the factual allegations "raise a right to relief above the speculative level," the complaint should not be dismissed for failure to state a claim. *Twombly*, 550 U.S. at 555.

Also, the requirement that a pleading contain a short and plain statement of claim

showing that pleader is entitled to relief does not require detailed factual

allegations but demands more than unadorned "the defendant unlawfully harmed

me" accusation. *Fed.Rules Civ.Proc.Rule* 8(a)(2), 28 U.S.C.A.

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

### III. Legal Basis

Plaintiff seeks remedies under the following statutes:

42 U.S.C. § 1981 - This statute ensures that all persons within the jurisdiction of

the United States have the same right to make and enforce contracts, to sue, be

parties, give evidence, and to the full and equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white

citizens. The Plaintiff alleges that ECU Health's actions interfered with her right to

the full and equal benefit of the law.

42 U.S.C. § 1983 - This statute provides a remedy for the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws by any

person acting under color of state law. The Plaintiff claims that ECU Health,

acting under color of state law, violated her constitutional rights to due process

and equal protection.

42 U.S.C. § 1985 - This statute addresses conspiracies to interfere with civil rights, including preventing officers from performing their duties and obstructing justice by intimidating a party, witness, or juror. The Plaintiff alleges that ECU Health conspired to obstruct justice and interfere with her civil rights.

Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) - This statute prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance. The Plaintiff alleges that ECU Health's actions were influenced by racial discrimination, impacting the handling of the investigation.

42 U.S.C. § 1988 - This statute allows for the recovery of attorney's fees and expert fees in civil rights cases. Although the Plaintiff is currently proceeding pro se, she reserves the right to seek attorney's fees should she retain counsel.

By citing these statutes, the Plaintiff clearly establishes the legal grounds for her claims against ECU Health, demonstrating that their actions violated her federally protected rights and entitle her to seek appropriate remedies.

## IV. Arguments Against Defendant's (ECU Health's) Memorandum

### A. Nature of the Case

Defendant's characterization of Plaintiff's Complaint as seeking to hold ECU Health liable for White's death is incorrect. (D.E. 21 at 1 ¶ 2, at 2 ¶ ¶ 1-2). Plaintiff does not seek to extend the wrongful death claim settled in 2016. Instead, Plaintiff's complaint focuses on the ongoing misconduct, obstruction of justice, conspiracy, and racial discrimination that have occurred since White's death and have violated the Plaintiff's civil rights. These claims are distinct from the original wrongful death claim and are based on Defendant's actions beginning the moment White's time of death was called in ECU Health's ICU on May 10, 2014, at 1:02 p.m. and through 2023. The fact that the Plaintiff's accusations do not include violations after 2016 and prior to 2022 does not reduce the Defendant's liability of conduct, as at any point over the years, the Defendant had ample opportunity to correct its conduct by holding their staff member(s) legally accountable with adequate reporting to local law enforcement.

Additionally, to clear up any misunderstandings, the purpose of the VI. BACKGROUND section of the Plaintiff's complaint is to facilitate the Court's understanding of why criminal charges were and are still warranted in the death of White. This section of the Complaint is necessary due to the Plaintiff's claims that the Defendants obstructed justice, violating her civil rights. Therefore, there

was never any intention to "plausibly explain how ECU Health is liable for White's death" in the context of her Complaint. (D. E. 21 at 2 ¶ 2).

Plaintiff's complaint addresses the continuing violation doctrine and alleges that ECU Health engaged in a pattern of obstructing justice, conspiracy, and racial discrimination, thereby violating Plaintiff's First and Fourteenth Amendment rights. These actions by ECU Health have perpetuated harm and obstructed justice for White and her family. Plaintiff's complaint identifies specific causes of action under 42 U.S.C. §§ 1981, 1983, 1985, 1988, and Title VI of the Civil Rights Act of 1964.[1]

Contrary to Defendant's assertion, (D. E. 21 at 2 ¶ 2), Plaintiff's claims are not barred by the statute of limitations as they pertain to ongoing misconduct and acts of discrimination and obstruction that have continued at least until 2023. The Complaint provides sufficient factual detail to support each claim and demonstrates a plausible entitlement to relief.

---

[1] Plaintiff agrees that U.S.C. 18 §241 does not apply as a cause for which plaintiff can seek damages.

## B. Statute of Limitations

Continuing Violation Doctrine

Defendant argues that all of Plaintiff's claims are time-barred by the applicable statutes of limitations. This argument fails to recognize the applicability of the continuing violation doctrine, which allows claims to be brought for actions that are part of an ongoing pattern of misconduct. Under this doctrine, a plaintiff may challenge not just the most recent instance of misconduct, but also earlier related acts as long as they are part of the same pattern.

In *Perry v. Pamlico County*, 88 F. Supp. 3d 518 (E.D.N.C. Feb. 18, 2015), the court stated, "Under North Carolina law, a continuing violation is occasioned for limitations purposes by continual unlawful acts, not by continual ill effects from an original violation." The court further explained that "[t]he continuing-wrong doctrine is an exception to the general rule that a state-law claim accrues when the right to maintain a suit arises." This principle was reaffirmed in *Godbold by & through Holloway v. Cherokee Cnty.*, No. 1:20 CV 202 MR WCM, 2021 WL 1590387, at *3 (W.D.N.C. Jan. 14, 2021), report and recommendation adopted, No. 1:20-CV-00202-MR-WCM, 2021 WL 1178060 (W.D.N.C. Mar. 29, 2021).

North Carolina recognizes the 'continuing wrong' or 'continuing violation' doctrine as an exception to the general rule that a cause of action accrues when the right

to institute and maintain suit arises. *Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 179 (2003).

Plaintiff has alleged a continuing pattern of obstruction of justice, conspiracy, and racial discrimination that began immediately following White's death in 2014 and has persisted through at least 2023. Specifically, the Plaintiff alleges that ECU Health has consistently engaged in actions that have prevented justice for White, protected its white employees from accountability, and discriminated against the Plaintiff. These ongoing actions by ECU Health include the following specific instances of misconduct:

- Failing to refer White's death to pathology despite circumstances that required a referral (2014);

- Prematurely completing the death certificate, falsely stating that White's manner of death was natural (2014);

- Failing to report White's death to appropriate law enforcement agencies and instead reporting it to the SBI, who, according to their website, do not accept complaints that are outside of their original jurisdiction, directing those with information to report otherwise, to report to their local law enforcement. (2014);

- Restricting access to personnel for interview during a subsequent investigation conducted by GPD and SBI. (2014);

- Withholding information and providing deceptive information to the BON and during the wrongful death settlement process (2014, 2016); and

- Blocking an official investigation into White's death (2023).

The conduct of ECU Health clearly indicates a pattern of behavior that prevented the surfacing of what happened to White. ECU Health took action ensuring that White's death did not come to the public's attention via a potentially high-profile homicide case, that had the potential to bring harm to their reputation, and thus, their bottom line on financial records. Considering the media fallout, protests, and civil unrest resulting from the excessive force used by white police officers against Black men, it is plausible that ECU Health would prefer to deny the Plaintiff her Constitutional rights to seek justice for the death of her daughter, rather than risk negative publicity. This is evident in cases like the 1992 Rodney King verdict, the July 2014 death of Eric Garner, whose death prompted a worldwide commemoration of his last words, "I Can't Breathe," and the August 2014 killing of Michael Brown in Ferguson, Missouri, prompting the Ferguson riots.

ECU Health likely wanted to avoid being known as the facility where a white nurse unnecessarily shackled a helpless Black patient to a bed, which is equivalent to the use of excessive force. The patient had complained of difficulty breathing, similar to "I can't breathe," and showed clear signs of lack of oxygen.

The nurse continued withholding oxygen and covered her tracks by deliberately withholding White's deteriorating condition from the physician, nurse practitioner, charge nurse, coworkers, and the Plaintiff until White was dead, and a code blue was called. The well-known cry for help in Garner's last words, "I Can't Breathe," would resonate more deeply in this context.

The Defendant's conduct in preventing justice from being served in White's death, from 2014 until at least 2023, constitutes an ongoing pattern of misconduct that falls within the scope of the continuing violation doctrine. "The 'continuing violation doctrine' is aimed at ensuring that illegal conduct is punished by preventing a defendant from invoking the earliest manifestation of its wrongdoing as a means of running out the limitations clock on a course of misconduct that persisted over time. The doctrine serves that end by treating the defendant's misconduct as a continuing wrong and deeming an action timely so long as the last act evidencing a defendant's violation falls within the limitations period." *United States v. Spectrum Brands, Inc.*, 924 F.3d 337 (7th Cir. 2019). Therefore, Plaintiff's claims are not time-barred and should be considered on their merits.

## C. Clarification of Alleged Contradictions

Contradiction Regarding Communications with the SBI:

On page 5 of the Defendant's Memorandum (Doc. 21 at 5 ¶ 2), the Defendant accused the Plaintiff of contradicting her own statements regarding the Plaintiff's assertion that Vicki Haddock (Haddock) lied about contacting the SBI. Defendant's Counsel specifically referred to Plaintiff's statements (Doc. 1 at 23 ¶¶ 20, 22), completely ignoring paragraph 21, which fell directly between paragraphs 20 and 22. This omission selectively disregards parts of the statements where Avens asserted that, upon speaking to several SBI agents, each agent denied communications with Haddock.

Under the circumstances, Haddock, representing ECU Health, had substantial stakes on the line, including potential legal, financial, and reputational consequences. Haddock lied by omission by withholding information regarding White's death during the disclosure meeting. Meanwhile, four SBI agents denied speaking to Haddock or having knowledge of the information she purportedly reported about White's death. The Plaintiff reacted based on the information provided to her.

Because individuals on both sides of this scenario were deceptive in their communications with the Plaintiff, all of their testimonies lead to suspicion and

doubt. The exception is Agent Brown, who is believed to have been excluded from this deceitful group. Therefore, the contradiction alleged by the Defendant is unfounded and arises from the deceitful actions of those involved, rather than from any inconsistency in the Plaintiff's statements.

Equitable Tolling:

In addition to the continuing violation doctrine, Plaintiff's claims are also supported by the principle of equitable tolling. Equitable tolling applies when a plaintiff, despite diligent efforts, is unable to discover critical facts that would allow for the timely filing of a claim. Courts have recognized that equitable tolling is appropriate in cases where defendants have engaged in deceptive or misleading conduct that prevents the plaintiff from discovering their cause of action.

In this case, the Plaintiff was not aware of information that was revealed in the final BON report until after the conclusion of the wrongful death settlement. Additional information came to light in 2022. The Defendant's actions in withholding information, providing false information, and obstructing justice prevented the Plaintiff from discovering critical facts necessary to bring her claims earlier. Therefore, the statute of limitations should be tolled, and Plaintiff's claims should be allowed to proceed. (e.g., *Perry v. Pamlico County*, *Marzec v. Nye*).

## D. Section 1983 Claim

State Actor Argument:

The Defendant argues that ECU Health is not a state actor and therefore cannot be held liable under Section 1983. However, this argument fails to consider the significant involvement of state actors and state resources influenced by ECU Health, effectively making the hospital's actions attributable to the state.

In the case of *Philips v. Pitt County Memorial Hospital*, 503 F.Supp.2d 776 (E.D.N.C. 2007), the court provides a framework for understanding how entities are evaluated concerning actions under color of state law. As cited in *Philips*, the Fourth Circuit has described circumstances under which a private entity like this hospital can be considered to have acted under color of state law, stating, "a state becomes responsible for a private party's act if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest." The decision in *Philips* sets a precedent that is directly relevant to ECU Health, also formerly known as Vidant Medical Center and Pitt County Memorial Hospital. It is imperative that the same legal standards that governed the court's decisions in 2007 continue to be upheld, ensuring consistency and fairness in judicial review.

The involvement of the hospital's Risk Management, headed by Haddock, exemplifies the entwining of private actions with state functions:

Exclusively State Capacity: Although the functions of Risk Management are not typically associated with state duties, the specific actions they undertook in directing and manipulating legal and medical investigations are akin to those typically reserved for state authorities, such as law enforcement and public health oversight. This alignment of their actions with state functions underscores the significance of their role in the matters at hand.

Restriction on Communication: The Defendant's Risk Management department implemented policies that specifically prevented the Plaintiff from accessing other investigatory channels, such as the hospital police. This control over ECU Health's in-house police department and its investigatory process constitutes a significant exercise of power that mirrors the power of chiefs of local police departments and other law enforcement agencies. This assumed authority demonstrates the Defendant's control over a critical civil rights issue—the right to a fair and impartial investigation into a death.

State's Direct Benefit: Risk Management's actions, which effectively managed the public narrative and controlled information flow during investigations, served the state's direct benefit by maintaining public trust and avoiding scandal within the local healthcare system.

Involvement with State Agencies

ECU Health's actions are intertwined with those of state agencies, demonstrating state action through:

**State Bureau of Investigation (SBI):** ECU Health reported the death of White to the SBI, a state law enforcement agency, rather than to local law enforcement, as instructed by the SBI on their official website. This instruction clearly indicates that the agency only accepts cases that are outside of their original jurisdiction by the request of local law enforcement agencies or state officials. Not only did the Defendant act as a state actor by reporting to the agency, but the SBI also enabled this by engaging in further communications with the Defendant about White's death, instead of requiring the Defendant to follow their written policy of reporting to local law enforcement. This interaction, therefore, placed ECU Health in a state-authorized position as if it were a local law enforcement agency or state official, reporting incidents to the SBI, as well as subsequent communications with the SBI regarding the incident reported.

This engagement between the SBI and the Defendant created a diversion of state resources that directly benefited the hospital by enabling them to pretend they followed mandated protocol in reporting White's death to the proper law enforcement, though, as stated previously, the SBI does not directly accept

complaints pertaining to matters outside of their original jurisdiction unless the reporting is commenced by local law enforcement or a state official.

The added benefit to the Defendant was their ability to obtain information from agents regarding Plaintiff's intentions and other statements that the Defendant could use to plan strategies on how to protect themselves, whether through liability in the subsequent wrongful death action and/or efforts to hinder the justice process aimed to sweep White's death under the rug. This conduct demonstrates the Defendant's assumed state position in that it reported White's death to the SBI and continued communications about the case with the SBI, conduct that was apparently approved of by the SBI.

During a subsequent investigation initiated by former DA Kimberly Robb, the investigative efforts of Special Agent Matherly and GPD Detective Alvarc Elias were significantly hindered by the Defendant's failure to make necessary personnel available for interviews. This obstruction allowed ECU Health to control which information was accessible to the investigators. Matherly has confirmed that she submitted her report to DA Robb. However, the investigation and the resulting report were incomplete due to the hospital's refusal to provide full access to relevant personnel and information.

The incomplete investigation led to an incomplete report being accepted by both former DA Robb and current DA Dixon. This acceptance demonstrates the undue influence ECU Health exerted over the state offices, effectively determining the content and outcome of the investigations. The failure of both district attorneys to insist that ECU Health cooperate fully further indicates the hospital's power over these state officials. This conduct demonstrates how ECU Health assumed state-like authority in these matters.

**Medical Examiner's Office:** The Medical Examiner's (ME) office, a state entity, was influenced by ECU Health. A recorded phone conversation with the ME office manager and contact person, Danene Lowery, revealed that the ME's office required permission from ECU Health's risk management and legal team before proceeding with the investigation into White's death. This demonstrates that the hospital had significant control over a state entity's actions, effectively making those actions state actions. Additionally, the ME relinquished her state authority to the Defendant by adhering to the directive requiring her to consult with the Defendant, thereby forfeiting her independence, power, and state authority to the Defendant, rather than review evidence in an official investigation initiated by the DA's office.

**District Attorney's Office**: The Plaintiff's phone calls to the ME's office were redirected to the Defendant's risk manager after the Plaintiff's previous calls

revealed that Dixon had lied about already having an ME report in July 2022. The redirections that occurred in September and October 2022 directly benefitted Dixon, an elected state official, by attempting to mask his deception and any further misconduct. According to the Fourth Circuit in *Philips*, this benefit satisfies as one of the three ways a private entity can be a state actor for the purpose of Section 1983 liability.

The above-mentioned interference obstructed the Plaintiff's exercise of her First Amendment right to effectively communicate with the ME's office; that is to speak freely, to give information, and to receive information.

Additionally, Lowery, believed she was the primary contact person and would be aware of the cases the ME was working on, as well as any evidence submitted to the ME. Since Danene was apparently bypassed during the communication process involving the submission, receipt, and/or transfer of evidence to the ME's office and/or within the ME's office, this suggests collusion between Dixon and Kelly. Such actions strongly indicate that Dixon plausibly colluded with the Defendant as well, due to Kelly's subservience to ECU Health.

Dixon's closing of the White case soon after receiving the report from Dr. Jason, on the surface, appears to be Dixon exercising his prosecutorial authority. However, considering the numerous instances where ECU Health shunned legal

duties, interfered with investigative processes, withheld evidence, concealed their wrongdoing, and outright lied when the Plaintiff was entitled to the truth, it is highly plausible that ECU Health made the charging decision in this case—a state authority only given to a prosecutor—masked with the face and letter-writing of DA Dixon.

Based on these criteria, ECU Health's actions, in collaboration with state agencies, should be considered state action, thus subjecting them to liability under § 1983.

**Policy or Custom:** The Defendant contends that ECU Health is not liable under Section 1983 because it is a private corporation and not a state actor. However, a private corporation can be held liable under Section 1983 if an official policy or custom of the corporation causes the alleged deprivation of rights. To establish liability, the Plaintiff must demonstrate that the corporation's policy or custom was the driving force behind the violation of constitutional rights. This requirement is derived from the precedent set in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which held that local government entities could be sued under Section 1983 for constitutional violations resulting from their policies or customs. This principle has been extended to private corporations performing state functions or operating in conjunction with state officials, where their policies or customs lead to constitutional violations.

**ECU Health's Custom of Non-Compliance:** ECU Health's repeated violations of federal healthcare regulations and its persistent failure to comply with laws and policies demonstrate a custom of non-compliance. These violations include but are not limited to:

- Governing Body: Failures in oversight and ensuring the hospital operates within legal and ethical standards.

- Patient Rights: Multiple violations indicating a systemic disregard for the rights and safety of patients.

- Patient Rights: Care in Safe Setting; instances where the hospital failed to provide a safe environment for patients.

- Patient Rights: Restraint or Seclusion; inappropriate use of restraints or seclusion without proper justification or monitoring.

- Nursing Services: Failures in the provision and supervision of adequate nursing services.

These violations were documented in inspection reports over several years, showing a pattern of behavior that endangers patient safety and violates federal regulations. This pattern of non-compliance establishes a custom or practice within ECU Health that contributed to the alleged violations of the Plaintiff's rights.

Additionally, it is paramount to note that ECU Health conducted its own investigation immediately following the death of White on May 10, 2014. However, the Defendant grossly failed to correct any of its deficiencies, indicating a seriously ineffective risk management department as ECU Health remained non-compliant in October 2014 when DHHS investigated. The Defendant did not make correcting its deficiencies a priority until they were threatened with the loss of revenue from federally funded Medicare and Medicaid payments.

It is unclear how long the Defendant was non-compliant prior to May 10, 2014, nor the number of patients who needlessly suffered as a result of the Defendant's non-compliance before May 10, 2014, or from May to October 2014, between the time of their internal investigation and correcting its deficiencies to comply with federal regulations.

Further noted here is the Defendant's failure to provide adequate nursing supervision, at least between May to October 2014, which can logically be assumed to be in the Defendant's best interest to save money on payroll expenses.

By showing a history of the above violations, it can be demonstrated that ECU Health has a custom of non-compliance, particularly when it comes to financial

interests, which supports the Plaintiff's claims of ongoing misconduct and failure to uphold the required standards of care and legal obligations.

**Mirroring the Actions of Linda Brixon and ECU Health:**

The actions of Brixon, the primary nurse in charge of White's care, reflect the broader policy and custom of non-compliance and misconduct at ECU Health. This mirroring of behavior demonstrates that Brixon's actions were not isolated but were in line with the hospital's established practices.

Brixon's Actions: Brixon failed to provide necessary medical care to White, including withholding oxygen, not releasing restraints, failing to monitor cardiac function, and not notifying the charge nurse, nurse practitioner, physician, or Emergency Response Team of critical changes in patient behavior, symptoms, and vital signs. She also failed to monitor White for side effects of opioid medications and did not initiate proper emergency procedures. Each of these failures directly opposed instructions from authority figures, written hospital policies, and/or federal regulations.

Brixon's Deception and Cover-Up: Brixon's attempt to cover up her actions by withholding information from co-workers, her chain of command, and the Plaintiff, as well as lying to the cardiac monitor technicians and the BON, is consistent with ECU Health's pattern of providing deceptive information, withholding critical

details from both the BON and the Plaintiff, as well as lying to the BON and the
Plaintiff.

ECU Health's Actions: The Defendant's non-compliance with policies and
regulations created a framework that enabled Brixon's failures. Specifically, ECU
Health's failure to staff a nurse manager for oversight during the night shift on
May 9, 2014, likely allowed Brixon to get away with her conduct. If staff members
had someone to call to report Brixon's behavior, it might have been addressed
sooner. ECU Health has a documented history of violating federal healthcare
regulations and failing to adhere to established standards of care. Brixon, with
her documented counselings in 2010 and 2013, mirrors this pattern of behavior.

**Connection to Plaintiff's Claims:**

The Plaintiff's claims of obstruction of justice, conspiracy, and racial
discrimination are supported by this demonstrated pattern of non-compliance.
ECU Health's persistent failure to comply with federal regulations and ethical
standards directly correlates with the allegations of misconduct that have
impeded justice for White and violated the Plaintiff's civil rights.

By establishing ECU Health's custom of non-compliance, the Plaintiff can show
that the alleged actions were not isolated incidents but part of a broader pattern
of behavior that has caused ongoing harm and injustice.

- Failing to refer White's death to pathology despite circumstances that required a referral (2014): This demonstrates a disregard for proper procedure and state regulations and plausibly serves as an attempt to avoid a thorough investigation into the cause of death.

- Prematurely completing the death certificate, falsely stating that White's manner of death was natural (2014): This action suggests an effort to misrepresent the circumstances of White's death and prevent further scrutiny.

- Failing to report White's death to appropriate law enforcement agencies and instead reporting it to the SBI (2014): By reporting to the SBI instead of local law enforcement, ECU Health diverted the investigation and hindered a proper inquiry. Actually, they prevented a proper inquiry.

- Restricting access to personnel for interview during a subsequent investigation conducted by GPD and SBI (2014): By restricting access to essential personnel, and failing to cooperate with an official investigation, ECU Health hindered the investigation process, obstructing justice further.

- Withholding information and providing deceptive information to the BON and during the wrongful death settlement process (2014, 2016): This indicates an effort to obstruct justice by preventing the Plaintiff from having access to all relevant information regarding White's death. Furthermore, continuing to withhold healthcare information relevant to White's care before and during the

wrongful death mediation proceedings constituted defrauding the Plaintiff to prevent having to pay a higher settlement.

- Blocking an official investigation into White's death (2023): This ongoing obstruction exemplifies a pattern of misconduct designed to prevent justice and accountability.

**Relevant documents and reports that support the existence of such a policy or custom at ECU Health:**

- Screenshot of the SBI's website indicating which types of cases are within their original jurisdiction and instructions of where to report incidents otherwise. This highlights the inappropriate reporting by ECU Health.
- NCGS statute 130A-383, explaining the medical examiner's jurisdiction, demonstrating the deviation from proper protocol by ECU Health.
- White's death certificate, showing the premature and false statement of natural death and indicating that White was not referred to a medical examiner.
- A report from Dr. Donald Jason, MD, JD, which contradicts White's death certificate by stating, with medical probability, that White's death should be classified as a homicide. This further indicates the inaccuracies and potential cover-up.

- The DHHS report documenting the events that occurred in the case of White on May 9 to May 10, 2014, as well as corrective measures the Defendant took to come back into compliance with federal regulations following the October 1, 2014 DHHS investigation.

- Other DHHS reports previously available on healthinspections.org: This website no longer publishes hospital violations discovered during DHHS or CMS investigations unless transparency is granted by the states. North Carolina chose not to be transparent. However, the Plaintiff has a screenshot listing the number of federal violations at ECU Health from 2011 to 2020 and recorded videos revealing such information for her social media platforms.

- The 194-page BON document released to the Plaintiff in March 2016, shortly after the wrongful death mediation that occurred on March 1, 2016, containing vital information withheld during the settlement process.

- Recorded conversation with Danene Lowery on March 10, 2023, confirming that the Plaintiff was supposed to be talking to risk management, refuting Dixon's claim that evidence had been sent to that office, and revealing that the ME's office was not doing anything with the case and that Kelly would need permission from risk management and attorneys before she could work on the case.

- Recorded conversation with retired SBI Agent Jennifer Matherly on May 30, 2024, revealing that the hospital let her come in and talk to them, gave her

medical records, but "they didn't give me a lot of access to their personnel from what I remember."

**Linking Policy or Custom to Civil Rights Violations:**

The established policy or custom of non-compliance and deception at ECU Health directly correlates with the violations of the Plaintiff's civil rights. The hospital's actions, or lack thereof, created an environment where misconduct could thrive and where efforts to obstruct justice and protect white employees were normalized.

Violation of Due Process, Equal Protection, and Constitutional Rights: The U.S. Constitution states in the Declaration of Independence that "all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are Life, Liberty and the pursuit of Happiness." This principle underpins the Fourteenth Amendment, which guarantees due process and equal protection under the law. Therefore, the Plaintiff has a constitutional right to pursue justice for her daughter by any lawful method, and this unalienable right cannot be taken away. Consequently, the Plaintiff is entitled to be treated equally and fairly by both the government and any private entity acting under color of state law.

ECU Health's policy of non-compliance and obstruction deprived the Plaintiff of her right to due process and equal protection under the law. By failing to report White's death to appropriate law enforcement, withholding critical information, and manipulating the investigation process, ECU Health ensured that the Plaintiff could not effectively pursue justice for her daughter. Additionally, ECU Health's conduct and influence over state agencies and officials perpetuated the treatment the Plaintiff received from these state entities, resulting in further violations of her rights under the Fourteenth Amendment.

Impact on Plaintiff's Civil Rights: The hospital's ongoing pattern of misconduct, as evidenced by the incidents involving Brixon and the broader policy of non-compliance, directly resulted in the violation of the Plaintiff's civil rights. The Plaintiff was denied the opportunity to have a thorough investigation into her daughter's death, access to truthful information, and the ability to advocate effectively for accountability of those responsible.

Retaliation and First Amendment Violations: The redirection of the Plaintiff's phone calls to risk management and the ME's requirement to consult with ECU Health before proceeding with the investigation represent retaliatory actions designed to silence the Plaintiff and prevent her from exercising her First Amendment rights. These actions were taken to protect the hospital's interests at the expense of the Plaintiff's right to seek information and justice, and also

benefited DA Faris Dixon by preventing the exposure of any further misconduct or collusion with the hospital. The conclusion of collusion, and thus, conspiracy, is drawn from the following facts:

- False Claims: Dixon falsely claimed to have the ME report. (July 2023)
- Sudden Decision: After the claim to already possess a report from the ME was revealed to be a lie, Dixon suddenly announced his decision to submit evidence to the ME. (July 2023)
- Redirection Orders: At some point between July and September 2023, instructions were given to redirect the Plaintiff's calls to the ME's office. The Plaintiff discovered this redirection in September when trying to follow up on Dixon's claim that evidence had been sent to the ME in August.
- Denial of Knowledge: Dixon denied knowledge of why the Plaintiff's calls were redirected when questioned in September 2023.
- Reliance on ME Report: In recorded calls from April 2023, Dixon demonstrated a heavy reliance on what the ME report or opinion would say.
- Lack of Insistence: Dixon never insisted that Dr. Kelly respond with her expert opinion. This is evidenced by Danene's statement in October 2024 that Dr. Kelly forgot to look at the evidence, and by the fact that, as of the filing of the complaint on March 22, 2024, an opinion had not been provided.
- Dismissal of Case: Despite being given Dr. Jason's opinion and report that supported homicide charges on January 24, 2024, Dixon closed the case on

March 6, citing insufficient evidence. This indicates a lack of intent to pursue

justice from the beginning, further violating the Plaintiff's rights to the same or

similar treatment afforded to others who report an unlawful killing.

The elements of a Section 1983 conspiracy claim require showing that (1) a state

actor conspired with a private party, (2) the purpose of the conspiracy was to

deprive the plaintiff of a constitutional right, and (3) an overt act in furtherance of

the conspiracy caused injury to the plaintiff. The above actions demonstrate a

coordinated effort between Dixon, a state actor, and ECU Health, a private entity,

to obstruct justice and deny the Plaintiff's constitutional rights.

Furthermore, the compliance of the ME to not work on a case that is under the

DA's guidance, and at the direction of the DA, indicates a conspiracy between the

ME and ECU Health, because the ME had the state-given authority to investigate

the death of White without the need to consult ECU Health's risk management or

attorneys. This collaboration between state officials and a private entity

exemplifies a pattern of behavior aimed at protecting the interests of ECU Heath

at the expense of the Plaintiff's constitutional rights.

ECU Health's pattern of misconduct, including hindering investigations and

protecting staff members, aligns with Plaintiff's claims of discrimination and

obstruction of justice in several key ways: Hindering investigations, protecting
staff members, discrimination, and obstructing justice.

**Hindering Investigations:**

ECU Health's actions have consistently obstructed the proper investigation into
Keisha White's death. By failing to report the death to local law enforcement and
instead engaging with the SBI, the hospital diverted state resources and avoided
standard investigative procedures. This diversion hindered the investigation and
prevented a thorough and unbiased examination of the circumstances
surrounding White's death. Additionally, by failing to make necessary personnel
available for interviews and withholding critical information from investigators,
ECU Health further obstructed the investigative process.

**Protecting Staff Members:**

ECU Health's protection of its staff members, such as Brixon and Elizabeth
Everette who falsified White's records, reflects a broader policy of shielding
employees from accountability. This protection was evident in the hospital's
deceptive practices during the BON investigation and the wrongful death
settlement process, where critical information was withheld. By not holding staff
members accountable for their actions, as well as failing to adhere to proper
protocols themselves, ECU Health perpetuated a culture of non-compliance and

misconduct, which directly impacted the Plaintiff's ability to seek justice for White's death.

**Discrimination:**

The hospital's actions demonstrate a pattern of racial discrimination. The decision to protect white staff members and the failure to support justice for a black patient indicate a discriminatory bias. The redirection of Plaintiff's calls and the requirement for the ME to seek permission from risk management and legal teams before proceeding with the investigation further exemplify this discriminatory treatment. These actions show a clear intent to deny the Plaintiff her constitutional rights to freedom of speech, freedom to seek redress, due process, and equal protection under the law.

In this scenario, where a black patient died due to egregiously negligent treatment under the care of a white nurse, in particularly, the patient being tied to the bed after complaining she couldn't breathe, the Plaintiff was discriminated against not because of her individual identity, but because of the color of her skin. The Defendant has demonstrated that, in addition to protecting white employees, their primary concern was safeguarding their revenue and reputation.

The specific circumstances of White's death had the potential to gain widespread attention and scrutiny, which could have significantly harmed ECU Health's

reputation and revenue streams, including patient care, donations, investments, and business contracts. By obstructing justice and discriminating against the Plaintiff, the Defendant sought to avoid the repercussions of their negligence and protect their financial interests.

**Obstruction of Justice:**

The cumulative effect of these actions amounts to obstruction of justice. ECU Health's efforts to mislead investigators, protect culpable staff, and manipulate investigative processes have directly impeded the Plaintiff's pursuit of justice. This obstruction is a clear violation of the Plaintiff's civil rights, as it has denied her the opportunity to effectively advocate for accountability of those responsible for White's death.

**Case Law Supporting Policy or Custom Claims:**

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978): The landmark case established that local governments could be sued under § 1983 for monetary, declaratory, or injunctive relief where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Although *Monell* directly addresses municipal liability, its principles have been extended to private entities performing state functions.

A "custom" for purposes of *Monell* liability must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691 (internal quotation marks and citation omitted).

*Feliciano v. City of Cleveland*, 988 F.2d 649 (6th Cir. 1993): This case emphasized that a custom must reflect a course of action deliberately chosen from among various alternatives. The notion of "law" must include "[d]eeply embedded traditional ways of carrying out state policy." *Nashville, Chattanooga St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940).

*Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996): The court defined a "custom" as a "legal institution" that is not documented by written law (cited in *Fulton v. W. Brown Local Sch. Dist. Bd. of Educ.*, Case No. 1:15-CV-53, at 10 (S.D. Ohio Jun. 23, 2015))

*Garner v. Memphis Police Dep't*, 8 F.3d 358 (6th Cir. 1993): The plaintiff must also show a direct causal link between the custom and the constitutional deprivation; that is, she must "show that the particular injury was incurred because of the execution of that policy."

The Plaintiff's claims of obstruction of justice, conspiracy, and racial discrimination are supported by ECU Health's demonstrated pattern of non-

compliance. By showing a history of the above violations, it can be demonstrated that ECU Health has a custom of non-compliance, which supports the Plaintiff's claims of ongoing misconduct and failure to uphold the required standards of care and legal obligations. This custom directly resulted in the violation of the Plaintiff's civil rights, including her rights to due process and equal protection under the law.

### E. Section 1981 Claim

<u>Addressing Defendant's Argument on Lack of Contractual Relationship Interference (D.E. 21 at 14-15)</u>: Defendant argues that Plaintiff has failed to demonstrate interference with a contractual relationship as required under Section 1981. This argument fails to recognize the broader interpretation of Section 1981, which protects against racial discrimination in the making and enforcement of contracts, including the rights to sue, give evidence, and be party to contracts for the security of persons and property as enjoyed by white citizens.

<u>Broad Interpretation of Section 1981</u>: Section 1981 states, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." This statute has been interpreted to protect not just existing contractual relationships but also the creation of new contracts and the overall legal process involving contracts.

<u>Defendant's Actions Interfered with Plaintiff's Contractual Rights</u>: ECU Health's actions have directly interfered with Plaintiff's ability to engage in and enforce contractual relationships. By obstructing justice, providing deceptive information, and engaging in discriminatory practices, ECU Health has impaired Plaintiff's right to the full and equal benefit of laws and proceedings. Specifically, the withholding of information during the wrongful death settlement process and the coercion to settle under threat of using unrelated healthcare information against the Plaintiff directly interfered with Plaintiff's contractual rights regarding the settlement.

**Specific Examples of Contractual Interference and Discrimination**:

<u>Interactions as Contractual in Nature</u>: All interactions with ECU Health concerning the treatment and post-mortem affairs of White were inherently contractual. These interactions created an implicit expectation of truthful disclosure and equitable treatment akin to what would be afforded to any family irrespective of race. This includes, but is not limited to:

- <u>ICU Physician's Deception</u>: The ICU physician's decision to ask the Plaintiff if she would like an autopsy performed, rather than explaining under which circumstances required the referral to an ME, constituted a deceptive

contractual relationship. The proper contract to enforce would have been for the ICU physician to explain the nature of which required referral to an ME (offer), resulting in the Plaintiff's acceptance, and subsequently carried out through the method of proper and legally required referral according to NCGS § 130A-383. Medical examiner jurisdiction.

- Initial Disclosure Meeting: The initial disclosure meeting in June 2014 constituted a contractual engagement between the Plaintiff and ECU Health, authenticated by Haddock's arrangement and the Plaintiff's acceptance of the meeting. Within this contractual relationship, there existed an implicit understanding and expectation that ECU Health, represented by Haddock, would provide the Plaintiff with full and accurate disclosure regarding the circumstances surrounding White's death. Haddock, acting as a representative of ECU Health, assumed a fiduciary duty to the Plaintiff, obligating her to act in the Plaintiff's best interests and provide complete transparency.

    However, ECU Health breached this contractual obligation by failing to deliver the promised disclosure during the initial meeting. Instead of fulfilling their duty to provide comprehensive information, Haddock and ECU Health withheld crucial details regarding White's death. Additionally, they suggested that the Plaintiff may want little league uniforms or church pews as a token from the facility under the circumstances. This deprivation of information and

the inappropriate suggestion of trivial gifts denied the Plaintiff the opportunity
to fully understand the circumstances and make informed decisions regarding
her legal options. Moreover, the offer of such menial gifts implied that the
meeting was actually a smokescreen to encourage the Plaintiff to accept the
gifts as a settlement based on fraud. This breach of contract undermined the
Plaintiff's trust in ECU Health and impeded her ability to seek justice for her
daughter.

- Demand Letter Meeting: During the meeting in Haddock's office that occurred
  in July or August 2014, the Plaintiff attempted to enter into a contract
  agreement with ECU Health by discussing the terms she had written in a
  demand letter, prior to the Plaintiff retaining an attorney. When Haddock
  looked over the document and saw the amount for punitive damages, she
  deliberately pointed out that ECU Health was not a "person" for which punitive
  damages could be sought, leaving the Plaintiff unsure of how to proceed.
  However, just as punitive damages are explained in Chapter 1D of the NCGS
  Civil Procedure statutes, § 1-75.2 states, "In this Article the following words
  have the designated meanings: (1) "Person" means any natural person,
  partnership, corporation, body politic, and any unincorporated association,
  organization, or society which may sue or be sued under a common name."

- <u>Wrongful Death Settlement Coercion and Fraud</u>: ECU Health's threat to leverage unrelated healthcare information against the Plaintiff if the case proceeded to trial coerced her into settling the wrongful death claim. This coercion amounted to interference with the Plaintiff's contractual rights within the wrongful death settlement process. Additionally, as crucial information was withheld both before and during this meeting, any agreement reached, or document signed as a consequence of the meeting was tainted by the Defendant's fraudulent actions.

- <u>GPD and Faris Dixon</u>: These entities implicitly entered into contracts with the Plaintiff to conduct fair and impartial investigations related to the circumstances of her daughter's death. The hospital's interference—whether through withholding information, influencing outcomes, or rerouting procedural actions—compromised these contracts under racially discriminatory motives.

- <u>Medical Examiner's Office</u>: Similarly, the agreement that the ME's office would conduct an unbiased examination of the evidence can be viewed under the same lens. The hospital's influence that potentially led to the non-performance of this duty also falls under discriminatory practices affecting the Plaintiff's ability to enforce this contract fairly.

**Legal Precedents:**

Implied-in-Fact Contracts: An implied-in-fact contract is formed through the parties' conduct. Unlike written and orally expressed contracts, the parties' intent and mutual assent to an implied-in-fact contract are proven through conduct rather than words. An agreement implied in fact is "founded upon a meeting of minds which although not embodied in an express contract is inferred as a fact from conduct of the parties showing in light of the surrounding circumstances their tacit understanding." *Hercules Inc. v. United State*s, 516 U.S. 417, 424, 116 S. Ct. 981, 134 L. Ed. 2d 47. Therefore, the elements required to form an implied-in-fact contract are identical to those required for an express agreement, that is offer, acceptance, and consideration. *In the Matter of Penn Central*, 831 F.2d 1221, 1228 (3d Cir. 1987); *In re Phillips Petroleum Securities Litigation*, 697 F. Supp. 1344, 1356 (D.Del.1988). There must be a meeting of the minds. To be a legally binding implied-in-fact contract, the parties' mutual assent to the contract terms must be objectively manifest or shown. An implied-in-fact contract is enforceable as if it were an express contract. *In the Matter of Penn Central*, 831 F.2d at 1228.

**Invocation of Continued Wrong Doctrine**:

The continued wrong doctrine supports the claim that the sequence of discriminatory actions by ECU Health formed a continuing violation, each instance renewing the clock for legal redress under 42 U.S.C. § 1981. This is crucial for recognizing the ongoing nature of the discrimination and its cumulative impact on the Plaintiff's rights to make and enforce contracts as protected under federal law.

**State Actor**

Reiteration of Arguments Made Under Section 1983 Regarding State Action**:**
ECU Health's actions are intertwined with those of state agencies, demonstrating state action through:

State Bureau of Investigation (SBI): ECU Health reported the death of White to the SBI, a state law enforcement agency, rather than to local law enforcement, as instructed by the SBI on their official website. This instruction clearly indicates that the agency only investigates cases that are outside of their original jurisdiction by the request of local law enforcement agencies or state officials. Not only did the Defendant place themselves in the position of a state actor by

reporting to the agency, but the SBI enabled this policy by engaging in further communications with the Defendant about White's death, rather than requiring the Defendant to adhere to their written policy of reporting to local law enforcement.

This engagement between the SBI and the Defendant created a diversion of state resources that directly benefited the hospital by enabling them to pretend they followed mandated protocol in reporting White's death to [proper] law enforcement, though, as stated previously, the SBI does not directly accept complaints pertaining to matters outside of their original jurisdiction.

The added benefit to the Defendant was their ability to obtain information from agents regarding Plaintiff's intentions and other statements that the Defendant could use to plan strategies on how to protect themselves, whether through liability in the subsequent wrongful death action and/or efforts to hinder the justice process aimed to sweep White's death under the rug. This conduct demonstrates the Defendant's assumed state position in that it reported White's death to the SBI and continued communications about the case with the SBI, conduct that was apparently approved of by the SBI.

<u>Medical Examiner's Office</u>: The Medical Examiner's (ME) office, a state entity, was influenced by ECU Health. As indicated by the recorded phone conversation

with Danene Lowery, the ME's office required permission from ECU Health's risk management and legal team before proceeding with the investigation into White's death. This demonstrates that the hospital had significant control over a state entity's actions, effectively making those actions state actions. Additionally, the ME relinquished her state authority to the Defendant through complicitly adhering to the directive requiring her to consult with the Defendant, thereby forfeiting her independence in reviewing evidence in an official investigation purportedly initiated by the DA's office.

District Attorney's Office: The Plaintiff's phone calls to the ME's office were redirected to the Defendant's risk manager after the Plaintiff's previous calls to that office revealed that Dixon had lied about already having an ME report in July 2022. The redirections that occurred in September and October 2022 directly benefitted Dixon by attempting to mask his deception and any further misconduct. According to the Fourth Circuit in *Philips*, this benefit satisfies one of the three ways a private entity can be a state actor for the purpose of Section 1983 liability.

The above-mentioned interference obstructed the Plaintiff's exercise of her First Amendment right to effectively communicate with the ME's office. For example, the ME office manager, Danene, believed she was the primary contact person and would be aware of the cases the ME was working on, as well as any

evidence submitted to the ME. Since Danene was apparently bypassed during the communication process involving the submission, receipt, or transfer of evidence to the ME's office and/or within the ME's office, this suggests collusion between Dixon and Kelly. Such actions strongly indicate that Dixon plausibly colluded with the Defendant as well.

Dixon's closing of the White case soon after receiving the report from Dr. Jason, on the surface, appears to be Dixon exercising his prosecutorial authority. However, considering the numerous instances where ECU Health shunned legal duties, interfered with investigative processes, withheld evidence, concealed their wrongdoing, and outright lied when the Plaintiff was entitled to the truth, it is highly plausible that ECU Health made the charging decision in this case—a state authority only given to a prosecutor—masked with the face and letter-writing of DA Dixon.

**Intentional Discrimination**

Protection of White Employees: ECU Health has a documented history of protecting its white employees from accountability, even when their actions result in severe consequences for patients. The failure to report misconduct to regulatory bodies, such as the BON, and the subsequent protection of these employees demonstrate a clear bias in favor of white staff members, in

particularly, regarding cases that have the potential to bring widespread scrutiny of the Defendant.

Racial Bias in Treatment and Investigation: The decision to redirect the Plaintiff's calls to the Defendant's risk management and legal team after discovering Dixon's deception is an example of intentional discrimination. This targeted action obstructed the Plaintiff's efforts to seek justice for her daughter and prevented transparent communication with the ME's office, thereby denying the Plaintiff due process and equal protection under the law.

Obstruction of Justice: The collusion between Dixon and Kelly, as well as the influence of ECU Health over state agencies, exemplifies a systemic issue of racial discrimination. By intentionally obstructing justice and hindering investigations, ECU Health has demonstrated a pattern of discriminatory practices aimed at protecting its reputation and white employees at the expense of black patients and their families.

Financial and Reputational Concerns: Plausibly, ECU Health's primary motivation for these discriminatory actions is to protect its financial interests and reputation. The potential media fallout and public scrutiny that could arise from the death of a black patient at the hands of a white nurse are significant factors driving the hospital's actions. By denying the Plaintiff her constitutional rights and obstructing

justice, ECU Health seeks to avoid the negative consequences that could result from a high-profile case of racial discrimination and medical negligence.

**Conclusion of This Section:**

By these actions, The Defendant engaged in discriminatory practices that favored white employees, effectively denying the Plaintiff the equitable contractual interactions guaranteed under Section 1981. This disparity underscores a systemic issue within the hospital's operations, highlighting a clear violation of the Plaintiff's rights to make and enforce contracts as protected under federal law.

## F. Section 1985 Claim

**Factual support showing a "meeting of the minds" for the conspiracy:**

Alleged Conspiracy: The Plaintiff alleges that ECU Health, in collaboration with SBI agents and other state actors, engaged in a conspiracy to obstruct justice and deny the Plaintiff's civil rights. This conspiracy began immediately following the death of Keisha Marie White and continues to the present day, aiming to

protect the hospital's interests and its employees at the expense of the Plaintiff's constitutional rights.

Involvement of SBI Agents: ECU Health reported White's death to the SBI rather than to local law enforcement. Despite the SBI's policy that limits cases outside of its original jurisdiction to cases referred by local law enforcement or state officials, the SBI engaged in communications with ECU Health. Haddock spoke to three different SBI agents to report one incident, each of whom communicated back with her, discussing the details of the case and information obtained from the Plaintiff's via her inquiries. This ongoing communication demonstrates the SBI's involvement and support of ECU Health's efforts to control the investigation and information flow. If the SBI had adhered to its policy, at least one of these agents should have redirected the complaint to local law enforcement, as they have done in other instances, in particularly, instances when the Plaintiff attempted to file a complaint with the SBI agency and was redirected to contact the district attorney. This pattern of behavior indicates a meeting of the minds and suggests a coordinated effort to assist ECU Health in managing the case.

District Attorney's Office: The DA's office, both under Kimberly Robb and later Faris Dixon, demonstrated a clear alignment with ECU Health's interests. This is evident through their acceptance of incomplete investigations conducted by Elias and Matherly, who failed to interview multiple key witnesses, a standard

investigative procedure in solving crimes. Furthermore, Dixon's false claim of possessing an ME report, his sudden decision to submit evidence to the ME after the Plaintiff discovered the lie, and the redirection of the Plaintiff's calls to ECU Health's risk management team suggest collusion, as well as a meeting of the minds.

Lack of Insistence on ME Report: Despite his overwhelming reliance on the ME report, Dixon never insisted that Dr. Kelly provide her expert opinion. This is evidenced by Danene's statement that Dr. Kelly forgot to look at the evidence and by the lack of an ME opinion by the time of the complaint filing on March 22, 2024, a year and a half after Dixon purportedly sent evidence directly to Kelly's email on August 11, 2022. This inaction aligns with ECU Health's strategy to hinder the investigation.

Closing of the Case: Dixon closed the case shortly after receiving Dr. Jason's report, citing insufficient evidence, despite Jason's opinion that White's manner of death was homicide. Given the pattern of interference and deception by ECU Health, it is plausible that Dixon's decision was influenced by the hospital, indicating a conspiracy to obstruct justice.

**Specific Class-Based, Invidiously Discriminatory Animus**

Definition and Legal Standard: Under Section 1985, the plaintiff must show that the defendants were motivated by a class-based, invidiously discriminatory animus. This means demonstrating that the defendants' actions were driven by discriminatory intent against a protected class, such as race.

Discriminatory Actions by ECU Health: Protection of White Employees: ECU Health has a documented history of protecting its white employees from accountability, even when their actions result in severe consequences for patients. The failure to report misconduct to regulatory bodies, such as the BON, and the subsequent protection of these employees demonstrate a clear bias in favor of white staff members, particularly in cases that have the potential to bring widespread scrutiny to the Defendant.

Racial Bias in Treatment and Investigation: The decision to redirect the Plaintiff's calls to the Defendant's risk management and legal team after discovering Dixon's deception is an example of intentional discrimination. This targeted action obstructed the Plaintiff's efforts to seek justice for her daughter and prevented transparent communication with the ME's office, thereby denying the Plaintiff due process and equal protection under the law.

Obstruction of Justice: The collusion between Dixon and Kelly, as well as the influence of ECU Health over state agencies, exemplifies a systemic issue of racial discrimination. By intentionally obstructing justice and hindering investigations, ECU Health has demonstrated a pattern of discriminatory practices aimed at protecting its reputation and white employees at the expense of black patients and their families.

Financial and Reputational Concerns: ECU Health's primary motivation for these discriminatory actions is to protect its financial interests and reputation. The potential media fallout and public scrutiny that could arise from the death of a black patient at the hands of a white nurse are significant factors driving the hospital's actions. By denying the Plaintiff her constitutional rights and obstructing justice, ECU Health seeks to avoid the negative consequences that could result from a high-profile case of racial discrimination and medical negligence.

Examples from Case Law: In *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993), the Supreme Court emphasized that claims under Section 1985(3) require showing that the conspiracy was motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus. The actions of ECU Health align with the discriminatory motivations outlined in *Bray*, demonstrating an intentional effort to disadvantage the Plaintiff based on her race.

By establishing these points, the Plaintiff can show that the alleged actions were not only part of a broader pattern of misconduct but were also driven by discriminatory intent. This supports the claim under Section 1985 for civil rights conspiracy with specific class-based, invidiously discriminatory animus.

## G. Title VI Claim

Plaintiff contends that the complaint sufficiently alleges facts that, if proven, would demonstrate racial discrimination in a program receiving federal financial assistance, entitling her to relief under Title VI.

Plaintiff asserts that ECU Health engaged in racial discrimination against her, which influenced the handling of White's death, and subsequent investigations. These actions occurred within the context of a federally funded program, bringing them under the purview of Title VI.

**Addressing Defendant's Claim of No Intentional Racial Discrimination (D.E. 21 at 16 #3, at 22):**

The Defendant argues that there is no intentional racial discrimination. However, the Plaintiff's allegations and evidence suggest otherwise. Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national

origin in programs and activities receiving federal financial assistance. The Plaintiff's claims are supported by specific instances of differential treatment that indicate racial bias.

**Evidence of Racial Bias:**

Protection of White Employees: ECU Health's documented history of protecting its white employees, even when their actions result in severe consequences for patients, is a clear indication of racial bias. The failure to report misconduct to regulatory bodies, such as the BON, and the subsequent protection of these employees, particularly in cases that could bring widespread scrutiny, demonstrates a preference for white staff members over black patients.

Differential Treatment and Investigation: The decision to redirect the Plaintiff's calls to the Defendant's risk management and legal team after discovering Dixon's deception is another example of racial bias. This action obstructed the Plaintiff's efforts to seek justice for her daughter and prevented transparent communication with the Medical Examiner's office, thereby denying the Plaintiff due process and equal protection under the law.

Obstruction of Justice: The collusion between Dixon and Kelly, along with the influence of ECU Health over state agencies, exemplifies systemic racial

discrimination. By intentionally obstructing justice and hindering investigations, ECU Health demonstrated a pattern of discriminatory practices aimed at protecting its reputation and white employees at the expense of black patients and their families.

Discriminatory Motives: ECU Health's primary motivation for these discriminatory actions appears to be the protection of its financial interests and reputation. The potential media fallout and public scrutiny that could arise from the death of a black patient at the hands of a white nurse are significant factors driving the hospital's actions. By denying the Plaintiff her constitutional rights and obstructing justice, ECU Health sought to avoid the negative consequences of a high-profile case of racial discrimination and medical negligence.

**Conclusion of This Section:**

The Plaintiff has provided substantial evidence indicating that ECU Health engaged in racial discrimination in a federally funded program, violating Title VI. The allegations and supporting evidence demonstrate that the Defendant's actions were not isolated incidents but part of a broader pattern of racial bias that influenced the handling of White's death and the subsequent investigations. Therefore, the Plaintiff's Title VI claim should not be dismissed, as it sufficiently

alleges intentional racial discrimination within the context of a program receiving federal financial assistance.

## H. 42 U.S.C. § 1988 and 18 U.S.C. § 241 Claims

Plaintiff cites 42 U.S.C. § 1988 for context and to support the arguments presented under the applicable civil rights statutes. Section 1988 provides the framework for the enforcement of civil rights claims and allows for the awarding of attorney's fees to the prevailing party in civil rights litigation. This statute underscores the importance of the Plaintiff's claims under Section 1983 and Section 1981, highlighting the legislative intent to provide remedies and encourage enforcement of civil rights protections.

Given that 18 U.S.C. § 241 is a criminal statute and does not provide a private cause of action, it is not applicable to this civil complaint and will be omitted from further discussion.

## V. Conclusion

In conclusion, the Plaintiff has demonstrated through detailed factual allegations and supporting evidence that ECU Health engaged in a pattern of discriminatory practices, misconduct, obstruction of justice, and conspiracy to violate the

Plaintiff's civil rights. These actions violated the Plaintiff's civil rights under Sections 1981, 1983, 1985, and Title VI, as well as other applicable federal statutes.

**Summary of Key Points:**

Pattern of Misconduct: ECU Health has a documented history of non-compliance with federal regulations and ethical standards, as detailed in the timeline and supporting evidence provided earlier in the document.

Discriminatory Practices: The Plaintiff has shown that ECU Health's actions were driven by racial bias, as evidenced by the protection of white employees and the differential treatment of the Plaintiff and her daughter's case post-mortem.

Obstruction of Justice: The Defendant's collusion with state agencies and intentional hindrance of investigations into White's death further underscore the systemic issues at ECU Health.

Civil Rights Violations: The Plaintiff's rights to freedom of speech, due process, equal protection, and fair contractual interactions have been repeatedly violated by the Defendant's actions.

<u>Legal Precedents</u>: Relevant case law supports the Plaintiff's claims and highlights the necessity for judicial intervention to address the ongoing civil rights violations.

Given the comprehensive evidence and legal arguments presented, the Plaintiff respectfully requests that the court deny the Defendant's motion to dismiss and allow this case to proceed to trial. Although the Plaintiff is currently proceeding pro se, she reserves the right to seek attorney's fees should she retain counsel, as permitted under 42 U.S.C. § 1988. Additionally, the Plaintiff seeks to recover any allowable court costs and expenses incurred as a result of representing herself, to ensure full redress of the civil rights violations suffered.

Respectfully submitted,

*/s/ Cynthia B. Avens*

Cynthia B. Avens
303 Riverside Trl.
Roanoke Rapids, NC 2870
Avens1@charter.net
252-203-7107

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2024, the Plaintiff's Response in Opposition to ECU Health's Motion to Dismiss and Memorandum of Law Supporting the Motion to Dismiss, was hand-delivered to the Clerk of the U.S. District Court in Greenville, NC. Upon docketing, the CM/ECF system will send electronic notification of such filing to the defendants' counsel:

Respectfully submitted,
/s/ Cynthia B. Avens
Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
Avens1@charter.net
252-203-7107
*Pro Se Litigant*

Chris D. Agosto Carreiro
Special Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
ccarreiro@ncdoj.gov
Telephone: (919) 716-6874
Facsimile: (919) 716-6755
State Bar No. 45356
*Counsel for DA Dixon*

Jeremy D. Lindsley
Assistant Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
jlindsley@ncdoj.gov
Tel: 919-716-6920
Fax: 919-716-6764
NC State Bar No. 26235
*Counsel for Dr. Karen Kelly*

Daniel D. McClurg
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202
daniel.mcclurg@klgates.com
(704) 331-7400
(704) 353-3114
NC Bar #53768
*Counsel for Defendant Pitt County Memorial Hospital, Inc.*

Terrence M. McKelvey
K&L Gates LLP
501 Commerce Street, Suite 1500
Nashville, Tennessee 37203
terrence.mckelvey@klgates.com
(615) 780-6700
(615) 780-6799
NC Bar #47940
*Counsel for Defendant Pitt County Memorial Hospital, Inc.*