FILED

JUL 17 2024

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BG _____ DEP CLK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### EASTERN DIVISION

Civil Action Number 4:24-CV-00051-M-RN

| | | |
|---|---|---|
| Cynthia B. Avens | ) | |
| | ) | |
|   (Plaintiff) | ) | PLAINTIFF'S RESPONSE IN |
| | ) | OPPOSITION TO DE 43 |
| | ) | MOTION TO DISMISS FOR |
| Faris C. Dixon, Jr., District Attorney | ) | FAILURE TO STATE A CLAIM |
| Pitt County Memorial Hospital, Inc. | ) | AND MOTION TO DISMISS FOR |
| Dr. Karen Kelly, Medical Examiner | ) | LACK OF JURISDICTION |
| John/Jane Doe | ) | |
| John/Jane Doe | ) | |
| John/Jane Doe | ) | |
|   (Defendants) | ) | |

## I.    INTRODUCTION

Plaintiff, Cynthia B. Avens ("Avens" or "Plaintiff"), Pro Se Litigant, submits this

memorandum in opposition to Defendant Faris C. Dixon, Jr.'s ("Defendant" or "Dixon")

motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

Procedure, and Rule 7(b) governing the submission of this response.

1

## II.    RESPONSE TO DEFENDANT'S STATEMENT OF FACTS RELEVANT TO CLAIMS AGAINST MR. DIXON

Dixon's counsel stated in her memorandum that Avens requested that an independent medical examiner ("IME") be retained to investigate her daughter's death (DE 44 at 6 ¶ 1). For clarity, Avens did not ask Dixon if he would hire an IME. Avens inquired with Dixon about the possibility of retaining an IME herself. After he refused to reveal any information about the ME report that he claimed to already have, Avens asked, "What if I hire an independent medical examiner?" (DE 33 at 32 ¶ 119).

## III.    STANDARDS OF REVIEW

Federal Rules of Civil Procedure (FRCP) 12(b)(1):

"When a facial challenge to subject-matter jurisdiction is raised, the facts alleged by the plaintiff in the complaint are taken as true, 'and the motion must be denied if the complaint alleges sufficient facts to invoke subject-matter jurisdiction.' *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)." *Burke v. N.C. Bd. of Law Exam'rs*, No. 5:18-CV-407-BO (E.D. N.C. Oct 15, 2018).

FRCP 12(b)(6):

- In accordance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), "[I]n order to survive a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, Plaintiffs' complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, U.S.,

2

129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing *Twombly*, 550 U.S. at 556). *Jones v. First Franklin Loan Servs.*, CIVIL NO. 3:10-CV-00360-FDW-DCK (W.D. N.C. Dec 13, 2010). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id. Barnett v. Marquis*, 16 F.Supp.3d 1218 (D. Or. 2014).

- "In reviewing a Motion to Dismiss under Rule 12(b)(6), we are to treat the well-pleaded allegations as true and in the light most favorable to the pleader. *Donovan v. Fiumara*, 114 N.C.App. 524, 526, 442 S.E.2d 572, 574 (1994). A complaint "must be liberally construed, and the court should not dismiss the complaint unless it appears beyond a doubt that the plaintiff could not prove any set of facts to support his claim which would entitle him to relief." *Block v. Cnty. of Person*, 141 N.C.App. 273, 277-78, 540 S.E.2d 415, 419 (2000)." *Carpenter v. N.C. Dep't of Health & Human Servs. - Office of the Chief Med. Exam'r,* COA22-170 (N.C. App. Feb 07, 2023).

Immunity:
- "An official claiming immunity bears the burden of showing that the particular immunity claimed applies. See *Burns v. Reed*, 500 U.S. 478, 486–87, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)." *Giraldo v. Kessler*, 694 F.3d 161 (2nd Cir. 2012).

3

- ""[W]hen prosecutors perform administrative or investigative, rather than advocatory, functions they do not receive absolute immunity." *Fletcher v. Kalina*, 93 F.3d 653, 655 (9th Cir.1996) (citation omitted)." *Barnett v. Marquis*, 16 F.Supp.3d 1218 (D. Or. 2014)

- "The traditional functions of an advocate also include 'the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.' *Buckley*, 509 U.S. at 273." *Doran v. Smith*, CV 4:18-cv-136-GF-SPW (D. Mont. Aug 06, 2019).

- "The doctrine of qualified immunity affords protection against individual liability for civil damages to officials 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). To discharge this burden, the plaintiff must satisfy a two-prong test." *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 251-52 (5th Cir. 2005). First, he must claim that the defendants committed a constitutional violation under current law. *Id.* (citation omitted). Second, he must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions

4

complained of. *Id. Huff v. McCullough*, CIVIL ACTION NO. 2:12-CV-254 (S.D. Tex. Feb 28, 2013).


Failure to State a Claim:

The Supreme Court in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957): "In appraising the sufficiency of the complaint we follow ... the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983).


Continuing Wrong:

"A cause of action based on negligence accrues when the wrong giving rise to bring suit is committed, even though the damages at that time be nominal and the injuries cannot be discovered until a later date.'" *Birtha v. Stonemor, __ N.C. __, LLC*, 220 N.C.App. 286, 292, 727 S.E.2d 1, 7 (2012) (quoting *Harrold v. Dowd*, 149 N.C.App. 777, 781, 561 S.E.2d 914, 918 (2002)). However, the continuing wrong doctrine is an exception to this general rule. *Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 179, 581 S.E.2d 415, 423 (2003). "Under the continuing wrong doctrine, the statute of limitations does not start running 'until the violative act ceases.'" *Marzec v. Nye*, 203 N.C.App. 88, 94, 690 S.E.2d 537, 542 (2010) (quoting *Babb v. Graham*, 190 N.C.App. 463, 481, 660 S.E.2d 626, 637 (2008)). In order for the continuing wrong doctrine to toll the statute of limitations, the plaintiff must allege "[a] continuing violation" by the defendant that "is occasioned by continual unlawful acts, not by continual ill effects from an original

5

violation." *Id.* (alteration in original) (citations and quotation marks omitted)." *Carpenter v. N.C. Dep't of Health & Human Servs. - Office of the Chief Med. Exam'r,* COA22-170 (N.C. App. Feb 07, 2023)

"In *Babb*, [that] Court noted the trustee's 'wrongful conduct, the refusal to make distributions, continued until he was removed as trustee[.]' *Id.* at 481, 660 S.E.2d at 637. Thus, this Court concluded the continuous refusal to make distributions constituted continual unlawful acts, warranting the application of the continuing wrong doctrine." *Carpenter v. N.C. Dep't of Health & Human Servs. - Office of the Chief Med. Exam'r*, COA22-170 (N.C. App. Feb 07, 2023).

Negligence Per se:

"Under traditional principles of tort law, '[t]he unexcused violation of a legislative enactment or an administrative regulation which is adopted by the court as defining the standard of conduct of a reasonable man, is negligence in itself,' or in more common usage, negligence per se." *Ries v. National R.R. Passenger Corp.*, 960 F.2d 1156 (3rd Cir. 1992).

## IV.    RESPONSE TO DEFENDANT'S CLAIM THAT PLAINTIFF LACKS A JUDICIALLY COGNIZABLE INTEREST TO INVOKE THE JURISDICTION OF THIS COURT

The Defendant argues that Plaintiff lacks a judicially cognizable interest, thus challenging the court's jurisdiction. Plaintiff contends that this assertion is unfounded and will demonstrate that this case falls squarely within the jurisdiction of this court.

FEDERAL QUESTION JURISDICTION:

Plaintiff's claims arise under federal law, specifically 42 U.S.C. § 1983, which provides a federal cause of action for the deprivation of constitutional rights. The allegations involve significant violations of the First and Fourteenth Amendments of the United States Constitution.

PLAINTIFF'S RIGHTS AS A VICTIM:

The Plaintiff has thoroughly explained how the death of her daughter, Keisha Marie White (White) has been covered up by the defendants in this case and others for more than ten years. In the case of *Love v. Bolinger*, the Plaintiffs brought suit against the defendants for allegedly covering up the death of their loved one, Joseph Love, who died in his jail cell. The case was dismissed because the family's claims were in support of Love's civil rights, and it was explained, "[a]fter death, one is no longer a person within our constitutional and statutory framework and has no rights of which he may be deprived." *Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir.1979). However, the *Love* case also expressed, "We do not hold that cover-up of a wrongful death is without civil or criminal effect; rather, we hold that 'the victims of a cover-up are the decedent's survivors, not the decedent himself.'" *Gibson*, 910 F.2d at 1523, citing, *Bell v. City of Milwaukee*, 746 F.2d 1205, 1264 (7th Cir.1984). *Love v. Bolinger*, 927 F.Supp. 1131 (S.D. Ind. 1996). Therefore, as the victim of the cover-up of White's death, the Plaintiff does have a judicially cognizable interest to seek relief from this Court as any cover-up, including the Defendant's misconduct by lying, stalling for time, and failures to conduct a proper investigation, affected the Plaintiff's efforts to pursue justice.

7

Defendant's assertion that Plaintiff does not have a right to compel prosecution misses the point. Plaintiff's claim centers on the deprivation of constitutional rights due to Dixon's failure to conduct a proper investigation, not on compelling prosecution.

While there is no cause of action for failure to prosecute, a cover-up of a killing which obstructs "legitimate efforts to vindicate the killing through judicial redress interferes with the due process right of access to the courts." *Bell*, 746 F.2d at 1261, citing, *Ryland v. Shapiro*, 708 F.2d 967; see also, *Vasquez*, 60 F.3d at 328 ("when police officers conceal or obscure important facts about a crime from its victims, rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged"). The defendants in *Love* argued that the right of access encompasses nothing more than the right to initiate a lawsuit, and therefore, because plaintiffs have brought this lawsuit, their right of access to the courts has not been abridged. The Court determined that was not an accurate characterization of the right to access. To deny access, defendants "need not literally bar the courthouse door or attack plaintiffs' witnesses." *Vasquez*, 60 F.3d at 329. The right is lost where officials "shield from the public and the victim's family key facts which would form the basis of the family's claims for redress." *Id*. In other words, formal access to the courts is not enough; access must also be "adequate, effective, and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822, 97 S.Ct. 1491 1495, 52 L.Ed.2d 72 (1977). Cited in *Love v. Bolinger*.

Seventh Circuit caselaw on this point establishes that a cover-up leads to a denial of access to the courts where the cover-up was to some extent successful. In *Bell*, the

8

Seventh Circuit held that a successful twenty-year cover-up of a police killing interfered with the due process right of access. 746 F.2d 1205. In *Vasquez* the Seventh Circuit reasoned that "the cornerstone of our decision in Bell was that the conspiracy had prevented a full and open disclosure of facts crucial to the cause of action, rendering hollow the plaintiffs' right of access." 60 F.3d at 329. *Love v. Bolinger*, 927 F.Supp. 1131 (S.D. Ind. 1996).

Based on the above-mentioned citations, the Plaintiff's due process rights to access of the court has been violated. It is also worth mentioning that due to the egregious cover-up of White's death, facts were concealed that prevented the Plaintiff from addressing the cover-up sooner. Prior to and including 2022, the Plaintiff did speculate that her daughter's death was being covered up, however, she lacked evidence beyond a speculative level. Couple that with the various affirmative defenses afforded this Defendant and others, the barriers to surpass dismissal were insurmountable.

The difference between the years prior to 2022 and since 2022 is (1) evidence was discovered to be missing from the DA's office that the Plaintiff could not have known about until the list of the evidence reviewed was issued; and (2) the lie that Dixon told to the Plaintiff when he claimed to already have a report from the medical examiner (ME) Dr. Karen Kelly (Kelly). This lie was addressed in the recorded phone calls with the Defendant and with the ME office manager, Danene Lowery (Lowery) in 2023. Lowery also revealed other information (Exhibit 9 pp. 13-17). Had she followed her directives and not spoken to the Plaintiff, the crucial information would have remained concealed.

9

Fortunately, the recorded phone calls in all of Exhibit 9 provided enough tangible evidence, that when used in conjunction with other evidence, including circumstantial, provided a basis to surpass affirmative defenses.

Let it also be noted that as the Defendant claimed in a recorded conversation (Exhibit 9 pp. 7-8 at 04:57, 05:19) that witnesses, including the Plaintiff, were never interviewed as part of the criminal investigation because no one thought "it was criminal." Yet, the Plaintiff learned on May 30, 2024, that hospital personnel were not interviewed and the reason for the failure had nothing to do with the SBI and GPD not believing a crime had occurred but was due to ECU Health's failure to cooperate with the investigation by not assisting investigators with necessary personnel information to facilitate interviews; i.e., names, addresses, and phone numbers (DE 33 p. 24 ¶ 97). Herein are just a few examples of how information was concealed from the Plaintiff by the Defendant and others during the shameless mockery purported to be a homicide investigation. The deliberate obstruction and misinformation by the defendants have prevented the Plaintiff from gathering the necessary evidence to substantiate her claims prior to the filing of this case with the U.S. District Court.

STANDING:

Standing to bring a suit is a prerequisite for obtaining a judicial resolution of a dispute. It is well established that for a person to have standing, they must be aggrieved by the matter being challenged. *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269 (Pa. 1975); *Nader v. Hughes*, 643 A.2d 747 (*Pa. Cmwlth*. 1994). "Aggrieved" is

defined as having an immediate, direct, and substantial interest in the challenged matter, beyond the interest of an individual member of the general public. *Citizens for State Hospital v. Commonwealth*, 553 A.2d 496 (*Pa. Cmwlth.* 1989). The party must demonstrate a "sufficiently close causal connection between the challenged action and the asserted injury to qualify the interest as 'immediate' rather than 'remote.'" *William Penn Parking Garage*, 346 A.2d at 286.

As explained earlier in *Love v. Bolinger*, when circumstances surrounding a death have been covered up, leading to a denial of access to the courts where the cover-up was to some extent successful, it is the survivors whose Fourteenth Amendment rights are violated. Therefore, being the victim of the cover-up, the Plaintiff has a clear, direct, and substantial interest in the matter, as defined by *William Penn Parking Garage, Inc. v. City of Pittsburgh* and *Nader v. Hughes*. This interest goes beyond that of a general member of the public due to her direct involvement and the significant impact on her pursuit of justice for her daughter's death. The Plaintiff has standing to seek redress from this Court for the violation of her civil rights.

PLAINTIFF'S RIGHT TO A FAIR AND COMPLETE INVESTIGATION:

The Plaintiff may not have a right to compel a prosecutor to investigate; however, if the prosecutor does initiate an investigation, he is bound by legal and ethical standards to conduct a thorough and unbiased investigation. When Dixon chose to investigate White's death, he assumed the responsibility to carry out this investigation according to these standards. This responsibility includes gathering all relevant evidence,

interviewing witnesses, evaluating all available information, and seeking assistance from professionals when necessary.

According to the North Carolina State Bar's (Bar) Rules of Professional Conduct, Rule 3.8, when analyzing new evidence or information, the prosecutor must evaluate the substance of the information received. Comment [1] to Rule 3.8 emphasizes that a prosecutor has the responsibility of a minister of justice and must ensure procedural justice. Comment [2] further clarifies that a prosecutor should not intentionally avoid pursuing evidence merely because it might damage the prosecutor's case or aid the accused.

As the Bar has referred to The American Bar Association (ABA) Standards for Criminal Justice, the ABA states in Section 1.3(e): "Before and throughout the course of complex or non-routine investigations, the prosecutor should work with the police and other participating agencies and experts to develop an investigative plan that analyzes:
(i) the investigative predicate or information concerning the matter that is then known;
(ii) the goals of the investigation;
(iii) the potential investigative techniques and the advantages of each, singularly and in combination, in producing relevant information and admissible evidence; and
(iv) the legal issues likely to arise during the investigation."

It is not the responsibility of the Plaintiff to instruct Dixon on how to conduct a proper investigation. Dixon's deliberate disregard for professional standards is overwhelming.

The above provisions underscore the ethical obligations of prosecutors to conduct thorough and unbiased investigations. By failing to adhere to these standards, Dixon neglected his duty to ensure a fair and impartial investigation, thereby violating Plaintiff's due process and equal protection rights.

## V. PLAINTIFF'S RESPONSE TO MULTIPLE IMMUNITIES:

ELEVENTH AMENDMENT:

"While state defendants sued in their official capacity for monetary damages under § 1983 are immune from suit under the Eleventh Amendment, they are not immune from claims seeking prospective declaratory or injunctive relief." *Smith v. Fla. Dep't of Corr.,* 318 Fed.Appx. 726, 728 (11th Cir. 2008) (first citing *Powell v. Barrett*, 496 F.3d 1288, 1308 & n. 27 (11th Cir. 2007); then citing *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1220 (11th Cir. 2000)). Indeed, "[u]nder the doctrine of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), there is a long and well-recognized exception to this rule for suits against state officers seeking prospective equitable relief to end continuing violations of federal law." *Fla. Ass'n of Rehab. Facilities, Inc.*, 225 F.3d at 1220. *Merritt v. Transp. Officer 1*, 5:21-cv-37-TKW/MJF (N.D. Fla. Feb 28, 2022).

The Eleventh Amendment does not protect against injunctive relief for ongoing violations of federal law. The Defendant has taken part in the cover-up of White's death since 2019 when the Plaintiff requested he reopen the case. Matherly stated that she

13

turned in her report to the DA's office at the completion of her investigation that began in November 2014. She worked alongside Greenville Police Department (GPD) Detective Alvaro Elias (Elias). The logical conclusion is that Elias also turned in his report to the DA's office. However, as Matherly informed the Plaintiff, ECU Health failed to make personnel available for interview. She also remembered that she did not interview the Plaintiff. Therefore, Dixon knew in 2019 that the concurrent SBI and GPD investigations were incomplete and lacked critical information necessary to make an informed decision that no crime had occurred in the death of White. The Defendant also had to be aware that Matherly and Elias both failed to exercise their authority in requiring ECU Health's cooperation with their investigation.

In 2019, Dixon had medical records, including nursing flow sheets, in his possession. In those records and flow sheets were over one hundred false vital signs readings recorded after White was transferred to ICU on life support and up to thirty-one hours after White had died. The Defendant has mentioned multiple times that he and others reviewed these records, yet he never followed up on the unlawful violations that suggest accessory to murder.

The Defendant has lied on multiple occasions including, but not limited to:

• Claims that no crime has happened in White's case;

• He possessed an ME report that he did not have;

• He could not use a report from an independent medical examiner (IME);

• Witnesses were not interviewed because no one thought anything criminal had taken place; and

• He was waiting on a report from Dr. Kelly, which if were true, he would have insisted she cooperate with his "investigation" by reviewing the evidence and providing him with a report of her determination.

The Defendant's obligation to White's case did not end because he closed the case after receiving confirmation that White's death was a homicide. That decision did not cease his violations of the Plaintiff's due process to open court. Closing the case in 2024 did not conceal his criminal behavior of obstructing justice into a neat little box with a bow on top. Dixon's decision to close the case added further injury to the Plaintiff by rendering hollow her efforts to pursue justice, thus abridging her right of access to the courts.

Under the *Ex parte Young* exception, the Plaintiff is within her rights to seek injunctive relief to end the Defendant's ongoing obstruction of justice of Plaintiff's efforts to pursue justice for the death of her daughter. As stated in the Plaintiff's amended complaint in the "Relief Sought" section, the Plaintiff requested:

• Injunctive Relief: The Plaintiff seeks injunctive relief requiring the defendants' cooperation if any investigation is initiated as a result of this case.

• Other Relief: The Plaintiff seeks any other relief that the Court deems just and proper to remedy the violations of her constitutional rights and to compensate for the harm suffered.

Though the Plaintiff's wording may not specifically stipulate the *Ex parte Young* exception, the two remedies sought fall squarely within such a remedy.

While the Court may not be able to grant some of the non-monetary remedies sought in the Plaintiff's complaint, the appointment of a special prosecutor and subsequent investigation into White's death can be negotiated with the Defendant. The Defendant does have the authority to grant such actions. The Court can provide injunctive relief requiring the defendants to halt their actions that have and continue to obstruct justice. And as far as the public symbol the Plaintiff requested, the Plaintiff never said that such an honoring had to be an erection of anything. There are many ways such a request may be granted. An example could include implementing a program to help others but still recognizes White in some way. However, this topic will be open for discussion should the case survive dismissal.

ABSOLUTE IMMUNITY:

The Defendant has quoted *Buckley* to support his claim to absolute immunity protections. However, *Buckley* further stated, "We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an

16

indictment has been made." *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

*Buckley* further clarified, "[t]he Supreme Court established a temporal line for absolute immunity: a prosecutor is not functioning as an advocate, and hence does not have absolute immunity, 'before he has probable cause to have anyone arrested.'" *Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994).

In other words, *Buckley* clearly delineates between which investigative functions are protected by absolute immunity and which are not. In the investigation into White's death, the Defendant had not made a decision to seek an indictment and had failed to establish probable cause. The Defendant stated multiple times that he did not believe a crime had happened in White's case. In the recorded conversations (Exhibit 9 p. 3 at 00:39; p. 10 at 08:35), the Defendant referenced that any response from the ME would be as part of an investigation.

"[P]rosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430, 431, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). "[W]hen prosecutors perform administrative or investigative, rather than advocatory, functions

17

they do not receive absolute immunity." *Fletcher v. Kalina*, 93 F.3d 653, 655 (9th Cir. 1996) (citation omitted); *Barnett v. Marquis*, 16 F.Supp.3d 1218 (D. Or. 2014).

Therefore, the Defendant is not entitled to absolute immunity..

QUALIFIED IMMUNITY:

To overcome a qualified immunity defense, the plaintiff must satisfy a two-prong test. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 251-52 (5th Cir. 2005). First, he must claim that the defendants committed a constitutional violation under current law. *Id.* (citation omitted). Second, he must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of. *Id. Huff v. McCullough*, CIVIL ACTION NO. 2:12-CV-254 (S.D. Tex. Feb 28, 2013).

Prong One - Constitutional Violation:

Being the victim of the cover-up of her daughter's death, the Plaintiff's First and Fourteenth Amendment civil rights were violated. The Plaintiff has sought justice for the death of White since 2014. However, the defendants in this case, along with others including but limited to the GPD, the SBI, the former DA Kimberly Robb (Robb), and ADA Futrell, have ensured that White's death could not be vindicated. The various acts of these entities and agents have been described throughout the Plaintiff's amended complaint. Supporting evidence was included as exhibits to the amended complaint.

<u>Prong Two - Clearly Established Right</u>:

Courts have determined, "[t]he right of access to the courts finds support in several provisions of the Constitution including: the Due Process Clause of the Fourteenth Amendment, *Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S.Ct. 2963 2986, 41 L.Ed.2d 935 (1974), the Equal Protection Clause, *Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S.Ct. 1990 1994, 95 L.Ed.2d 539 (1987), the First Amendment, *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254 2259, 96 L.Ed.2d 64 (1987)(citing *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)), and the Privileges and Immunities Clause of Article IV, see, e.g., *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907); *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir.1990).

The right of access in its most formal manifestation protects a person's right to physically access the court system. Without more, however, such an important right would ring hollow in the halls of justice. See *Chambers*, 207 U.S. at 148, 28 S.Ct. at 35. *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1996).

The Defendant, being well-educated with about fifteen years of experience in the DA's office as an assistant DA and an elected official, knew or should have been aware of the implications of his actions. As a prosecutor, Dixon is well-equipped with the knowledge of laws and regulations that govern our society. There is no excuse for his conduct, and qualified immunity should not protect his behavior.

19

In the Defendant's memorandum, multiple pieces of evidence were listed as having been reviewed by Dixon (DE 44 p. 17 ¶ 2 a-g):

- o The death certificate that stated manner of death was natural: The death certificate was completed on May 10, 2014, before any investigation by ECU Health, the North Carolina Department of Health and Human Services (DHHS), the North Carolina Board of Nursing (BON), and Dr. Donald Jason, MD., JD., were conducted. Dixon failed to consider the information in these reports that supported a manner of death other than natural. As a prosecutor, the Defendant should understand the importance of newer evidence that comes to light, especially when such evidence is supports an alternate theory.

- o The absence of a performed autopsy: In his position, the Defendant is or should be well aware of which types of deaths would warrant referral to a medical examiner. He viewed the death certificate. Therefore, he was aware that White's death was not referred to an ME. This alone should have begged the question, "Why not?" He knew Code Blue was called while White was restrained to a bed. The falsified medical records and other reports showed that White was denied physician prescribed oxygen and that White suffered due to a plethora of other medical failures.

- o The opinion of natural death by the former chief medical examiner, Dr. Radisch, MD., MPH.: Again, more information was revealed after Dr. Radisch's opinion was released. Implying that Dixon did or does not understand that subsequent information after a fact has to be weighed against what was previously known is

preposterous. Dixon's failures were intentional and now he wants to be protected for his illicit behavior with immunities like he is a simple person. He is not simple.

o The conclusion of NC SBI Special Agent Matherly's investigative findings: Matherly's investigation was incomplete, and the Defendant is well-aware of that fact. Yet, he accepted it and used it to base his charging decision. This supports his denial of the Plaintiff's right to equal protection, unless this reliance on incomplete data is the manner in which all of his charging decisions are made. This logic should question every charging decision he's made as a District Attorney.

o The conclusion of the GPD's investigative findings: The GPD's investigation was incomplete. What the plaintiff just said in (d) goes double for (e).

o Various medical records from 2014: Counsel for the Defendant cleverly included all of the medical records in Dixon's possession into one item. Dixon specifically reviewed flow sheet data, physician's orders, monitor technician notes, and hospital restraint and seclusion records. (Exhibit 8 pp. 5-6). Regarding these records:

  o The Defendant had access to falsified medical records that contained invalid vital signs recorded on May 10, 2014, after White was removed from the unit following Code Blue, taken to ICU and placed on life support; and on May 11, 2014, the day after White was already deceased. The Defendant has repeatedly stated that he and other law enforcement officials reviewed these records.

21

- The Defendant was aware of the numerous physician's orders that were not followed by the nurse.
- In Dixon's own words:
  - "[O]ur review of this case took significant time." (Exhibit 8, p. 6).
  - "After ADA Futrell reviewed all documents at my direction, you requested that I review said document. I personally reviewed the material." (Exhibit 8, p. 7)
  - "[T]he case documents, including the medical records, have been reviewed numerous times both by members of the Pitt County District Attorney's Office, before and after my election." (Exhibit 8, p. 7).
  - Dixon's explanation for why witnesses were not interviewed: "[T]hat would have been because at the time, no one thought that it was, it was criminal." (Exhibit 9, p. 7-8, at 04:57 and 05:19).
- Dixon's claim that "no one thought that it was criminal," either undermines the competence of those who investigated, including himself, or demonstrates a willful disregard for the truth. Falsifying legal documents is a criminal act in itself, and Dixon's failure to act on this knowledge highlights a significant neglect of his duty to conduct a thorough and impartial investigation. In the case of *United States v. Mathews*, 874 F.3d 698 (11th Cir. 2017), the court addressed the serious nature of falsifying medical records. This case demonstrates the severe legal consequences associated with falsifying records and underscores the importance of addressing such misconduct in any investigation.

- Similarly, in the case at hand, Dixon's failure to address the falsified medical records by Everette, who was not assigned to White's care, indicates a neglect of his duty to conduct a thorough and impartial investigation. In the three pages of medical records provided in Exhibit 4, Everette entered over one hundred false vital sign readings into White's chart, including Oxygen (SpO2), blood pressure (BP), and pulse.
    - Twenty-three false readings at 0643 (6:43 a.m.) on May 10, 2014; about thirty minutes after White was transferred to the intensive care unit following resuscitation after Code Blue was called.
    - Thirty-eight false readings at 1935 (7:35 p.m.) on May 11, 2014; almost a day and a half after time of death was called for White.
    - Fourteen false readings at 1936 (7:36 p.m.) on May 11, 2014.
    - And thirty-four false readings at 1937 (7:37 p.m.) 0n May 11, 2014.
- Despite having access to these falsified records and acknowledging their review on multiple occasions, Dixon chose not to investigate this criminal act, chose to ignore the potential implications of such acts, yet continues to cite "insufficient evidence." "Insufficient evidence" is a poor excuse when there are significant failures in obtaining information, such as failure to interview the suspect, witnesses, and hospital personnel; failure to require complete investigative reports from law enforcement; and failure to require cooperation from a medical examiner to whom evidence was submitted. These actions were not only the opposite of what is expected of a prosecutor, but they

23

further obstructed justice and violated Plaintiff's due process and equal protection rights.

- ○ In addition to the false vital sign entries, the cardiac monitor had been silenced from the patient's room, (DE 33 p. 14 ¶¶ 63-64) which prevented cardiac strips from being printed by the cardiac monitor technician. Dixon's failure to acknowledge the missing cardiac readings, to question hospital personnel about the missing readings, or to seek assistance from medical professionals about the missing readings, all overlook the value that the missing cardiac readings indicate. In this situation, the missing readings show when the cardiac monitor in White's room was silenced to the monitor technician, which is a strong indication of premeditation. The silencing of White's cardiac monitor in this way not only prevented anyone in or near the room from being alerted White was in danger, but it also prevented audible alarms from sounding at the nurse's station. This information is especially important, because:

  - ▪ With the absence of audible alerts, which are a necessary function of a cardiac monitoring system, no one was aware when White stopped breathing, when her heart ceased to beat, or had any warning that White was in danger of these events happening. The absence of audible alerts prevented White from receiving life-saving assistance from any individual on 3 South, where White's room was located (Exhibit 10).

  - ▪ White was on a unit that was dedicated to patients who required cardiac monitoring. (DE 33 p. 6 ¶ 18).

24

- There were physician's orders for continued cardiac monitoring (DE 33 p. 6 ¶¶ 17, 20 and Exhibit 10).

- Linda Brixon (Brixon), the former nurse assigned to White's care, failed to re-install the cardiac leads when the vest and bilateral wrist restraints were applied between midnight and 00:11 a.m. on May 10, 2014 (DE 33 pp. 7, 11 ¶ 26, 49).

- Brixon gave three different accounts to three different people for why the cardiac leads were not connected, which shows premeditation as Brixon attempted to conceal her actions (DE 33 p. 9, 11 ¶¶ 33-35, 46).

- In *U.S. v. Hunt*, "[I]ntent can be inferred "from efforts to conceal the unlawful activity."" *U.S. v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) This case is relevant due to Brixon's failure to inform those in her chain of command of White's deteriorating condition, causing the arterial blood gas test to be cancelled, withholding critical information, and lying to the monitor technician, the Plaintiff, and to the BON.

## VI.    RESPONSE TO PLAINTIFF'S FAILURE TO STATE A 42 U.S.C. §1983 CLAIM

<u>Violation of Rights</u>:

The Plaintiff has clearly stated which rights were violated by District Attorney Faris Dixon, a state official. The Defendant's conduct has abridged Plaintiff's access to the court, violating her First and Fourteenth Amendment rights by:

- Lying and providing misinformation.

- Relying on outdated and/or incomplete information while disregarding subsequently released evidence.

- Accepting incomplete reports from law enforcement.

- Failing to conduct a thorough investigation expected of a district attorney.

- Failing to act on criminal evidence supporting various charges, including first-degree murder, second-degree murder, patient abuse and neglect, involuntary manslaughter, assault and battery, falsification of legal documents, and potentially accessory to homicide.

- Deliberately stalling the investigation by failing to insist on the medical examiner's cooperation.

- Claiming to need a report from a medical examiner only to close the case upon receiving one.

- Failing to identify and act on obstructions of justice by ECU Health, Dr. Kelly, and others.

- Personally participating in obstructions of justice and conspiring to obstruct justice.

<u>Intent and Conflict of Interest</u>:

Dixon's closure of the case after receiving a report establishing White's death as a homicide shows that his intention was to close the case regardless of Dr. Kelly's decision. Whether the determination was natural, accidental, or homicide, Dixon's predetermined decision to close the case is evident. This is not speculation, but a logical conclusion drawn from the circumstances (res ipsa loquitur). This behavior was

at the expense of the Plaintiff's time, efforts, finances, and health; emotionally, psychologically, and physically.

Ethical Violations and Recusal:

There is no standard, ethical, legal, or otherwise, that supports Dixon's conduct, nor his charade of conducting a fair investigation. His actions were a mockery of the judicial system and aimed at covering up his lie about possessing a medical examiner's report, criminal obstructions, conspiracy, and criminal negligence causing White's death, all to protect ECU Health, creating a conflict of interest. Due to this conflict, Dixon should have recused himself and his office, especially since ADA Futrell also participated in the cover-up, and requested a special prosecutor.

Denial of Constitutional Rights:

The Defendant's actions have denied the Plaintiff her constitutional right to equal protection of the law, access to the court, and the freedom to adequately seek judicial remedy for her daughter's death..

Addressing Defendant's Counsel Arguments:

Counsel's assertion that the Plaintiff lacks a cognizable right to the prosecution of others misses the point. The issue is the Defendant's conduct. By choosing to reopen the investigation, Dixon assumed the responsibility to conduct it within legal and ethical bounds. His failure to do so, regardless of the decision to prosecute, is the crux of the Plaintiff's argument.

Counsel's statements that the Plaintiff did not have standing to challenge the Defendant's decisions are dismissive and overlook the essence of the First Amendment right to seek redress. The Plaintiff's challenge is not about who the Defendant is but about his conduct. As recognized in *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), a prosecutor's conduct can absolutely be challenged if it falls outside protected immunity.

## VII.   NEGLIGENCE PER SE AND CONTINUING WRONG

In pointing out that the Plaintiff based her claims against the Defendant on the theories of continued wrong and negligence per se, Counsel for the Defendant has, again, missed the point. The Plaintiff's point in exercising these two legal theories is (1) the conduct of the Defendant obstructed justice, which is illegal and caused the Plaintiff harm by violating her civil rights; hence negligence per se; and (2) the Defendant's conduct spanned beyond the three-year period within the statute of limitations; hence the continued wrong doctrine.

As established in *State v. Wright*, obstruction of justice is a broad concept encompassing various actions that hinder public or legal justice (*State v. Wright*, No. COA09-674, N.C. Ct. App. 2010). This concept was further defined in *Henry v. Deen*, where creating false and misleading entries in a medical chart was deemed an act that obstructed public or legal justice, even in the absence of pending legal proceedings (*Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326, 334 (1984)). Similarly, the Defendant's

28

actions in claiming to have a Medical Examiner's report when none existed and ignoring obstructions such as falsified medical records by Everette and incomplete investigative reports from Elias and Matherly, constitute deliberate acts to obstruct justice. The Supreme Court in *Henry* emphasized that such acts, if found to have occurred, obstruct, impede, or hinder public or legal justice, amounting to the common law offense of obstructing public justice. The Defendant's failure to identify and act on these obstructions, coupled with his own obstructive behavior, clearly falls within the scope of actions deemed to obstruct justice as set out in *In re Kivett*, *Henry*, and *Grant* (*In re Kivett*, 309 N.C. 635, 309 S.E.2d 442, 462 (1983); *Grant v. High Point Reg'l Health Sys.*, 184 N.C. App. 250, 645 S.E.2d 851 (2007)).

Additionally, the violation of professional standards, such as NC Bar and ABA regulations, can constitute negligence per se, as seen in *Ries v. National R.R. Passenger Corp.*, where the violation of OSHA regulations was deemed negligence per se (*Ries v. National R.R. Passenger Corp.*, 960 F.2d 1156, 1164 (3rd Cir. 1992)). Therefore, the Plaintiff's claims based on the theories of continued wrong and negligence per se are valid, as they highlight the ongoing illegal conduct and its impact on her civil rights.

To be clear, the Plaintiff is invoking the negligence per se doctrine, which holds that the violation of a statute constitutes negligence in itself, shifting the burden of proof onto the Defendant to disprove negligence. In this case, the Defendant's conduct, including obstruction of justice and violations of professional conduct standards, constitutes

negligence per se, thereby requiring the Defendant to demonstrate that their actions did not constitute negligence.

## VIII.  CONCLUSION:

For these reasons argued above, the claims alleged by the Plaintiff should not be dismissed.  Respectfully submitted,

July 15, 2024

/s/ <u>Cynthia B. Avens</u>
Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
Avens1@charter.net
252-203-7107
Pro Se Litigant

CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2024, I mailed by USPS, the Plaintiff's Amended Pleading to the Clerk of the U.S. District Court. Upon docketing, the CM/ECF system will send electronic notification of such filing to the defendants' counsel.


Respectfully submitted,


/s/ Cynthia B. Avens

Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
Avens1@charter.net
252-203-7107
*Pro Se Litigant*

Chris D. Agosto Carreiro
Special Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
ccarreiro@ncdoj.gov
Telephone: (919) 716-6874
Facsimile: (919) 716-6755
State Bar No. 45356
*Counsel for DA Dixon*

Jeremy D. Lindsley
Assistant Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
jlindsley@ncdoj.gov
Tel: 919-716-6920
Fax: 919-716-6764
NC State Bar No. 26235
*Counsel for Dr. Karen Kelly*

Daniel D. McClurg
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202
daniel.mcclurg@klgates.com
(704) 331-7400
(704) 353-3114
NC Bar #53768
*Counsel for Pitt County Memorial Hospital, Inc.*

Terrence M. McKelvey
K&L Gates LLP
501 Commerce Street, Suite 1500
Nashville, Tennessee 37203
terrence.mckelvey@klgates.com
(615) 780-6700
(615) 780-6799
NC Bar #47940
*Counsel for Pitt County Memorial Hospital, Inc.*