# IN THE UNITED STATES DISTRICT COURT

FILED

AUG - 5 2024

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY_____ DEP CLK

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### EASTERN DIVISION

Civil Action Number 4:24-CV-00051-M-RN

| | | |
|---|---|---|
| Cynthia B. Avens | ) | |
| | ) | |
| (Plaintiff) | ) | PLAINTIFF'S RESPONSE IN |
| | ) | OPPOSITION TO ECU |
| | ) | HEALTH MOTION TO |
| Faris C. Dixon, Jr., District Attorney | ) | DISMISS FOR FAILURE TO |
| Pitt County Memorial Hospital, Inc. | ) | TO STATE A CLAIM DE 49 & 50 |
| Dr. Karen Kelly, Medical Examiner | ) | |
| John/Jane Doe | ) | |
| John/Jane Doe | ) | |
| John/Jane Doe | ) | |
| (Defendants) | ) | |

## I.     INTRODUCTION

Plaintiff, Cynthia Avens, respectfully submits this response to Defendant ECU Health's

Motion to Dismiss the Amended Complaint. This case arises from the tragic death of

Plaintiff's daughter, Keisha Marie White, and the subsequent alleged misconduct by

ECU Health and other defendants in obstructing justice and violating Plaintiff's civil

rights.

1

Case 4:24-cv-00051-M-RN     Document 57     Filed 08/05/24     Page 1 of 61

## II.     STANDARD OF REVIEW

**FEDERAL RULE OF CIVIL PROCEDURE (FRCP) RULE 12(b)(6):**

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. The court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. To survive a Rule 12(b)(6) motion, a complaint must state a claim to relief that is plausible on its face. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**FRCP 8(a)(2):**

Under Federal Rule of Civil Procedure (FRCP) 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "While Rule 8 does not require detailed factual allegations, a properly pled claim must contain enough facts to 'state a claim to relief that is plausible on its face.'..." See *United States v. U.S. Telecom Long Distance*, *Inc.*, Case No.: 2:17-cv-02917-JAD-NJK (D. Nev. Sep 24, 2018)

The plausibility standard requires more than a sheer possibility that a defendant has acted unlawfully. It does not impose a "probability requirement," but a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. See *Twombly,* 550 U.S. at 556; *Iqbal*, 129 S. Ct. at 1937. A court must draw on its judicial experience and common sense to determine whether the pleader has stated a plausible

claim for relief. See Iqbal, 129 S. Ct. at 1937; *Mosely-Sutton v. Macfadyen*, Civil Action No. RDB 10-1130 (D. Md. Jun 17, 2010).

The court must accept the well-pled allegations of the complaint as true and construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. See *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *Monbo v. Upper Chesapeake Med. Ctr., Inc.*, Civil Action CCB-21-4, CCB-20-3403 (D. Md. Aug 23, 2021).

**FAILURE TO STATE A CLAIM**:

The Supreme Court in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), established that "In appraising the sufficiency of the complaint we follow ... the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief." This principle was further affirmed in *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983).

**FRAUDULENT SETTLEMENT AGREEMENT**:

In *Fuku-Bonsai, Inc. v. E.I. du Pont de Nemours & Co.*, 187 F.3d 1031 (9th Cir. 1999), the court held that a settlement agreement is not enforceable if it was fraudulently induced. The court stated that fraudulent actions and a lack of good faith negotiations undermined the plaintiffs' ability to bargain freely for a fair settlement, thereby nullifying the agreement.

3

**CONTINUED WRONG DOCTRINE:**

"Under the continuing wrong doctrine, the statute of limitations does not start running 'until the violative act ceases.'" *Marzec v. Nye*, 203 N.C.App. 88, 94, 690 S.E.2d 537, 542 (2010) (quoting *Babb v. Graham*, 190 N.C.App. 463, 481, 660 S.E.2d 626, 637 (2008)). In order for the continuing wrong doctrine to toll the statute of limitations, the plaintiff must allege "[a] continuing violation" by the defendant that "is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Id.* (alteration in original) (citations and quotation marks omitted)." *Carpenter v. N.C. Dep't of Health & Human Servs. - Office of the Chief Med. Exam'r*, COA22-170 (N.C. App. Feb 07, 2023).

**42 U.S.C. 1983**:

I.    "A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights." *Arizona Students' Assoc. v. Arizona Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). To prove retaliation in violation of the First Amendment, a plaintiff must show:

(1) [that] he engaged in constitutionally protected activity;

(2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and

(3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.

4

*Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). "To rise to a

constitutional violation, the defendant's adverse action 'must be of a nature that

would stifle someone from speaking out.'" *Id.* at 544. *Derby v. City of Pittsburg*,

Case No. 16-cv-05469-SI (N.D. Cal. Feb 23, 2017).


II.    "'[P]rivate activity will generally not be deemed "state action" unless the state has

so dominated such activity as to convert it to state action: "Mere approval of or

acquiescence in the initiatives of a private party" is insufficient.'" *Wahi*, 562 F.3d

at 616 (quoting *DeBauche v. Trani*, 191 F.3d 499, 507 (4th Cir.1999)). *Philips v.

Pitt County Memorial Hosp.*, 572 F.3d 176 (4th Cir. 2009).


**<u>STATE ACTOR REQUIREMENTS</u>**:

A state becomes responsible for a private party's act if the private party acts (1) in an

exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific

behest. It acts in an exclusively state capacity when it "exercises powers traditionally

exclusively reserved to the state(,)" 419 U.S. 352, 95 S.Ct. 454; for the state's direct

benefit when it shares the rewards and responsibilities of a private venture with the

state, see *id.*, 357-58, 95 S.Ct. 456-57, *Burton v. Wilmington Parking Authority*, 365 U.S.

715, 723-24, 81 S.Ct. 856, 860-61, 6 L.Ed.2d 45 (1961); and at the state's specific

behest when it does a particular act which the state has directed or encouraged. See

419 U.S. 354, 357, 95 S.Ct. 455, 456. *Modaber v. Culpeper Memorial Hospital*, Inc., 674

F.2d 1023 (4th Cir. 1982).

5

As stated in *Philips v. Pitt County Memorial Hosp., 572 F.3d 176 (4th Cir. 2009)*:

- "'[t]he judicial obligation is ... to assure that constitutional standards are invoked `when it can be said that the State is responsible for the specific conduct of which the plaintiff complains....'" *Id.* at 295, 121 S.Ct. 924 (citation omitted) (emphasis in part original and added)."

- Commentators and appellate courts, including our own, have attempted to categorize situations that justify the state-action label. See, e.g., *Moore*, 560 F.3d at 179 (noting "a private entity's action can constitute state action if `'there is a sufficiently close nexus between the State and the challenged action of the regulated entity that the action of the latter may fairly be treated as that of the State itself,'" but `state involvement without state responsibility cannot establish this nexus'")(emphasis added) (citation omitted); *DeBauche*, 191 F.3d at 507.

## **POLICY OR CUSTOM**:

A § 1983 claim against a private entity must satisfy *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, a plaintiff may establish a claim for relief only if the constitutional violation was caused by: (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority. *Stewart*, 14 F.4th at 765. *Popp v. Copeland*, 21-C-1305 (E.D. Wis. Mar 29, 2022).

**42 U.S.C. 1981**:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C.A. § 1981. *Walker v. City of Coatesville*, CIVIL ACTION No. 14-853 (E.D. Pa. Nov 26, 2014).

"In order to state a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute . . . ." *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001). *Farrar v. McNesby*, CIVIL ACTION No. 13-5683 (E.D. Pa. Mar 24, 2015).

**42 U.S.C. 1985**:

Section 1985(3) proscribes conspiracies to "deprive[] . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ." 42 U.S.C. § 1985(3). "A mere general allegation . . . [or] averment of conspiracy or collusion without alleging the facts which constituted such conspiracy or collusion is a conclusion of law and is insufficient [to state a claim]." *Young v. Kann*, 926 F.2d 1396,

7

1405 n. 16 (3d Cir. 1991). *Farrar v. McNesby*, CIVIL ACTION No. 13-5683 (E.D. Pa. Mar 24, 2015).

To maintain a cause of action for conspiracy under 42 U.S.C. § 1985(3), a plaintiff must establish the following four elements:

(1) a conspiracy involving two or more persons;

(2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws;

(3) an act in furtherance of the conspiracy;

(4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.

See *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996) (citing J*ohnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)); *Smith v. Thornburg*, 136 F.3d 1070, 1078 (6th Cir. 1998).

The plaintiff further must demonstrate that the conspiracy was motivated by a class based animus, such as race. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005); *Collyer*, 98 F.3d at 233; *Johnson*, 40 F.3d at 839; *Seguin v. City of Sterling Heights*, 968 F.2d 584, 590 (6th Cir. 1992). *Cade v. Puffenberger*, Case No. 1:16-cv-714 (W.D. Mich. Jul 12, 2016).

8

**INVIDIOUS DISCRIMINATORY ANIMUS**:

Invidious discrimination is defined as, "[a]ny distinction drawn in a population for inappropriate reasons. Invidious discrimination is the creation or perpetuation of a burden on one individual or group, particularly if the motivation for the creation of that burden is ill-will toward the individual or group or a desire to harm one for the benefit of another."

When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as an invidious discrimination as if it had selected a particular race or nationality for oppressive treatment. *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (Douglas, J.). INVIDIOUS DISCRIMINATION  (Bouvier Law Dictionary (2012 Edition)).

**NEGLIGENCE PER SE**:

"Under traditional principles of tort law, '[t]he unexcused violation of a legislative enactment or an administrative regulation which is adopted by the court as defining the standard of conduct of a reasonable man, is negligence in itself,' or in more common usage, negligence per se." *Ries v. National R.R. Passenger Corp.*, 960 F.2d 1156 (3rd Cir. 1992).

**PRIMA FACIE**:

"It has held that, even after *Iqbal*, the plaintiff is not required to satisfy the prima facie burden at the motion to dismiss stage. *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d

49, 54 (1st Cir. 2013); *Garayalde-Rijos*, 747 F.3d at 24." *Corson v. Modula, Inc.*, CIVIL

NO. 2:20-CV-104-DBH (D. Me. Jul 21, 2020).


## III.    CLARIFICATIONS


### WRONGFUL DEATH SETTLEMENT

A.  <u>FRAUD AND COERCION</u>: Counsel for the Defendant acknowledges that the 2016
wrongful death settlement with ECU Health "released all claims related to the
medical services that White [Keisha Marie White, Plaintiff's daughter] received" (DE
50 p. 2 ¶ 1); emphasis on "claims related to the medical services." Counsel
incorrectly asserts that the Plaintiff still seeks to hold ECU Health liable for White's
death. This is a mischaracterization. The Plaintiff has not filed a wrongful death case
or a medical malpractice case with the U.S. District Court. The Plaintiff has also not
alleged any violations of White's civil rights related to her medical care. This case
concerns the repeated violations of the Plaintiff's civil rights by the defendants,
including ECU Health, over the past decade.


The 2016 wrongful death settlement does not preclude the Plaintiff from filing claims
related to events that occurred after White's death,[1] just as Counsel has pointed out
that the agreement specifically focused on White's medical treatment up to and

---

[1] See Exhibit 12: Settlement and Release. The copy provided is the unsigned
document. The Plaintiff is having difficulty locating the signed document but will attempt
to provide it during Discovery. However, the Defendant does have a signed copy and
can compare the two for confirmation.

including, May 10, 2014. Signing that agreement did not provide ECU Health with blanket protection for illegal and violative conduct subsequent to White's death.

Moreover, the mediated settlement on March 1, 2016, occurred despite the North Carolina Board of Nursing (BON) report revealing critical information that was not disclosed to the Plaintiff before the settlement. ECU Health, through its internal investigation, was aware or should have been aware details that had not been disclosed to the Plaintiff sooner, such as:

- There were only two forms of treatment identified for White's hypoxia; restraints and sedating medication.
- The primary nurse, Linda Brixon (Brixon) failed to release restraints and failed to initiate CPR during a code blue.
- Due to the side effects of opioid medication, Brixon was required to, but failed to assess White for side effects before and during the shift, in particularly due to the drug's ability to cause symptoms that causes difficulty differentiating between a resting patient and a dying patient.

ECU Health's failure to disclose this and other information unknown to the Plaintiff, prior or during negotiations of a wrongful death settlement, constitutes fraud and a breach of fiduciary duty, nullifying the settlement agreement.

Furthermore, the Plaintiff was coerced into the settlement with threats that unrelated healthcare information would be used against her if the case went to trial, thereby creating an environment of duress. Although this information was not related to

11

White's cause of death, Plaintiff's wrongful death attorneys failed to address the Defendant's coercion. Instead, they informed her that North Carolina law allows a defendant to avoid liability if they can convince a jury that the victim was even one percent responsible for their outcome, further pressuring the Plaintiff to settle instead of going to trial. Given these circumstances, the settlement agreement is invalid.

These factors combined — the critical nondisclosures and the coercion — render the settlement agreement legally invalid, as per the precedents set in *Fuku-Bonsai, Inc. v. E.I. du Pont de Nemours & Co.*, where agreements induced by fraudulent means are not enforceable.

B. SETTLEMENT CONSIDERATIONS: In addressing the observations made in the defendant's memorandum supporting their motion to dismiss, Counsel notes Plaintiff's silence in the amended complaint about the amount received (DE 50 p. 5 Footnote 5). It is imperative to underscore that the settlement amount is completely irrelevant to the current legal proceedings. The focus of this case is on the alleged continuous violations of civil rights, which are entirely distinct from any past monetary settlements regarding wrongful death claims.

Moreover, the emphasis on the 'consideration' received as part of the wrongful death settlement by the Defendant's counsel raises significant concerns about their motives. This focus appears to be a strategic diversion rather than a substantive legal argument, suggesting an attempt to mislead or influence the court's perception

12

of the plaintiff's motivations or the merits of the case. Even if the settlement agreement was considered binding and relevant, the specific monetary figure resolved upon would remain immaterial to the violations of civil rights being contested. Such arguments presented by the defense do not detract from the legitimacy and severity of the ongoing claims and should not influence the court's evaluation of the merits of those claims.

C. MISSING EXHIBIT: As referenced by the defense (DE 50 p. 6 ¶ 1), documents integral to or referenced in the complaint are considered in a motion to dismiss and should govern over conflicting allegations, per *Goines v. Valley Community Services Board*, 822 F.3d 159, 166 (4th Cir. 2016). It is notable that counsel, representing a prestigious law firm such as K&L Gates, bases a significant portion of their dismissal argument on the settlement agreement's scope—yet notably fails to provide this key document as an exhibit. This omission not only undermines the credibility of their argument but also raises questions about the transparency and completeness of the evidence they present.

Furthermore, the Defendant's acknowledgment of the settlement agreement without providing it in full for court review suggests a strategic avoidance, possibly due to the document not supporting their assertions as strongly as claimed. This tactic could mislead the court regarding the enforceability of the agreement concerning the plaintiff's ongoing claims.

Counsel correctly identifies the document, as opposed to identifying it as a

"nondisclosure agreement," for example, confirming that he has read the agreement,

has a copy of the agreement, or both. Therefore, Counsel should be aware that the

agreement does not preclude non-healthcare claims post-May 10, 2014.[2] Therefore,

if the court deems the settlement agreement relevant, it should note that its terms do

not support the defense's motion to dismiss and that their reliance on it in this

context is misplaced.


**BASIS FOR OBSTRUCTION AND CONSPIRACY CLAIMS**:

Counsel for the Defendant addressed the Plaintiff's complaint, asserting that the

Plaintiff's primary concern was White's medical care received at ECU Health. (DE 50 p.

3 ¶ 3). For clarification, the Plaintiff explained in detail the care White received

because of the nature of claims she made against ECU Health and the other

defendants, in particularly obstructions of justice and conspiracy that resulted in

violations of the Plaintiff's civil rights. These medical details are crucial as they directly

support the allegations of obstruction of justice. The defendants and others controlled

the improper narrative for a decade that a crime had not taken place in the death of

White, despite evidence of the contrary. Additionally, telling the Court what happened to

White and providing evidence supporting criminal activity, the Plaintiff potentially

prevented the defendants from claiming that there was no criminal conduct related to

White's death, possibly asserting to the Court that there could be no obstruction of

justice.

---

[2] See Exhibit 12.

In the original pleading filed on March 22, 2024 (DE 1), it was alleged that Nurse Linda Brixon's treatment of Keisha White was motivated by racial bias, amounting to a hate crime. Although this specific allegation was not included in the subsequent amended pleading (DE 33), the underlying concerns about racial discrimination remain pertinent. This shift in focus does not negate the evidence suggestive of racial animus, nor does it diminish the relevance of these concerns to the overall allegations of civil rights violations.

Notably, while the amended pleading does not explicitly state that Brixon's actions were motivated by racial discrimination, the pattern of her behavior provides a compelling implication of such. The detailed accounts demonstrate that Brixon's white patients, who were situated in the same unit requiring similar cardiac monitoring and care, did not suffer from the same neglect and malpractice. This discrepancy is evident from the absence of similar complaints or disciplinary actions concerning Brixon's treatment of white patients, as per records and co-worker statements.

This selective negligence—exclusively affecting Keisha White, a black patient, during a single shift—raises serious questions about the motives behind Brixon's actions. The lack of similar issues with other patients under her care strongly suggests a discriminatory practice was at play. Given that no further disciplinary actions were reported by the North Carolina Board of Nursing (BON) regarding other patients, we can infer that Brixon provided adequate care to patients who were not of the same racial background as Keisha. Such differential treatment, supported by Brixon's ability to

competently care for other patients, underlines a deliberate deviation from standard medical practices influenced by racial bias.

**Clarification of SBI Jurisdiction and ECU Health's Reporting Actions:**

In addressing the mischaracterization by Counsel in footnote 4 of DE 50, p. 5, it is critical to clarify the nature of the SBI's involvement as asserted by the Plaintiff. Contrary to Counsel's claims, the Plaintiff did not erroneously suggest that the SBI lacked legal authority or jurisdiction to investigate Keisha White's death. It is clearly stated, despite attempts by Counsel to obfuscate the facts, that ECU Health directly involved the SBI rather than local law enforcement (DE 33 pp. 18, 20-21 ¶¶ 77, 83, 85, 86).

ECU Health's decision to involve the SBI directly, bypassing local law enforcement, is a critical point of contention. Under North Carolina policy, the SBI does not initiate investigations reported directly by entities like ECU Health unless these cases fall within their direct, predefined jurisdictional mandate. Such matters are intended to be first reported to local law enforcement or the district attorney, who can then request SBI involvement if deemed necessary. This standard procedure ensures that the appropriate local authority assesses whether a broader state-level investigation is warranted. The approach taken by ECU Health raises questions about their intent and the appropriateness of their actions in handling the reporting of White's death. By circumventing usual protocols and maintaining direct communications with the SBI, ECU Health's actions could be seen as an attempt to control the investigative process, potentially limiting the scope and depth of the inquiry. Counsel's labeling of the Plaintiff's

complaint as 'convoluted' and 'unclear' appears to be a strategic attempt to divert attention from these procedural irregularities and to downplay the significance of how ECU Health managed the reporting process.

Furthermore, Attorney Daniel McClurg, operating in Charlotte, North Carolina and being well-versed in North Carolina's legal framework, ought to recognize the implications of this deviation from standard reporting protocols. The fact that similar policies exist in Tennessee, where Attorney Terrence McKelvey operates, reinforces the standard nature of these procedures. The Plaintiff's allegations are grounded in a clear understanding of these legal processes, and they precisely highlight concerns over potential misuse of the investigative framework by ECU Health to manipulate or constrain the investigative outcome.

## IV.    ARGUMENT

**CONTINUING WRONG DOCTRINE**:

Defendant argues that all of Plaintiff's claims are time-barred by the applicable statutes of limitations. This argument overlooks the critical applicability of the continuing violation doctrine, which recognizes that claims may be brought for actions that are part of an ongoing pattern of misconduct. Under this doctrine, a plaintiff may challenge not just the most recent instance of misconduct, but also earlier related acts, provided they are part of the same continuous pattern.

In *Perry v. Pamlico County*, 88 F. Supp. 3d 518 (E.D.N.C. Feb. 18, 2015), the court clarified, "Under North Carolina law, a continuing violation is occasioned for limitations

17

purposes by continual unlawful acts, not by continual ill effects from an original

violation." This principle is further supported in *Godbold by & through Holloway v.*

*Cherokee Cnty.*, No. 1:20 CV 202 MR WCM, 2021 WL 1590387, at *3 (W.D.N.C. Jan.

14, 2021), where it was reaffirmed that the continuing-wrong doctrine serves as an

exception to the general rule that a state-law claim accrues when the right to maintain a

suit arises. Additionally, North Carolina recognized this 'continuing wrong' or 'continuing

violation' doctrine as an exception to the general rule in *Williams v. Blue Cross Blue*

*Shield of N.C.*, 357 N.C. 170, 179 (2003).


ECU Health's actions exemplify this doctrine. The organization maintained a pattern of

illegal conduct, including obstructing justice and violating the Plaintiff's civil rights, which

persisted at least through 2016. Notably, in 2022, when ECU Health interfered with the

operations of the Pitt County medical examiner's (ME) office—located in its partly

owned Brody School of Medicine—it effectively restarted the statute of limitations clock.

This interference is a clear continuation of ECU Health's pattern of misconduct, allowing

the Plaintiff to consolidate all related conduct from 2014 through 2023 into a single

claim, as permitted by the continuing wrong doctrine.


**FRAUDULENT CONCEALMENT:**

As the Defendant argues that all of Plaintiff's claims are time-barred by the applicable

statutes of limitations, Counsel failed to account for the doctrine of fraudulent

concealment. On May 30, 2024, Plaintiff learned from former SBI Agent Jennifer

Matherly (Matherly) that ECU Health obstructed the joint investigation by the SBI and

18

GPD, which began in November 2014 under former GPD Chief Hassan Aden (Aden).
This new revelation highlights that ECU Health intentionally failed to make key
personnel available, critically undermining the investigation's credibility and
thoroughness.

Under the Commission on Accreditation for Law Enforcement Agencies (CALEA)
Standards, which govern both the GPD and the SBI, law enforcement is required to
conduct thorough preliminary and follow-up investigations, which include locating and
interviewing key witnesses and personnel.[3] The failure of ECU Health to cooperate, and
the failure of law enforcement to enforce cooperation, points to a deliberate attempt to
protect ECU Health and obfuscate the truth surrounding the circumstances of White's
death.

The intentional non-disclosure by ECU Health, coupled with the lack of investigative
rigor by GPD, SBI, and the district attorneys involved, constitutes fraudulent
concealment. This misconduct misled the Plaintiff about the investigation's progress and
findings, directly impacting her ability to seek timely justice. The concealment of these
critical facts meets the criteria for tolling the statute of limitations as outlined in key
precedents:

- In *Muller v. Thaut*, the court held that concealing a material fact which causes the
  opposite party to delay filing suit allows for the tolling of the statute of limitations
  (*Muller v. Thaut*, 230 Neb. 244, 430 N.W.2d 884 (Neb. 1988)).

_____

[3] See Exhibit 13: CALEA Standards

- Similarly, *Bailey v. Glover* supports that the statute of limitations does not begin to run until the fraud is discovered by the party harmed by the fraud, especially when the plaintiff remains ignorant of the fraud without any fault or lack of diligence on their part (Bailey v. Glover, 21 Wall. 342, 348, 22 L.Ed. 636).

Given these principles and the actions of ECU Health and law enforcement, there is a clear basis for applying the doctrine of fraudulent concealment to toll the statute of limitations in this case. The deliberate failure to disclose non-cooperation in the investigation constitutes intentional deception aimed at protecting ECU Health from legal repercussions, thus justifying the tolling of the statute of limitations based on the ongoing concealment of critical information necessary for the accrual of Plaintiff's claims.


**CONCRETE FACTUAL ALLEGATIONS:**

Counsel for the Defendant asserts that the Plaintiff failed to allege any "concrete factual allegations regarding acts or omissions by ECU Health within the limitations period" (DE 50 p. 8 ¶ 2). However, at the pleading stage, according to FRCP Rule 8(a)(2), all factual assertions made by the Plaintiff are presumed true, requiring only a "short and plain statement of the claim." The necessity to establish a prima facie case does not apply at this preliminary stage.


Despite this, *arguendo*, the Plaintiff did present substantial evidence, notably through the transcript of a recorded conversation with Danene Lowery (Lowery) on April 10, 2023 (Exhibit 9 pp. 13-17). In this conversation, Lowery disclosed that Dr. Kelly's

involvement in White's investigation was contingent on approval from ECU Health, illustrating a clear overreach of authority and interference in the independent functions of the Medical Examiner's office.

This directive from ECU Health is supported by multiple instances of interference:

- In September 2022, when the Medical Examiner's office redirected the Plaintiff to speak with risk management instead of providing information directly, this was a direct consequence of directives issued by and/or adhered to by ECU Health, especially since such diversions began after it was discovered through the ME's office that Dixon had lied about possessing an ME report.
- Subsequent interactions in October 2022 and March 2023 consistently redirected the Plaintiff to risk management, reinforcing the pattern of interference and control exercised by ECU Health.
- Lowery's admissions in March and April 2023 that she was instructed not to communicate directly with the Plaintiff further corroborate ECU Health's influence over the ME's office operations.

This pattern of behavior logically points to ECU Health as the entity with both motive and opportunity to influence the ME's office, particularly in light of their vested interest in the outcomes of investigations linked to their operations. The lack of involvement from other possible entities like East Carolina University or state officials further narrows the logical source of these directives to ECU Health.

21

Moreover, even assuming ECU Health did not explicitly issue these directives, the necessity for Kelly to seek permission from ECU Health's risk management and attorneys before proceeding with her duties as a medical examiner starkly illustrates the undue influence and control exerted by ECU Health over a state function, attributing liability and responsibility to them for any resultant obstructions or misconduct.

During discovery, the Plaintiff aims to uncover further evidence pinpointing the specific individuals within ECU Health responsible for these directives and the systematic denial of information, pursuant to FRCP Rule 26. This right to discovery is protected unless it is shown beyond doubt that no set of facts could support the Plaintiff's claim, as affirmed in *Conley v. Gibson*, 355 U.S. 41 (1957).

## MISCHARACTERIZATION AND OBSTRUCTION IN SBI INVESTIGATIONS:

**Erroneous Assertions And The Reality Of SBI Involvement**:

Counsel for the Defendant erroneously asserts that ECU Health cooperated with SBI investigations (DE 50 p. 8 ¶ 3). Contrary to these claims, the Plaintiff provides compelling evidence of non-cooperation and deceptive practices surrounding the SBI investigations into White's death.

**The Fake SBI Investigations Explained**

- First Fake Investigation (May-August 2014):

  Vicki Haddock (Haddock), ECU Health's risk manager, falsely claimed the necessity to report White's death directly to the SBI, contradicting policies that require reporting to local law enforcement first. This misdirection was facilitated by SBI

agents Joe, Donnie, and Anthony, with whom Haddock had inappropriate connections. The interactions between Haddock and these agents, none of whom conducted any investigative activities, point to a concerted effort to obstruct justice. The double-faceted effort created an illusion that Haddock followed proper reporting protocol, while attempting to conceal the agents' complicit involvement in obstructing justice and conspiracy. The activity between Haddock and the SBI agents, referred to as an "investigation" by the Defendant's counsel, was never an investigation as indicated by the agents:

- ○ lying to the Plaintiff, asserting they had no communications with Haddock;
- ○ denying any knowledge of White;
- ○ denying any knowledge of an investigation of White's death;
- ○ relaying information from the Plaintiff to Haddock;
- ○ failure to adhere to CALEA regulations of locating and interviewing witnesses and suspects, if anyone could assume that anything resembling an investigation took place.

- Second Fake Investigation (Pre-September 13, 2014):

Alleged by former GPD Chief Hassan Aden in communications with the Plaintiff, this investigation was purportedly conducted without any engagement with the Plaintiff, a key witness. (See Exhibit 6 p. 5.) This previously undisclosed investigation, never acknowledged by the DA in his communications with the Plaintiff, served to cause further confusion and delay.

23

- Investigation Post-November 7, 2014:

  Despite formal announcements (See Exhibit 6 p. 8), this investigation, initiated by Aden with former SBI Agent Jennifer Matherly and GPD Detective Alvaro Elias assigned to lead, failed to meet the basic investigative standards mandated by CALEA. The absence of interviews with crucial witnesses, including the Plaintiff and relevant hospital personnel, whom the Defendant failed to make available for interview, rendered this investigation superficial. The investigative report produced by this process was uncritically accepted by the DA's office, leading to unfounded claims that a complete and thorough investigation had been conducted, which concluded erroneously that no crime occurred in the death of White.

These so-called investigations illustrate not only a failure on the part of ECU Health to adhere to lawful procedures but also a systemic failure among local law enforcement and the DA's office to enforce proper investigative protocols. The ongoing acceptance of ECU Health's obstructions by state actors reveals a troubling pattern of misconduct and collusion aimed at protecting institutional interests over justice.

**CONTINUED DISCRIMINATION AND INTERFERENCE**:

Despite assertions by Counsel that the last discriminatory act referenced by the Plaintiff occurred in 2014, the evidence demonstrates persistent interference by ECU Health. As detailed in the Plaintiff's amended complaint (DE 33 pp. 44-45) under "Acts of Discrimination," ECU Health's actions have continuously disrupted legitimate investigative efforts well beyond 2014. This includes initial failures immediately following

Keisha White's death, such as not referring her case to a medical examiner, ongoing protection of white personnel like Linda Brixon, and directly impeding Dr. Kelly's duty to review critical evidence in a homicide investigation.

Counsel's portrayal of ECU Health's actions as non-discriminatory deliberately mischaracterizes the sustained nature of their misconduct. The allegations brought forth by the Plaintiff extend beyond the initial events of 2014, highlighting a systematic cover-up and protection regime motivated by racial discrimination. This ongoing shielding of discriminatory practices by ECU Health constitutes intentional, continuing discrimination.

Moreover, it is crucial to recognize that ECU Health's actions have perpetually impacted the Plaintiff's pursuit of justice. These are not isolated incidents but elements of a broader, ongoing discriminatory agenda, actively maintained by ECU Health to obscure the truth about White's death. Such assertions by the Defendant to minimize these actions are contradicted by the evidence and only serve to mislead the Court.

**ASSERTION THAT ACTS WERE DISCRETE AND NOT REPEATED**:
Counsel's characterization of ECU Health's discriminatory acts as discrete and non-repetitive is fundamentally flawed and misconstrues the underlying issue. The Plaintiff has documented multiple instances of discriminatory conduct by ECU Health that has occurred over the years, demonstrating a pattern of behavior aimed at obstructing justice. It is not merely about the frequency of a single type of act but the presence of

25

various illegal acts, all converging towards a common goal: to prevent justice from being served.

The assertion that these acts are discrete because they did not repeatedly occur in the exact same manner overlooks the broader context of systemic discrimination. For instance, the failure to refer Keisha White to pathology in 2014—while a singular event—forms part of a wider pattern that includes lying to the BON, withholding crucial details about White's death, and exerting undue influence over the medical examiner.

Drawing an analogy, Counsel's argument is akin to claiming that an individual is not a serial killer because they only killed one elderly man. However, if the same individual also killed an elderly woman, a teenage boy, an adolescent girl, a baby girl, a pregnant woman, and a middle-aged father, each under different circumstances, the pattern clearly indicates serial killing. Similarly, ECU Health's varied acts of discrimination, while different in detail, all aimed at protecting their interests by evading accountability, clearly constitute a systematic and ongoing abuse of power.

This perspective underscores the necessity of viewing ECU Health's actions in totality rather than isolating each act, to fully appreciate the extent and impact of their discriminatory practices.

**The Court Need Not Reach Issue?**:

The suggestion that the Plaintiff's amended complaint should be dismissed on the basis of the statute of limitations or other affirmative defenses, while concurrently asserting that it is unnecessary for the Court to consider the 2016 Settlement Agreement and Release, reveals the weakness of this defense. If the settlement agreement were decisively relevant to dismiss the current action, Counsel for the Defendant would have attached a copy of the agreement both when filing the motion to dismiss the Plaintiff's original pleading and with the current motion to dismiss the amended pleading. The absence of such documentation undermines the Defendant's reliance on this argument and suggests an attempt to mislead the Court by not fully engaging with the implications of the settlement agreement.

### V. SECTION 1983

Counsel for the Defendant has argued that ECU Health is not a state actor on the following basis:

- The Plaintiff referenced ECU Health as a "private entity" (DE 33 p. 3 ¶ 8).

- This Court has previously determined that Pitt County Memorial Hospital, aka ECU Health, was not a state actor in *May v. Univ. Health Sys. of E. Carolina, Inc.*, 2021 WL 5868135, at *5 (E.D.N.C. Dec. 9, 2021) and in *Philips v. Pitt County Memorial Hosp.*, 503 F.Supp.2d 776 (E.D. N.C. 2007).

27

**PLAINTIFF'S REFERENCE OF ECU HEALTH BEING A PRIVATE ENTITY**:

Counsel appears to evade the point by directing blame onto the Plaintiff due to her reference of the Defendant as a "private entity." The point is while there are likely a number of functions the Defendant conducts that satisfies the requirement of operating as a private entity, there are also functions conducted by the Defendant that can be attributed to the State. "A private party 'may be designated a state actor for some purposes but still function as a private actor in other respects.' *Caviness v. Horizon Community Learning Ctr.*, 590 F.3d 806, 814 (9th Cir. 2010)." *Morris v. Canyon Cnty. Pub. Defender's Office*, Case No. 1:20-cv-00062-BLW (D. Idaho Apr 02, 2020).

**STATE'S RESPONSIBILITY THROUGH LAW ENFORCEMENT:**

The Fourth Circuit described three circumstances in which a seemingly private entity can be considered to have acted under color of state law, explaining that "[a] state becomes responsible for a private party's act if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest." *Id.* at 1025. *Philips v. Pitt County Memorial Hosp.*, 503 F.Supp.2d 776 (E.D. N.C. 2007). *Philips* further elaborated on the three circumstances:

- "First, a private entity 'acts in an exclusively state capacity when it exercises powers traditionally exclusively reserved to the state."

- "Second, a private entity acts 'for the state's direct benefit when it shares the rewards and responsibilities of a private venture with the state."

- "A private entity acts 'at the state's specific behest when it does a particular act which the state has directed or encouraged.' *Modaber*, 674 F.2d at 1025." *Philips v. Pitt County Memorial Hosp.*, 503 F.Supp.2d 776 (E.D. N.C. 2007).

While the Court has previously recognized ECU Health primarily as a private entity performing functions not typically attributed to state actors, this case presents unique circumstances. Instead of relying on ECU Health's business agreements with Pitt County, the composition of its Board of Directors, or its receipt of state funds, this matter hinges on ECU Health's deep and indistinguishable collaboration with state agencies. This entanglement blurs the lines between state authority and private action to a degree that necessitates treating ECU Health as a state actor under Section 1983.

For instance, in 2014, SBI Agents Donnie and Anthony, both veterans, along with trainee Joe, deviated from standard protocols. Their failure to redirect Vicki Haddock's (Haddock) report to appropriate local law enforcement, their unauthorized sharing of information from the Plaintiff with Haddock, and their continued unauthorized discussions about the case effectively granted ECU Health state-derived benefits. By allowing Haddock to bypass required reporting channels—powers typically reserved for the police or the district attorney—she effectively operated as a state actor on behalf of ECU Health.

Moreover, ECU Health's refusal to make key personnel available for interviews during the joint SBI and GPD investigation in November 2014 further exemplified the state's

delegation of authority to ECU Health. This allowed the hospital to dictate the flow of information and the investigative focus, thereby controlling the narrative and outcome of the investigation. This deviation from CALEA standards not only facilitated but endorsed ECU Health's actions, illustrating a shared responsibility in the mishandling of the investigation.

The collaboration extended to the extent that both state agencies, by failing to assert control, effectively consented to ECU Health's lead in the investigation. As defined in *C & B Co. v. Collins*, consent involves more than passive acquiescence; it implies active agreement to something that otherwise could not exist without such permission (239 S.E.2d 725, S.C. 1977). In this context, the corruption and obstruction witnessed could not have persisted without the state agencies' tacit approval and involvement, embedding ECU Health's actions within the framework of state operations. This is further underscored by Matherly's and Elias's submission of a faulty investigation report to the DA's office.

## STATE'S RESPONSIBILITY THROUGH THE DISTRICT ATTORNEY'S OFFICE

In July 2022 when DA Faris Dixon claimed to have a medical examiner's (ME) report from Dr. Kelly, through the Plaintiff's communication with the ME's office, she proved that Dixon lied about having such a report. By the next time she called the office in September 2022, a different ME office worker withheld information from the Plaintiff, instructing her to contact ECU Health's risk manager instead. The same occurrence repeated itself in October 2022. The redirection was confirmed in March and April 2023

30

when Lowery explained that she was not supposed to be talking to the Plaintiff, but the Plaintiff was supposed to be talking to risk management, instead. These redirections, authorized by ECU Health, directly benefitted the State as it aimed to shield the district attorney by preventing the Plaintiff from potentially learning other misconduct by Dixon. As stipulated by the Fourth Circuit, "a private entity is considered a state actor…when it acts "for the state's direct benefit[.]" *Philips v. Pitt County Memorial Hosp.*, 503 F.Supp.2d 776).

Additionally, due to the timing, it is plausible that the decision to redirect the Plaintiff's phone calls, was retaliatory in nature, aimed to silence the Plaintiff.

### SATE'S RESPONSIBILITY THROUGH THE MEDICAL EXAMINER:

ECU Health performed activities that are exclusively a state function when it inflicted control over the medical examiner's office in 2022 and 2023. Medical examiners, by the nature of their job function, have exclusive authority to direct death investigations and to operate their offices without external influences and pressure. Kelly was appointed by the state, is employed by the state, and operates as a state entity. ECU Health's control over the ME's office by instructing workers to withhold information from the Plaintiff, which was a targeted act in violation of Plaintiff's First Amendment, was not a function nor a duty of a private entity's daily operations. ECU Health's requirement that Kelly obtain the permission of their risk manager and attorneys further placed the Defendant in a state-exclusive position as it effectively stripped the medical examiner of her state-sanctioned authority. Furthermore, Kelly authorized and encouraged ECU Health's

conduct as she willingly relinquished her authority to the Defendant and adhered to their authority by failing to review the evidence in White's case, thus failing to provide her expert opinion based on medical probability. These acts were more than mere acquiescence, as they also violated the Plaintiff's civil rights, including access to information from an otherwise willing speaker, access to the courts, due process, and equal protection.

Counsel asserts that ECU Health, as a private corporation, cannot be held liable under a respondeat superior theory but only through an official policy or custom that causes the deprivation of federal rights.

In *Blum v. Yaretsky*, 457 U.S. 991 (1982), the Supreme Court emphasized that for a private entity's action to be considered state action, the state must have provided significant encouragement or exercised coercive power over the entity's actions. Mere approval or acquiescence is not sufficient. Similarly, in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), the Court explained that joint participation in action with state officials satisfies the state action requirement. Furthermore, in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), the Court elaborated that pervasive entwinement between the private entity and the state can convert private actions into state actions. In *Morris v. Canyon Cnty. Pub. Defender's Office*, the court outlined several contexts in which a private party can be considered a state actor for purposes of a civil rights action, including: (1) the state's "exercise of coercive power" or "significant encouragement"; (2) participation in "joint activity" with

the state; (3) being "controlled by an agency of the State"; (4) being "delegated a public function by the State"; and (5) being "entwined with governmental policies," or the government being "entwined in [the private party's] management or control" (*Morris v. Canyon Cnty. Pub. Defender's Office*, Case No. 1:20-cv-00062-BLW (D. Idaho Apr 02, 2020)).

**MISREPRESENTED INFORMATION**:

Counsel for the Defendant has again misrepresented the Plaintiff's statements. In DE 50 p. 16 ¶ 3, Counsel referenced Plaintiff's amended complaint (DE 33 p. 48), asserting that Plaintiff "simply concludes that ECU Health has adopted 'Discrimination as Policy.'" Counsel follows this assertion with "Once again, however, she fails to allege a single supporting factual allegation," and other statements used to support his misrepresentation that Avens failed to support her claim under § 1983.

Counsel's assertions are incorrect because the section of the Amended Complaint he referenced, "Discrimination as Policy," was part of the Plaintiff's argument for § 1981, which requires allegations and support for discrimination. Under § 1983, it is not necessary to prove discrimination, only a civil rights violation by a state actor. The Plaintiff's argument for § 1983 begins after the section referenced by Counsel. This misrepresentation cannot be attributed to Plaintiff's amended complaint being "convoluted" or "not clear," as each issue under her "Cause of Action" is clearly labeled with headings and subheadings.

In response to Counsel's claim that Avens' civil rights could not have been violated because she was not a patient of ECU Health, Counsel has missed the point of Plaintiff's argument and referred to an argument that the Plaintiff did not use to support a § 1983 claim. Counsel's references to Plaintiff's assertions that ECU Health placed finances over patient safety (DE 50 p. 17 ¶ 2) are part of Plaintiff's § 1981 claims (DE 33 pp. 44-49). Therefore, the above arguments do not apply.

**OFFICIAL POLICY OR CUSTOM:**

Under § 1983, the Plaintiff must show that an official policy or custom of ECU Health caused the deprivation of her federal rights. The Plaintiff has identified several actions within her amended pleading (DE 33), as well as in this response to Defendant's motion to dismiss. The commonality in ECU Health's conduct is their persistent effort to obstruct justice, efficiently causing the coverup of White's death and concealing the circumstances thereof from the eyes of the court. Through their conduct, ECU Health has consistently violated the Plaintiff's civil rights, including the right to give and receive information, access the courts, due process, and equal protection.

ECU Health's established customs and unwritten policies include:

- Failure to comply with state and federal mandates, including healthcare regulations, and adequately and honestly reporting to oversight boards;

- Consistent interference with state functions including those of the ME, SBI, GPD, DA, and possibly others; and

- Ongoing protection of white staff members despite illegal implications of their actions.

"An unwritten policy or custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled' practice." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). *Burress v. Idaho State Trooper Rutland*, 1:22-cv-00518-DCN (D. Idaho Apr 25, 2023)."

In applying these cases, ECU Health's unwritten policy or custom:
- Was so persistent that the Defendant's conduct spanned an entire decade;
- Was so widespread that it involved complicit involvement of state agencies affecting those in charge as well as subordinates working and training under their guidance; and
- Was repeatedly endorsed from their initial failure to refer White to pathology in 2014, thereby preventing a lawful medical examiner evaluation, to their prohibition of Kelly's review in 2022 and 2023, establishing a permanent and well-settled practice.

All of the above in this particular case, has been at the expense of the Plaintiff's civil rights, physical health, psychological well-being, time, efforts, and finances.

35

## VI. SECTION 1981

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind. 42 U.S.C.A. § 1981. *Walker v. City of Coatesville*, CIVIL ACTION No. 14-853 (E.D. Pa. Nov 26, 2014).

While the Plaintiff contends that ECU Health intentionally discriminated against her due to her race, this assertion does not exclude the Defendant's intentional racial discrimination against Plaintiff's daughter, White.

The Plaintiff contends that white personnel at ECU Health committed egregious and fatal abuse and neglect based on racial discrimination, and the Defendant perpetuated this bias through its persistent protection of those employees. ECU Health's conduct was undeniably intentional. While lapses in judgment may occur sporadically, consistently violating the law reflects deliberate action. ECU Health's conduct targeted the Plaintiff, evident in the Defendant's violative conduct over an extended period, from 2014 - 2023. Their actions aimed to control the narrative and prevent the criminal prosecution of the white nurse responsible for White's death, thereby shielding the entity from media and public fallout.

36

For a decade, the Plaintiff was repeatedly told, by law enforcement and the DA's office, that no crime occurred in her daughter's death. In a December 7, 2015, letter from former GPD Chief Mark Holtzman (Holtzman), for example, he stated, "Based on all of the information available, it is clear that a thorough review of the facts of this matter has been conducted by several law enforcement agencies, and each review resulted in a finding that this was not a criminal matter."[4] Though Holtzman did not explicitly state whether witnesses were not interviewed, his language led the Plaintiff to reasonably assume that such interviews were part of the "thorough review." The Plaintiff knew she had not been interviewed but never considered the possibility that no witnesses were interviewed, as interviewing witnesses is a fundamental part of any investigation.

It was only when Matherly revealed that hospital personnel had not been interviewed that the Plaintiff understood the true extent of the investigative deficiencies. This revelation contrasted sharply with the assurances from Holtzman and DA Dixon, who had stated, "Greenville Police Department and the North Carolina State Bureau of Investigation conducted a concurrent inquiry. Both agencies' findings were subsequently turned over to the Pitt County District Attorney's Office. Assistant District Attorney A. Futrell was tasked with reviewing the information." Such statements would lead any reasonable person to believe that a proper investigation, including witness interviews, had been conducted.

---

[4] See Exhibit 14: Letter from Former GPD Chief, Mark Holtzman.

The Plaintiff's ability to seek redress was obstructed by these misleading assurances. It was only upon learning, on May 30, 2024, that no witnesses had been interviewed, that the Plaintiff realized the investigation had been fundamentally flawed and that there was a basis for a civil rights claim. This critical information was not available to the Plaintiff within the three-year statute of limitations for filing a timely civil rights claim, which should have been filed by November 2017, based on when the failure to interview witnesses presumably took place. The Defendants' systematic obstruction and concealment of information prevented the Plaintiff from discovering the truth and taking timely legal action.

Due to ECU Health's conduct in posthumously handling White's death and their incessant interference with or prevention of an adequate investigation into White's death, the Plaintiff's ability to seek redress prior to filing the case at hand was not just hampered but completely obstructed. This redress includes Avens' pursuit of criminal justice for the death of her daughter, as well as any civil course of action against ECY Health, the City of Greenville, and/or other parties involved, which was inherently the point of the coverup.

In the case of *Foster v. MCI Telecommunications Corp*, the Court explained, "…disparate treatment cases do require a showing of discriminatory intent. The proof of discriminatory intent required to establish liability under § 1981 apparently differs little, if at all, from the proof of discriminatory intent required to prove liability under a "disparate treatment" theory. As in any other kind of case, proof of intent is seldom, if ever, possible

except by indirect or circumstantial evidence. Here the totality of the evidence, including Harrell's actions in evaluating Foster, as well as his general attitude in race relations, fully justifies an inference that there was intent to discriminate against Foster because Foster is black. I find and conclude that the defendant was guilty of intentional discrimination as required under § 1981." *Foster v. MCI Telecommunications Corp.*, 555 F.Supp. 330 (D. Colo. 1983).

The prevention of such a claim in 2017 can be directly attributed to ECU Health due to their systematic obstruction, discriminatory protection of white personnel, and concealment of information, as well as their immense control over state agencies. This directly impacted the Plaintiff's ability to seek redress.

## VII. SECTION 1985

Counsel for the Defendant has argued that the Plaintiff failed to state a claim for relief under § 1985.

As the Fourth Circuit stated in *Hinkle v. City of Clarksburg*: "Appellants have a weighty burden to establish a civil rights conspiracy. **While they need not produce direct evidence of a meeting of the minds, Appellants must come forward with specific circumstantial evidence** that each member of the alleged conspiracy shared the same conspiratorial objective. See *Hafner v. Brown*, 983 F.2d at 576-77; *Abercrombie v. City of Catoosa.* Okl, 896 F.2d 1228, 1230-31 (10th Cir.1990); *Fonda v. Gray*, 707 F.2d 435,

39

438 (9th Cir. 1983). In other words, to survive a properly supported summary judgment motion, Appellants' evidence must, at least, reasonably lead to the inference that Appellees positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan. *Burt v. Hale*, Civil Action No. 3:09-3343-SB (D. S.C. Sep 26, 2011)."

Similarly, this Court in *Eley v. Harders*, determined, "[t]o the extent Eley alleges a conspiracy claim under 42 U.S.C. § 1985, to state a claim, Eley must plausibly allege "that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the plaintiff's] deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). To show joint, concerted action, plaintiffs must, at minimum, provide "specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id. Eley v. Harders*, No. 2:17-CV-59-D (E.D. N.C. Jul 23, 2018).

In neither of the above-referenced cases did the Court determine that the "meeting of the minds" requirement had to be fulfilled with direct evidence; only plausible allegations. The Plaintiff has met this burden by showing that each of the state entities, the DA, SBI, GPD, and ME, through their complicit cooperation with ECU directives and acceptance of ECU Health's interference, to the extent that each of the named entities forsook their state-sanctioned authority, as well as standards of regulatory agencies, such as CALEA, demonstrated their meeting of the minds with ECU Health's objectives in blocking an adequate homicide investigation.

As Counsel has indicated (DE 50 p. 22 last ¶), §1985 claims have been rejected in absence of concrete supporting facts. Counsel has well acknowledged the communications between Haddock and the SBI during the summer months of 2014, for example, though he has mischaracterized the interaction as an investigation. Counsel's acknowledgement confirms the concrete supporting fact. Additionally, the Defendant can not produce a single shred of evidence that supports an investigation at that time had an investigation actually taken place as purported by the Defendant.

The three SBI agents (Donnie, Joe, and Anthony) were not from the local SBI office in Greenville, NC, as would have been ordinarily expected, thus adding another layer to ECU Health's failure to contact local law enforcement. For that reason, when the Plaintiff attempted to gather information from the SBI, she contacted the Greenville office and spoke to an Agent Brown who had no knowledge of any such investigation, no knowledge of White's death, and no knowledge of any communications with Haddock.

Other concrete facts include statements from Matherly who revealed that ECU Health failed to make personnel available for interview after she and Elias were assigned to the case in November 2014. Their report was submitted to the DA's office, and both DA's (former DA Kimberly Robb (Robb) and the current DA, Faris Dixon) accepted the reports lacking statements from witnesses, hospital personnel, suspects, and the Plaintiff. Dixon claimed in the recorded phone call that the Plaintiff was not interviewed because, "that would have been because at the time, no one thought that it was, it was

criminal." See Exhibit 9 p. 8 at 05:19. He further asserted that the Plaintiff could only be interviewed depending on the medical examiner's findings. See Exhibit 9 p. 8 at 06:13. Both statements by Dixon were clear misrepresentations due to the investigators' CALEA requirement to interview witness and suspects. Therefore, the DA, Matherly, and Elias did have a meeting of the minds with ECU Health to ensure that an adequate investigation into White's death was not conducted. Intentional oversight of falsified medical records in the DA's possession further underscores the conspiracy.

Lastly, the transcript of the phone call with Lowery serves as a concrete supporting fact, as well as the absence of a report from Dr. Kelly who was provided evidence to review, but failed to perform her job functions, opting instead, to adhere to ECU Health's requirement to obtain their approval before acting.

In all of the above situations where concrete supporting facts are indicated, the essential nature of the single plan was to obstruct justice by preventing a lawful investigation into White's death. Through ECU Health, each party, including ECU Health, has taken justice out of the court's hands and decided for themselves that Linda Brixon, Elizabeth Everette, and possibly others, will not be prosecuted for their crimes. By claiming no crime was committed in White's death, Dixon did not have to acknowledge the obstruction and conspiracy that followed.

## INVIDIOUS DISCRIMINATORY ANIMUS (IDA)

## TOLERANCE OF RACIAL ANIMOSITY:

To satisfy the IDA requirement, the Plaintiff has pointed out the consistent pattern of ECU Health's actions aimed at protecting their financial interests at the expense of providing justice for a black patient, White, and her family. The Plaintiff contends that ECU Health's protective measures for white personnel involved in White's death, their persistent interference with investigations, and the systemic exclusion of the Plaintiff from obtaining crucial information were motivated by racial discrimination. This pattern of behavior indicates that the actions taken by ECU Health were not random or isolated but were driven by an intent to shield white employees from legal repercussions, thus protecting their image, rather than to risk being known as the hospital where white nurses kill helpless black patients. This goal demonstrates racial animus. This animus is evident in the way the Defendant prioritized its interests over the Plaintiff's right to justice, which is a key element of proving a § 1985 conspiracy. Additionally, because there is no logical reason for why Brixon deliberately chose to repeatedly abuse and neglect Keisha White over the course of a twelve-hour shift, covering her tracks in the process, racial animosity is the only conclusion that can logically be drawn. ECU Health's protection of this conduct further underscores that their intent was based on race and reflects a disregard for the rights and dignity of Black patients and their families, suggesting a discriminatory policy within the institution.

The ongoing conduct and the apparent institutional endorsement of such practices demonstrate that ECU Health not only tolerates but actively supports an environment

43

where racial discrimination is condoned. This protective stance towards staff members accused of racially biased actions and the systematic obstruction of justice serve as stark evidence of ECU Health's invidious discriminatory animus, because through their influence and control of state agencies, (the GPD, SBI, ME, and DA) ECU Health has prevented the Plaintiff from receiving fair and equal treatment in those agencies.

The court found in *Jiminez v. Mary Washington College*, 57 F.3d 369 (4th Cir. 1995), once a commitment is made, there is a duty to protect from racial animus. In *Jiminez*, MWC was found to have a duty to protect Jiminez from racial and national origin animus once he was employed. Similarly, ECU Health's acceptance of White as a patient obligated them to protect her from racial animus. After failing to do so, ECU Health's protective measures for personnel involved in her death demonstrate an ongoing invidious discriminatory animus. Similarly, when ECU Health representatives decided to report to the BON and law enforcement, ECU Health had an obligation to protect the integrity of the reports, thus protecting the Plaintiff's rights.

The court in *Jiminez* also emphasized that ignoring tainted information and failing to conduct an investigation into such animus is a form of discrimination. This is directly applicable here, where ECU Health ignored the tainted medical records falsified by Everette, protected white personnel, including Brixon, and interfered with proper investigations, perpetuating racial animus.

**THE UNADDRESSED MIDDLE GROUND**:

It has been well-settled that the court system does not cognizably recognize the right to the investigation or the prosecution of another, such as has been determined in *Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir. 2007)..." *Hoff v. Joyce*, 1:22-cv-151 (D. N.D. Aug 16, 2023).

It has also been settled in the court system that because decedents do not have cognizable recognizable rights in the courts, a cover-up of the decedent's death provides a cause of action for a civil rights claim to the true victim of the cover-up; the surviving family members. For example, in the case of *Love v. Bolinger*, the Plaintiffs brought suit against the defendants for allegedly covering up the death of their loved one, Joseph Love, who died in his jail cell. The case was dismissed because the family's claims were in support of Love's civil rights via his estate, and it was explained, "[a]fter death, one is no longer a person within our constitutional and statutory framework and has no rights of which he may be deprived." *Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir.1979).

However, the *Love* case also expressed, "We do not hold that cover-up of a wrongful death is without civil or criminal effect; rather, we hold that 'the victims of a cover-up are the decedent's survivors, not the decedent himself.'" *Gibson*, 910 F.2d at 1523, citing, *Bell v. City of Milwaukee*, 746 F.2d 1205, 1264 (7th Cir.1984). *Love v. Bolinger*, 927 F.Supp. 1131 (S.D. Ind. 1996).

45

To simplify, the above cases indicate:

1. The court does not recognize a legal right to an investigation of or the prosecution of another person.

2. Dead people do not have recognized rights.

3. If a death is covered up, the surviving family members are the victims of any civil rights violations resulting from the cover-up.

4. If a death is covered up, the perpetrators of the cover-up may be held criminally responsible.

5. If there are civil rights violations as a result of a death being covered up, the legal victims (decedent's family) can seek civil remedy.

What is not addressed in these cases is a middle ground that could potentially apply in other circumstances, such as in the Plaintiff's case. In cases that involve the cover-up of a death, the court acknowledges a civil remedy to the victim. Yet, the court fails to recognize that if there was no cover-up, justice could prevail through the investigation and prosecution of another. Since it is illegal to violate one's civil rights in the process of covering up a death, then one must have a right to the investigation or prosecution of another, because if not for the cover-up, an appropriate investigation and/or prosecution could take place. The Plaintiff believes this is a fundamental flaw in the reasoning of our court system; a flaw that should be reasonably addressed. The evaluation of such a concern should not threaten prosecutorial boundaries in the process. Contrarily, it would support those boundaries, because if there is evidence of foul play in a death, and the evidence supports criminal prosecution, then there is no encroachment on ethical prosecutorial decisions. The Plaintiff is asking the Court to consider the middle ground.

The victim of the cover-up, in this case the Plaintiff, does have a cognizable right to the investigation or prosecution of another since the cover-up is the but/for; if not for the cover-up, the victim's rights would not have been violated. If the victim's rights are not violated, then a proper investigation and potentially, prosecution would take place, ensuring that just would prevail for one side or the other. It is in this regard that the courts system has either failed to or has not had the opportunity to bring the circumstances together, creating an exception to known practices.

**THE EXCLUSION OF NON-PARTIES**

**UNNAMED AGENTS**:

Counsel for the Defendant has again misrepresented the Plaintiff's statements. In DE 50 p. 23 ¶¶ 2 and 3, Counsel asserts that Plaintiff's allegations regarding a civil rights conspiracy are vague and lack supporting facts, further claiming that Plaintiff does not concretely identify the parties to the purported conspiracy and suggests involvement of "unidentified SBI agents" (DE 33 ¶ 85). This is inaccurate.

The Plaintiff has clearly identified the SBI agents involved, as outlined in DE 33 ¶¶ 83 and 85 of the amended complaint. In paragraph 83, Plaintiff specified the names of the agents—Anthony, Donnie, and Joe—as provided by Haddock. In paragraph 85, Plaintiff detailed an encounter in Haddock's office where the agents were again referenced by their first names, and further information was provided about Joe being trained by Donnie.

47

The selective reference to paragraph 85 while overlooking paragraph 83 while also failing to recognize the agents' names in both paragraphs does not excuse Counsel from the responsibility to accurately represent the Plaintiff's statements. Such repeated misrepresentations appear intentional and undermine the integrity of the argument. It also appears that Counsel is attempting to discredit the Plaintiff's safety concerns by tempting her into revealing full names in her public documents.

**THE NON-PARTIES**:

- Counsel overlooks the fact that while SBI agents and GPD officers are not named as defendants in the current case, their exclusion is due to the expiration of the three-year statute of limitations on their alleged actions and the Plaintiff's lack of evidence at the time of filing. Additionally, the Plaintiff was unaware of law enforcement's failure to interview key witnesses, particularly hospital personnel, until after this suit was filed.

- However, the discovery of previously hidden evidence may warrant tolling the statute of limitations, allowing these non-parties to be added at a later date or to be named defendants in a separate case. ECU Health has been named because of its continued involvement in conspiratorial activities with the defendants who are parties to this litigation. The absence of law enforcement officials as current parties does not prevent their future inclusion in place of the "John and Jane Doe" defendants.

- Leveraging the absence of SBI agents and GPD officers in the lawsuit to undermine the Plaintiff's claims is a diversionary tactic. Such arguments do not absolve ECU Health of its wrongdoing. The focus should remain squarely on ECU Health and the

48

named defendants, whose ongoing conspiracy falls well within the statute of limitations and is robustly documented and supported by the Plaintiff's evidence. This ensures that the primary responsibility for the wrongful actions lies where it truly belongs, independent of any actions by non-parties.

**SUMMARY:**

The Plaintiff has met the burden of showing concrete facts necessary to establish a § 1985 conspiracy through documented interactions and the persistent, coordinated actions of state entities in alignment with ECU Health's directives. The Plaintiff has also demonstrated that these actions were motivated by invidious discriminatory animus, as evidenced by the Defendant's consistent protection of white employees through their interference with lawful investigations of law enforcement, the medical examiner, and district attorney's office.

This quote from *Bray* supports how ECU Health could be held liable under § 1985 in two ways: (1) by conspiring to deprive the Plaintiff of her equal protection rights; and (2) by conspiring to prevent state authorities from providing equal protection. "I find it unnecessary to address the merits of this argument, however, as I am content to rest my analysis solely on the basis that respondents are entitled to invoke the protections of a federal court under the second clause of § 1985(3). Whereas the first clause of the statute speaks of conspiracies whose purpose is to "depriv[e], either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," the second clause address conspiracies

49

aimed at "preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws."... *Bray v. Alexandria Women Health Clinic*, 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993).

## VIII. TITLE VI.

Counsel for the Defendant has argued that the Plaintiff has failed to plausibly allege intentional racial discrimination under Title VI. However, the legal principles established in *Bryant v. School District No. I 38 of Garvin County, Ok.*, 334 F.3d 928 (10th Cir. 2003), directly support the Plaintiff's claim.

In *Bryant*, the court held that maintaining a hostile environment can indeed be intentional, especially when those in authority are aware of egregious acts of discrimination and choose to do nothing. The court emphasized that school administrators, who are responsible for maintaining a non-discriminatory educational environment, can be held liable under Title VI if they are deliberately indifferent to known acts of racial discrimination. This standard is based on the Supreme Court's reasoning in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), which established that deliberate indifference to known harassment can constitute an intentional violation under Title IX, and by extension, Title VI.

The *Bryant* court articulated a four-part test for establishing deliberate indifference under Title VI, which includes:

- Actual Knowledge: The defendant had actual knowledge of the discriminatory acts.

- Deliberate Indifference: The defendant was deliberately indifferent to these acts.

- Severity and Pervasiveness: The harassment was so severe, pervasive, and objectively offensive that it

- Deprivation of Benefits: Deprived the victim of access to the benefits or opportunities provided.

In the present case, ECU Health had actual knowledge of the discriminatory practices and the racially hostile environment faced by Keisha Marie White and her family. The Defendant was aware that White, the only black patient under Brixon's care, was also the only patient under Brixon's care who was severely and fatally neglected. ECU Health was aware that White's cardiac leads were the only set of leads not connected a patient under Brixon's care and in a department designated for cardiac monitoring patients. The Defendant was also aware that White's cardiac monitor was deliberately silenced, yet this was not the case among Brixon's other patients. The silencing of the monitor, as well as the failure to connect the cardiac leads made it impossible for staff to be alerted when White stopped breathing and when her heart stopped beating. Despite this knowledge, ECU Health chose to protect Brixon and other personnel from criminal interrogation, while doing nothing to address the discrimination, thereby demonstrating deliberate indifference. This indifference was severe and pervasive, contributing to a hostile environment that deprived the Plaintiff and her daughter of their rights and

benefits. Because this protection of white workers has continued through various acts of the Defendant, the continuous wrong doctrine applies.

Therefore, under the standards established in Bryant and Davis, the Plaintiff has plausibly alleged intentional racial discrimination under Title VI. The Plaintiff's claims are supported by specific facts that demonstrate ECU Health's deliberate indifference to known acts of racial discrimination, which constitutes an intentional violation of her civil rights.

**FEDERAL FUNDS**:

Counsel claims that the Plaintiff only "generally alleges that ECU Health received 'federal funds,'" referencing DE 33 ¶ 8. However, this assertion overlooks detailed evidence provided in the amended complaint. It is well-documented that ECU Health not only received substantial federal funding through Medicare and Medicaid but was also at risk of losing these funds due to non-compliance with federal healthcare regulations established by the Center for Medicare and Medicaid Services (CMS) in 2014, as detailed in DE 33 ¶¶ 40, 95, and page 45. Furthermore, Exhibit 7 explicitly outlines ECU Health's Non-Compliance Issues on pages 5-7, substantiating these claims.

### IX. § 1988

Though the Plaintiff is currently self-represented, she reserves the right to seek attorney's fees in the event that counsel is retained to represent the case at hand.

## X. NEGLIGENCE PER SE

Counsel for the Defendant argues that the Plaintiff fails to plausibly allege any of the essential elements for a negligence per se claim under North Carolina law, citing *Hardin v. York Mem'l Park*, 221 N.C. App. 317, 326, 730 S.E.2d 768, 776 (2012). This argument overlooks the specific allegations and legal standards referenced in the Plaintiff's amended complaint.

**ELEMENTS OF NEGLIGENCE PER SE**

In order to prevail on a claim of negligence per se, plaintiff must show,

(1) a duty created by a statute or ordinance;

(2) that the statute or ordinance was enacted to protect a class of persons which includes the plaintiff;

(3) a breach of the statutory duty;

(4) that the injury sustained was suffered by an interest which the statute protected;

(5) that the injury was of the nature contemplated in the statute; and,

(6) that the violation of the statute proximately caused the injury.

North Carolina's appellate courts have articulated that at common law, it is an offense to obstruct, impede, or hinder public or legal justice. This was first recognized in *In re Kivett*, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983), concerning a judge's attempt to prevent a grand jury investigation into suspected criminal conduct.

Furthermore, North Carolina recognizes a civil cause of action for obstruction of justice. This tort was established in *Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326 (1984), involving wrongful death claims alongside allegations of false medical record entries and concealment of genuine records. This principle was reaffirmed in *Braswell v. Medina*, 805 S.E.2d 498, 255 N.C. App. 217 (N.C. App. 2017).

These precedents support the Plaintiff's claim that ECU Health's failure to adhere to federal healthcare laws and the subsequent cover-up activities meet the criteria for negligence per se.

**A DUTY CREATED BY A STATUTE OR ORDINANCE:**

As defined in In re Kivett, the duty to not obstruct justice applies universally, not just to individuals in the judicial system. In Kivett, a judge's attempt to delay a grand jury investigation highlights that no one is beyond accountability, including businesses and institutions. This precedent establishes that everyone under the rule of law is expected to adhere to statutes and common law ordinances against obstruction of justice and conspiracy, reinforcing that such duties are deeply embedded in our legal framework.

**THAT THE STATUTE OR ORDINANCE WAS ENACTED TO PROTECT A CLASS OF PERSONS WHICH INCLUDES THE PLAINTIFF STATUTE**:

The statutes against obstruction of justice and civil conspiracy are specifically designed to protect individuals involved in legal proceedings from any interference or unlawful conspiracies that could obstruct the course of justice. As the Plaintiff depended on the

justice system to investigate her daughter's death with the same diligence and impartiality afforded to other homicide and potential homicide cases, she clearly falls within the class of persons these laws aim to protect. This alignment underscores that the Plaintiff is directly protected by these statutes, ensuring that her rights to a fair investigation and pursuit of justice are upheld.


**A BREACH OF THE STATUTORY DUTY:**

The Defendant, ECU Health, breached the statutory duty by:

- failing to refer White to a medical examiner,

- failing to accurately complete White's death certificate,

- withholding information in their report to the BON,

- lying to the BON about Brixon's previous disciplines,

- failing to hold Everette accountable for falsifying medical records, including in-house disciplines, reporting to the BON, and reporting criminal conduct to law enforcement,

- failing to report White's death to the proper law enforcement agency,

- maintaining an improper relationship with SBI agents, not local to Greenville, thereby exchanging unauthorized information over a period of at least several months, bout a case they were not authorized to discuss due to their jurisdictional restrictions,

- withholding information from the Plaintiff during the disclosure meeting and other communications up and including the wrongful death mediation process,

- failing to cooperate with a joint police and SBI investigation implemented in November 2014, by withholding information and failing to make personnel available for interview,

- requiring the Medical Examiner's office to withhold information from the Plaintiff after the Plaintiff discovered Dixon lied about having an ME report by calling the ME's office,

- requiring the ME, Dr. Kelly, to obtain their permission before she could be "allowed" to participate in the death investigation of White.

Each of these actions by ECU Health not only breached statutory duties but also strategically obscured the circumstances surrounding White's death, demonstrating a concerted effort to hinder justice.

## THAT THE INJURY SUSTAINED WAS SUFFERED BY AN INTEREST WHICH THE STATUTE PROTECTED:

The interests protected by common law obstruction of justice and conspiracy encompass the right to a fair and unimpeded legal process. ECU Health's actions have directly harmed the Plaintiff's ability to seek criminal and civil redress, effectively positioning itself as a gatekeeper to the court. This has created an insurmountable barrier to accessing justice, thus sealing off state-level courts from the Plaintiff and infringing upon her civil rights. This obstruction directly impacts the Plaintiff's ability to access the legal remedies and protections that these statutes are designed to ensure.

## THAT THE INJURY WAS OF THE NATURE CONTEMPLATED IN THE STATUTE:
The laws against obstruction of justice and conspiracy are designed to prevent specific harms such as interference with legal proceedings, tampering with potential witnesses,

56

and the concealment of critical evidence—all of which could adversely affect the outcome of legal actions. Through the conduct of ECU Health and the other defendants, the Plaintiff was systematically denied access to the courts, due process, equal protection under the law, and the freedom to give and receive information, which are precisely the types of injuries these laws aim to prevent.

**THAT THE VIOLATION OF THE STATUTE PROXIMATELY CAUSED THE INJURY:**

ECU Health's actions directly infringed upon the Plaintiff's civil rights, prompting the filing of this lawsuit in U.S. District Court. The Defendant's control over state entities has barred the Plaintiff from seeking remedies through state-level avenues. The only entities mentioned in the Plaintiff's filings are those for which factual evidence exists, with the hope that discovery will uncover further unlawful involvement with other state entities.

ECU Health's incessant interference has necessitated extraordinary measures by the Plaintiff, such as retaining an independent medical examiner and recording conversations with key officials. Had it not been for ECU Health's obstruction, a comprehensive police investigation would have been initiated in 2014, involving interviews with hospital personnel, the Plaintiff, and her family, potentially leading to justice based on the complete scope of evidence.

The persistent impediment of justice by ECU Health over a decade not only implies guilt but demonstrates a clear consciousness of guilt. As noted in *Marshall v. State*, 583 A.2d

1109, 85 Md.App. 320 (Md. App. 1990), interference with police investigations is considered conduct indicative of consciousness of guilt.

**PUBLIC SAFETY ISSUES**:

Obstruction of justice fundamentally undermines public safety by interfering with the legal system's ability to enforce laws designed to protect the public from crimes such as homicide, assault, battery, and patient abuse and neglect. This enforcement is crucial for deterring such offenses and maintaining trust in public institutions. In Keisha White's case, the failure to uphold the law effectively places healthcare workers above the law, suggesting that they are untouchable even when laws are broken. This is a prime example of obstruction of justice being an issue of public safety.

Acts of obstruction can include:

- Interfering with law enforcement's ability to investigate or make arrests;
- Influencing judicial processes or tampering with witnesses, including expert witnesses like medical examiners;
- Destroying or concealing evidence to prevent fair investigations and trials; and
- Using deceit or corruption to prevent justice from being served.

Obstruction of justice in the context of healthcare goes beyond mere non-compliance with healthcare regulations; it enters the realm of criminal activity when it involves deliberate actions that lead to patient harm or death. In the case of Keisha White, the allegations suggest that White was murdered by her nurse, while ECU Health subsequently, took actions taken to cover up this wrongdoing.

58

This kind of obstruction:

- Prevents proper legal investigations and criminal proceedings against those responsible, effectively placing healthcare workers who commit severe malpractices above the law.

- Destroys the integrity of healthcare services, as it sends a chilling message that patient safety means little, in particularly, compared to reputation and finances.

- Indicates a severe breach of public trust, suggesting that patients entering healthcare facilities are at risk of abuse or neglect that could be deliberately concealed by those in authority.

The case of Keisha White exemplifies the worst fears of many who trust healthcare providers with their lives—only to find that in some instances, the system designed to protect them may shield those who do harm. It is crucial, therefore, that such cases are thoroughly investigated and prosecuted to ensure that justice is served, not only for Keish White, but for the safety and well-being of all patients.

The concealment of wrongful acts, especially to protect white personnel at the expense of a black patient and her family, starkly contrasts with high-profile accountability cases, such as the indictment of former President Donald Trump. The message this sends— that in some areas like Pitt County, North Carolina and the other twenty-eight counties served by ECU Health—it is permissible for healthcare workers to fatally neglect and abuse patients; a dire public safety threat.

Covering up a hospital death to evade public scrutiny and financial loss, and hindering a medical examiner from performing her duties, are acts that endanger public safety. Such conduct, if proven, suggests that healthcare facilities could manipulate outcomes with impunity, leaving families without closure and the truth obscured, such as it is with this Plaintiff. This necessitates a call for transparent investigations and accountability to prevent such injustices from being repeated.

## XI. CONCLUSION

For the reasons outlined herein, this case presents substantial legal and factual questions that merit further examination. Accordingly, it is respectfully requested that this case not be dismissed, but allowed to proceed to ensure that justice is served. Respectfully submitted,

August 5, 2024
/s/ Cynthia B. Avens
Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
avens1@charter.net
252-203-7107
*Pro Se Litigant*

CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2024, the Plaintiff's Amended Pleading was delivered

in person to the Clerk of the U.S. District Court. Upon docketing, the CM/ECF system

will send electronic notification of such filing to the defendants' counsel.

Respectfully submitted,


/s/ Cynthia B. Avens

Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
Avens1@charter.net
252-203-7107
*Pro Se Litigant*

Chris D. Agosto Carreiro
Special Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
ccarreiro@ncdoj.gov
Telephone: (919) 716-6874
Facsimile: (919) 716-6755
State Bar No. 45356
*Counsel for DA Faris Dixon*

Jeremy D. Lindsley
Assistant Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
jlindsley@ncdoj.gov
Tel: 919-716-6920
Fax: 919-716-6764
NC State Bar No. 26235
*Counsel for Dr. Karen Kelly*

Daniel D. McClurg
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202
daniel.mcclurg@klgates.com
(704) 331-7400
(704) 353-3114
NC Bar #53768
*Counsel for Pitt County Memorial Hospital, Inc.*

Terrence M. McKelvey
K&L Gates LLP
501 Commerce Street, Suite 1500
Nashville, Tennessee 37203
terrence.mckelvey@klgates.com
(615) 780-6700
(615) 780-6799
NC Bar #47940
*Counsel for Pitt County Memorial Hospital, Inc.*