**FILED**

AUG 2 2 2024

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### EASTERN DIVISION

Civil Action Number 4:24-CV-00051-M-RN

| | | |
|---|---|---|
| Cynthia B. Avens | ) | |
| | ) | |
| (Plaintiff) | ) | MOTION TO DETERMINE |
| | ) | VALIDITY AND APPLICABILITY |
| | ) | OF 2016 SETTLEMENT |
| Faris C. Dixon, Jr., District Attorney | ) | AGREEMENT AND ADDRESS |
| Pitt County Memorial Hospital, Inc. | ) | ETHICS AND TACTICS |
| Dr. Karen Kelly, Medical Examiner | ) | OF OPPOSING COUNSEL |
| John/Jane Doe | ) | |
| John/Jane Doe | ) | |
| John/Jane Doe | ) | |
| (Defendants) | ) | |

## I.    INTRODUCTION

Cynthia B. Avens ("Avens" or "Plaintiff"), proceeding pro se, respectfully submits this

motion in response to a recent email from counsel for Defendant ECU Health,

attorneys Terrence McKelvey ("McKelvey") and Daniel McClurg ("McClurg") of K&L

Gates (collectively, "Gates"). In this email, Gates threatened Plaintiff with legal action

if she does not strike the unredacted 2016 Wrongful Death Settlement Agreement

("Agreement") from the docket. Plaintiff believes this communication constitutes an

unethical and coercive attempt to intimidate her and improperly influence the

proceedings.

1

## II.   BACKGROUND

**Wrongful Death Settlement**:

Plaintiff pursued a wrongful death action against ECU Health concerning the egregious patient abuse and neglect inflicted upon her daughter, Keisha Marie White ("White"), while under the care of her primary nurse, Linda Brixon ("Brixon"), on May 9-10, 2014.

The wrongful death case was settled through mediation on March 1, 2016. However, material facts relating to White's care were intentionally withheld from Plaintiff both prior to and during the mediation process. Although Plaintiff and her counsel were aware that the North Carolina Board of Nursing ("BON") had not released its final report to her, she was unaware of specific information contained within that report. Plaintiff also could not have fathomed how much additional information the BON report might reveal, given that the detailed 2014 report from the North Carolina Department of Health and Human Services ("DHHS") already disclosed numerous details surrounding the circumstances of White's death.

While Avens was denied access to any "new" information that was not previously available through other means, ECU Health was aware of the undisclosed details included in the BON report, particularly information that would have been revealed in

2

their internal investigation following White's death. Such details include, but are not limited to:

- **Brixon's failure to provide CPR during a code blue**, opting instead to chart, despite her claim that she did not panic and that she received CPR training every two years over her 22 years as a registered nurse;

- **Brixon's failure to assess White for potential opioid side effects** at the beginning of and during the shift, including the drug's ability to cause a patient to appear to be sleeping when, in fact, they are dead or dying;

- **Brixon's training and demonstrated competence in validating bedside equipment,** although she told the BON she did not know how to validate suspicious oxygen readings.

- **Brixon's training and demonstrated competence in the proper use of restraint and seclusion procedures,** although she failed to adhere to proper protocols, such as employing least restrictive measures like turning on the bed alarm; and releasing restraints at the earliest possible time.

- **Brixon's training and knowledge of how to read cardiac rhythms** on the bedside cardiac monitor, although she failed to alert staff in her chain of command of White's deteriorating condition.

Additionally, the BON's final report revealed omissions, misinformation, and inconsistencies in ECU Health's June 2014 report to the BON, such as:

- **ECU Health's failure to report that Brixon did not follow physician orders**
  for:
  - continued oxygen therapy, including an ignored order that was given nine minutes prior to White's oxygen being recorded at 62% at 2:00a.m. on May 10, 2014;
  - continued cardiac monitoring;
  - continued pulse-oxygen monitoring;
  - notifications regarding changes in patient vital signs, behavior, and condition; and
  - vital sign recordings every four hours;
- **ECU Health's failure to report Brixon's prior disciplinary actions**, initially denying any disciplines during the BON's investigation, only to admit to two prior disciplines during a second investigation following Plaintiff's complaint; and
- **Communicating to the BON that White's cause of death was "unclear,"** despite the death certificate completed on May 10, 2014, which listed anoxic brain injury and cardiopulmonary arrest as the causes of death.

These misrepresentations and omissions by ECU Health, aimed at protecting its personnel and financial interests while covering up White's death, amounted to fraudulent reporting and obstruction of civil and criminal justice.

4

During the mediation, when Plaintiff refused several monetary offers, the mediator revealed that if a settlement was not reached, ECU Health would use unrelated healthcare information against Plaintiff in retaliation for proceeding to trial. A previous attorney had valued the case at $4 million. However, Plaintiff's then-current counsel, instead of protecting White's estate, encouraged Plaintiff to follow ECU Health's lead in accepting a significantly lower settlement and failed to address the coercion. Counsel further informed Plaintiff that, under North Carolina law, ECU Health could escape liability if the jury found White to be even 1% responsible for her outcome.

Had Plaintiff been armed with the full scope of circumstances surrounding her daughter's death and ECU Health's fraudulent activity with the BON, she would have been in a stronger position to convince a jury that White was not responsible for her outcome. Additionally, with the physical, non-conclusory evidence in the BON report, Plaintiff could have exposed ECU Health's bad faith reporting to the BON, thereby discrediting their testimony.

**Use of the Agreement in the Immediate Case**:

Avens filed her initial complaint with the U.S. District Court on March 22, 2024 (DE 1). In this pleading, Avens did not delve into the 2016 Agreement due to strategic reasons and her awareness of the confidentiality clauses within the Agreement. However, she asserted that ECU Health had obstructed both criminal and civil

5

justice, thereby preserving her right to address the allegation further if necessary, such as during the non-public discovery process.

In their motion and memorandum to dismiss the original complaint, Gates invoked an affirmative defense, asserting that the Agreement precluded Avens from filing the present case (DE 23).

Because Gates introduced the Agreement into the public realm, Avens was not only compelled to address the Agreement in her amended pleading (DE 33, pp. 48-49), but she also had a right to do so. In her amended pleading, Avens explained the coercive and fraudulent nature under which the Agreement was signed.

In Gates's motion and memorandum to dismiss Avens's amended complaint (DE 50), the Agreement was again used against Avens. One such instance asserted, "Avens presumably only seeks to disavow the parts of the Settlement Agreement and Release that she views as unfavorable, rather than the entire Agreement. The Amended Complaint is silent regarding the status of the consideration Avens received in exchange for the release contained within that purportedly void Agreement" (DE 50, p. 5, Footnote 5). By introducing this footnote in their public document, Gates entered a specific aspect of the Agreement into the public domain: the "consideration."

6

Because the Agreement was being used as an affirmative defense to support

Gates's motion to dismiss Avens's amended pleading, and in light of their claim that

Avens selectively ignored parts of the Agreement while remaining "silent" regarding

the consideration, Avens submitted an unredacted version of the Agreement as

evidence along with her response to the Defendant's motion to dismiss, which was

docketed on August 6, 2024 (Exhibit 12).

### III.    REMINDER

Plaintiff wishes to remind the Court that the case at hand is neither a wrongful death

nor a medical malpractice claim, nor is it a claim seeking damages for the coercion

and fraud that occurred during the 2016 wrongful death mediation. Plaintiff has not

asserted any cause of action related to these matters. Rather, all causes of action in

this case revolve around the harm Plaintiff has suffered as a result of civil rights

violations during the ten-year aftermath of her daughter's death.

### IV.    LEGAL STANDARD

**Sword and Shield Doctrine:**

"Under the sword and shield doctrine, a party who raises a claim that will necessarily

require proof by way of a privileged communication cannot insist that the

communication is privileged." *Allstate Ins. Co. v. Levesque*, 263 F.R.D. 663, 667

(M.D. Fla. 2010) (citing *GAB Bus. Servs., Inc. v. Syndicate*, 627, 809 F.2d 755, 762 (11th Cir. 1987)).

"Plaintiff cannot hide behind the shield of privilege to prevent Defendant from effectively challenging Plaintiff's evidence and allegations. See *Savino v. Luciano*, 92 So. 2d 817, 819 (Fla. 1957) (finding that a party who bases a claim on matters which would be privileged, the proof of which will necessitate the introduction of privileged matters into evidence, and then attempts to raise the privilege, may be deemed to have waived that privilege)." *Strong v. Geico Gen. Ins. Co.*, Case No: 8:16-cv-1757-T-36JSS (M.D. Fla. Mar 15, 2017).

"...a party who bases a claim on [a] matter which would be privileged, the proof of which will necessitate the introduction of privileged matter into evidence, and then attempts to raise the privilege so as to thwart discovery, may be deemed to have waived the privilege." Id. (quoting *GAB Business Servs., Inc. v. Syndicate* 627 , 809 F.2d 755, 762 (11th Cir. 1987) ).

**Fraudulent Concealment**:

"The elements of fraudulent inducement are '"(1) a material misrepresentation or omission of fact; (1) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.'"' *MVP Health Plan, Inc. v. Cotiviti, Inc.*, No. 1:18-CV-677 (FJS/CFH), 2019 U.S. Dist. LEXIS 190440, *7 (Nov. 1, 2019) (Scullin, J.) (quoting *Levine v.*

8

*Landy*, 860 F.Supp.2d 184, 193 (N.D.N.Y. 2012) (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006))). The elements of actual fraud are essentially the same under New York law. See *Southwestern Payroll Serv. v. Pioneer Bancorp, Inc.*, No. 1:19-CV-1349 (FJS/CFH), 2020 U.S. Dist. LEXIS 66906, *6-*7 (N.D.N.Y. Apr. 16, 2020) (Scullin, J.).

Importantly, an omission or "concealment of facts supports a cause of action for fraud only if the non-disclosing party has a duty to disclose." *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995) (citations and footnote omitted). A duty to disclose omitted facts "ordinarily arises where the parties are in a fiduciary or other relationship signifying a heightened level of trust." *Id.* (citations omitted). "In the absence of a fiduciary relationship, a duty to disclose may arise if: (1) one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party, …; or (2) 'one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.' …" *Id.* at 1484 (internal citations omitted). "In either case, a disclosure duty ripens only when it becomes apparent to the non-disclosing party that another party is operating under a mistaken perception of a material fact." *Id.* (citation omitted). *Bollinger Indus. v. Walter R. Tucker Enters.*, 3:20-CV-95 (FJS/ML) (N.D. N.Y. Nov 29, 2021).

Case 4:24-cv-00051-M-RN    Document 62    Filed 08/22/24    Page 9 of 23

## V. CAUSE OF MOTION

On August 9, 2024, at 5:23 p.m. Eastern Standard Time (EST), Paula K. Graves, a Senior Practice Assistant at K&L Gates, sent Avens an email with an attached letter on behalf of Terrence McKelvey. The email was copied to McKelvey and Daniel McClurg. In the letter, McKelvey stated that because Avens submitted the Agreement into the public record without any redaction of the settlement amount, she violated the Agreement, entitling ECU Health to $50,000 in liquidated damages. McKelvey requested that Avens take immediate action to strike the Agreement from the docket on or before August 14, 2024. The letter further stated, "If you do not take immediate action in this regard, we will assume that you intend to persist in your violation of the Settlement Agreement and will take necessary action." (See Exhibit 15.)

## VI. WHY THE COURT SHOULD TAKE ACTION

The Court should take action because Gates has used the Agreement as a central component of their defense strategy, despite valid reasons to question the Agreement's validity and applicability to the case at hand. Additionally, Gates has sought to benefit from the Agreement while simultaneously using threats and intimidation tactics to prevent Plaintiff from doing the same. Under these circumstances, Plaintiff respectfully requests that the Court:

1. Determine the validity of the Agreement,

2. Rule on the relevance of the Agreement to the case at hand,

3. Decide whether the Agreement has the ability to dismiss Avens's amended complaint,

4. Determine whether the confidentiality of the Agreement has been waived,

5. Decide if the Agreement should remain on the docket as an exhibit in its current unredacted form, and

6. Determine whether the actions of Gates, including the use of threats and intimidation, and the imposition of a three-business-day compliance window, constitute coercion or improper conduct that warrants further judicial scrutiny.


## 1. INVALIDITY OF THE AGREEMENT

Argument Summary:

- The 2016 Settlement Agreement should be deemed invalid due to the deliberate withholding of material facts and coercion applied to Avens during mediation.

- Evidence of the withheld information is contained in the 194-page document released by the Board of Nursing (BON) in March 2016, after the mediation.

Timeline and Evidence Contained within the BON Report:

- September 29, 2014: Avens filed her report with the BON, expecting to receive a full report upon completion of the investigation. (See Exhibit 16 p. 2.)

- July 21, 2015: BON informed Avens of their conclusions regarding Linda Brixon (Brixon), indicating that the investigation was complete. (See Exhibit 16 p. 10.)

- November 18, 2015: Brixon signed the BON's Published Consent Order, which should have triggered the release of the final report to Avens. (See Exhibit 16 p. 9.)

- Repeated Requests: Avens repeatedly requested the BON report but was informed it was not ready.

- January 16, 2016: Amy Fitzhugh, former BON Staff Attorney, informed Avens that the report would be ready in 45 days, setting the expected release around March 1, 2016. (See Exhibit 16 p. 11.)

- March 1, 2016: Mediation was held, and the Agreement was signed without Avens having received the BON report. The mediation occurred in Raleigh, in the office of ECU Health's then-attorney.

- Avens received the BON's report nearly eight months after the completion of the Board's investigation.

If Gates has a copy of the BON report, they have the dated information in the timeline above, meaning that they are aware that Avens could not have received the information therein prior to mediation. Therefore, Gates is or should be aware that information was withheld from Avens from July 2015 until March 2016, indicating a deliberate withholding of information, supporting Avens' claims that the Agreement was signed under fraudulent pretenses. If Gates does have this report, and still chose to use the Agreement to support their motion to dismiss, they have opted to intentionally mislead the Court in two ways:

12

1. Using the Agreement as an affirmative defense while in possession of evidence supporting that information was withheld, and

2. Using the Agreement as an affirmative defense when the language in the Agreement does not bar the Plaintiff's current claims.

If Gates does not have the BON report, it raises two issues:

1. Withholding by ECU Health: ECU Health is again withholding crucial information, this time from chosen counsel retained to represent them.

2. Negligence by Gates: Gates failed to request the BON report from their client, even though they knew Avens used it to support her claims. This negligence undermines their defense and suggests a lack of diligence in representing their client's interests.

## 2. RELEVANCE OF THE AGREEMENT

The Agreement does not apply to the case at hand, neither does it preclude it. (See Exhibit 12.) As Gates pointed out in their motion and memorandum to dismiss Plaintiff's amended complaint (DE 50 p. 2 ¶ 1), Avens "released all claims related to the **medical services** that White received," up to and including May 10, 2014. That is the entire scope of the Agreement, and on which the Agreement is based. As such, the Agreement does not provide ECU Health with blanket protection that covers conduct unrelated to White's care, especially violative conduct that goes against constitutional rights, state ordinances, common law. and/or public policy.

13

### 3. POWER OF THE AGREEMENT

Gates has improperly relied on the power of the Agreement to support their claim that Avens's amended complaint should be dismissed. Given the language of the Agreement, applying strictly to White's medical treatment and damages associated with a wrongful death action, the Agreement is powerless, whether on its own, or used in conjunction with another affirmative defense, to bar the current civil action against ECU Health.

### 4. CONFIDENTIALITY

**Gates's Use of the Agreement as, both, a Sword and a Shield:**

In the Defendant's motion to dismiss Avens's amended complaint, Gates used the Agreement as a sword, claiming that the Agreement barred the Plaintiff's current claims and asserted that these claims should be dismissed accordingly. Specifically, Gates stated, "All of Avens' claims against ECU Health not only are barred by the applicable statutes of limitations, they also are barred by the terms of the 2016 Settlement Agreement and Release." (DE 50 p. 11 Footnote 10).

Subsequently, after Avens provided a copy of the Agreement to defend her stance and show the Court that Gates was improperly relying on an agreement that did not support dismissal of Plaintiff's current claims, Gates attempted to hold Avens accountable for purportedly violating the confidentiality clause of the Agreement under the threat of $50,000 in liquidated damages, if she did not file a motion to strike the Agreement from the docket within three business days, thus using the

14

Agreement as a shield to protect their client and themselves. Such an act, if Avens had complied, would have the potential to prevent Avens from using the document to support her claims that the Agreement does not bar the current action, potentially affecting the outcome of this litigation.

The court in *Strong v. Geico Gen. Ins. Co.* made it clear that a party cannot rely on privileged information to support its claims (the "sword") while simultaneously using that privilege to block the opposing party from challenging or rebutting those claims (the "shield").

The Second Circuit explained, a party cannot "affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party. *Stokes v. Ikea U.S. Retail, LLC.* CIVIL 1: 22-cv-01377-JMC (D. Md. Feb 13, 2023).

*Pearce* quoted *Carswell*, "the plaintiff sought to pick up the shield, (after) having first used the sword. This the law does not permit.' *Carswell v. Greene*, 253 N.C. 266, 116 S.E.2d 801." *Pearce v. Barham*, 267 N.C. 707, 149 S.E.2d 22 (N.C. 1966).

**Waived Confidentiality:**

As Gates introduced the Agreement in their argument as a basis to dismiss Avens's original complaint and her amended complaint, Counsel for the Defendant has implicitly waived the confidentiality of the Agreement. The sword and shield doctrine

allows the Plaintiff to defend her case against Gates's claims that the Agreement possesses the strength to bar her current action.

Furthermore, when Gates pointed out Avens's silence on the consideration given in the Agreement, though the consideration is absolutely irrelevant to the case at hand, they further opened the door for the Plaintiff to address the amount of damages settled for into the public realm. Because the consideration of the Agreement was immaterial in the first place, it can only be assumed that Gates brought the silence of the consideration into the purview of the Court for the purpose of discrediting and belittling the Plaintiff, downplaying the relevant facts of the case, and distracting the court from the core issue of her claims rooted in civil rights violations.

Waived Confidentiality - In *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975), the court found that: All of the established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party. The factors common to each exception may be summarized as follows:

(1) assertion of privilege was a result of some affirmative act, such as filing suit, by the asserting party;

(2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and

16

(3) application of the privilege would have denied the opposing party access to information vital to his defense.

Thus, where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct. *Id.* at 580. *WLIG-TV, INC. v. Cablevision Systems Corp.*, 879 F.Supp. 229 (E.D. N.Y. 1994).


Opening the Door Doctrine: Under the "opening the door" doctrine, "otherwise irrelevant evidence may be admitted when the opposing party has 'opened the door' to such evidence." *Grier v. State*, 351 Md. 241, 260 (1998) (citations omitted). The doctrine "authorizes admitting evidence which otherwise would have been irrelevant in order to respond to . . . admissible evidence which generates an issue"; it "makes relevant what was irrelevant[.]". *Robertson*, 463 Md. at 352 (citations omitted). *Bivans v. State*, No. 3299 (Md. App. Jul 27, 2020).


## 5. ALLOWING THE DOCKETED UN-REDACTED AGREEMENT:

Because Gates chose to rely on an invalid document that is inapplicable to the case at hand, waiving the confidentiality of the Agreement, and introduced irrelevant information from the Agreement into the public domain, the Agreement, provided as an exhibit by the Plaintiff, should be permitted to remain on the docket in its original un-redacted form.

17

## 6. EVALUATING GATES'S ACTIONS:

Gates did not address the claimed confidentiality issue in front of the court, which raises concerns about their understanding of the Agreement and their motives behind addressing purported compliance issues in private. Avens's concerns include Gates's selective enforcement, their clandestine communication, and the three business days they required compliance, aimed to bully Avens into submission.

   a. Selective Enforcement: The Agreement aims to prohibit more than just the public disclosure of the consideration agreed upon. It also aims to bar publicly acknowledgment of the Defendant's name, past, present, and future; associated entities; specific locations where their business is located including city and county; and any other identifying information connected to the consideration. Yet, Gates focused only on Avens's failure to redact the dollar amount settled upon in the Agreement.

   b. Clandestine Communication: The Agreement does not provide any allowances for time to correct, redact, remove, or withdraw alleged violative dissemination of confidential information. Avens is seeking $156 million in damages. Gates, according to the letter they sent to Avens, had a chance to collect $50,000 in liquidated damages from Avens. Nevertheless, Gates chose not to file a counterclaim against Avens, opting instead to allow her three business days to comply. Gates does not represent Avens. They represent ECU Health. Up until this point, Gates has advocated for their client with such ferocity that they intentionally misrepresented to the Court that the Agreement barred Avens's current claims. Additionally, while the email Avens received

18

from Graves was copied to McKelvey and McClurg, and a responsive email from McKelvey was copied to McClurg, ECU Health representatives were not copied in either response, indicating a possible conflict of interest in their representation of the case at hand.

c. Three Business Days to Comply: Gates sent a letter to Avens on Friday, August 9, 2024, "requesting" her to "strike" the Agreement from the docket by Wednesday, August 14, 2024, thus requiring compliance within three business days. Even if Gates were to claim that they were trying to "help" Avens by allowing her an opportunity to correct a perceived wrong, that would go directly against their duty to ECU Health. Therefore, providing such a short window of time for Avens to comply, even if she felt she had a duty to do so, was unfair, unrealistic, and unreasonable. K&L Gates, with 45 offices globally and extensive resources, coupled with the ability to use the electronic filing system, is extremely well-situated to meet legal requirements and deadlines in a fair amount of time as allowed by the federal rules of civil procedure (FRCP). Avens, a pro se litigant, has extremely few resources and is required to mail or hand deliver documents to the Court for filing.

The time period Gates set restricted the time Avens would need to draft an acceptable motion and would require her to drive approximately eighty miles to the nearest federal courthouse or would have required her to pay for expedited shipping, all of which inflicts undue burden on the Plaintiff.

19

It appears that K&L Gates, through McKelvey and McClurg, sought to leverage their weight, via knowledge, experience, and resources against Avens, a pro se litigant with no formal legal education or expertise and little resources, which is exploitation. Gates acknowledged Avens's limitations in his responsive email. (See Exhibit 15 p. 2.) With the threat of $50,000 in liquidated damages, especially when there is evidence in the firm's possession to indicate the Agreement was signed under coercive and fraudulent, or at the least, suspicious, pretenses, is in itself, coercion, and borders on the lines of criminal activity.

It is clear that Gates's insistence that Avens strike the Agreement, rather than request that she redact and resubmit it (though this option would still go against the open door and sword and shield doctrines), is an attempt to force Avens to destroy her use of and the Court's use of evidence crucial to the Court's decision-making process. This tactic not only aims to obscure the facts but also seeks to manipulate the judicial process by eliminating key evidence that contradicts Gates's narrative and undermines their defense. Such conduct is not merely aggressive litigation strategy; it crosses into unethical behavior designed to suppress evidence and intimidate a litigant, who is also a witness, into compliance under the threat of severe financial penalties.

## VII.   LIST OF EXHIBITS

**EXHIBIT 15:**

Email Communications and Letter from Attorneys Terrence McKelvey and Daniel McClurg

**EXHIBIT 16:**

Information from NC Board of Nursing's Final Report:

- Published Consent Order
- Letter to Avens
- Email regarding status of final report

## VIII.   CONCLUSION

By filing this motion with the Court, Avens seeks protection from unfair litigation tactics, threats of penalty of an unenforceable agreement, and intimidation practices aimed to take advantage of her. Such conduct is a reflection of why the case at hand was filed in federal court. ECU Health has successively controlled the narrative, obstructed justice and conspired to obstruct justice with the support of various state entities as described in Avens's amended complaint and responses to the defendants' motions to dismiss. Subsequently, their counsel is doing the same thing. Striking the Agreement from the docket is an attempt to control the narrative and

obstruct justice in this case. The fact that McKelvey and McClurg have acted together implies collusion and conspiracy to control the narrative and obstruct justice.

Given the circumstances that have compelled the filing of this motion, Avens respectfully requests that the Court consider the impact of this motion on the overall case schedule. Avens did not initiate this motion out of a desire to prolong the proceedings but was forced to act in response to efforts by ECU Health's counsel to prejudice this case and create unnecessary legal conflicts. Therefore, Avens requests that this motion be addressed without causing undue delay to the case schedule or negatively impacting the trial calendar. The Plaintiff should not be penalized for defending against tactics that serve, not only to distract from the merits of the case and obstruct the pursuit of justice, but to also create confusion and add frustration to the case, as well. Thank you.

Respectfully Submitted,

August 17, 2024

/s/ Cynthia B. Avens

Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
Avens1@charter.net
252-203-7107
*Pro Se Litigant*

CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2024, I mailed by USPS, the Motion To Determine

Validity And Applicability Of 2016 Settlement Agreement And Address Ethics And

Tactics Of Opposing Counsel to the Clerk of the U.S. District Court. Upon docketing, the

CM/ECF system will send electronic notification of such filing to the defendants'

counsel. Respectfully submitted,

August 17, 2024

/s/ Cynthia B. Avens

Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
Avens1@charter.net
252-203-7107
*Pro Se Litigant*

Chris D. Agosto Carreiro
Special Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
ccarreiro@ncdoj.gov
Telephone: (919) 716-6874
Facsimile: (919) 716-6755
State Bar No. 45356
*Counsel for DA Dixon*

Daniel D. McClurg
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202
daniel.mcclurg@klgates.com
(704) 331-7400
(704) 353-3114
NC Bar #53768
*Counsel for Pitt County Memorial Hospital, Inc.*

Jeremy D. Lindsley
Assistant Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
jlindsley@ncdoj.gov
Tel: 919-716-6920
Fax: 919-716-6764
NC State Bar No. 26235
*Counsel for Dr. Karen Kelly*

Terrence M. McKelvey
K&L Gates LLP
501 Commerce Street, Suite 1500
Nashville, Tennessee 37203
terrence.mckelvey@klgates.com
(615) 780-6700
(615) 780-6799
NC Bar #47940
*Counsel for Pitt County Memorial Hospital, Inc.*