1    **UNITED STATES DISTRICT COURT**

2    **EASTERN DISTRICT OF NORTH CAROLINA**

3                              )
     **CYNTHIA B. AVENS,**      )
4                   **Plaintiff,**   )   DOCKET NO. 4:24-CV-51-M-RN
     **v.**                     )
5    **FARIS C. DIXON, JR., ET AL.,**  )
                                )
6                   **Defendants.**  )

───────────────────────────────

7

8                    **TRANSCRIPT OF MOTIONS HEARING**
                **BEFORE MAGISTRATE JUDGE ROBERT T. NUMBERS, II**
                  **TUESDAY, OCTOBER 8, 2024; 2:05 PM**
9                      **GREENVILLE, NORTH CAROLINA**

10   **FOR THE PLAINTIFF:**
             Cynthia B. Avens, Pro Se
11           303 Riverside Trail
             Roanoke Rapids, NC 27870
12   **FOR THE DEFENDANT FARIS C. DIXON, JR.:**
             NC Department of Justice
13           By:  Chris D. Agosto Carreiro
             114 West Edenton Street, NC DOJ Suite
14           Raleigh, NC 27602-0629
     **FOR THE DEFENDANT ECU HEALTH:**
15           K&L Gates, LLP
             By:  Daniel D. McClurg
16           300 South Tryon Street, Suite 1000
             Charlotte, NC 28202
17   **FOR THE DEFENDANT DR. KAREN KELLY:**
             NC Department of Justice Education Section
18           By:  Jeremy D. Lindsley
             PO Box 629
19           Raleigh, NC 27602

20   Audio Operator:              Clerk's Office Personnel

21
     eScribers, LLC
22                       7227 N. 16th Street
                            Suite 207
23                       Phoenix, AZ 85020
                          800-257-0885
24                       www.escribers.net
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.

Colloquy

1                    P R O C E E D I N G S

2          THE CLERK:  All rise.  This is United States District

3   Court for the Eastern District of North Carolina is again in

4   session.  The Honorable Robert T. Numbers, II, presiding.

5   This Court will come to order.  You may be seated.

6          THE COURT:  Good afternoon, everyone.

7          I'm United States Magistrate Judge Robert Numbers,

8   and we are here in the United States District Court for the

9   Eastern District of North Carolina, sitting in Greenville for

10  a hearing in the case of Avens v. Dixon and others, case 4:24-

11  CV-51.

12         Ms. Cynthia Avens, the pro se plaintiff, is here

13  today.

14         Good afternoon, ma'am.

15         MS. AVENS:  Yes, sir.

16         THE COURT:  All right.  And would defense counsel

17  please identify themselves and note who they represent.

18         MS. AGOSTO CARREIRO:  Your Honor, my name is Chris

19  Agosto Carreiro, and I represent DA Faris Dixon.

20         MR. LINDSLEY:  May it please the Court, Jeremy

21  Lindsley, North Carolina Department of Justice, here on behalf

22  of Dr. Kelly.

23         MR. MCCLURG:  Hello, Your Honor.  Daniel McClurg,

24  from K&L Gates, on behalf of ECU Health.

25         THE COURT:  All right.  Good afternoon, everyone.

Colloquy

1        So we have a number of motions on the docket today.

2   Each of the defendants has filed a motion to dismiss Ms.

3   Avens' claims against them.  Ms. Avens has filed a motion to

4   determine the validity of a settlement agreement that was

5   apparently entered previously.  And the ECU defendants have

6   filed -- or defendant has filed a motion to seal a document

7   that Ms. Avens filed.  I want to begin with those last two

8   motions because I think they're more narrow issues there.

9        Ms. Avens, I want to begin with you and ask, with

10  respect to the -- you filed a document that's entitled Motion

11  to Determine Validity and Applicability of 2016 Settlement

12  Agreement and address ethics and tactics of opposing counsel.

13  The ECU defendants responded by indicating they didn't know

14  what motion -- what rule of civil procedure you were

15  proceeding under.  They presumed it was a summary judgment

16  motion, and you replied saying, it's not a summary judgment

17  motion.  So I'm trying to figure out, for myself, what rule

18  you're proceeding under, because depending on what rule you're

19  proceeding under, that determines how I assess that motion.

20  So I'm hoping you can clarify that for me.

21        MS. AVENS:  Yes, sir.  If it pleases the Court.  I

22  filed that motion under 7(b) of the Federal Rule of Civil

23  Procedure.

24        THE COURT:  Okay.  So I appreciate that.  And I know

25  you're not a lawyer, so I understand some of this is confusing

Colloquy

1 to you or you may not understand it as well as the attorneys

2 do.  Rule 7(b) is just kind of a general rule that allows

3 people to file motions and tells you what to kind of put in a

4 motion.  And so I'm trying to figure out what are the other

5 rules you might be proceeding under.  I mean, maybe if you

6 don't have a particular rule -- I mean, if you have a

7 particular rule in mind, let me know.  If you don't, let me

8 know that too, and that'll tell me how to proceed.

9    MS. AVENS:  I don't see a particular rule other than

10 filing the motion under 7(b).

11    THE COURT:  All right.  And I know in here you say

12 what you'd like the Court to do.  On pages 10 and 11 of that

13 motion, you say you want the Court to determine the validity

14 of the agreement, rule on the relevance of the agreement to

15 the case at hand, decide whether the agreement has the ability

16 to dismiss your amended complaint, determine whether the

17 confidentiality of the agreement has been waived, decide if

18 the agreement should remain on the docket as an exhibit in its

19 current, unredacted form, and determine whether the actions of

20 defense counsel, including the use of threats and intimidation

21 and the imposition of a three-day compliance window constitute

22 coercion or improper conduct that warrants further judicial

23 scrutiny.  Those are the things you want the Court to do with

24 your motion?

25    MS. AVENS:  Yes, sir.  The motion, I had not

Colloquy

1  addressed it in my original complaint.  And this is not a

2  motion for a summary judgment, because a summary judgment, to

3  my understanding, would determine the outcome of the case.

4  And this is just one piece of the case.  So I wanted to

5  address this issue, because in my original complaint, I did

6  not address the settlement agreement.  I only mentioned that I

7  believe that ECU Health had obstructed justice, both civilly

8  and criminally, in their response for ECU Health's counsel.

9  In their response, they introduced the settlement agreement as

10 a claim -- as an affirmative defense, I believe, because they

11 said that it appeared that my case seemed to be a healthcare

12 liability case rather than a civil rights case.

13        And so to address the healthcare liability that they

14 tried to mischaracterize my complaint as, then they introduced

15 the settlement agreement as having the weight to bar my

16 current action, which is not a healthcare liability case, it's

17 a civil rights case.

18        So in doing that, when I amended my complaint, then I

19 addressed the agreement further.  And in their response again,

20 they made statements saying how that agreement barred claims

21 to this action.  That agreement was just in reference to the

22 healthcare -- the wrongful death settlement and Keisha White's

23 health care.  This case is the civil rights violations that

24 has occurred over the last ten years after her death, as I

25 have attempted to get criminal justice.

Colloquy

1          THE COURT:  Okay.  Thank you.

2          MS. AVENS:  So it was brought in inappropriately

3   anyway, because this is not a healthcare liability case, and

4   I've made that clear.

5          THE COURT:  Thank you.

6          Mr. McClurg, let me just ask you straight out, is

7   your client depending on the settlement agreement at this

8   stage of the case to dismiss anything?

9          MR. MCCLURG:  No, Your Honor.

10         THE COURT:  All right.  Let me ask about the motion

11   to seal.  And the background for that is that among the

12   documents Ms. Avens filed at -- what's -- docket entry 57-1

13   was a document that she titled Wrongful Death Settlement and

14   Release.  It does appear to be a settlement agreement, as the

15   underlying document is entitled Settlement Agreement and

16   Release in Full.  And ECU defendant now claims that that

17   should be kept under seal.

18         Mr. McClurg, I'm somewhat confused because, as I look

19   at that document, at 57-1, it's not executed by anyone.  It

20   appears to solely be a draft document that no one has entered

21   into.  So even if it does contain some sort of confidentiality

22   clause, if it's not executed and it's not enforced, what basis

23   is there for keeping it under seal at all?

24         MR. MCCLURG:  So in that draft agreement, there's no

25   trigger.  There's no confidentiality provision that is

1    effective.  However, it mirrors a final agreement which was

2    entered, which includes a confidentiality provision.  And

3    though there are slight differences between the draft version

4    that has been filed on the public record and the filed final

5    version, which was ultimately executed, the confidentiality

6    provisions are the same.

7          THE COURT:  Well, have you -- I mean, is that final

8    executed agreement in front of the Court in any way?

9          MR. MCCLURG:  It is not yet, Your Honor.

10          THE COURT:  So how can I decide what the bounds of

11    confidentiality are?

12          MR. MCCLURG:  We would be happy to submit a copy for

13    in camera review or under seal, if that would make your job

14    easier.

15          THE COURT:  Well, I mean, if I don't have it in front

16    of me, I can't decide anything.  So that --

17          MR. MCCLURG:  Understood.

18          THE COURT:  My job is pretty easy, actually, without

19    it in the record, to be honest.  But the other question I have

20    is are you telling me the confidentiality provision is

21    effectively the same in the final agreement versus in this

22    agreement?

23          MR. MCCLURG:  Yes, Your Honor.  I believe it's a

24    mirror image.

25          THE COURT:  So as I review the paragraph here about

Colloquy

1  confidentiality, what I've got here says, "The terms of the

2  settlement of this matter shall remain confidential as to

3  settlement amount and shall not be disclosed by any party or

4  any parties' counsel to anyone."  And then it goes on a little

5  bit.  So if that is what's in the final settlement agreement

6  the parties agreed to, why does the whole document need to be

7  sealed?

8           MR. MCCLURG:  So there are restrictions later in

9  the -- admittedly, it's a very long confidentiality provision.

10  It's about a quarter of the agreement.  However, there are

11  restrictions later within the confidentiality provision which

12  are specific to Ms. Avens as the signatory on that agreement.

13  And it includes components of the agreement beyond just the

14  settlement figure.  So that --

15           THE COURT:  Well, so as I review it -- and you can

16  point me to what you think controls here -- I mean, in that

17  first paragraph, at the end, is a sentence that says "The

18  undersigned therefore agrees that other than to say the matter

19  has been resolved, if asked, either Cynthia Avens, as

20  administrator of the estate of Keisha White, Robert White, or

21  any attorneys will disclose any information whatsoever

22  concerning this settlement amount."

23           And then there's a restriction further on that the --

24  that "Ms. Avens and her attorneys will not disclose

25  information related to the allegations or contentions in this

Colloquy

1   litigation, the amount of settlement, or the terms of the

2   release on any website", and it lists several popular

3   websites.  There are a lot of other words there, but those are

4   the only restrictions I see.  And I'm -- again, I'm still

5   struggling on how to -- how this relates to sealing the entire

6   docket.

7           MR. MCCLURG:  Understood, Your Honor.  And I don't

8   believe we would have an issue with just filing a sealed

9   version of the document with respect to the confidential

10  settlement figure sum.

11          THE COURT:  Getting down to the merits of the motion.

12  You know, there's a complicated test that the Fourth Circuit

13  requires courts to apply.  It's so important that, earlier

14  this year, the Fourth Circuit issued a writ of mandamus

15  overturning a decision to place documents under seal.  So it's

16  something that I take very seriously in light of how seriously

17  the Fourth Circuit took it, given the extraordinary standard

18  you have to meet to get a writ of mandamus.

19          The submission from your client didn't seem to

20  address whether this qualifies as a judicial document, whether

21  the common law or First Amendment right of public access

22  applies, or specifically how you overcome either of those

23  rights.  And so without that information, I can't grant the

24  motion, so.

25          MR. MCCLURG:  I will say, Your Honor, that I don't

1    believe that there is a public interest in this document being

2    on the public record.  It's not relied upon, and it's not

3    related to any of the claims that are asserted in this case.

4    Our motion to dismiss does not cite it as a basis for

5    dismissal at this point.

6         And on the other side, there's a countervailing

7    interest or harm to the parties if it is allowed to remain on

8    the public record.  The confidentiality provision was a core

9    component of that agreement.  As I mentioned, it's about a

10   quarter of the entire settlement agreement.  And there's also

11   potential harm to Ms. Avens in that there's an enforcement

12   mechanism contained within the confidentiality provision that

13   can be invoked for breaching that section.

14        THE COURT:  And certainly there is a liquidated

15   damages clause in there.  And that gave rise to a question for

16   me, which is, if there is a liquidated damages clause that

17   your client can invoke, why does it need to be sealed?

18        MR. MCCLURG:  Frankly, Your Honor, because we don't

19   want to bring a claim against Ms. Avens, if possible.

20        THE COURT:  Fair enough.  I mean, I get that and I

21   get the challenges of bringing a claim to recover, you know,

22   this amount of liquidated damages.  But it seems that, to some

23   extent, your client made a decision that that was a remedy for

24   them, if this is publicized.  It's been publicized to some

25   extent.  And so there are -- one of the questions I have to

Colloquy

1  answer, whether remedy short of sealing or restricting public

2  access that are appropriate, and your client seems to have put

3  forward one in the agreement.  So I don't know if sealing is

4  appropriate, given that your client does have the option to

5  sue.

6          MR. MCCLURG:  I think the more reasonable approach of

7  the two -- rather sealing versus having ECU Health bring some

8  sort of claim for the liquidated damages -- I think the more

9  reasonable of those two approaches would be to have the

10 document sealed, so we don't have to go down that road.

11         THE COURT:  Thank you.

12         MR. MCCLURG:  Yes, Your Honor.

13         THE COURT:  Ms. Avens, anything you wish to say on

14 the motion to seal?

15         MS. AVENS:  Yes, sir, I do.  Again, the ECU Health is

16 trying to use the document as a sword and shield, as I

17 referenced in my response.

18         THE COURT:  Well, but Mr. McClurg has said -- I asked

19 him, is your client relying on this to dismiss anything at

20 this point?  He said no.

21         MS. AVENS:  Yes, sir, I understand that, but there

22 was still statements in their motions to dismiss saying that

23 this would bar my current claims.  And he -- they also

24 mentioned the consideration of it in a footnote, saying how

25 that the amended complaint is silent on the consideration of

Colloquy

1  the agreement.  This is in the public record.  So I introduced

2  the agreement, the copy that I could find because I cannot

3  find my sealed copy.  I made a note that, if I could find

4  it -- I mean my signed copy.

5       I'm sorry.  I made a note that, if I could find it,

6  then I would provide it during the discovery phase.  But I

7  also was aware that ECU Health would have a copy and could

8  also argue, if I submitted something, that had been altered in

9  any way.  But they introduced the agreement into the

10  discussion on public record.  They introduced the

11  consideration into the public record.  Now they want to remove

12  it after I have used it to argue against statements that they

13  made.

14       And whereas ECU Health is concerned about public, I

15  guess, opinion of this being -- of this document on the public

16  record because these other statements was made, if the public

17  could also assume that I'm bringing a frivolous case, because

18  it says right here, she signed an agreement that she

19  wouldn't -- she can't bring another claim.  But yet there's

20  nothing from me on the public record to support that that's

21  not what this agreement can do for this case.  So it's more

22  than just about their reputation on the public docket; it's

23  mine too.

24       So I had not addressed -- I had not introduced

25  anything as far as, like I said, the original complaint did

1    not bring this into the conversation.  Their response did.  So

2    then I put it in my amended complaint, and they brought it

3    back into the conversation by adding the confidenti -- I mean,

4    the consideration into the public conversation.

5         After I did that, then that's when they sent the

6    emails and the letters telling me that they wanted me to

7    strike the document because of the breach of confidentiality

8    and then filed the motion to seal the document, claiming that

9    they had asked me to seal.  They never asked me to seal.  They

10   asked me to strike the follow-up emails asking me to remove

11   which both of those are different than sealing a document.

12   They never asked me to agree to seal.

13        THE COURT:  Thank you.  Let me take those two matters

14   under advisement for the time being.  Let's move on to the

15   motions to dismiss.

16        Ms. Avens, I just want to give you the opportunity to

17   be heard first, even though they're the defendants' motion.

18   So I'm happy to hear anything you wish to say.  I've got some

19   particular questions, but I want to give you the opportunity

20   to be heard on your position on these motions to dismiss

21   first.

22        MS. AVENS:  Yes, sir.  Address all of the arguments

23   that was made or?

24        THE COURT:  Well, I've read everything the parties

25   have submitted.  If there are particular points you want to

Colloquy

1  make, I'm happy to hear those.  You don't need to go over

2  everything because I've read everything already.  But if there

3  are particular points you want to make or particular things

4  you want to say, I'm happy to give you the opportunity to do

5  so.

6         MS. AVENS:  Would it be okay to let them go first?

7  Because that's how I practiced.

8         THE COURT:  Sure.  Sure.  I mean, I have different

9  questions for each side that -- and I'll certainly hear from

10  everyone.  In that case, let's -- I'll start with the Dixon

11  motion to dismiss.

12         And Ms. Avens, I'm going to start with you with a

13  couple of questions.  There's a discussion in these briefs

14  about whether you have standing, the legal right to sue, to

15  compel the DA to prosecute someone.  That's the argument that

16  Dixon makes in his motion.  And you respond and say, I'm not

17  trying to get a prosecution.  I'm trying to get an

18  investigation.  And I'm trying -- if the Court lacks the

19  ability to compel the DA to prosecute someone, why is there a

20  legal right for you to have the DA to investigate someone?

21         MS. AVENS:  Well, sir, this case is a civil rights

22  case, not a case to compel investigation or prosecution.  And

23  it's about the civil rights that were violated in his

24  decision -- in the decisions that he has made and failures

25  that he has made.

Colloquy

1        THE COURT:  Yeah.  I guess what I'm getting at is
2   even if you say it's a civil rights case, like you couldn't --
3   you would have a very, very difficult time bringing a civil
4   rights case, saying your civil rights or your daughter's civil
5   rights were violated by the DA's decision not to prosecute the
6   nurse here.

7        So what I'm trying to get at is, if we can't -- if
8   you don't have a legal right to make the prosecutor do the
9   top -- the thing that's really the prosecutorial authority to
10  bring criminal charges, why does anyone have the authority to
11  seek to try to have the DA do an investigation, which
12  obviously precedes any sort of criminal charges?

13       MS. AVENS:  Well, he took that upon himself, Your
14  Honor.  He chose to reopen the case when -- when I contacted
15  him in 2019.  With that decision, comes the expectation of a
16  fair investigation.  And that is not what he did.  And I'm
17  just now finding out this year that he accepted reports from
18  the SBI and the Greenville Police Department, where they
19  didn't even interview witnesses.

20       And I just happened to find some contact information
21  regarding former SBI Agent Jennifer Matherly and contacted
22  her.  And she revealed in a recorded conversation that the
23  hospital did not make personnel available for them to
24  interview.  It's not about forcing Attorney Dixon -- or
25  District Attorney Dixon into investigation.  It's because he

1   volunteered to take on that role and then how he handled it

2   was a blodged [sic] investigation.

3       But you would expect, because he did say that he

4   would look into it and handle it, for it to be handled fairly.

5   And you don't expect for the District Attorney to accept half

6   complete or incomplete reports from law enforcement.  You

7   don't expect the District Attorney to claim that he has

8   evidence that he does not have.  And that's exactly what he

9   did when he claimed in 2022 to have a report from Dr. Karen

10  Kelly that he did not have.

11      So it goes beyond trying to force or have a right to

12  an investigation or to prosecution.  Once he decides to move

13  forward in that direction, then there -- you expect it to be

14  done correctly.  You expect it to be done appropriately.  You

15  expect it to be done fairly.  And that was not done in this

16  case.

17      THE COURT:  Thank you.

18      Is it Ms. Carreiro?

19      MS. AGOSTO CARREIRO:  Agosto Carreiro, Your Honor.

20      THE COURT:  All right.  So again, I've gone over the

21  lay of the land here.  Your motion to dismiss -- your client's

22  motion to dismiss said no right to compel -- "no standard to

23  compel a prosecution."  Ms. Avens responds -- is saying, I'm

24  not trying to compel a prosecution.  I'm trying to compel

25  investigation.  And there was no reply brief filed.  So I've

Colloquy

1   got no response to you -- from your client or you about that
2   argument.  So I want to give you the opportunity to address
3   that.
4           MS. AGOSTO CARREIRO:  Thank you, Your Honor.
5           With respect to a citizen's right to compel an
6   investigation, whether it's a police department or the DA's
7   office, we're not aware of any case law, any state or federal
8   statutes that would give a citizen a Constitutional right to
9   demand an investigation by an elected district attorney or his
10  jurisdiction.  And in fact, the responsibilities and
11  obligations of a district attorney in North Carolina are set
12  by the Constitution.  And within those responsibilities and
13  obligations, nowhere does it say that they're required -- a DA
14  is required to initiate, continue, open, reopen any
15  investigations with respect to an alleged criminal offense.
16          So because there's no Constitutionally protected
17  right to initiation of a prosecution, I think, one, we were
18  relying on the fact that there really isn't any case law or
19  statutory obligation to make an investigation and, two,
20  analogous to initiating a prosecution, there's no right here
21  for Ms. Avens to compel the DA's office to initiate an
22  investigation.
23          THE COURT:  So Ms. Avens indicates that there is --
24  the lawyers would call it an assumption of the duty, right?
25  That your client has assumed the duty to do this in a

Colloquy

1   constitutionally appropriate manner once he chooses to

2   investigate something.  How do you respond to that argument?

3          MS. AGOSTO CARREIRO:  Well, we would characterize DA

4   Dixon's actions not as investigating the matter, but reviewing

5   the investigations that were done by other agencies.  So in a

6   letter that DA Dixon provided to Ms. Avens, he kind of laid

7   out the five or six categories of information that he

8   reviewed.  And three of those, Your Honor, were an

9   investigative report that was provided by the Greenville

10  Police Department, one that was provided by a North Carolina

11  SBI agent, and one investigation that had been conducted by

12  the North Carolina Department of Health and Human Services.

13  And so it was in review of those investigative files, in

14  addition to, I believe, it was the ME's report and some

15  medical files that led DA Dixon to determine that there was no

16  criminal offense.  There had been no crime committed against

17  Ms. Avens' daughter and that there was not going to be any

18  subsequent prosecution in that case.

19         THE COURT:  At this phase of the case, I have to take

20  the factual allegations and the complaint as true.  And I

21  understand all three defendants' clients may dispute some or

22  all of what Ms. Avens has alleged, and that's to be fleshed

23  out if this case proceeds to discovery.  But the complaint

24  seems to allege that DA Dixon was engaged in additional

25  investigatory activities, sending things to the ME, waiting on

1    the ME's report, you know, things of that nature.  So is that

2    not investigatory in nature?

3          MS. AGOSTO CARREIRO:  Well, it would be our position

4    that, no, Your Honor, those aren't investigatory in nature.

5    Those are actions that would be protected by absolute

6    prosecutorial immunity, because it is, again, part of the

7    examination of the evidence and other information -- evidence

8    and investigation that was done by another party.

9          That case law comes from Imbler v. Pachtman and other

10   related cases, Your Honor.  To the extent, however, that Your

11   Honor would view some of that ancillary conversation with the

12   ME's office as some kind of investigation, one, I would

13   caution against that because a prosecutor, in reviewing

14   evidence that's compiled by somebody else, will often have to

15   contact a witness and get clarification of the evidence or

16   clarification about their statements.  It's not uncommon, and

17   I don't think that that transforms an evaluation of evidence

18   into the gathering of evidence, Your Honor.

19          And further, to the extent that it is investigative

20   and that Your Honor determines that it's not protected by

21   absolute prosecutorial immunity, I believe that the standard

22   under qualified immunity would apply and that those

23   allegations of an investigation would still be barred under

24   qualified immunity.

25          I would like to state, however, Your Honor, that

Colloquy

1    while Ms. Avens may allege that an investigation occurred, I

2    don't believe that the individual facts that she cites support

3    that conclusion, Your Honor.

4        Again, I would say that any information that DA Dixon

5    subsequently received from the medical examiner, you know,

6    that would just be in furtherance of understanding the

7    original finding on the death certificate that it was -- that

8    Ms. Avens' daughter passed due to natural causes.  But would

9    not be the elected DA actually standing or stepping into the

10   shoes of a detective, and in fact, investigating a potential

11   crime.  Does that address, Your Honor, the question that you

12   had?

13       THE COURT:  Yes, I mean, I think I -- I'm trying to

14   look at the complaint.  You know, obviously this is a very

15   lengthy complaint with lots of detail in it.

16       MS. AGOSTO CARREIRO:  Yes, Your Honor.

17       THE COURT:  Unlike many pro se complaints that we all

18   are familiar with, this --

19       MS. AGOSTO CARREIRO:  Yes.

20       THE COURT:  -- this one goes to great length.  And I

21   guess, so your position is that -- I take it that this is --

22   the DA's function here was reviewing evidence --

23       MS. AGOSTO CARREIRO:  Yes.

24       THE COURT:  -- and ancillary calls to the medical

25   examiner or others for clarification is not so investigatory

Colloquy

1    in nature that it moves it outside of the scope of

2    prosecutorial immunity?

3            MS. AGOSTO CARREIRO:  Yes, Your Honor.

4            THE COURT:  Thank you.

5            MS. AGOSTO CARREIRO:  Thank you.

6            THE COURT:  Ms. Avens, I'll allow you to respond to

7    that if you'd like to do so.

8            MS. AVENS:  Yes, sir.  Thank you.  I am trying to

9    find it in the transcript of the phone call, because Mr. Dixon

10   identified that any response from Dr. Kelly would be part of

11   the investigation.  He identified what he was doing as an

12   investigation into recorded phone calls.  So I argue that the

13   steps that he was taking as, out of his own mouth, he was

14   involved in an investigation, an investigation that he chose

15   to enter into, that I did not have to force him into or compel

16   him into, against whatever right that I don't have to do so.

17   He agreed, when I asked him to reopen the case because the

18   former DA had not moved, that she would be more in line with

19   somebody, that I couldn't force to do anything because I

20   couldn't even hardly talk to her.  But when I spoke with DA

21   Dixon, he said that he would look into the matter.  He

22   identified what he was doing as an investigation in the

23   recorded phone calls.

24           And absolute immunity does not kick in until he has

25   identified probable cause.  He can review anything that he

Colloquy

1  wants to.  He can take whatever the steps that he needs to do
2  to try to even determine his charging decision, but absolute
3  immunity does not kick in until he has identified probable
4  cause.  And that's going by -- I don't know the name of the
5  court case, but it's one of the same ones that the defense
6  mentioned in their defense.  And when I read further into the
7  case, then I understood that absolute immunity does not apply
8  prior to establishing probable cause, which he never did.  So
9  he's not protected by that.

10         THE COURT:  Thank you.

11         Ms. Carreiro, on that probable cause point, there is
12  some case law that indicates that as kind of the dividing line
13  between when prosecutorial immunity applies and when it
14  doesn't.  So you know, how do you respond to that argument?

15         MS. AGOSTO CARREIRO:  The first thing that I would
16  say, Your Honor, the case that we referred to and I believe
17  that Ms. Avens is referring to is Buckley v. Fitzsimmons.  And
18  that site is 509 U.S. 259.  That was decided in 1993.
19  Specifically in that case, at 272, the Court says that "The
20  duty of the prosecutor in his role as advocate for the State
21  involves actions preliminary to the initiation of prosecution
22  and includes actions outside of the courtroom."

23         It also includes, "professional evaluation of
24  evidence assembled by the police."  This is exactly the kind
25  of conduct that DA Dixon engaged in, and it's exactly the type

Colloquy

1    of conduct that absolute prosecutorial immunity is meant to

2    protect.  So the evaluation of evidence assembled by the

3    police or other investigatory bodies is a preliminary matter

4    to the initiation of a prosecution.

5         And so while there's some language that Ms. Avens

6    refers to, as far as, you know, here's this clear-cut, black-

7    and-white line as to before or after probable cause.  In the

8    same case, Your Honor, there are nuances that the Court finds.

9    And one of those is it's not really probable cause because you

10   have to evaluate that evidence before probable cause is found,

11   by the DA, anyway.  There may have been a magistrate judge or

12   someone else who issued a warrant and they made a

13   determination about probable cause.  But at the end of the

14   day, it's the DA who has to review the evidence.  It's the DA

15   who has to bring the case if they're going to bring it.

16        And so I believe that it's not as clear cut as Ms.

17   Avens is representing to the Court.  I think that case and

18   subsequent cases that we cited in the brief show that, you

19   know, there is some nuance between that border of probable

20   cause and no probable cause.  And a district attorney, a

21   prosecutor needs to have the flexibility and needs to have the

22   discretion to review that evidence before deciding whether to

23   move forward with prosecution.

24        I would also just like to state that Ms. Avens

25   characterizes DA Dixon's actions as reopening a case.  And I

Colloquy

1    just want to clarify that there was no case to reopen.  There

2    wasn't a case, in fact.  Nothing had been charged.  What there

3    was, was Ms. Avens, as a citizen, requesting some type of

4    review or investigation by the earlier administration under DA

5    Robb.  And then again, she visited DA Dixon when he became the

6    DA in 2019.  So reopening or opening a case, Your Honor, I

7    don't think that's an accurate representation of what was

8    really happening here.  But that would be my response to the

9    Buckley case, Your Honor.

10        THE COURT:  Thank you.

11        Ms. Avens, in your response, you cite the Love case

12   to try to establish standing to pursue these claims.  In that

13   case, the Court discussed whether there was a coverup that

14   prevented decedents from pursuing a claim related to the death

15   of their loved one.  And I'm trying to figure out what claims

16   have you been hindered in pursuing regarding your daughter's

17   death by the defendant's actions?

18        MS. AVENS:  Sir, I believe the Love case was the case

19   where the loved one's death had been covered up?

20        THE COURT:  Yes.

21        MS. AVENS:  Okay.  And in that case -- I'm just

22   trying to recall from memory -- they determined because the

23   family brought the suit under the estate of their loved one

24   and tried to bring a suit -- a civil rights case for the loved

25   one through their estate.  And it was determined that, while

Colloquy

1    the court does not agree, or some other word similar to that,

2    to the circumstances of the person's death being, you know,

3    covered up, that the court does not recognize civil rights of

4    a decedent.  But then it went on to say that the family were

5    the actual victims of the coverup, not the deceased son.  And

6    that that's where I -- that was the angle that I was using

7    that case.

8        THE COURT:  Fair enough.  As I look at that case,

9    I've got it in front of me, the Court says in part,

10   "Plaintiffs do not allege that their claims against the other

11   defendants in the present lawsuit have been hindered,

12   devalued, or otherwise damaged by the coverup.  Nor do they

13   allege that they were prevented or otherwise hindered in

14   filing a state law wrongful death suit."  And so because of

15   that, the Court found there was no 1983 claim, no

16   Constitutional violation.

17       So what I'm trying to figure out here is what claims

18   have you been unable to bring, related to your daughter's

19   death, in light of what you claim the defendants have done?

20       MS. AVENS:  Well, for one, the agreement that I

21   entered into in 2016 was not a fair agreement because it was

22   coerced and it was information that was withheld that ECU

23   Health should or was aware of since they did do an internal

24   investigation after my daughter's death.  But there was

25   information that was revealed in the North Carolina Board of

 1    Nursing report that had not been revealed previously, even by

 2    the Department of Health and Human Services when they

 3    investigated.  So that agreement was not even entered into

 4    without coercion or fraud or withholding of information.  And

 5    it was more or less forced because of those circumstances.

 6         The case that I have now, had I known that ECU Health

 7    prevented or withheld their personnel from being interviewed

 8    during the 2014 -- and let me clarify.  During the November

 9    2014 investigation between the SBI Agent Matherly and Det.

10    Alvaro Elias of the GPD, something may -- could have been done

11    prior to this case if that information had been revealed.  I'm

12    just learning it this year when I was able to contact Agent

13    Matherly.

14         So those are the two that I -- you know, cases that

15    could have either been handled differently or handled sooner

16    than now but couldn't because information has been withheld.

17    You know, it's the coercion that I mentioned in the 2016

18    wrongful death settlement.

19         Prior to that, I had already hired -- fired two

20    attorneys because I felt like they were representing the

21    hospital in the wrongful death case and not representing me.

22    In November 2015, that's when I fired the second one, and I

23    hired a law firm from Charlotte.  And they told me -- when I

24    first spoke to them, they said, well, you have -- the statute

25    of limitations runs out on May 10th.  This was close to

Colloquy

```
 1   Thanksgiving.  He said normally we do not take cases that have
 2   less than six months left on the statute of limitations.  And
 3   he said, you will be hard pressed to find another firm to take
 4   this type of case on for less than six months.  But he agreed
 5   to do it.
 6        So fast-forward.  The Board of Medicine had completed
 7   their investigation by July 2015.  I requested a copy of their
 8   report.  They would not release it.  In November 2015, the
 9   nurse signed the published consent order.  I, again, asked for
10   a copy of this report.  They would not release it.  I asked in
11   December.  They would not release it.  January, I sent the
12   email and their staff attorney responded, it'll be another 45
13   days.  45 days coincidentally landed on March 1st, the date of
14   mediation.  I did not get it before mediation.  I got it a few
15   days after, but this information was withheld because it took
16   the Board of Nursing eight months to release this report.
17        THE COURT:  What does that have to do with any of
18   these defendants?
19        MS. AVENS:  I'm leading up to the -- or we're not
20   talking about ECU Health?
21        THE COURT:  Right.  But you're saying the Board of
22   Nursing wouldn't give you the documents.  That sounds like --
23   I mean, if that's a problem, that's the Board of Nursing
24   problem.  So what does that have to do with this lawsuit?
25        MS. AVENS:  Okay.  Well, I did attach that to ECU
```

Colloquy

1    Health due to their -- there was information in that report
2    that they did not reveal.  And the day of mediation when we
3    were discussing different, you know, numbers to settle on and
4    I was hesitant to agree to anything, then that's when the
5    mediator comes back and says, well, they have said that, if
6    you take this to trial and don't settle, then they're going to
7    tell the jury that your daughter refused some of her Lovenox
8    shots.  A Lovenox is a blood thinner.
9        THE COURT:  All right.  So I mean, what happens in
10    mediations is largely inadmissible in court.  So I don't want
11    to get into that.  I mean, I take it you brought a wrongful
12    death lawsuit against ECU Health and some other people, right?
13        MS. AVENS:  Well, just ECU Health.  That was in 2016.
14        THE COURT:  And you settled that case?
15        MS. AVENS:  Yes.
16        THE COURT:  Okay.  And then the other thing you've
17    talked about is -- ECU not making people available to the
18    Greenville PD, is that an issue?  Why is that an issue?
19        MS. AVENS:  I didn't hear you.
20        THE COURT:  I've asked you how you were impeded in
21    pursuing claims by the defendants' actions.  And you talked
22    about the settlement and you talked about people not talking
23    to Greenville PD.  I need you to explain that to me more.
24        MS. AVENS:  As far as talking to Greenville PD, the
25    hospital was required to report my daughter's death to law

1   enforcement and they reported to SBI.  Is that what you're

2   talking about?

3            THE COURT:  I'm trying to -- my overall point here is

4   getting this Love case that you've cited, in which the court

5   said that you have to somehow be prevented from bringing a

6   lawsuit.  And I asked you how you've been prevented from

7   bringing a lawsuit, and you talked about the settlement, and

8   then you mentioned something about people not talking to the

9   Greenville police.  And so I'm trying to get that second

10  point.

11           MS. AVENS:  Okay.  Right.  When they interviewed, the

12  hospital did not let -- didn't give her any information as far

13  as who was working on the night of May 9th or the morning of

14  May 10th, what their names were, any contact.  The information

15  was not given to the police or the FBI agent who was working

16  with the police because she said that -- you see that the

17  hospital did not make personnel available.

18           THE COURT:  Okay.  How did that harm you?

19           MS. AVENS:  Because I -- what do you mean how did it

20  harm me?  It corrupts the investigation for them to be allowed

21  to withhold or not provide personnel information and then for

22  law enforcement to allow the uncooperation -- or

23  noncooperation.

24           THE COURT:  So again, this relates to whether you can

25  bring a lawsuit and how you've been harmed in your ability to

Colloquy

1    pursue a lawsuit.  So how did that -- if I assume they did

2    what you're saying and ECU told their employees not to talk to

3    the police, how did that impact your ability to bring a

4    lawsuit related to your daughter's death?

5         MS. AVENS:  Because that may have given me the

6    evidence to bring this case sooner instead of ten years later.

7    That happened back in 2014.  I didn't know.  I didn't have the

8    tangible evidence to make it pass, conclusory-type statements.

9    But if I would have had this knowledge, then that was an

10   avenue that maybe I could have pursued sooner rather than

11   later.

12        THE COURT:  But you are pursuing it now?

13        MS. AVENS:  Yes.

14        THE COURT:  All right.  Thank you.

15        Ms. Carreiro, late in your brief on page 21, you

16   say -- you're talking about Ms. Avens' negligence per se

17   claim.  And you say, "second negligence per se and the

18   continuing wrong doctrine relate to tort claims", none of

19   which plaintiff appears to bring in this suit.  And I'm

20   confused by that, because on page 70 of her complaint, there

21   is clearly a claim for negligence per se.  So I'm trying to

22   understand your argument there.

23        MS. AGOSTO CARREIRO:  Your Honor, my understanding is

24   with respect to the actual claims that Ms. Avens was bringing

25   had to do with -- excuse me, lack of a thorough investigation.

Colloquy

1    That there was conspiracy or obstruction of justice, and

2    hiding some of the evidence in the case, that there was a

3    First Amendment violation and a 14th Amendment violation.  To

4    the extent that she may have brought up negligence per se, it

5    certainly wasn't clear to me upon reading the amended

6    complaint what exactly that negligence per se was trying to

7    allege.

8         I would also say, Your Honor, that, at least in North

9    Carolina, any kind of negligence tort claims would not be

10   going through Superior Court.  It would be going through the

11   Industrial Commission.  And so we would certainly argue that

12   that would not be an appropriate claim to bring in this court,

13   Your Honor, that, if anything, it would be a state claim

14   brought in the Industrial Commission but would not invoke the

15   jurisdiction of this courtroom.

16        So I don't have -- I apologize, I don't have that

17   specific amended complaint printed out in front of me.  And I

18   was not allowed to bring in my phone or laptop into the

19   courtroom, so I can't pull that up, Your Honor.  But with

20   respect to the negligence per se claim, there's nothing that I

21   can see in the facts that she alleged that would have brought

22   that up.  I mean, if anything, Ms. Avens makes some conclusory

23   arguments or conclusory statements about how there was this

24   intention, this collusion on behalf of DA Dixon to hide

25   information from her, that he lied to her, and kind of other

1    types of allegations along those lines.  And that would not be

2    in line with what a negligence per se claim is, Your Honor.

3          So I think that the allegations and facts that she's

4    alleging in her complaint, in and of themselves, would count

5    against and would kind of contradict any claim for negligence

6    per se.

7          THE COURT:  So you're telling me even an individual

8    capacity claim against the DA for negligence per se has to go

9    in front of the Industrial Commission?

10          MS. AGOSTO CARREIRO:  Under North Carolina law, yes,

11    Your Honor, it would be.  Specifically, negligence claims are

12    the exclusive jurisdiction of the Industrial Commission under

13    the state scheme, Your Honor.  And those would not ever be

14    brought against the state in Superior Court.

15          The other thing I would say, Your Honor, is that the

16    Love v. Bolinger case, which, you know, I'm sure you're aware

17    of this, having already read the case and asked questions

18    about it to Ms. Avens, that is a case out of the Southern

19    District of Indiana.  And so it's certainly defendant's

20    position that it's not binding on this Court.  And in fact,

21    it's not persuasive.  It's pretty much a different set of

22    facts and circumstances.  However, if you were to go along

23    with the holding in this case, you know, Ms. Avens really

24    hasn't identified how she was deprived of access to the courts

25    or how any of what she was discussing with respect to what

Colloquy

 1    happened in 2014 or 2015 was the result of anything that DA

 2    Dixon did.  He wasn't the elected DA until 2019, five years

 3    later.  So we think that Love really isn't an appropriate case

 4    to guide your decision in the case.  But as I said, even if it

 5    were, Ms. Avens doesn't satisfy the requirements or factors

 6    that the Southern District of Indiana is seeking.

 7          THE COURT:  Thank you.

 8          Ms. Avens, anything you wish to be heard on, on the

 9    points we've just discussed?

10          MS. AVENS:  Yes, sir, Your Honor.  State v. Wright

11    identified obstruction of justice as anything that hinders or

12    impedes the judicial process.  Okay.  And District Attorney,

13    first Dixon, first of all, as far as the negligence per se, I

14    can bring that in with my current case under supplemental

15    jurisdiction, if I'm not mistaken, sir.

16          THE COURT:  I mean, I understand that's your

17    argument, yes.

18          MS. AVENS:  Yes, that's my argument under

19    supplemental jurisdiction, because, again, it is a civil

20    rights case.  The -- I've lost my train of thought.  I'm

21    sorry.  Can you ask me the question again?

22          THE COURT:  Well, Ms. Carreiro talked about a bunch

23    of different things.  I was just wanting to see if you had any

24    response to them.  Most of what she talked about was the

25    negligence per se issue, which you've addressed in terms of

Colloquy

1   the -- where it can be brought.  She argued that negligent --

2   it doesn't establish negligence per se either.  I'm happy to

3   hear from you on that point if you want to discuss it.

4        MS. AVENS:  Well, negligence per se is when

5   negligence that resulted from a criminal act, if I'm not

6   mistaken.  For example, if somebody was speeding or driving

7   drunk and was in an accident and hurt somebody, it's assumed

8   that they were already doing something illegal when they did

9   what they did that caused harm to somebody.  So negligence per

10  se would come into question.  And that was why I brought it

11  into this case, which that particular argument can be dropped

12  if it's not necessary because it doesn't -- it's not part of

13  the motions to dismiss.  I mean, it's not an affirmative

14  defense or whatever that will cause dismissal of the case.

15  But it still doesn't change the fact that the defendant still

16  obstructed justice.

17       For about a year and a half, he claimed to rely on

18  the necessity of a medical examiner's report so that he could

19  decide how he was going to move forward in the case, claiming

20  first that he already had a report that he did not have, after

21  it was discovered that he was -- that he lied about it, then,

22  okay, well, I'm going to submit the evidence to the medical

23  examiner, but I thought you said do you want me to submit it

24  or not?  Okay.

25       After that, the medical examiner had people in their

Colloquy

 1    office who were told not to talk to me anymore because the

 2    office manager is how I learned that the DA had lied about

 3    having the report that he didn't have.  So further calls to

 4    them resulted in, Ms. Avens, I was told that, if you call, to

 5    tell you that you need to contact risk management.  All the

 6    way up until 2023, when I called and the office manager

 7    answered the phone, she made reference to the same thing, but

 8    yet still she did talk to me and she's telling me again, we

 9    don't have anything in our office, we don't have anything in

10    our system.  Same thing that she had told me in 2022.  Even

11    though the DA claimed that he sent evidence to her in August

12    2022.

13          So after then, then that's when I started recording

14    the phone calls, because that would make two times that he --

15    you know, that he's lying about what he did, sending evidence

16    or receiving reports.

17          And in the next conversation that I recorded from him

18    and he was saying how that, okay, well, he sent it to the

19    medical examiner's office.  Nobody was interviewed previously

20    because nobody believed a crime happened, even though CALEA's

21    standard says that, at the minimum, the complainant, the

22    witnesses, and suspects are to be located and interviewed and

23    followed up with at a minimum of an investigation.  It says at

24    a minimum in their standards.  These things did not occur.

25          And then he -- like I said, he further -- and send

www.escribers.net | 800-257-0885

Colloquy

1   the transcripts.  He further placed his weight on needing this

2   report from the medical examiner, which never happened.  He

3   never required her to cooperate with his so-called

4   investigation since he said that any response from her will be

5   a part of the investigation.  He never required her to

6   cooperate or to give her opinion, outside this six months,

7   even after then, October 2023.  When her office worker tells

8   me that, oh, well, Dr. Kelly forgot.  Where is Attorney Dixon?

9   He's not asking for this.  He said he needed this.  He said he

10  needed this report.

11          So from August 2022 to October 2023, there's still no

12  report from medical examiner.  Attorney Dixon is still not

13  doing his part since he said he needed this report.  Prompted

14  me to hire an independent medical examiner.  I got that back

15  in January, forwarded to the DA's office and the Greenville

16  police.  We're going to close the case now.  Insufficient

17  evidence.  Even though the independent medical examiner said

18  that our daughter's death was homicide based on criminal

19  negligence.

20          So he put all this emphasis for well over a year on

21  needing this report from the medical examiner, just to close

22  the case when he gets a report from the independent medical

23  examiner.  Which begs the question, what did you expect Dr.

24  Kelly's report to say had she given one?  If she said

25  homicide, were you still going to close the case?  Where was

Colloquy

1    this necessary?

2         THE COURT:  Thank you.

3         Ms. Carreiro, anything final from -- on DA Dixon's

4    motion?

5         MS. AGOSTO CARREIRO:  Yes, Your Honor, just a couple

6    of things.  First, to the extent that Ms. Avens was talking

7    about, you know, criminal negligence, I don't believe that an

8    American citizen has the right to initiate criminal charges

9    against another citizen.

10        THE COURT:  Doesn't North Carolina recognize citizen

11   complaints?

12        MS. AGOSTO CARREIRO:  It does, Your Honor.  There are

13   citizen-initiated warrants.

14        THE COURT:  Like citizens can go to a magistrate and

15   put forward probable cause in an affidavit and have an

16   affidavit from a law enforcement officer or some independent

17   person and seek a warrant or a summons; isn't that part of

18   North Carolina law?

19        MS. AGOSTO CARREIRO:  It is part of North Carolina

20   law, Your Honor.  It would require an independent

21   determination of probable cause by a magistrate.  And I

22   believe all one hundred counties in North Carolina don't allow

23   felony charges to be initiated by a citizen.  They require an

24   independent investigation be done by law enforcement agency.

25   I just didn't know whether Ms. Avens was talking about trying

Colloquy

1    to institute some kind of criminal charges under a federal

2    statute against DA Dixon.

3         THE COURT:  Well, individuals can't do that.  Only

4    the U.S. Attorney can do that.  So that's not at play here.

5         MS. AGOSTO CARREIRO:  Yes, Your Honor.  The other

6    thing is that my colleague did bring to my attention, and I've

7    not specifically read the case, Your Honor, but there is a

8    North Carolina State Supreme Court case which specifically

9    says that the negligence per se doctrine applies only to

10   violations of public safety statutes.  And so I believe that

11   that's similar to what Ms. Avens was saying with respect to,

12   you know, speeding and that kind of a thing but not with

13   respect to something like a criminal conspiracy, Your Honor.

14        And I don't believe that Ms. Avens was alleging any

15   kind of public safety violation that DA Dixon, that his

16   actions, you know, amounted to any kind of public safety

17   violation.  And so that's another reason, Your Honor, that her

18   negligence per se claim doesn't really stand.

19        And there were a couple other things that we brought

20   up in the motion to dismiss.  I just want to, you know, say

21   them for the record.  Not only would absolute prosecutorial

22   immunity bar the claim and qualified immunity, as I stated,

23   but also sovereign immunity, Your Honor, under the Eleventh

24   Amendment, that would also be a bar to these types of claims

25   against DA Dixon in his official capacity, and that

Colloquy

1    prosecutorial immunity would protect him under any personal

2    capacity.  And in any event, we still stand by the argument

3    that Ms. Avens does not have standing to bring this claim.

4          THE COURT:  Thank you.

5          MS. AGOSTO CARREIRO:  Thank you, Your Honor.

6          THE COURT:  That reminded me of one other question I

7    wanted to ask Ms. Avens, the Eleventh Amendment issue.  You

8    talk about the ex parte Young doctrine, and that requires --

9    that allows courts to enjoin state officials from ongoing

10   violations of federal law.  And I just want you to articulate

11   for me what is the ongoing violation of federal law you

12   contend the Court needs to stop the defendants from doing

13   here.

14         MS. AVENS:  Yes, sir.  I had not identified anything

15   to use under the ex parte Young order at, but I didn't know if

16   something would be discovered during discovery where I could

17   try to seek some type of injunction relief or something of

18   that nature from the Court.  So I left that as something that,

19   in case there's something comes up during discovery that would

20   allow me to use that and, you know, so that they can't -- no

21   one can say, well, she didn't say that in her pleadings that

22   she would, you know, exercise this.

23         But as far as the investigation or criminal

24   investigation goes into the death of my daughter, that was

25   something that I was hoping to negotiate for during

Colloquy

1  negotiations, when and if we have them, you know, if the case

2  is not dismissed.  That is something that could be brought

3  into the conversation with Attorney Dixon and his counsel as

4  part of a settlement:  Would he be willing to use his

5  resources to bring a special prosecutor into the case to take

6  over the investigation of my daughter's death?

7          THE COURT:  Thank you.

8          I want to move on to Dr. Kelly's motion to dismiss.

9  Just at the outset, Mr. Lindsley, are you arguing the standing

10  argument that DA Dixon raised applies to your client as well

11  and, if so, why?

12          MR. LINDSLEY:  I would suggest to the Court that it

13  applies only to the extent that there might be suggestion in

14  parts of the complaint that plaintiff is seeking to have Dr.

15  Kelly -- to force Dr. Kelly to engage in a review of records

16  to the end that, you know, she's seeking a criminal

17  prosecution.  And Dr. Kelly doesn't have a role in such an

18  action of criminal prosecution.  So there's no claim against

19  Dr. Kelly in terms of trying to obtain a criminal prosecution

20  through this case.  But other than that, it doesn't apply to

21  Dr. Kelly.

22          THE COURT:  Okay.  A lot of the arguments are

23  predicated on Dr. Kelly being a state official and not a local

24  official.  Where do I look for that authority?

25          MR. LINDSLEY:  That's in the State statutes.  I

Colloquy

1  apologize to Your Honor.  I didn't anticipate that question.

2  I don't have the statutory reference top of mind at the

3  moment, but it is set out in state law.

4      THE COURT:  So the state medical examiner, I believe;

5  is that correct?

6      MR. LINDSLEY:  That's correct.

7      THE COURT:  And does that person appoint Dr. Kelly?

8      MR. LINDSLEY:  Right.

9      THE COURT:  And is her jurisdiction county based; is

10  it regional?

11      MR. LINDSLEY:  It's regional.  So she serves in

12  multiple counties.

13      THE COURT:  And the state ME appoints her to that

14  authority?

15      MR. LINDSLEY:  Right.

16      THE COURT:  It doesn't seem to be in dispute between

17  the parties.  I just need a clarification on that --

18      MR. LINDSLEY:  Yes, sir.

19      THE COURT:  -- point.  Thank you.

20      Ms. Avens, I'm trying to understand your First

21  Amendment claim against Dr. Kelly.  It involves her failure to

22  provide her expert opinion to you.  And you say in your

23  complaint that, through the nature of her job, she's

24  ordinarily a willing speaker.  However, her failure to perform

25  her governmental- or state-mandated duties demonstrated her

Colloquy

1  subservience to ECU Health by allowing the facility to dictate

2  which cases she was to work on without first requiring their

3  approval, thereby chilling the speech of an otherwise willing

4  speaker.

5      And I want you to tell me if I'm wrong about this,

6  but I think what you are arguing is that Dr. Kelly has chilled

7  her own speech.  And I don't -- and if that is what you're

8  arguing, I need you to explain to me how that's a First

9  Amendment violation for Dr. Kelly to have decided not to speak

10  in a particular circumstance.

11      MS. AVENS:  Yes, sir.  Dr. Kelly being a medical

12  examiner for -- you said district -- area medical examiner,

13  when cases are given to her, then she gives her opinion based

14  on her assessment, her review, her investigation, or whatever

15  means that she used to come up with whatever that was

16  necessary for that case, whether it's manner of death, cause

17  of death, you know, or things that support such decisions.

18      In this case, she did not do that.  She was given the

19  information, I assume, because first Dixon said that he gave

20  it to her on August 11th -- that he submitted it to her on

21  August 11th by email.  That was in 2022.  But then in April,

22  after the office manager said that she didn't have -- that

23  they didn't have anything in their system.  Then he sent it

24  again that day while I was still on the telephone with him.

25  And then I followed up with the medical examiner's office

Colloquy

1    after the fact to make sure that they did receive this

2    information this time.  And they did.

3            So he's given her information that, according to him,

4    he expects a response from.  So because he said he needed this

5    response to determine whether or not he would move forward

6    with charges.  So it's only logical to assume that she will

7    participate in an investigation supposedly led by the District

8    Attorney when he submitted evidence to her.  And then to turn

9    around and not cooperate denies me of information because that

10   was something that had not been done.

11           The information had been sent to Dr. Radisch, but she

12   made her decision based on incomplete evidence, because more

13   information came out after she made her decision.  So in my

14   opinion -- and I don't feel like it's an unfair opinion or

15   unreasonable opinion to assume that her initial decision may

16   have been or was flawed because she was not privileged to

17   other information that came out later.  Dr. Kelly was

18   privileged to this information because DA Dixon said that he

19   submitted everything to her.

20           So now there's an expectation that she will comply

21   with his investigation, that he titled as an investigation,

22   and provide her information.  Because she did not do that,

23   then I was compelled to hire an independent medical examiner.

24           THE COURT:  I mean, I understand everything you've

25   said.  I'm just trying to understand how you believe that

Colloquy

1    violates your First Amendment rights.  I mean --

2           MS. AVENS:  Because --

3           THE COURT:  -- what I've heard you say is Dr. Kelly

4    should have done an evaluation of the new evidence and then

5    told the DA what her finding was.  And if I assume you're

6    right about that, how does that violate your First Amendment

7    rights?

8           MS. AVENS:  Because the First Amendment rights is

9    reciprocal, where you can receive information as well as give

10   information.  She did not give the information.

11          THE COURT:  Thank you.

12          Mr. Lindsley, do you wish to respond to that?

13          MR. LINDSLEY:  Yeah.  Thank you, Your Honor.

14          I think Your Honor's question is directly on point

15   here.  And I'll point, Your Honor, to the case that plaintiff

16   herself cites in her complaint, Martin v. U.S. Environmental

17   Protection Agency, the case out of the District Court for the

18   District of Columbia, where I believe plaintiff is basing her

19   claim here.  And although there is a reciprocal right under

20   the First Amendment not only to speak but to receive

21   information, a party does not have the right simply to

22   command, from the government, information.  That's not what

23   this principle as espoused in the Martin case is about.

24          Instead, if otherwise willing speaker is chilled by a

25   third party against speaking and that third party is a

Colloquy

1    government agency, then a First Amendment right based in

2    receiving information may be implicated. That's not the

3    situation that we have here. Dr. Kelly is the speaker, if you

4    will. And first, there's no inclination -- there's no

5    evidence suggesting that she was a willing speaker on the

6    first hand. And on the second hand, if there were some

7    evidence of chilling of her speech, Dr. Kelly herself is not

8    the correct target. It's some other party, some other person

9    who's responsible for chilling her speech. That would be the

10   implicated defendant, if you will, under this First Amendment

11   right to receive information theory.

12        THE COURT: I mean, as I take Ms. Avens, what she

13   shared is that she believes Dr. Kelly should have done the

14   investigation the DA asked her to do or wanted her to do and

15   then reported the results back to either the DA or to Ms.

16   Avens herself and that that is what violates their rights.

17   And just the medical examiners have an obligation to do this

18   sort of work?

19        MR. LINDSLEY: The medical examiner has certain

20   duties under statute. If a district attorney were to ask for

21   a record review, I don't know that that's necessarily a

22   statutory duty. You know, if it's within the confines of her

23   mandate, perhaps, but there's no evidence in the case that

24   it's within her mandate to perform a record review after

25   another medical examiner, in this case, the chief medical

1    examiner, has already made a determination which was done

2    early on in this case.

3           So whether or not she has a statutory obligation or

4    duty, there's certainly no allegation other than conjecture on

5    the part of Ms. Avens of the existence of such a duty.  And

6    even if she didn't perform the duty, that doesn't -- it still

7    doesn't implicate a First Amendment right possessed by Ms.

8    Avens in not receiving the information.

9           Certainly, I think we'd be hard pressed to find any

10   statutory duty to report her findings directly to a member of

11   the public, even if that member of the public requested it.

12   Whether or not she would have a duty to report it to the

13   district attorney is another matter.  But here, based on the

14   allegations in the complaint and this Martin case, there

15   simply is not a First Amendment right that Ms. Avens can claim

16   for not receiving information from Dr. Kelly.

17          THE COURT:  Thank you.

18          Ms. Avens, you also alleged that Dr. Kelly violated

19   your Fourteenth Amendment rights to due process and equal

20   protection.  And I'm trying to understand that argument.  So I

21   want to start with due process and then we'll talk about equal

22   protection after that.

23          How do you believe Dr. Kelly not doing this

24   additional work violated your due process rights?

25          MS. AVENS:  Yes, sir, Your Honor.  Because she -- my

 1    understanding for the due process part goes along with the

 2    investigation that Faris Dixon was conducting, you know, and

 3    then he, you know, end up, you know, closing the case.  So

 4    part of -- which I know she didn't close the case.  That was

 5    his doing when he closed it in January -- early this year when

 6    that happened.  But still, I feel like, because she was given

 7    the evidence to cooperate with an investigation, that that is

 8    part of the process due so that the DA could make a charging

 9    decision based on the information.  So that was my line of

10    reasoning for the due process.

11         THE COURT:  And on equal protection, you indicate --

12    you say in your complaint that Dr. Kelly's conduct resulted in

13    a denial of your right to equal protection under the law, as

14    you were not treated with the same impartiality and diligence

15    that other similarly situated individuals would receive.  And

16    what I'm curious about is that last portion.  You say that

17    other similarly situated individuals would receive different

18    treatment, and I'm trying to find allegations in your

19    complaint that support that.

20         MS. AVENS:  The differential treatment would come

21    from any case that she has cooperated with investigation by

22    the district attorney.

23         THE COURT:  Are you aware --

24         MS. AVENS:  Is --

25         THE COURT:  -- if there are any such cases?

www.escribers.net | 800-257-0885

Colloquy

1          MS. AVENS:  Excuse me?

2          THE COURT:  Are you aware of there actually being any

3     such cases like that?

4          MS. AVENS:  I have not done that type of research to

5     see what other cases might be, but I know that there are

6     homicide cases prosecuted in the Pitt County Courthouse, where

7     many of those cases, especially if they happen, you know, like

8     some type of suspicious circumstance or suspected murder

9     circumstance, that it would be her office that is brought in

10    to investigate and evaluate and to make that determination if

11    it's a homicide or not or if it's suicide or whatever the

12    manner she chooses.

13         So if she is participating in these other cases that

14    are brought before the Court -- because again, when these

15    situations arise, people are prosecuted, they need the opinion

16    from the medical examiner to support what the cause of death

17    was, how the person died, what was the manner.  In this case

18    that did not happen.  So I might not pinpoint this case, this

19    case, or this case, but to require me to pinpoint those will

20    also be, to me, the same as saying that there aren't any that

21    she has cooperated with, and that's unreasonable.

22         THE COURT:  And again, in your complaint, are there

23    allegations that I can look at that establish somehow that Dr.

24    Kelly was doing this on the base of some sort of protected

25    characteristic you have:  your race, your gender, one of those

www.escribers.net | 800-257-0885

Colloquy

1    sort of things?  Can I look for any allegations in the

2    complaint on that basis?

3        MS. AVENS:  I did not accuse Dr. Kelly of anything

4    like that.  Only ECU Health.  I did not accuse her of any type

5    of discrimination.  Neither did I accuse DA Dixon of any type

6    of discrimination.  That doesn't mean that something will not

7    be shown during discovery if the case should proceed to there,

8    but I do believe that she cooperated with ECU Health to

9    benefit ECU Health, and that ECU Health motives were

10   discriminatory.

11       THE COURT:  Thank you.

12       Mr. Lindsley, any response?

13       MR. LINDSLEY:  Only to say, Your Honor, that the

14   amended complaint does not allege sufficient facts to

15   establish any violation of due process or of equal protection

16   in the case.  You bring up the lack of comparators in the

17   complaint.  There's no evidence alleged that any other person

18   in Ms. Avens' position was treated differently than she has

19   been by Dr. Kelly.  It's just not there.  So on the face of

20   the complaint, there just is not sufficient allegations to

21   establish those claims against Dr. Kelly.  That's all.

22       THE COURT:  Thank you.

23       Ms. Avens, any final comments you'd like to share

24   regarding Dr. Kelly?

25       MS. AVENS:  Yes, sir.  As far as the -- I wanted to

1  get back to the willing speaker.  She's a willing speaker, by

2  the nature of her job.  She writes opinions based on her

3  investigation and provides these opinions.  As far as whether

4  or not there's any statute or right for the public to get a

5  copy of these opinions, when Dr. Radisch investigated

6  initially, I was able to communicate directly with Dr.

7  Radisch, and Dr. Radisch sent me a copy of her decision.  So

8  whether or not it is a right for that, I don't know.  But it

9  is a practice that the decision of the medical examiner is

10  released to the -- I guess the closest relative or the --

11  whoever the administrator of the estate may be.  I'm not sure

12  exactly which one of those little nuances work there, but she

13  did send me a copy of the letter as well.  It wasn't just sent

14  to Kimberly Robb.

15         And then in terms of chilling the speech, if she is

16  required to seek permission from ECU Health Risk Management

17  and attorneys before being allowed to work on this case, then

18  yes, her speech has been chilled.

19         THE COURT:  Let me --

20         MS. AVENS:  Because --

21         THE COURT:  Let me ask you about that because

22  that's -- it's getting into ECU.  And I'm going to give Mr.

23  Lindsley a chance to make any final comments.  But I know

24  there's the -- you allege that you called the medical

25  examiner's office, and one or more people who answered the

Colloquy

 1    phone said, I'm supposed to refer you to ECU Risk Management.

 2         MS. AVENS:  Yes.

 3         THE COURT:  And I'm trying to understand where in the

 4    complaint there's an allegation that establishes that that was

 5    done, because ECU said to do it that way or because the

 6    medical examiner's office said to do it that way.  Because

 7    it's possible, certainly, you know, you've alleged that this

 8    is some -- or you've discussed that somehow it's ECU telling

 9    the medical examiner to refer you to their office, but it's

10    also equally possible the medical examiner said, next time Ms.

11    Avens calls, tell her to call ECU, because, you know, that's

12    where all of this happened.

13         So what allegation do I look at in the complaint to

14    establish that it was ECU's doing that the medical examiner

15    was referring you back to ECU?

16         MS. AVENS:  When that first started happening, those

17    calls -- redirection of calls, they did start happening right

18    after it was discovered that DA Dixon had lied about having

19    the report.  I don't know at what point this particular

20    instruction was given.  I just know that the next time I

21    contacted that office in September 2022 and October 2022, that

22    those are the responses that I was given.

23         And then in 2023, when I spoke with the office

24    manager, in one of the recorded conversations, she told me

25    that that I was supposed to be talking to Risk Management.

Colloquy

 1    And then she went on to tell me how Dr. Kelly -- and she kept

 2    saying that we are not doing anything with this case.  And

 3    then she went on to tell me that Dr. Kelly would need to talk

 4    to Risk and the attorneys to see what she would be allowed to

 5    do.  And I know that's not the way it works either.  So if she

 6    has to talk to Risk Management and ECU Health's attorneys to

 7    see what she would be allowed to do when she is expected to

 8    perform her job duties independently and without outside

 9    influence, then that's where the rerouting of the

10    conversations and everything comes back to, because that

11    office is now being controlled under ECU Health, because she

12    should not have to get permission from anybody to perform her

13    job functions to the public.

14           THE COURT:  Thank you.  All right.

15           So Mr. Lindsley, any final comments?

16           MR. LINDSLEY:  Yes, sir.  Just to return to that

17    First Amendment issue.  Even if Dr. Kelly's speech were

18    chilled and even if it were chilled by a government agent, Dr.

19    Kelly is not the correct target for a claim for First

20    Amendment violation.  She herself is the, quote/unquote,

21    willing speaker or potentially willing speaker.

22           The plaintiff, in her complaint, clearly brings a

23    First Amendment violation claim against Dr. Kelly, and it just

24    does not lie under the case law against Dr. Kelly.  It may

25    potentially lie against some other person or some other

Colloquy

1    government office but not against Dr. Kelly.

2         And I just wanted to conclude by bringing up that

3    plaintiff has also made a negligence per se claim against Dr.

4    Kelly.  I'll just briefly address that.  In particular, you

5    know, under state law, there are a number of requirements that

6    must be shown to make out a case for negligence per se,

7    including a duty created by a statute.  The statute was

8    enacted to protect the class of persons, which includes the

9    plaintiff, a breach of the statutory duty, an injury sustained

10   by that breach, the injury was of the nature contemplated by

11   the statute, and a violation of the statute proximately caused

12   the injury.

13        I would suggest to Your Honor that plaintiff's

14   complaint doesn't establish any of those elements in the

15   context of her allegations.  And as my counsel to my left

16   indicated earlier that negligence per se claims, really at

17   their heart, address matters of public safety statutes,

18   plaintiff does not allege or identify any such statute that

19   Dr. Kelly could have breached or did breach.  And on those

20   bases, the claim for negligence per se is invalid.  I mean,

21   there simply is nothing in the complaint to sustain a claim

22   for negligence per se against Dr. Kelly.

23        THE COURT:  Thank you.

24        MS. AVENS:  Can I respond?

25        THE COURT:  Yes, ma'am.

Colloquy

 1    MS. AVENS:  Yes, sir.  I would like to make a quick

 2    response to that.  As far as the negligence per se, there are

 3    safety codes that people like, I guess, the medical examiner

 4    and other state officials are -- or different agencies, there

 5    are safety codes that they still have to adhere to.  I was not

 6    able to come up with the particular safety codes or codes of

 7    ethics or other things similar to that for the North Carolina

 8    Medical Examiner's Office.  That is something that I am hoping

 9    to be able to come up with during discovery.  But it has

10    already been determined in some other cases that these --

11    violations of these particular standards still can constitute

12    negligence per se.  Because it might not be an actual North

13    Carolina general statutes standard, but it still may be a

14    legal standard that she is obligated to follow.

15         I did submit as an exhibit a list of those standards

16    that I was able to find from a different, I guess, state -- I

17    can't remember, but I have yet to find one for -- that applies

18    here to Dr. Kelly in North Carolina.  But I would also find it

19    difficult to believe that the standards vary that much from

20    place to place, based on the standards that the medical

21    examiner is held to.

22         THE COURT:  Thank you.

23         So let's talk about ECU.  Finally, Mr. McClurg, you

24    discussed the statute of limitations and say this is all

25    barred by the statute of limitations.  Ms. Avens responds that

Colloquy

1     there are these allegations about ECU meddling in the medical

2     examiner's office and that part of a continuing wrong against

3     her.  If I accept those allegations as true, is her case

4     timely?

5           MR. MCCLURG:  If you accept them as true and not

6     conclusory, Your Honor?

7           THE COURT:  Right.  I mean, given where we are in

8     this case --

9           MR. MCCLURG:  Right.

10          THE COURT:  -- if I accept the well-pleaded factual

11    allegation is true, if I find that those well-pleaded

12    allegations are that ECU meddled with the medical examiner in

13    2022, is this case timely?

14          MR. MCCLURG:  I still don't believe so.  I mean, the

15    underlying claims are all arising out of facts that occurred

16    back in 2014, 2016.  The conclusory allegations that took

17    place in 2022 are completely separate and distinct from all of

18    the allegations that specifically relate to ECU Health.

19    They're not a part of the same course of conduct, and they're

20    a decade apart in time.

21          THE COURT:  If her allegation is that there's this

22    conspiracy amongst the three defendants here to cover up this,

23    this -- what she contends was a murder or, I presume, ECU's

24    reputational benefit in the community.  I mean, that seems to

25    be the general gist of what she's arguing.  I understand your

Colloquy

1    client would disagree with that, but --

2              MR. MCCLURG:  Right.

3              THE COURT:  -- if I accept that, isn't the case

4    timely if it's been a ten-year-long conspiracy?

5              MR. MCCLURG:  I would say there still needs to be a

6    meeting of the minds and the acts that have occurred allegedly

7    in 2022 could be attributable to something else other than ECU

8    Health directing the ME's office.  As Your Honor noted

9    earlier, it could have just been passing the buck off to ECU

10   Health, not at their direction.  So I don't think that that

11   would revive a claim that expired in 2017.

12             THE COURT:  Thank you.

13             Ms. Avens, do you wish to be heard on that at all?

14             MS. AVENS:  Yes, sir.  First of all, the claim would

15   not have expired in 2017, even if there was nothing new in the

16   more recent years.  It would have been -- if there was nothing

17   else, my opinion in 2019, but that's not the issue.  The issue

18   is that they have been involved since then and I didn't make

19   up the information.  This is the information that was given

20   from the medical examiner's office.

21             And the conduct, even though counsel is saying that

22   it's different conduct -- the conduct is still the same, to

23   keep my daughter's death swept under the rug -- there has

24   still been an obstruction of justice.  There is meeting of the

25   minds, because if they require Dr. Kelly to need their

Colloquy

1    permission before working on a case, then their minds are met

2    because she agreed.  Because evidently, she didn't never

3    review the evidence or compile a report based on her review of

4    the evidence.  So her compliance, that's the meeting of the

5    minds right there.

6              THE COURT:  Thank you.

7              Mr. McClurg, there's been discussion in your brief

8    about whether ECU is a state actor, and I appreciate that

9    numerous other cases ECU has been found to be a private actor

10   and not a state actor.  But again, if I find that the well-

11   pleaded complaints here allege that ECU was conspiring with

12   two state actors to cover up this death, does that make ECU a

13   state actor in this case, under those facts?

14             MR. MCCLURG:  Not necessarily, Your Honor.  It has to

15   be controlled that the State is exercising over the entity.

16   Here, there are conclusory allegations that ECU Health is

17   somehow exercising control over some State decision.  So I

18   don't believe that would be sufficient.

19             THE COURT:  Again, I understand your client disagrees

20   with all of this.

21             MR. MCCLURG:  Right.

22             THE COURT:  But if your client is effectively in

23   control of the DA and in control of the medical examiner, does

24   that not make them a state actor?

25             MR. MCCLURG:  I think it likely would, Your Honor.

Colloquy

1          THE COURT:  Thank you.

2          Ms. Avens, any thoughts on that point?

3          MS. AVENS:  Just in direct response to what he said,

4    or -- because you said you already have everything else.

5          THE COURT:  Well, I'm asking him, if I accept -- if I

6    find that you have properly pled that there is this

7    conspiracy, does it make them a state actor?  And that was the

8    question I asked him.  And he generally said, if I fully

9    accept everything that you've argued, then they would be a

10   state actor.  Do you wish to be heard on that at all?

11         MS. AVENS:  Well, I mean, I think that they did act

12   not just in the instances that he referenced, even going back

13   to the reporting to the SBI.  I believe that was them acting

14   as a State, considering that they took advantage of a loophole

15   where the requirement was that certain deaths ought to be

16   reported to the medical examiner, and that is even listed in

17   the North Carolina General Statute 130A-383.  That says that

18   under these particular circumstances, these are supposed to be

19   reported to the medical examiner.  You know, it says,

20   "Occurring under any suspicious, unusual, or unnatural

21   circumstance, the medical examiner of the county in which the

22   body is deceased is found, shall be notified by the physician

23   in attendance, hospital," et cetera.

24         Considering that my daughter was not expected to die

25   at 1 a.m. on May 10th, when I spoke with the nurse

Colloquy

1    practitioner because she was showing symptoms that I was not

2    used to, and I asked him, do I need to be prepared myself?  He

3    said no.  He looked back at her chart and said that me and her

4    physicians, we believe -- or we expect her condition to

5    improve.  So they had not given up care or put her on hospice

6    or end of life measures; they expected her condition to

7    improve.

8         So when she did die, and illustrates that

9    necessitated this death to be referred to the medical

10   examiner's office, which was not done.  And then it also

11   necessitated a report to law enforcement.  Maybe the people

12   who wrote that particular rule didn't think it was necessary

13   to include the word local law enforcement in that requirement,

14   because the SBI being not considered local, they're supposed

15   to redirect you if you file a complaint with them or try to,

16   because I tried to file several complaints with them.  They

17   always tell me that we can't do anything.  You have to contact

18   your local law enforcement or your prosecutor, your district

19   attorney.

20        But in this case, ECU Health was able to not only

21   file the report with them -- and you would think that even if,

22   let's just say for -- what's that word, arguendo.  Let's just

23   say for arguendo that they thought they were calling the right

24   law enforcement agency.  They did not call the local SBI

25   office.  You would think that, even if they assumed that, they

Colloquy

1   would have called the local office.  No, they called agents

2   who were not local to the SBI office here in Greenville.

3       And then you would think that maybe they would just

4   report to one SBI agent.  They reported to three SBI agents

5   who were not local to the SBI office here in Greenville, North

6   Carolina.  And then the conversation continued.  They were not

7   redirected to report to local law enforcement.  The three

8   agents denied to me anything about my daughter's case, her

9   name, spoken with Vicki Haddock, spoken with anybody from the

10  hospital.  But yet took the information that I gave them and

11  gave it back to the hospital.  That has put through their own

12  cooperation or meeting of the minds ECU Health as a state

13  actor, because according to the SBI, they can only be brought

14  in on cases when they are asked to do so by a state agency.

15      So how did ECU Health get the privilege to report to

16  them, maintain communication with them, exchange and receive

17  information from them?  Under the circumstances that the SBI

18  is only to be brought in by a state agency.  ECU Health had to

19  be acting as a state to have this privilege with those SBI

20  agents.

21      So that goes, in addition, to managing the medical

22  examiner's office and also with controlling the subsequent

23  investigation under Chief Hassan Aden in November 2014 that

24  was supposed to take place where witnesses were withheld or

25  employees or personnel was not made available, because for

Colloquy

1  them to allow that uncooperation means that there's got to be

2  a meeting of those minds because they were trained according

3  to CALEA standards to interview witnesses, suspects, and

4  complainant, to locate and find these people and interview

5  them and then to follow up.  And that did not happen.  Our

6  family members, our witnesses we were not interviewed.

7         So they have, on multiple occasions, taken it upon

8  themselves to act as state, whether it's controlling an

9  investigation -- or, basically, I guess, that's what it boils

10  down to, controlling investigations.

11         THE COURT:  Thank you.

12         So Ms. Avens, you touched on this a few minutes ago,

13  but a couple of your claims against ECU are based on a concept

14  that they've engaged in some sort of race-based discrimination

15  against you.  I know at one point in your amended complaint,

16  you alleged that you and your daughter are African American

17  and most of the employees at ECU Health are White.  But I'm

18  trying to find out what other allegations in the complaint

19  support your claim that this is race-based discrimination?

20         MS. AVENS:  Yes, sir.  Because the nurse that was

21  over my daughter's care, Linda Brixon, she is White.

22  Elizabeth Everett (ph.) is White.  The hospital has not made

23  any moves whatsoever to hold these people accountable for

24  their conduct.  I know Brixon was terminated, but that is not

25  the same as holding her accountable for her conduct.  Because

Colloquy

1    just as anybody else, if they break the law or something, you

2    would expect the law to step in, not they just get fired.

3         THE COURT:  I want us to stay focused here.  I mean,

4    so I understand that there are a bunch of White people on one

5    side and a bunch of African-American people on the other side.

6    What is it that you can point to that says they treated you

7    this way because you are Black?

8         MS. AVENS:  I am pointing to the differential

9    treatment because they hold -- have failed to hold them

10   accountable in this case and have failed to -- for example,

11   getting back to the 2016 wrongful death settlement, using this

12   as an example, when they were going to reveal unrelated health

13   data to the jury to try to persuade the jury --

14        THE COURT:  Well, I don't want to --

15        MS. AVENS:  -- that my daughter was responsible.

16        THE COURT:  Again, I don't want to talk about what

17   happened at mediation, because what happened at mediation is

18   confidential.  So that's not supposed to be shared outside of

19   mediation.  But again, what -- and as I consider your motion,

20   I'm looking at this document you filed.

21        MS. AVENS:  Yes.

22        THE COURT:  So where in here do I look for something

23   that says, they did this to me because of my race?

24        MS. AVENS:  That's an assumption based on their

25   protection of White staff members.

Colloquy

1      THE COURT:  And is there anything in there talking

2   about other instances where a White person died and someone

3   was punished or anything like that that you can show me,

4   there's an allegation in here of different treatment of people

5   based on their race?

6      MS. AVENS:  Well, I know that everybody that was on

7   that particular wing of the hospital that night were White,

8   and they lived.  Yet the hospital is protecting the people.

9      THE COURT:  So I guess, I mean, are there any

10  allegations here that White people died and they did prosecute

11  that nurse or things of that nature?  I'm trying to get at --

12  I mean, I very much understand what you're saying, that the

13  people involved are of different races here, and it seems like

14  a person of a race different than yours has not been punished

15  for what you believe they should be punished for.  I get that.

16  I'm trying to get at where -- what can I look to in here that

17  you filed to show me that that decision was based on race?

18  That the way you've been treated in this case -- that you

19  claim you've been treated in this case is based on race?  How

20  do I find that in here?

21      MS. AVENS:  The conclusion based on race was drawn

22  due to, again, the protection of these people, whether it was

23  reports to the Board of Nursing or whatever, where information

24  was withheld, there was three White workers who the hospital

25  protected and continues to protect.  Whereas in this case --

Colloquy

1    THE COURT:  Mr. McClurg, any thoughts on this point?

2    MR. MCCLURG:  Just one short point, Your Honor.

3    I would just note that the allegation that ECU Health

4    protected the White nurse involved in the care of plaintiff's

5    daughter back in 2014 is not supported.  It's actually

6    contradicted by the allegations in the pleading.  That nurse

7    was terminated.  That nurse was reported, criminally, to law

8    enforcement, and there was a Board of Nursing report made on

9    behalf of ECU Health.

10    THE COURT:  Thank you.

11    Ms. Avens, one of your claims is a Title 6 claim.

12    And I'm trying to understand what program or activity that

13    received federal financial assistance you believe you were

14    excluded or denied -- excluded from or denied the benefits of?

15    MS. AVENS:  Okay.  Coastal (ph.) -- I can't say right

16    off, and I'm trying to find it in my notes, sir.

17    THE COURT:  As I look at your complaint -- and this

18    is on page 57 and then several pages afterwards -- it seems

19    like you're saying that because ECU, as an entity, receives

20    federal financial assistance and they've engaged in

21    discriminatory conduct, that is what you base your Title 6

22    claim on; is that correct?

23    MS. AVENS:  Well, as far as any programs or things

24    like that for the Title 6, that still goes back to the

25    beginning because of the way that this particular death was

Colloquy

1    handled.  You know, I can't compare this to another death, for

2    example, because I don't know other people's circumstances or

3    what happened or didn't happen.  But I know that under, you

4    know, just the referrals that were supposed to be made were

5    not made such as, you know, referring the decedent to the

6    medical examiner, reporting to the police, to me.  Those are

7    part of their programs that they -- for family members who

8    lose somebody there under questionable circumstances.  These

9    are measures that are supposed to be in place.  So that is,

10   you know, a program that was not taken care of appropriately.

11          THE COURT:  Thank you.

12          Mr. McClurg, any thoughts on that point?

13          MR. MCCLURG:  No, Your Honor.

14          THE COURT:  And Ms. Avens, you also bring a Section

15   1981 claim.  And I'm trying to be clear on what -- I believe,

16   that claim involves your allegation that your right to enter

17   into contracts has been interfered with by ECU.  Is that what

18   you're arguing, and if so, what contract or contracts did ECU

19   interfere with that you entered or hoped to enter?

20          MS. AVENS:  Yes, sir.  The settlement agreement that

21   was entered into under the circumstances that I described, as

22   well as, again, bringing this case sooner because there was

23   information hidden and which, by the way, because information

24   has been come to light this year, also should tell that

25   statute of limitations that we were discussing earlier,

Colloquy

1    because again, had I been aware that personnel were not made

2    available, then through speaking with an attorney or something

3    or doing the proper research, this case could have been

4    brought about sooner than now to address those issues, but it

5    was kept in the dark.

6              THE COURT:  Thank you.

7              Mr. McClurg, any thoughts on that issue?

8              MR. MCCLURG:  I would just point out, Your Honor,

9    that we have not heard of a contractual interest upon which a

10   Section 1981 claim may be based.

11             THE COURT:  Thank you.

12             Ms. Avens, those are all my questions on ECU.  Any

13   final points you want to make regarding the ECU defendants?

14             MS. AVENS:  Not that I can think of.  I'm sorry.  Not

15   that I can think of, Your Honor.

16             THE COURT:  Thank you.

17             Mr. McClurg, any final comments?

18             MR. MCCLURG:  No, Your Honor.

19             THE COURT:  Well, I'm going to take these matters

20   under advisement, and I hope the issue of ruling in the not

21   terribly distant future.

22             I do want to say, Ms. Avens, I've been doing this for

23   about a decade now, and I think -- you know, and I don't know

24   which way this is going to come out.  I might grant the

25   motions.  I might deny the motions.  I don't know.  I still

Colloquy

1    need to look at the law and figure it out.  But I do want to

2    say that you've done a tremendous job advocating for your

3    daughter.  You've made a very thorough complaint laying out

4    what you believe went on and why you believe your daughter was

5    wronged and why you believe you were wronged, and you've

6    made -- you've handled the issues raised by the defense very

7    well and better than most pro se advocates have -- pro se

8    parties do.

9         And again, I don't know how I'm going to decide the

10   motions, but I have no doubt your daughter is proud of the

11   work you've done on her behalf.  So --

12        MS. AVENS:  Thank you.

13        THE COURT:  And again, this is -- you know, this case

14   is -- you know, obviously there was something horrible

15   happened in this case that your daughter died.  I know there's

16   disputes and disagreements over what all transpired, but

17   undoubtedly this is a case in which someone who was loved

18   passed away.  And you know, that is never a good thing.  And I

19   certainly understand why you're fighting hard for your

20   daughter.

21        The attorneys on this side have done a fantastic job

22   for their clients, as well.  But given the nature of this

23   case, I thought it was worthwhile to say that again.  But rest

24   assured, the law will drive my decision, as that's my mandate

25   as a judge.  But I thought that was worth saying, so.

Colloquy

1          All right, Counsel, I'll ask the court reporter to

2     prepare a chambers copy of the transcript.  And as I said,

3     I'll take this under advisement.  We'll be in recess.

4          THE BAILIFF:  All rise.  This Honorable Court is now

5     adjourned.

6                    (Court is adjourned)

7                      *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF TRANSCRIBER

2

3           I, Elana Friedman, court-approved transcriber, in and

4    for the United States District Court for the Eastern District

5    of North Carolina, do hereby certify that pursuant to Section

6    753, Title 28, United States Code, that the foregoing is a

7    true and correct transcript from the official electronic sound

8    recording of the proceedings held in the above-entitled matter

9    and that the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12              Dated this 15th day of October, 2024.

13

14                    /s/ Elana Friedman

15   _____

16   ELANA FRIEDMAN, CDLT-160

17   COURT-APPROVED TRANSCRIBER

18

19

20

21

22

23

24

25