IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:24-CV-00051-M-RN

| | |
|---|---|
| **Cynthia B. Avens,** | |
| Plaintiff, | |
| v. | **Memorandum & Recommendation** |
| **Faris C. Dixon, Jr.,** et al. | |
| Defendants. | |

Cynthia B. Avens believes that a nurse at Pitt County Memorial Hospital murdered her daughter, Keisha Marie White, in 2014 while Keisha was a patient there. What's more, Avens believes that the company that runs the hospital and various governmental actors have conspired to cover up White's murder for the last decade.

Avens, proceeding pro se, now seeks to hold those allegedly involved in the conspiracy responsible in this court. She has sued Pitt County District Attorney Faris C. Dixon, Jr.; Dr. Karen Kelly, a medical examiner; and Pitt County Memorial Hospital, doing business as ECU Health Medical Center ("ECU Health") for violating several federal laws and committing various state-law torts.

Defendants ask the court to dismiss Avens's Amended Complaint. Dixon claims that Avens lacks standing to challenge his prosecutorial or investigatory decisions. And all Defendants maintain that Avens has failed to state a claim for relief against them, either because they are immune from suit or because her Amended Complaint fails to plausibly allege claims against them.

## I.    Background

In April 2014, Keisha was admitted to ECU Health to receive treatment for renal failure. Am. Compl. ¶ 13, D.E. 33. A month later, while under the care of, among others, Registered Nurse Linda Brixon, Keisha died. *Id.* ¶¶ 14. Avens believes Brixon killed her daughter by intentionally depriving Keisha of oxygen and otherwise provided grossly inadequate medical care. *Id.* ¶¶ 21–66.

After her daughter's death, Avens contacted the State Bureau of Investigation and the local District Attorney's Office. *Id.* ¶¶ 78–82. Avens claims that the District Attorney told her that his office did not believe that Keisha's death was criminal. *Id.* ¶ 82. Various investigations continued from 2014–2018, but no one concluded a crime occurred. *Id.* ¶¶ 82–104.

In early 2019, after Dixon became the Pitt County District Attorney, Avens asked him to review Keisha's case. *Id.* ¶ 105. Several months later, Dixon told Avens he did not think a crime occurred. *Id.* ¶ 107.

Avens contacted Dixon again in July 2021 to request a list of the evidence Dixon reviewed to reach this conclusion. *Id.* ¶ 108. Eight months later, in March 2022, Dixon sent her that list. *Id.* ¶ 107. The evidence Dixon considered included: Keisha's death certificate, the lack of an autopsy, the opinion of the former Chief Medical Examiner, the conclusions of an SBI agent and the Greenville Police Department, Keisha's medical records, and findings from a Department of Health and Human Services investigation. *Id.* ¶ 109.

Avens claims this information is flawed in several ways. She points to incomplete witness interviews, suspicious communications between the Medical Examiner's Office and the SBI, documentation of Keisha's vital signs somehow recorded after her death, and the fact that Keisha's

2

death certificate was issued before an investigation. *Id.* ¶¶ 110–113. In Avens' eyes, these issues suggest that no one undertook a fair and complete investigation into Keisha's death. *Id.* ¶ 110.

Avens shared her concerns with Dixon and pointed him to additional evidence he should consider. *Id.* ¶ 114. Dixon said he would look into those materials. *Id.*

Yet in June 2022, Dixon told Avens he had not reviewed the newly obtained evidence. *Id.* ¶ 117. But he said that if his perspective changed after doing so, he would send the evidence to the Medical Examiner's Office. *Id.*

Two weeks later, in July 2022, after allegedly completing his review, Dixon told Avens that he had not changed his mind about Keisha's death. *Id.* ¶ 118. Dixon claimed he could not file criminal charges because he had received a report from the Medical Examiner's Office that did not support criminal charges. *Id.*

Avens thought it curious that Dixon had received a report from the Medical Examiner's Office since he said he would only send evidence to the medical examiner if his perspective on Keisha's cause of death had changed. *Id.* ¶ 118. She also doubted that Dixon could have reviewed the voluminous materials she submitted, sent "thousands of pages" of materials to the medical examiner, and received an evaluation from the medical examiner in just two weeks. *Id.* When Dixon sought a copy of the medical examiner's evaluation, Dixon would not give it to her, tell her who signed it, or tell her the date it was signed. *Id.*

After her conversation with Dixon, Avens contacted the Medical Examiner's Office and spoke with Danene Lowery, the office manager. *Id.* ¶ 120. Lowery told Avens that their system contained no information about Keisha. *Id.*

In a follow up conversation, Lowery told Avens that the Medical Examiner's Office had reached out to the District Attorney's Office about the report. *Id.* ¶ 121. According to Lowery, the

District Attorney's Office responded that the medical examiner needed to "find" the report. *Id.* But Lowery doubted that any report existed since there was nothing in their system about White. *Id.*

Shortly after Avens's call with Lowery, Dixon called Avens and told her that he intended to submit the evidence she gave him to the Medical Examiner's Office. *Id.* ¶ 122. When Avens tried to question him about this statement, he did not let her do so. *Id.*

Then, in September 2022, Avens called the Medical Examiner's Office to ask whether the office had received the evidence from the District Attorney. *Id.* ¶ 124. The person who answered Avens's call shared that she had been instructed to refer Avens to ECU Health Risk Management if she called. *Id.* ¶ 124.

Avens suspected that Dixon was responsible for that instruction and called him to confront him about it. *Id.* ¶ 125. But Dixon denied any involvement. *Id.* When Avens called the Medical Examiner's Office the next month, she received the same response. *Id.* ¶ 126.

In early 2023, Avens asked Dixon for an update. *Id.* ¶ 128. He told her that Dr. Kelly, a state medical examiner, was out on family and medical leave. *Id.* ¶¶ 7, 128. The Medical Examiner's Office confirmed Dr. Kelly's absence. *Id.* ¶ 129.

Avens contacted the Medical Examiner's Office again in March 2023. *Id.* ¶ 130. Lowery answered and told Avens that Dr. Kelly had not returned to the office. *Id.* When Avens asked about the materials the Dixon allegedly sent over, Lowery said she could not talk with Avens and told Avens to contact ECU Health Risk Management. *Id.* ¶ 130. But Lowery did share that there was still no information on Keisha in their system. *Id.*

Avens contacted Dixon and the Medical Examiner's Office multiple times in March and April 2023. She received differing stories about whether Dixon ever sent evidence to the Medical

4

Examiner's Office and was continually redirected to ECU Health Risk Management. *Id.* ¶¶ 132–40.

In October 2023, Avens called the Medical Examiner's Office to ask for a copy of Dr. Kelly's findings. *Id.* ¶ 142. She eventually learned that Dr. Kelly had forgotten to look at the evidence but planned to do so that weekend. *Id.* ¶ 143.

Then, in December 2023, Avens hired her own medical examiner to evaluate the circumstances of Keisha's death. *Id.* ¶ 146. Less than a month after Avens hired him, her medical examiner ruled Keisha's death a homicide. *Id.* ¶¶ 147–48.

Avens sent her medical examiner's report to several people, including Dixon in late January 2024. *Id.* ¶ 148. Dixon told Avens he received the report, but he still maintained no crime occurred. *Id.* ¶ 150.

Avens then sued Dixon, Dr. Kelly, and ECU Health in March 2024. D.E. 1. She seeks $156,654,559.04 in compensatory and punitive damages. Am. Compl. at 83. She also "demands the initiation of a comprehensive and impartial criminal investigation" into Keisha's death and the appointment of a special prosecutor or independent counsel to oversee the investigation. *Id.* at 82–83. Avens further seeks "a declaration that Defendants' actions violated her constitutional rights under the First and Fourteenth Amendments," the Defendants full cooperation in an investigation, an amended Death Certificate that reflects "Homicide" as Keisha's cause of death, and a "public memorial." *Id.* at 83.

In response, the Defendants asked the court to dismiss her claims. D.E. 43, 47, 49.

## II.  Discussion

### A.  Motion to Dismiss Due to Lack of Standing

Dixon argues that this court lacks jurisdiction over Avens's claims against him because she lacks standing to challenge his decision not to prosecute anyone for Keisha's death. In response, Avens argues that her suit does not challenge his decision not to bring charges against Brixon. Instead, she asserts that her claims focus on Dixon's failure to adequately investigate her daughter's death. But courts have also rejected plaintiffs' claims that they have standing to sue on that basis. So the District Court should dismiss Avens's investigation-based claims[1] against Dixon for lack of subject-matter jurisdiction.

Federal courts may only address matters that qualify as a case or controversy under Article III of the Constitution. To meet this requirement, a plaintiff must show, among other things, that they have "a personal stake in the outcome of the controversy[.]" *Baker* v. *Carr*, 369 U.S. 186, 204 (1962).

The Supreme Court discussed whether a person has a sufficient personal stake in a district attorney's decision not to prosecute a third party to establish standing in *Linda R.S.* v. *Richard D.*, 410 U.S. 614, 617 (1973). In that case, an unmarried mother sued in federal court to enjoin what she believed was the discriminatory enforcement of a child support statute. *Id.* at 614–15. She alleged that her child's father had not paid child support as required by law. *Id.* Although the law provided criminal penalties for those who violated it, when the mother asked the district attorney to prosecute her child's father, he refused to do so. *Id.* The district attorney based his decision on his view that the statute did not apply to children born out of wedlock. *Id.* The mother claimed that

---

[1] This includes her claims against Dixon under the Fourteenth Amendment and her state-law claims against him.

this interpretation violated the Fourteenth Amendment's Equal Protection Clause. *Id.* at 616. But a three-judge court dismissed her case for lack of standing. *Id.* at 615.

The Supreme Court affirmed the lower court's decision. It began by noting that plaintiffs must have a sufficient personal stake in litigation to satisfy Article III's case or controversy requirement. *Id.* at 616–17. And while the mother "does have an interest in the support of her child[,]" that interest was not sufficient to establish standing to sue over the district attorneys' decision not to prosecute her child's father. *Id.* at 619. It explained that the Court's "prior decisions consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* Those decisions established "that, in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Id.* And so it concluded that the lower court was "correct in dismissing the action for want of standing[.]" *Id.*

Avens, for her part, does not claim that she has standing to sue Dixon for his failure to prosecute anyone for Keisha's death. Resp. to Dixon Mot. to Dismiss at 8, D.E. 53. But she argues that she does have standing to sue over "Dixon's failure to conduct a proper investigation[.]" *Id.* She says that she has a "judicially cognizable interest" because the alleged "cover-up" of the true cause of Keisha's death, including Dixon's "lying, stalling for time, and failure[] to conduct a proper investigation" impacted her "efforts to pursue justice." *Id.* at 7.

But federal courts regularly reject attempts to establish standing based on a district attorney's investigation of a third party. *See Pratt* v. *Helms*, 73 F.4th 592, 595 (8th Cir. 2023) (holding that a party has no standing to sue based on a government official's failure to investigate the alleged perpetrator of a crime); *Lefebure* v. *D'Aquila*, 15 F.4th 650, 652–55 (5th Cir. 2021) (finding that a party lacks standing to sue based on a failure to investigate a third party); *Graves-*

*Bey* v. *City & Cnty. of San Francisco*, 669 F. App'x 373, 374 (9th Cir. 2016) (concluding that "[d]ismissal of Graves-Bey's request for a criminal investigation and prosecution of defendants was proper because Graves-Bey lacks standing to compel the investigation or prosecution of another person."); *Cmty. for Creative Non-Violence* v. *Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) (explaining that federal courts' "authority is non-existent" to hear claims challenging a decision not to investigate a third party).

These cases compel the conclusion that Avens lacks standing to sue Dixon over the way he investigated Keisha's death. *See Graves* v. *Haywood*, No. 5:19-CT-3043-FL, 2022 WL 945598, at *4 (E.D.N.C. Mar. 29, 2022) (holding that a plaintiff lacked standing challenge the adequacy of an investigation into a third party because there is no "constitutional right to a thorough or complete investigation of [a citizen's] allegations."). Thus, Dixon is entitled to have Avens's investigation-based claims dismissed due to lack of standing.

In an attempt to avoid this conclusion, Avens points the court to *Love* v. *Bolinger*, 927 F. Supp. 1131 (S.D. Ind. 1996). In *Love*, the family of a detainee who died while in custody sued for various constitutional violations, including a claim for denial of access to the courts based on "an alleged cover-up of the circumstances of his death." *Id.* at 1133. In addressing a motion to dismiss for failure to state a claim, the court began by rejecting the plaintiffs' attempt to base their denial of access claim on the lack of a criminal prosecution of those allegedly responsible for the decedent's death. *Id.* at 1137. But it then explained that, in the civil context, "a cover-up of a killing which obstructs 'legitimate efforts to vindicate the killing through judicial redress interferes with the due process right of access to the courts.'" *Id.* at 1138 (quoting *Bell* v. *City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984)).

Yet even so, to state a viable denial of access claim, the *Love* court explained that there must be "some concrete injury to the decedent's survivors resulting from the alleged cover-up." *Id.* at 1138. And the plaintiffs in *Love* failed to make that showing. They did "not allege that their claims against the other defendants in the present lawsuit have been hindered, devalued, or otherwise damaged by the cover-up." *Id.* at 1138. "Nor do they allege that they were prevented or otherwise hindered in filing a state-law wrongful death suit." *Id.* at 1138–39. Since the "plaintiffs were not hindered in bringing a lawsuit to vindicate their rights" they had not stated a denial of access claim based on the alleged cover-up. *Id.*

*Love* does not require the court to find that Avens has standing to sue Dixon for his investigation into Keisha's death. To begin with, *Love* did not deal with subject-matter jurisdiction, it dealt with the sufficiency of a complaint's allegations. So it does not address the question before the court.

But in any event, like the plaintiffs in *Love*, Avens has not been hindered in her ability to bring a civil suit to vindicate her rights related to Keisha's death by the alleged cover-up. She already brought and resolved a civil claim against ECU Health directly related to Keisha's death. And there are no allegations that the alleged cover-up prevented her from bringing claims in this court. So, like the plaintiffs in *Love*, Avens lacks a basis to seek relief. Her investigation-related claims against Dixon should be dismissed.

But unlike her other claims against Dixon, Avens's First Amendment claim does not directly relate to Dixon's investigation. Instead, it relates to Dixon's communications with Avens about that investigation. Dixon has not explained why the holding of *Linda R.S.* and similar cases requires dismissal of that claim, thus it should not be dismissed for lack of standing. So the District

9

Court should dismiss only Avens's investigation-based claims against Dixon due to a lack of subject-matter jurisdiction.

## B.    Motion to Dismiss Due to Failure to State a Claim

Each Defendant argues that Avens's Amended Complaint fails to state a claim for relief against them. The governmental actors claim that various kinds of immunities require the court to dismiss her claims. And all the Defendants claim that Avens's factual allegations fail to state a claim against them.

### 1.    Standard for a Rule 12(b)(6) Motion

Defendants' motions argue that Avens' Amended Complaint should be dismissed because it fails to state a claim upon which relief may be granted. The Supreme Court has explained that to withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Therefore, while a court must accept all the factual allegations contained in a complaint as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.*

After *Iqbal*, a court considering a motion under Rule 12(b)(6) must subject a complaint to a two-part test. First, the court must identify the allegations in the complaint that are not entitled to the assumption of truth because they are conclusory or no more than a formulaic recitation of the elements of a claim. *Id.* at 679. Then, taking the remaining factual allegations as true, the court must determine whether the complaint "plausibly suggest[s] an entitlement to relief." *Id.* If, after conducting this two-part analysis, "the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief'" *Id.* If a party fails to show that they are entitled to relief, the court must dismiss the deficient claims.

Avens's status as a *pro se* party relaxes, but does not eliminate, the requirement that a complaint contain facially plausible claims. Although a court must liberally construe a pro se plaintiff's allegations, it "cannot ignore a clear failure to allege facts" that set forth a cognizable claim. *Johnson* v. *BAC Home Loans Servicing, LP*, 867 F. Supp. 2d 766, 776 (E.D.N.C. 2011).

## 2. Eleventh Amendment Immunity

Dixon and Dr. Kelly both argue that since they are state officials the Eleventh Amendment to the Constitution deprives this court of jurisdiction to hear Avens's official capacity claims against them. Avens responds that her claims fit within an exception to the Eleventh Amendment for injunctive relief to address ongoing violations of federal law. But considering the allegations in her Amended Complaint, Avens's argument is unpersuasive. She has not shown that the court has jurisdiction to hear her claims against Dixon and Dr. Kelly in their official capacities.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although the Amendment's text is silent on the issue, the Supreme Court has held that this limit on judicial authority also applies to suits brought by a state's own citizens. *Edelman* v. *Jordan*, 415 U.S. 651, 666–68 (1974).

So unless a state waives its immunity or Congress abrogates it, the Eleventh Amendment bars an action for damages in federal court against governmental entities that are characterized as "arm[s] of the State." *Regents of the Univ. of Cal.* v. *Doe*, 519 U.S. 425, 430 (1997) (quotation

11

omitted). Similarly, state officials sued in their official capacities are also entitled to Eleventh Amendment immunity because they are considered to be alter egos of the state. *Id*.

Both Dixon and Kelly are state officials. The Pitt County District Attorney's Office,[2] which Dixon leads, is an arm of the State of North Carolina. *See* N.C. Gen. Stat. § 7A-60 ("The State shall be divided into prosecutorial districts . . . . There shall be a district attorney for each prosecutorial district[.]"); *Felix* v. *Doughtie*, No. 2:21-CV-7-FL, 2021 WL 2345252, at *10 (E.D.N.C. June 8, 2021). And Dr. Kelly's position is also created by the state. Am. Compl. ¶ 7 (stating that Dr. Kelly is "[e]mployed by the state as a medical examiner"); N.C. Gen. Stat. § 130A-382 (requiring the Chief Medical Examiner to appoint two or more medical examiners for each county). So they are both entitled to Eleventh Amendment immunity for Avens's claims in their official capacities.

While that conclusion forecloses Avens's ability to seek monetary damages from them in their official capacity, it does not necessarily prohibit her from obtaining injunctive relief against them. In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court created an exception to Eleventh Amendment immunity for "suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew* v. *Hawkins*, 540 U.S. 431, 437 (2004) (emphasis added).

But not every claim for injunctive relief against state officials falls within the *Ex Parte Young* exception. Instead, it applies only when a "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc.* v. *Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, (2002).

---

[2] It would be more accurate to describe Dixon as the District Attorney for North Carolina's Third Prosecutorial District. *See* N.C. Gen. Stat. § 7A-60 (describing the various prosecutorial districts in North Carolina). But since Pitt County is the only county in the Third Prosecutorial District, *id*., either description will suffice.

12

Avens's claims fall outside the *Ex Parte Young* exception. Her Amended Complaint does not allege an ongoing violation of federal law. Neither Dixon, nor Kelly are engaged in an ongoing investigation into Keisha's death. The possibility that there could be an investigation in the future is insufficient to qualify for the *Ex Parte Young* exception. *See Allen* v. *Cooper*, 895 F.3d 337, 354 (4th Cir. 2018) (holding that in a copyright infringement case "suggesting the possibility of other infringing displays[] does not plausibly allege the existence of an ongoing violation of federal law.").

So given that Dixon and Kelly are state officers, and none of the exceptions to the Eleventh Amendment apply here, they are immune from Avens's suit in their official capacities. The District Court should dismiss these claims.

### 3.    Prosecutorial Immunity

Dixon next argues that he is immune from Avens's claims under the doctrine of absolute prosecutorial immunity. But Avens argues that the immunity does not apply here because she is suing him for actions that are investigatory, not prosecutorial.

It has been the law for decades that "prosecutors are absolutely immune from damages liability when they act as advocates for the State." *Savage* v. *Maryland*, 896 F.3d 260, 268 (4th Cir. 2018). This immunity "safeguards the process, not the person" so "it extends only to actions 'intimately associated with the judicial phase of the criminal process.'" *Nero* v. *Mosby*, 890 F.3d 106, 117 (4th Cir. 2018) (quoting *Imbler* v. *Pachtman*, 424 U.S. 409, 430–31 (1976)).

To determine whether a particular action is entitled to absolute immunity, courts "look to 'the nature of the function performed,' without regard to 'the identity of the actor who performed it,' 'the harm that the conduct may have caused,' or even 'the question whether it was lawful.'" *Id.* at 118 (quoting *Buckley* v. *Fitzsimmons*, 509 U.S. 259, 269 (1993)). The principal distinction is

between "advocative functions," which receive absolute immunity, and "investigative or administrative functions," which do not. *Id.* A prosecutor's activities fall into the former category when he "professionally evaluates evidence assembled by the police, decides to seek an arrest warrant, prepares and files charging documents, participates in a probable cause hearing, and presents evidence at trial." *Id.* (citations omitted). But his actions fall into the latter category when he "gives legal advice to police during an investigation, investigates a case before a probable cause determination, and personally attests to the truth of averments in a statement of probable cause." *Id.* (citations omitted). Dixon has the burden of showing that he is entitled to prosecutorial immunity. *Burns* v. *Reed,* 500 U.S. 478, 486 (1991) ("An official seeking absolute immunity bears the burden of showing that such immunity is justified.").

Dixon is not entitled to prosecutorial immunity for Avens's First Amendment claim. In that claim, she alleges that he violated her First Amendment right by "providing misleading and deceptive information" to Avens. Am. Compl. at 68. This alleged conduct cannot be characterized as an integral part of the judicial process. And speaking with a victim's family "does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions." *Buckley*, 509 U.S. at 277 (holding that a prosecutor is not entitled to prosecutorial immunity for statements made to the press). So Dixon has not shown that he is entitled to prosecutorial immunity on Avens's First Amendment claim.

But Dixon is entitled to prosecutorial immunity for Avens's investigation-related claims. The Supreme Court has explained that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler*, 424 U.S. at 431 n.33. These duties "may require the obtaining, reviewing, and

14

evaluating of evidence." *Id.* A prosecutor engaged in these activities is "entitled to absolute immunity." *Buckley*, 509 U.S. at 272.

Avens's investigation-related claims involve Dixon's evaluation of evidence connected to Keisha's death and whether the evidence justified bringing criminal charges. Avens claims he should have obtained and evaluated additional evidence—including evidence from the Medical Examiner—before determining whether a crime occurred. Am. Compl. at 66–69 (describing evidence Dixon should have considered). She also claims that in making his charging decision, Dixon should have discounted certain evidence and given greater weight to other evidence. *Id.* (explaining how evidence Dixon relied on was flawed or incomplete). And she believes he should have done all of this in a timely manner. *Id.* ("Dixon, however, does not have the right to infringe upon this right by deliberately wasting years of the Plaintiff's efforts through meaningless bureaucratic maneuvers.") These activities are all core duties of a prosecutor as he determines whether to initiate criminal charges. Thus Dixon is entitled to prosecutorial immunity on these claims.

### 4. Claims Under 42 U.S.C. § 1983

Avens alleges that the Defendants violated her rights under the First and Fourteenth Amendments to the Constitution. Generally speaking, she claims they violated her First Amendment rights by impeding her ability to obtain information from Dr. Kelly regarding the cause of Keisha's death. And she claims that they violated her rights under the Fourteenth Amendment's Due Process of Law Clause by failing to conduct a proper investigation into Keisha's death and interfering with her ability to conduct her own investigation into her daughter's death. Avens also claims the Defendants violated her rights under the Fourteenth Amendment's Equal Protection Clause by engaging in racially motivated discriminatory practices.

15

The Defendants respond to Avens's claims in several ways. They all assert that Avens's claims are not cognizable under the First or Fourteenth Amendment. ECU Health also argues that it cannot be held liable under § 1983 and, if it can, Avens has not established that the constitutional violations result from an official policy or custom. Dixon and Kelly both claim that they are entitled to qualified immunity because, if Avens has alleged a violation of her constitutional rights, those rights were not clearly established at the time of the alleged violation.

This opinion will first provide an overview of § 1983 and then proceed to address the merits of the Defendants' arguments.

### a) Overview of § 1983 Claims

Federal law, under 42 U.S.C. § 1983, creates civil liability for any person acting under the color of state law who deprives a plaintiff of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. So to state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West* v. *Atkins*, 487 U.S. 42, 48 (1988); *Philips* v. *Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Under § 1983, a defendant may be sued in their individual capacity, their official capacity, or both. The capacity in which a defendant is sued determines what a plaintiff must show to prevail on that claim and what defenses a defendant is entitled to raise in response.

When a plaintiff brings an individual capacity claim, he is trying "to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky* v. *Graham*, 473 U.S. 159, 165 (1985). To do so, a plaintiff must establish that a defendant was

16

personally involved in the deprivation of the plaintiff's rights. *See Vinnedge* v. *Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

Defendants sued in their individual capacity may invoke the defense of qualified immunity. Under that doctrine, a defendant may only be held liable if two elements are satisfied. First, the defendant must have "violated a federal statutory or constitutional right[.]"*District of Columbia* v. *Wesby*, 583 U.S. 48, 62–63 (2018). And second, "the unlawfulness of their conduct was 'clearly established at the time." *Id.* Courts are free to consider whether a right was clearly established before determining whether the official violated the right at issue. *Pearson* v. *Callahan*, 555 U.S. 223, 236–42 (2009).

A right is clearly established if "at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *Wesby*, 583 U.S. at 63 (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741–42 (2011)). To meet this standard, "[t]he rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority[.]'" *Id.* (citation and quotations omitted).

A different standard applies to a defendant sued in their official capacity. A claim against a defendant in their official capacity is the same if the plaintiff has brough suit against the defendant's employer. *Kentucky* v. *Graham*, 473 U.S. 159, 165 (1985). So to establish official capacity liability, a plaintiff must show that the violation resulted from an official policy or custom of that employer. *See Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A § 1983 claim against a private corporation is also governed by this standard. *Austin* v. *Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999)

There are various ways for a plaintiff to establish an official capacity claim. An official policy may arise from written ordinances and regulations. *Carter* v. *Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (citing *Monell*, 436 U.S. at 690). Or it can stem from affirmative decisions of policymaking individuals. *Id.* (citing *Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 483–84 (1986)). And it may result from the omissions of policymakers manifesting "deliberate indifference to the rights of citizens." *Id.* (citing *Canton* v. *City of Harris*, 489 U.S. 378, 388–89 (1989)). An official custom may exist if "a practice is 'so persistent and widespread' and 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id.* (quoting *Monell*, 436 U.S. at 691).

With this background in mind, the court turns to the various arguments Defendants have raised against Avens's § 1983 claims.[3]

### b)      First Amendment – Right to Receive Information

Avens claims that the Defendants violated her First Amendment right to receive information. Am. Compl. at 52, 68, 73. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend I. The Amendment applies to the states through the Fourteenth Amendment. *Billups* v. *City of Charleston*, 961 F.3d 673, 682 (4th Cir. 2020); *Fusaro* v. *Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

The Supreme Court has recognized "that the Constitution protects the right to receive information and ideas." *Stanley* v. *Georgia*, 394 U.S. 557, 564 (1969). So, for example, courts will protect a person's "right to receive information and ideas from a willing speaker." *Stephens* v. *Cnty. of Albemarle*, 524 F.3d 485, 491 (4th Cir. 2008) (quotation omitted). Similarly, courts have recognized a First Amendment right to listen to musical performances, *Willis* v. *Town of Marshall*,

_____

[3] ECU Health argues that it cannot be held liable under § 1983 because it is not a state actor. In light of the court's resolution of the merits of Avens's constitutional claims, it need not address that argument. The same goes for ECU Health's statute of limitations argument.

18

426 F.3d 251, 260 (4th Cir. 2005), and access newspapers, *Rossignol* v. *Voorhaar*, 316 F.3d 516, 522 (4th Cir. 2003).

Based on this concept, Avens claims she has a right under the First Amendment to receive truthful and accurate information from Dixon. Am. Compl. ¶ 68. There is some appeal to this argument because one would hope that government officials, barring a compelling reason, would be honest and forthright with their constituents. But Avens has not pointed the court to a case recognizing that right. The court's independent research has not turned up any cases reaching that conclusion either. And the cases it has found are to the contrary. *See Gray* v. *Morrison*, No. 18-CV-02608, 2018 WL 4501142, at *3 (N.D. Cal. Sept. 18, 2018) ("The act complained of (i.e., telling a lie) did not violate [plaintiff's] First Amendment right to free speech."). So Avens has not established that Dixon's alleged conduct, if proven, would violate the First Amendment.

Avens's First Amendment claims against Dr. Kelly and ECU Health stand on different ground. She argues that Dr. Kelly violated her First Amendment rights by "failing to provide her expert opinion based on the evidence she received in the investigation of" Keisha's death. Am. Compl. at 73. According to Avens, "Dr. Kelly, through the nature of her job function, is ordinarily a willing speaker." *Id.* Yet because Dr. Kelly allegedly allowed ECU Health "to dictate which case(s) she was to work on[,]" she has "chill[ed] the speech of an otherwise willing speaker." *Id.*

But the problem with this argument is that, based on the Amended Complaint's allegations, Dr. Kelly was not a willing speaker. Instead, she is alleged to have "collaborat[ed] with ECU Health" to withhold information regarding Keisha's death. Am. Compl. ¶ 72. So while Avens may have some right to receive information from a willing speaker, she has not established that she has a First Amendment right to receive information from an unwilling speaker. Thus her First Amendment claims against Dr. Kelly and ECU Health fail to state a claim.

19

A more generic way of looking at Avens's First Amendment claim against Dr. Kelly and ECU Health is that she has a right to receive information from a government employee regarding their official activities. But, "[t]he Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act." *Houchins* v. *KQED, Inc.*, 438 U.S. 1, 14 (1978). In fact, *Martin* v. *E.P.A.*, a case Avens cited, explains that "the First Amendment does not require the government to provide access to information it possesses on demand, and it certainly does not require the government to gather information." 271 F. Supp. 2d 38, 48 (D.D.C. 2002). As a result, "[a] plaintiff does not state a First Amendment violation by simply claiming that he was denied government information he wanted, because there is no constitutional right to have access to particular government information, or to require openness from the bureaucracy." *Id.* (cleaned up).

The upshot of all of this is that Avens has failed to plausibly allege that Dr. Kelly or ECU Health violated her First Amendment rights. Thus they are entitled to have these claims dismissed.

### c)  Fourteenth Amendment – Equal Protection Clause

Avens also brings claims against the Defendants under the Fourteenth Amendment's Equal Protection Clause, which provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. There are three elements to an equal protection claim. To begin with, the plaintiff must allege that they were "treated differently from others with whom he is similarly situated[.]" *Morrison* v. *Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Then, the plaintiff must show "that the unequal treatment was the result of intentional or purposeful discrimination." *Id.* And finally, the plaintiff must show that the different treatment is not "justified under the requisite level of scrutiny." *Id.*

Dixon allegedly violated the Equal Protection Clause by "fail[ing] to treat Avens's reports of criminal activity the same as other reports of criminal activity[.]" Am. Compl. at 68. Avens

20

claims "Dixon failed to adhere to ethical standards and legal principles" in her case, but in other cases his "focus was on seeking the truth and acting on that truth." *Id.* at 68.

Avens's equal protection claim against Dr. Kelly is based on the assertion that the medical examiner "fail[ed] to conduct a thorough and unbiased post-mortem examination and . . . allow[ed] external influences to dictate her actions[.]" *Id.* ¶ 73. She then asserts that "she was not treated with the same impartiality and diligence that other similarly situated individuals would receive." *Id.*

And ECU Health's allegedly violated Avens's equal protection rights by engaging in "discriminatory polices and practices[.]" *Id.* at 52. Its actions were supposedly "motivated by racial animus and a desire to protect its reputation and financial interests." *Id.*

Each of these claims suffers from the same problem. Avens's claims of disparate treatment are conclusory. There are no concrete factual allegations to support her assertion that the Defendants' treated her differently from others. And the Amended Complaint lacks any non-conclusory factual allegations that their actions towards her were based on an impermissible consideration, such as her race or gender.

Avens attempts to salvage her equal protection claims by asserting, in her response briefs, that her claims survive under the class-of-one-doctrine. To state a claim under that doctrine, a plaintiff must allege "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook* v. *Olech*, 528 U.S. 562, 564 (2000).

But even under this theory, Avens's allegations are insufficient. She has failed to allege in anything more than a conclusory fashion that she was treated differently from other similarly situated individuals. So the District Court should dismiss Avens's equal protection claims.

### d) Fourteenth Amendment – Due Process Claims

Finally, Avens alleges that Dixon, Kelly, and ECU Health violated her rights under the Fourteenth Amendment's Due Process of Law Clause. That clause provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV § 1. The Clause protects procedural rights and, under Supreme Court precedent, substantive rights as well. *See Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997).

Dixon allegedly violated Avens's due process rights by failing to conduct a "fair and thorough investigation" into Keisha's death. Am. Compl. at 68. She also asserts that Dixon violated her Fourteenth Amendment right "to live her life in any lawful way she chooses" by impeding her ability to "pursue justice for the death of her daughter." *Id.* at 69.

Avens alleges that Dr. Kelly violated the Due Process of Law Clause[4] "[b]y failing to conduct a thorough and unbiased post-mortem examination and by allowing external influences to dictate her actions[.]" *Id.* at 73. As a result, Avens believes Dr. Kelly "obstructed [her] access to crucial information regarding her daughter's death." *Id.*

Her due-process-based claims against ECU Health are similar. It allegedly committed a constitutional violation when it "actively interfered with a proper investigation into her daughter's death[.]" *Id.* at 52. These actions prevented her from "obtaining crucial information" and "hinder[ed] her pursuit of justice." *Id.* And she claims that ECU Health has violated her "right to use her faculties in any lawful way she desires" by requiring her to "relentlessly fight" against ECU Health's influence in her pursuit for justice. *Id.*

---

[4] It is not clear whether Avens has actually brought a due process claim against Dr. Kelly. Her Amended Complaint says that Dr. Kelly violated her "rights to due process and equal protection." Am. Compl. at 73. But after describing Dr. Kelly's actions, it says that her acts "resulted in a denial of [Avens's] right to equal protection under the law[.]" *Id.* Out of an abundance of caution, the court assumes that Avens intended to bring a due process claim against Dr. Kelly as well.

22

As discussed above, courts have not recognized a due process right related to the quality of an investigation into a crime against another, unless the person bringing that claim was accused of committing the crime. So Dixon is entitled to have Avens's investigation-based due process claim dismissed.

That leaves Avens's claim that the Defendants violated her due process rights by impeding her ability to pursue justice for her daughter. Defining the right at issue here is challenging.

As best the court can tell, it appears that Avens is alleging she has been denied access to the courts because that had Dixon and Kelly undertaken a complete and accurate investigation into Keisha's death, it would have led to criminal charges. Am. Compl. at 74 (alleging that Kelly "violated the legal standards set forth to protect the rights of individuals seeking truth and accountability in the aftermath of potential criminal homicides."); Resp. to Dixon Mot. to Dismiss at 18 ("[T]he defendants . . . have ensured that White's death could not be vindicated."), 26 ("Dixon's predetermined decision to close the case is evident."). But, as discussed above, no such right exists.

Avens could also be alleging interference with her ability to bring a civil suit. But that claim would fare no better. While the Due Process of Law Clause protects a right of access to the courts, that right "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher* v. *Harbury*, 536 U.S. 403, 415 (2002). So "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Id.*

Yet the Amended Complaint demonstrates that Avens previously pursued and settled a wrongful death case against ECU Health related to Keisha's death in 2016. Am. Compl. at 48–49.

23

That pleading does not identify any other civil claim that Defendants have prevented her from pursuing. So Avens has failed to state a claim on this front as well. The District Court should dismiss Avens's due process claims.

### 5.     Claim Under 42 U.S.C. § 1981

Avens claims that ECU Health violated 42 U.S.C. § 1981 when it intentionally discriminated against her and impeded her ability to "effectively pursue justice" for her daughter's death. *Id.* at 44. They did this by supposedly interfering with her ability to enter into contractual agreements with various governmental actors to investigate Keisha's death. In response, ECU Health argues that she has failed to state a claim because she has not plausibly alleged raced-based discrimination or an impairment of her ability to make and enforce contracts.

The court's analysis begins, as it must, with the statute's text. Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This right extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).

A plaintiff wishing to pursue a § 1981 claim "must allege facts that, if accepted as true, allow the court to draw a reasonable inference as to" three things. *Nadendla* v. *WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022). First, "that the defendant intended to discriminate on the basis of race[.]" *Id.* Second, "that the discrimination interfered with a contractual interest." *Id.* And third, "that the interference with a contractual interest would not have happened but for the plaintiff's race." *Id.*

ECU Health first attacks the sufficiency of the Amended Complaint's allegations about race-based discrimination. The only raced-based allegations in the Amended Complaint related to Avens's § 1981 claim are that she and Keisha are both Black and that Keisha "died in [a]

24

predominantly white facility under the care of a white nurse[.]" Am. Compl. at 44. Avens goes on to allege that ECU Health's discriminatory actions were based on economic motivations and a desire to protect its reputation. *Id.* at 45–48. These allegations do not plausibly allege that ECU Health intended to discriminate against her on the basis of her race or that the alleged interference would not have occurred but for her race. *See Delon* v. *News & Observer Pub. Co.*, No. 1:05-CV-259, 2007 WL 5433774, at *6 (M.D.N.C. Nov. 5, 2007) ("Plaintiff's simply being a member of a protected class does not give rise to an actionable claim of race discrimination.").

Avens has also failed to plausibly allege that ECU Health interfered with a contractual relationship. Avens alleges that ECU Health prevented her from entering a contractual relationship with Dixon, Kelly, and the Greenville Police Department to investigate Keisha's death and that ECU Health interfered with them honoring their obligations under those contracts. Am. Comp. at 48. But death investigations are not a matter of private contract, they are a governmental function. *See Brogan* v. *United States*, 522 U.S. 398, 402 (1998) ("Certainly the investigation of wrongdoing is a proper governmental function[.]"); *State* v. *Gaines*, 332 N.C. 461, 471, 421 S.E.2d 569, 574 (1992) ("[T]he official duties of law enforcement officers . . . include[ ] such duties as investigative work[.]"). The Amended Complaint also lacks the necessary elements to establish the creation of a valid contract with any of the named entities. So Avens has not plausibly alleged that ECU Health's discrimination interfered with a contractual relationship.

Having reviewed the allegations in Avens's Amended Complaint, this opinion concludes that she has failed to state a claim for a violation of § 1981. Thus, the District Court should dismiss this claim.

### 6.    Claim Under 42 U.S.C. § 1985

Next, Avens alleges ECU Health's conduct violated 42 U.S.C. § 1985. That statute makes it illegal to conspire to violate someone's civil rights or obstruct justice. She claims that ECU Health conspired with the other Defendants "to obstruct the investigation" into Keisha's death. Am. Compl. at 54. ECU Health argues that the court should dismiss this claim because she did not plausibly allege a conspiracy or that its alleged actions were due to race-based animus.

There are several elements to a claim under § 1985. To begin with, a plaintiff must plausibly allege that a conspiracy existed involving two or more individuals. *Simmons* v. *Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). That conspiracy must be "motivated by a specific class-based, invidiously discriminatory animus to . . . deprive the plaintiff of the equal enjoyment of rights secured by the law to all[.] *Id.* The conspiracy must also "result[] in injury to the plaintiff" that is the "consequence of an overt act committed by the defendants in connection with the conspiracy." *Id.*

ECU Health challenges whether the Amended Complaint plausibly alleges that the conspiracy's alleged actions were motivated by a race-based animus. Avens specifically alleges that "ECU Health's conduct was motivated by their financial interests by seeking to protect their reputation from a potentially high-profile homicide case." Am. Compl. at 54. Since § 1985 does not apply to economically motivated conspiracies, *United Bhd. of Carpenters, Loc. 610* v. *Scott*, 463 U.S. 825, 837–39 (1983), this allegation requires the dismissal of this claim.

### 7.    Claim Under Title VI

Avens's final federal claim is based on a violation of Title VI of the Civil Rights Act of 1964. She maintains that ECU Health violated Title VI because it is a recipient of federal financial assistance and engaged in race-based discrimination against her in the provision of various benefits

26

and services. In seeking the dismissal of this claim, ECU Health argues that she did not sufficiently allege that it discriminated against her because of her race.

Title VI provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To state a claim under that provision, a plaintiff must plausibly allege that the defendant "received federal financial assistance and engaged in intentional racial discrimination." *Glenn* v. *Wells Fargo Bank, N.A.*, No. PX 15–3058, 2017 WL 371956, at *15 (D. Md. Jan. 26, 2017), *aff'd*, 710 F. App'x 574 (4th Cir. 2017).

Avens has not plausibly alleged a Title VI claim against ECU Health. Again, although Avens mentions her race in a few places within the Amended Complaint, she does not connect it to any act of discrimination. She only also states ECU Health is a predominantly white institution but provides no insight on how this connects to her claims. Thus she failed to sufficiently plead this claim. So the District Court should grant ECU Health's motion on this claim.

### 8. State Law Claims

Avens's Amended Complaint also contains several claims under North Carolina law. If the District Court adopts the recommendation that it should dismiss all of Avens's federal claims, it should decline to exercise supplemental jurisdiction over her state-law claims. These claims involve issues about the liability of state actors under state law, and thus they are best resolved by state courts.

Federal courts have limited jurisdiction to hear state-law claims. But so long as a district court has original jurisdiction over a dispute, it may exercise supplemental jurisdiction over any state law tort claims that are "part of the same case or controversy under Article III of the United

27

States Constitution." 28 U.S.C. § 1367(a). A district court, however, may decline to exercise supplemental jurisdiction over a case once it has dispensed with all the claims over which it had original jurisdiction. *Id.* § 1367(c)(3); *Shanaghan* v. *Cahill*, 58 F.3d 106, 110 (4th Cir. 1995).

This opinion recommends dismissing all the claims that created this court's original jurisdiction. After considering the interests of judicial economy, fairness, federalism, and comity, the undersigned recommends that the district court should decline to exercise supplemental jurisdiction over all of Avens' state-law claims. Her state-law claims involve questions of the liability of state actors under state law related to performance of their official acts. These questions are best answered by the state courts. Thus, these claims should be dismissed without prejudice.

### III.    Conclusion

For all these reasons, the District Court should grant Defendants' motions (D.E. 43, 47, 49) and dismiss Avens' claims against them.

The Clerk of Court must serve a copy of this Memorandum and Recommendation ("M&R") on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated:  January 30, 2025

_Robert T Numbers II_
Robert T. Numbers, II
United States Magistrate Judge