FILED

FEB 13 2025

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY ___ DEP CLK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### EASTERN DIVISION

Civil Action Number 4:24-CV-00051-M-RN

Cynthia B. Avens )
)
(Plaintiff) )
)
)
)
Faris C. Dixon, Jr., District Attorney )
Pitt County Memorial Hospital, Inc. )
Dr. Karen Kelly, Medical Examiner )
John/Jane Doe, John/Jane Doe, John/Jane Doe )
(Defendants) )

PLAINTIFF'S OBJECTION TO
DE 87 MEMORANDUM AND
RECOMMENDATION

## PLAINTIFF'S OBJECTION TO COURT'S DE 87 MEMORANDUM AND RECOMMENDATION TO MOTIONS TO DISMISS

### INTRODUCTION

Plaintiff, Cynthia Avens, respectfully submits this objection to the Court's Memorandum and Recommendation (M&R) (DE 87) regarding Defendants' motions to dismiss. The findings and conclusions in the M&R are fundamentally flawed, as they (1) mischaracterize Plaintiff's claims, (2) overlook key factual allegations and evidence, and (3) apply incorrect legal standards that, if left unchallenged, would set a dangerous precedent for civil rights violations.

The M&R improperly dismisses well-pleaded claims under the First and Fourteenth Amendments, 42 U.S.C. §§ 1981, 1983, 1985, and Title VI, despite clear allegations of due process violations, equal protection violations, obstruction of justice, and selective enforcement. The Court further ignores critical exhibits submitted by Plaintiff that substantiate these claims.

For these reasons, and as outlined below, Plaintiff objects to the M&R's misapplication of the law and requests the District Court to reject the recommendation for dismissal and allow this case to proceed.

## CORRECTIONS AND CLARIFICATIONS

1. According to the Memorandum and Recommendation ("M&R"), "*When Dixon sought a copy of the medical examiner's evaluation, Dixon would not give it to her, tell her who signed it, or tell her the date it was signed*" (DE 87 p. 3). This statement is not correct. At that time, Dixon had not sought a copy of the medical examiner's ("ME") opinion. Instead, he claimed he already possessed the ME's findings. Yet, when Avens asked basic questions about the report, he could not provide answers (DE 33, p. 32). There is a fundamental distinction between "would not" and "could not." Dixon **could not** provide this information because the report did not exist. The evidence shows that Dixon lied about possessing an ME report—this is confirmed by his subsequent decision to forward evidence to the ME on August 11, 2022 (Exhibit 9, p. 19). If Dixon had the report in July 2022, forwarding evidence to the ME a month later would have been unnecessary. His fabrication is further corroborated by his own statements to Avens in their conversation, where he admitted, "No, I can not" provide the information (DE 33 p. 32).

2. The M&R stated, "According to Lowery, the District Attorney's Office responded that the medical examiner needed to "find" the report." (DE 87 pp. 3-4). For clarification, according to Lowery, "they were told by the DA's office that they had to "find" the report." (DE 33 p 33). "They" in this context refers to Dixon's own office, not the ME's office. Dixon's office was claiming that they themselves had to find the report; the report that Dixon claimed to already have. He did not shift responsibility of finding the non-existent report to the ME's

office. As stated, **if** such a report existed, it would not have been necessary to forward evidence to Dr. Kelly at a later date. She would have already had the evidence to base her report on.

3. The Court assumes that Avens had access to the courts due to a wrongful death settlement in 2016 (DE 87 p. 9). However, this is inaccurate. During the wrongful death process, Avens was denied access to the court.

Avens retained representation from two separate counsel to handle the wrongful death of her daughter, Keisha White. The first was retained in November 2014. Not understanding the process, Avens fell victim to a Greenville attorney who wasted a full year without ever having filed the case in court despite multiple requests from Avens to do so. This particular counsel's office telephone was disconnected, and his website was shut down. The last time Avens asked him about filing the case in court, he responded, "I can't even afford to keep my phone on. I do not have the money to file this case in court." Avens fired him and hired a Charlotte law firm in November 2015, with six months remaining on the statute of limitations. Soon after, she asked them to file the case in court so it could be on record. The firm refused, explaining the potential costs in litigating the case may not be beneficial. Avens continued to ask but received the same response. Rather than file the case in court, counsel and ECU Health rushed into mediation to settle the case despite Avens's concerns that the Board of Nursing ("BON") report had not been released. This process did not fairly benefit Avens. It benefitted her counsel who saved money in litigation expenses, and it benefitted ECU Health by keeping the facts of what happened off the public record as well as forcing a settlement without full disclosure. The wrongful death settlement **was not a legal remedy**,

because Avens was not given the opportunity to have full disclosure of critical evidence, a fair adjudication of her claims in court, or an informed choice free from coercion.

4. The inclusion of Avens's requested remedies in the background section of the Court's recommendation is a clear attempt to mischaracterize Plaintiff's claims (DE 87 p. 5). Avens has never argued that this Court should compel prosecution, nor has she relied on such an argument to establish standing or jurisdiction. Remedies listed in a complaint are not dispositive of the legal claims themselves, and courts routinely disregard remedies beyond their power rather than using them as a basis for dismissal. The Court's attempt to frame Plaintiff's civil rights claims as an effort to force criminal prosecution is improper and contrary to established legal principles.

## MOTION TO DISMISS DUE TO LACK OF STANDING – DIXON

The Court's recommendation erroneously frames the central controversy in this case as whether District Attorney Faris Dixon ("Dixon") properly conducted an investigation (DE 87 p. 6). However, this is a fundamental mischaracterization of Avens's claims. Avens is not challenging Dixon's decision not to prosecute as an isolated act. At the same time, the quality of his investigation is not the core issue at hand either. Rather, she is challenging a broader pattern of civil rights violations that included obstruction, deception, selective enforcement, and deliberate indifference to justice. These ongoing violations deprived Avens of equal protection under the law and access to fair legal proceedings, both of which are protected under the U.S. Constitution.

According to Article III of the U.S. Constitution, federal courts may only adjudicate matters that qualify as a "case or controversy" under Article III of the U.S. Constitution. To meet this requirement, a plaintiff must demonstrate a "personal stake in the outcome of the controversy."

*Baker v. Carr*, 369 U.S. 186, 204 (1962). The Court has incorrectly applied this standard to the wrong controversy. The actual controversy before this court is not whether Dixon investigated Keisha White's death adequately or whether the government should be compelled to prosecute. Instead, the controversy is:

- Whether state actors, including Dixon, the SBI, and ECU Health, engaged in a pattern of obstruction and constitutional violations that deprived Avens of due process and equal protection.

- Whether Avens was unlawfully denied access to legal remedies due to state interference, deception, and procedural manipulation.

- Whether these actions created a state-sanctioned deprivation of justice that harmed Avens as she sought redress for her daughter's death.

Avens has standing because she has suffered direct harm from these actions, which extend beyond the mere failure to investigate. This case is about civil rights violations. The Court's reasoning improperly suggests that Plaintiff's claims are invalid because she has no legal right to compel an investigation. However, this mischaracterizes the nature of Plaintiff's constitutional claims.

If the Court upholds the flawed reasoning, it would effectively allow state actors to evade accountability simply by failing to act. This is not the law. The government cannot weaponize inaction to suppress civil rights. The government cannot shield itself from liability by deliberately obstructing justice and then claiming there is no standing to challenge the obstruction itself. Avens's claims are not speculative. They are rooted in documented misconduct, submitted evidence, and procedural manipulation that collectively amounts to a deprivation of constitutional rights.

**_Linda R.S_ (DE 87 p. 6)**

The case of _Linda R.S._ does not remotely apply here. In that case the "mother sued in federal court to enjoin what she believed was the discriminatory enforcement of a child support statute" (DE 87 p. 6). In that case, it was determined that her issue was with a written law that prevented the prosecutor from initiating a prosecution against her child's father. Avens is not challenging the enforcement of any law; nor is she attempting to compel a prosecution through this federal lawsuit.

Avens's civil rights claim aligns with well-established legal precedent holding that (1) state actors violate constitutional rights when they actively interfere with a person's access to justice, _Christopher v. Harbury_, 536 U.S. 403, 412-415 (2002); (2) a government entity's affirmative misconduct that increases the risk of harm may constitute a constitutional violation, _DeShaney v. Winnebago County Dept. of Social Services_, 489 U.S. 189 (1989); and (3) selective enforcement, obstruction of legal processes, and disparate treatment can constitute equal protection violations. _Village of Arlington Heights v. Metro. Hous. Dev. Corp._, 429 U.S. 252 (1977).

**Sought Remedies**

The Court's recommendation, however, mischaracterizes Avens's claims as an attempt to compel prosecution, rather than recognizing the civil rights violations at issue. To clarify, Avens reminds the Court that the remedies listed in the Damages section of her Amended Complaint (DE 33) are not remedies she seeks through judicial mandate. At the October 8, 2024, she clearly explained that any mention of a criminal investigation or special prosecutor was merely a potential negotiation point if the case proceeded—not a demand for the Court to compel prosecution (DE 75). Additionally, in her response to Dixon's motion to dismiss, she also explained, "While the Court may not be able to grant some of the non-monetary remedies sought

in the Plaintiff's complaint, the appointment of a special prosecutor and subsequent investigation into White's death can be negotiated with the Defendant" (DE 53 p. 16).

The Court is mischaracterizing the Damages section as a basis to reframe Avens's claims, which, if so, is both improper and unfair. Every civil plaintiff has the right to request relief based on the harm suffered, and those requests should not be weaponized as grounds for dismissal. Using Avens's damages request as a pretext to reclassify her claims distorts the true nature of this lawsuit, which is centered on civil rights violations—not an attempt to compel prosecution.

If the Court upholds the flawed reasoning, it would effectively allow state actors to evade accountability simply by failing to act. This is not the law. The government cannot weaponize inaction to suppress civil rights. The government cannot shield itself from liability by deliberately obstructing justice and then claiming there is no standing to challenge the obstruction itself. Avens's claims are not speculative. They are rooted in documented misconduct, submitted evidence, and procedural manipulation that collectively amounts to a deprivation of constitutional rights.

### *Love v. Bolinger* **(DE 87 p. 8)**

The court's attempt to distinguish *Love v. Bolinger*, 927 F. Supp. 1131 (S.D. Ind. 1996), from this case is flawed. While the court acknowledges that *Love* recognized a denial-of-access-to-the-courts claim where a cover-up obstructed the plaintiffs' ability to seek legal redress, it misapplies the case's reasoning in an attempt to dismiss Avens's claims.

First, the court argues that in *Love*, the plaintiffs' denial-of-access claim failed because they did not show concrete injury—meaning they did not allege that their legal claims had been hindered, devalued, or otherwise damaged by the cover-up. The plaintiffs were still able to file a wrongful death lawsuit, and therefore, their right to seek judicial redress was not obstructed.

Unlike in *Love*, where the plaintiffs could still pursue their claims without interference, Avens's ability to hold the appropriate parties accountable—both civilly and criminally—was actively obstructed. ECU Health and her former attorneys hindered her wrongful death case, while Dixon and other parties obstructed the criminal case.

Second, the court dismisses *Love* on procedural grounds, arguing that *Love* dealt with the sufficiency of allegations rather than standing and subject-matter jurisdiction. However, this distinction actually undermines the court's position rather than supporting it. If *Love* was about whether the plaintiffs had sufficiently alleged a denial-of-access claim, then Avens's claims should be subject to the same analysis—meaning they should be evaluated on their merits rather than dismissed outright for lack of standing.

Further, the court overlooks the fundamental principle in *Love*—that a cover-up that obstructs legitimate efforts to seek justice violates due process. Dixon's actions fall squarely within this precedent. The court cannot dismiss this case under *Love* without ignoring the very precedent that case established.

## ELEVENTH AMENDMENT POSITION (DE 87 p. 11)

The Court's application of Eleventh Amendment immunity is misplaced. Avens has sued Dixon and Kelly in **both their official and personal capacities**, which was clearly stated in the Amended Complaint and reiterated in her responses to their motions to dismiss. The Court's extended discussion on *Ex Parte Young* is irrelevant because Avens has not sought injunctive relief at this stage. She explicitly reserved the right to seek an injunction if warranted based on discovery findings, a position she explained at the October 8, 2024, hearing (DE 75). The Court erroneously conflates Eleventh Amendment immunity with personal capacity liability, improperly shielding Dixon and Kelly from accountability.

## DIXON'S FLAWED ABSOLUTE IMMUNITY DEFENSE (DE 87 p. 13)

A fundamental principle of absolute immunity is that the burden of proof **rests solely** on the official seeking immunity—not on the opposing party. Dixon, as the defendant asserting absolute immunity, had the obligation to demonstrate that his conduct was prosecutorial in nature and "intimately associated with the judicial phase of the criminal process." *Burns v. Reed*, 500 U.S. 478, 486 (1991). He has not done so because he **cannot.**

### Legal Standard: Burden of Proof Rests with Dixon

The Supreme Court has made clear that prosecutors do not automatically receive absolute immunity simply by asserting it. Rather, they must affirmatively prove that their actions were prosecutorial, not investigative or administrative. *Burns*, 500 U.S. at 486 (holding that "[t]he official seeking absolute immunity bears the burden of showing that immunity is justified for the function in question."). Similarly, in *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993), the Court reaffirmed that courts must "look to the nature of the function performed, not the identity of the actor" to determine whether AI applies.

Despite these clear legal standards, Dixon's Motion to Dismiss **never once** meets this burden. Instead, it merely asserts that prosecutors enjoy absolute immunity when engaged in prosecutorial functions—without proving that his own conduct falls into that category. The Court, in turn, has improperly shifted the burden away from Dixon and onto Avens, despite well-established precedent dictating that Dixon must justify his claim to absolute immunity.

### Dixon's Conduct Was Investigative and Administrative—Not Prosecutorial

The Supreme Court has consistently ruled that prosecutors are not entitled to absolute immunity when engaging in investigative or administrative functions. See *Burns*, 500 U.S. at 496 and *Buckley*, 509 U.S. at 273.

Dixon's actions never advanced beyond the investigative phase and never triggered prosecutorial protections. **At no time did Dixon move towards prosecution, initiate charges, seek an indictment, or present a case to a grand jury**. Instead, his activities consisted entirely of functions associated with law enforcement or administrative oversight. These functions include, but are not limited to: (1) Reviewing records; (2) Complying with Avens's Request for a list of evidence in 2022; (3) Reviewing the missing evidence in 2022; (4) Forwarding evidence to the Medical Examiner (ME); (5) Closing the case in 2024, citing "insufficient evidence." If law enforcement had performed any of these tasks, they would only be entitled to qualified immunity. Dixon does not receive greater protection simply because he holds the title of "prosecutor." His role in this case was investigative **at best** and administrative **at worst**, making absolute immunity inapplicable.

### Catch-22: Dixon's Own Statements Contradict Absolute Immunity

Dixon has stated, on multiple occasions, that **no crime occurred,** therefore probable cause was never identified. He said this in 2019, in 2022, 2023, and again in 2024 when closing the case. Absolute immunity is reserved for functions "intimately associated with the judicial phase of the criminal process." *Burns,* 500 U.S. at 486. If no criminal process was initiated, there is no prosecutorial function to protect. Dixon cannot simultaneously claim that Keisha White's case never met the threshold for prosecution while asserting immunity reserved for prosecutorial actions.

Moreover, the Supreme Court has also ruled that a prosecutor engaged in investigative work before a probable cause determination is acting outside of prosecutorial functions. "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." Buckley, *509 U.S. at 274.* Dixon never reached probable cause.

His own statements prove that he was never moving the case forward toward prosecution—and in fact, never intended to. Thus, **by his own admission,** his absolute immunity defense is inapplicable.

## Court's Double Standard in Applying Legal Burdens

The Court has strictly enforced the plausibility standard under *Iqbal* and *Twombly* against Avens yet has failed to hold Dixon to an equivalent legal burden. While the Supreme Court in *Burns* made clear that Dixon bears the burden of proving that absolute immunity applies, the Court has not required him to do so.

If Avens is required to meet every pleading standard without assistance from the Court, then Dixon must also meet his burden of proof without the Court stepping in to rescue his flawed defense. The Court cannot selectively impose legal standards to favor one party over the other.

## Obstruction of Justice Cannot Be Cloaked in Absolute Immunity

Even if the Court were inclined to stretch absolute immunity protections beyond prosecutorial functions, Dixon's conduct still fails to qualify. Prosecutorial immunity does not extend to acts of **sabotage, dishonesty, or obstruction of justice.**

Dixon knowingly, (1) ignored falsified records, allowing inaccurate and misleading documentation to stand unchallenged; (2) **lied** about the existence of an ME report, equating to fabrication of evidence to support a predetermined conclusion rather than seeking the truth; (3) relied on a **sabotaged** law enforcement investigation that failed to meet basic CALEA standards, despite both the Greenville Police Department (GPD) and State Bureau of Investigation (SBI) being accredited agencies; and (4) **Allowed ECU Health to interfere** with Dr. Kelly's ability to review the case. Dixon cannot claim ignorance of this interference, as the timeline itself proves his complicity.

Standard 3-3.4(c) of the American Bar Association ("ABA") states: The prosecutor

or the prosecutor's agents should seek to interview all witnesses." The ABA did not

say, "except for…" It said, "all witnesses." Witnesses includes Avens. She was not

just a complainant, but she was and is a key witness to the circumstances regarding

her daughter's death.

By allowing this blatant refusal to cooperate, Dixon **knew or should have known** that Dr.

Kelly's failure to perform her duties was not coincidental. If he truly did not know, it was <u>only</u>

<u>because he did not want to know.</u> That level of willful ignorance is not an act of advocacy—it is

an **abuse of power and an obstruction of justice.**

These actions are **not** prosecutorial functions. They are deliberate misconduct aimed at

preventing a case from ever reaching the judicial phase. There is no precedent—in any Supreme

Court or Circuit Court case—that extends absolute immunity to acts of sabotage, obstruction, or

deliberate misrepresentation.

### Other Actions That Cannot Be Protected by Absolute Immunity

The Court has isolated pieces of Avens's arguments and treated them individually,

justifying Dixon's conduct, rather than evaluating his cumulative actions as a whole. This flawed

approach distorts the true nature of Dixon's role in Keisha's case.

The Court states: "Avens claims he should have obtained and evaluated additional

evidence—including evidence from the Medical Examiner ("ME")—before determining whether

a crime occurred." (DE 87, p. 15). Dixon **himself** claimed that **he needed** an ME report to make

a charging decision. That is not on Avens. If the Court argues that Avens is merely second-

guessing his prosecutorial discretion, it is incorrect. Avens expects Dixon to do what he himself

claimed was necessary. Instead of ensuring Dr. Kelly's compliance, Dixon allowed ECU Health

to block her from reviewing the case. This is not a prosecutorial function—it is an **abdication of duty**.

The Court states: "She also claims that in making his charging decision, Dixon should have discounted certain evidence and given greater weight to other evidence." (DE 87 p. 15). This statement implies that Dixon merely weighed evidence improperly. That is not Avens's claim. Avens's claim is that Dixon relied on incomplete reports from law enforcement—reports that failed to meet basic CALEA standards that both agencies, the GPD and SBI, are accredited under. Law enforcement's actions sabotaged the investigative process, and Dixon's failure to correct or investigate further was not an act of prosecutorial discretion—**it was an investigative failure.** Dixon's role in relying on compromised evidence and allowing a law enforcement failure to stand impeded justice.

Furthermore, Dixon's own words contradict the Court's conclusion that he was acting in a prosecutorial role. In a recorded conversation on April 10, 2023 (Exhibit 9), Dixon explicitly referred to his actions as an investigation. If he was investigating, he was not prosecuting—and if he was not prosecuting, he cannot claim prosecutorial immunity. See *Buckley*.

### The Court's Fundamental Flaw

By selectively citing statements in Avens's arguments, the Court aimed to characterize Dixon's actions as merely reviewing evidence prior to making a charging decision—an activity that, if accurate, would constitute prosecutorial functions and therefore be protected by absolute immunity. The Court also acknowledges that Dixon's actions took years—and therein lies the damaging flaw. The Court's reasoning exposes two possible conclusions:

1. For Dixon's review of **existing** evidence to have taken **years**, one of two things must be true, Dixon was in fact investigating; **OR**

2. Dixon deliberately stalled the review process for years.

○ Prosecutors do not have an unlimited right to stall justice. According to the ABA 3-3.4(d), "[t]he prosecutor should not use means that have no substantial purpose other than to embarrass, **delay**, or **burden**, and not use methods of obtaining evidence that violate legal rights." When Dixon claimed to have an ME report, he delayed. When he failed to follow up with the ME regarding the report **that he said he needed**, he caused delay and burden. This resulted in Avens retaining an independent ME to do the job that Kelly neglected to do.

○ Even if his acts were prosecutorial, deliberate delays violate due process and obstruct justice, placing them outside of absolute immunity.

○ If he was not reviewing new evidence but merely sitting on the case, this contradicts the Court's assertion that Dixon was "evaluating evidence to determine whether charges should be brought."

○ The length of time itself proves that this was not a simple prosecutorial review—it was either obstruction, neglect, or an ongoing investigation.

Therefore, the Court's conclusion is fundamentally flawed. Reviewing evidence to make a charging decision **does not take years**. Dixon himself proved this in 2019 when Avens requested him to reopen the case. Despite inheriting open cases from former DA Kimberly Robb, Dixon still managed to review the case and reach a decision within months. His ability to do so then completely contradicts the notion that his years-long delays were a legitimate part of a prosecutorial review.

Moreover, in the Court's reasoning it has stepped in to justify Dixon's actions as being covered by absolute immunity, rather than addressing whatever arguments Dixon made or failed to make to prove absolute immunity applies. It is well settled that bare assertions devoid of

factual enhancement are not enough—whether made by a plaintiff or a defendant. See *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted). Although *Nemet* specifically stipulates that the Court should view facts in the light most favorable to the plaintiff, the Court has clearly done the opposite by viewing the facts in the light most favorable to the defendant.

## DIXON'S FIRST AMENDMENT VIOLATION CANNOT BE DISMISSED FOR LACK OF PRECEDENT

The Court has already determined that Dixon is not entitled to prosecutorial immunity for Avens's First Amendment claim regarding Dixon's deceptive claims by "providing misleading and deceptive information." DE 87, p. 14. Then on page 19, the Court dismisses Avens's First Amendment claim, asserting she failed to cite a relevant case law to support her argument that she is entitled to truthful information. This reasoning is **deeply flawed** for several reasons.

### The Court Acknowledges That Dixon Lied but Imposes No Consequences

The Court states that "one would hope that government officials, barring a compelling reason, would be honest and forthright with their constituents." DE 87, p. 15. However, this statement is irrelevant and legally meaningless in the face of clear evidence that Dixon **lied on multiple occasions**. He lied about possessing evidence. He lied about the reason Avens was never interviewed. He lied about whether a crime was committed with direct evidence of falsified records in his hands. Hope does not dictate legal outcomes—**facts and legal standards do**.

If the Court concedes that Dixon's deception does not qualify for prosecutorial immunity, then it must fully address the claim under the First Amendment rather than dismissing it under an artificially imposed burden on Avens.

## The Lack of an Identical Case Does Not Mean the Right Does Not Exist

The Court's reasoning relies on a flawed circular argument: *Because no previous case has ruled on this exact issue, the court cannot recognize the violation.* This is not how the law works. Courts establish new precedents by applying legal principles to new fact patterns. If legal rights could only be recognized when prior courts had already ruled on identical cases, then no precedent would ever exist.

The Supreme Court has already ruled that the right to receive information is protected under the First Amendment. See *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (holding that "the Constitution protects the right to receive information and ideas"). Courts have also upheld the right to receive information from willing speakers. See *Stephens v. County of Albemarle*, 524 F.3d 485, 491 (4th Cir. 2008). **Dixon's lies are the equivalent of <u>withholding information</u>. If he did not tell the truth, he still violated Avens's right to receive information**.

Dixon's actions directly deprived Avens of truthful, factual information that she had a right to receive. The fact that no *identical* case has been cited does not mean her right was not violated—it simply means this case should be the one to establish it.

Furthermore, the Court's reasoning that higher courts have not explicitly stated that protected information under the First Amendment must be truthful is flawed. This logic mirrors the loophole ECU Health exploited by reporting Keisha's death to the SBI instead of local law enforcement. At the motions hearing, Avens noted that the law's drafters likely assumed 'local' was unnecessary under the circumstances. It evades common sense, as well as SBI protocol. Perhaps, higher courts and drafters of the Constitution did not feel compelled to add the word, "truthful." Truth from a government agency was likely assumed.

Aitionally, courts have consistently ruled that retaliation for exercising free speech is a First Amendment violation. *Hartman v. Moore*, 547 U.S. 250 (2006). Avens's right to speak out and seek redress has been met with active deception and obstruction by Dixon—actions that constitute retaliatory conduct under established precedent. By knowingly misrepresenting the existence of critical evidence, fabricating claims of an ME report he did not possess, and failing to ensure a lawful investigation, Dixon's conduct directly hindered Avens's ability to seek justice. His deceptive tactics were not mere negligence; they were deliberate efforts to discourage and punish Avens for persistently exercising her First Amendment rights.

## The Court Has Held Avens to the Highest Standard While Holding Dixon (and et. al.) to None

Throughout the M&R, the Court has repeatedly stated that "conclusory" allegations cannot be taken as fact. Yet, when it suits the Court to absolve Dixon and Dr. Kelly, it treats Avens's conclusory allegation that "Dr. Kelly collaborated with ECU Health" as established fact. (DE 87 p. 16). This double standard cannot stand. The Court has an obligation to apply the same level of scrutiny to both parties, or it acknowledges its own bias in favor of the defendants. Avens's allegations must be evaluated under the same standard that has been used against her throughout this litigation.

## Acknowledging That Dixon's Actions Directly Impeded Avens's First Amendment Rights

Beyond simply denying her information, Dixon's lies delayed and obstructed her ability to seek redress through legal avenues. The First Amendment does not merely protect free speech—it protects access to information and access to the courts. Dixon's false statements interfered with both. For example, when Dixon realized that Avens had not been interviewed as a witness to the events surrounding Keisha's death, according to the ABA, it was his responsibility

to ensure that such an interview took place; not lie to Avens, claiming she was never interviewed because no one thought Keisha's death was criminal at the time. This is not the standard. Because the Court asserts that Avens assumes that charges would have been filed if a complete investigation had taken place, ignores the other end of the spectrum that questions "How does the Court (or anyone else) know that a full investigation would NOT have resulted in criminal charges.

By failing to require law enforcement to conduct a proper investigation and refusing to allow Avens to provide critical information via investigative interviews, Dixon actively hindered her ability to contribute to the investigative process, further obstructing justice. See Exhibit 9 (CALEA standards on investigative procedures).

## FIRST AMENDMENT VIOLATION – DR. KELLY AND ECU HEALTH (DE 87 p. 18)

The Court's reasoning for dismissing the First Amendment claim against Dr. Kelly and ECU Health is deeply flawed. The Court's argument rests on the premise that Kelly was an unwilling speaker but reached this conclusion by selectively picking statements while ignoring key facts and legal mandates that contradict the Court's position.

**Dr. Kelly's Silence Was Not Voluntary—It Was Forced.**

The Court asserts that Avens cannot claim a First Amendment violation because Dr. Kelly was not a "willing speaker." However, this reasoning fails for two reasons:

- First, Dr. Kelly's lack of cooperation was not a personal choice but rather a direct result of external influence and pressure. Avens's complaint and supporting evidence make clear that Kelly did not operate independently in withholding information. Her own office manager stated that she would have to speak to "Risk and the attorneys" to see what she would be "allowed" to do. The use of the word "allowed" demonstrates that Kelly was not exercising

independent discretion—she was being blocked by external forces, namely ECU Health's legal team and risk management.

- Second, Dixon himself acknowledged that an independent medical examiner (IME) could not be used because jurors would expect an opinion from the local ME—Dr. Kelly, whom he "typically" utilized. This directly contradicts Numbers's claim that Kelly was an unwilling speaker (DE 33 at 119). Dixon's statement proves that Dr. Kelly was the expected and proper source of information in cases like this, meaning she would normally be a willing speaker. The only difference here is that Kelly's cooperation was intentionally obstructed.

## The Law Mandates That Kelly Provide Information—She Had No Right to Withhold It.

The Court relies on *Martin v. EPA* to argue that Avens had no right to demand information. However, this argument completely ignores North Carolina law, which **required** Dr. Kelly to provide information regarding Keisha's death.

- North Carolina General Statutes (NCGS) impose a legal duty on the medical examiner to investigate deaths under certain circumstances. Dr. Kelly's refusal to fulfill that duty is not protected by any First Amendment loophole—it is a legal failure that cannot be excused by simply calling her an "unwilling speaker."

- The Court fails to distinguish between discretionary government information and legally mandated duties. This is not a case where Avens simply wanted access to government records. Dr. Kelly was legally obligated to conduct an independent review and provide her findings, yet she deliberately failed to do so. This is not about forcing a government actor to speak—this is about ensuring a government actor fulfills their statutory duty.

## The Court's Argument is Based on a False Premise—Kelly's Willingness is Irrelevant.

Even if the Court were to assume Kelly was an unwilling speaker, the Court's argument still falls apart because Kelly's duty to provide medical determinations regarding Keisha's death is not discretionary.

- The First Amendment does not shield government officials from accountability when they obstruct mandated processes. Dr. Kelly's refusal to provide information was not an act of personal discretion; it was an abandonment of duty.

- The Court attempts to redefine this case as if it were about a journalist demanding information from a government office. That is not what happened here. This case involves a medical examiner whose job requires her to provide objective, fact-based determinations regarding the manner and cause of death.

- The Court's reliance on *Martin v. EPA* is misplaced because that case concerned general government transparency laws, not legally mandated death investigations. The Court's attempt to stretch *Martin* to cover this situation is an abuse of legal reasoning.

**The Court Cannot Dismiss This Claim Without Creating a Dangerous Precedent.**

If the Court excuses Kelly's failure to provide legally mandated information under the guise of First Amendment protections, it will be setting a dangerous precedent:

- This ruling would empower government officials to hide behind "unwillingness" as a defense to obstruct transparency and avoid fulfilling their legally mandated duties.

- It would also reward collusion between medical examiners and powerful institutions like ECU Health, allowing them to dictate which cases receive attention and which are buried. That in itself is horrifying! Such a precedent would allow anyone in the medical profession (and potentially other professions) to kill at will if they so desire, because they could simply tell the ME to ignore the case. Likewise, and equally horrifying is the potential ability for

healthcare entities (and others) to simply tell the ME what to write in their report as well as what to write on the death certificate. There are laws and policies on the books for a reason. No court should support such a miscarriage of justice, especially at this level.

**If a medical examiner can ignore evidence, refuse to communicate, and obstruct an investigation without consequence, then the integrity of death investigations in North Carolina—and beyond—is compromised.**

## FOURTEENTH AMENMENT EQUAL PROTECTION CLAUSE (DE 87 p. 20)

### The "Conclusory" Excuse: Selective Application of Standards

The Court is selectively choosing when to apply the standard for conclusory claims. Avens's Amended Complaint **did** provide factual allegations supporting her Equal Protection claims—The court is choosing to ignore them.

If Dixon has managed other homicide cases with thorough investigations, including following up on leads, obtaining statements from witnesses and suspects, and securing timely reports from Dr. Kelly without tolerating interference from individuals, then the handling of Keisha's case and Avens's complaint demonstrates clear disparate treatment. The standard does not require a plaintiff to have direct evidence of discriminatory intent—circumstantial evidence and patterns of behavior can prove it.

Avens demonstrated in her pleadings that standard procedures were ignored in Keisha's case. Courts have long recognized that discrimination is rarely proven through direct evidence or a "smoking gun" admission. Instead, it is most often demonstrated through circumstantial evidence, patterns of behavior, and deviations from standard procedures. As noted in *Parrish v. Sollecito*, 253 F. Supp. 2d 713 (S.D.N.Y. 2003), it would "eviscerate the purposes and do

violence to the spirit of the discrimination laws" to dismiss a case simply because a plaintiff lacks direct evidence of misconduct, particularly when relevant evidence is controlled by the defendant. Dismissing Avens's claims at this stage denies her the opportunity to uncover and present additional evidence that may further support her allegations.

**The Role of the Jury in Discrimination Cases**

Courts have recognized that the ultimate determination of discrimination is often a question for the jury. As stated in *Norton v. Sam's Club*, 145 F.3d 114 (2d Cir. 1998), "[A] case may be built entirely out of circumstantial evidence," and the assessment of such evidence is a matter of credibility and inference best suited for the jury. By prematurely dismissing Avens's claims, the Court denies her the opportunity for a jury to evaluate the totality of evidence and make the appropriate determination of whether discrimination occurred.

**Dixon's Violation of Equal Protection**

Avens's Equal Protection claims against Dixon are not "conclusory." They are grounded in facts that demonstrate a clear departure from standard practices in homicide investigations. In determining whether Avens's civil rights were violated, the Court should allow these questions:

- **Does Dixon typically lie about the evidence he has in his possession?**
  - If the answer is, "yes," he admits to about 16 years of violating a plethora of laws, regulations, and standards; including but not limited to obstruction of justice.
  - If the answer is, "no," he admits that he treated Avens differently, thus violating her rights to due process, equal protection, access to the courts, and freedom of speech in her right to gather information.

- **Does Dixon typically accept flawed and incomplete police reports that do not comply with C.A.L.E.A. standards, in particularly from agencies accredited by C.A.L.E.A., such as the Greenville Police Department and the NC State Bureau of Investigations?**
  - If the answer is, "yes," he admits to about 16 years of violating a plethora of laws, regulations, and standards; including but limited to obstruction of justice. Additionally, he reveals that it is typical for law enforcement to disregard standard procedures governed by the very agency that accredits them, C.A.L.E.A.
  - If the answer is, "no," he admits that he treated Avens differently, thus violating her rights to due process, equal protection, access to the courts, and freedom of speech in her right to gather information.
- **Does Dixon typically fail to follow up on leads before deciding whether he will prosecute, including leads where there is evidence of another crime involved, such as the falsification of medical records or any other records?**
  - If the answer is, "yes," he admits to about 16 years of violating a plethora of laws, regulations, and standards; including but limited to obstruction of justice.
  - If the answer is, "no," he admits that he treated Avens differently, thus violating her rights to due process, equal protection, access to the courts, and freedom of speech in her right to gather information.
- **Does Dixon typically allow non-cooperation with his investigations, including non-cooperation from the ME and law enforcement?**
  - If the answer is, "yes," he admits to about 16 years of violating a plethora of laws, regulations, and standards; including but limited to obstruction of justice. He also acknowledges weakness in exercising his authority.

- If the answer is, "no," he admits that he treated Avens differently, thus violating her rights to due process, equal protection, access to the courts, and freedom of speech in her right to gather information.

- **Does Dixon typically expect the ME to participate in his homicide investigations?**

  The answer to this question is answered in Avens's amended complaint (DE 33 p. 32 at 119) where she described a conversation between her and Dixon. After Dixon lied about having an ME report, Avens asked him if she could hire an independent ME for his consideration. "His response was that he could not use an IME because it might raise questions from jurors as to why he did not utilize the services of the local ME, **whom he typically utilized**." Yet, it is clear that Dixon never required Dr. Kelly's cooperation nor participation in **this** case: the case involving the killing of Keisha White.

- **Does Dixon typically ignore criminal conduct once he has evidence supporting that a crime did occur?**

  - If the answer is, "yes," he admits to about 16 years of violating a plethora of laws, regulations, and standards; including but limited to obstruction of justice.

  - If the answer is, "no," he admits that he treated Avens differently, thus violating her rights to due process, equal protection, access to the courts, and freedom of speech in her right to gather information.

- **Does Dixon typically close homicide cases after a homicide has been identified by a licensed ME?**

  - If the answer is, "yes," he admits to about 6 years of violating a plethora of laws, regulations, and standards; including but limited to obstruction of justice.

- If the answer is, "no," he admits that he treated Avens differently, thus violating her rights to due process, equal protection, access to the courts, and freedom of speech in her right to gather information.

- **Are interviews of complainants, witnesses, and suspects typically part of his investigative process when a homicide (or even a potential homicide) has been reported to him?**
  - If the answer is, "no," he admits to about 16 years of violating a plethora of laws, regulations, and standards; including but limited to obstruction of justice. He also acknowledges that it is typical for him to accept flawed law enforcement reports that do not include minimal standards of the investigative process.
  - If the answer is, "yes," he admits that he treated Avens differently, thus violating her rights to due process, equal protection, access to the courts, and freedom of speech in her right to gather information.

- **Does Dixon typically allow outside influence (whether it be from a parent of a suspect, a drug boss, or an institution) to dictate his investigative process or the process of any investigation he relies on before making his charging decision?**
  - If the answer is, "yes," he admits to about 6 years of violating a plethora of laws, regulations, and standards; including but limited to obstruction of justice. He would also acknowledge that he allows and/or accepts illegal interference by ECU Health and others who have interfered with a criminal investigation.
  - If the answer is, "no," he admits that he treated Avens differently, thus violating her rights to due process, equal protection, access to the courts, and freedom of speech in her right to gather information.

These are fundamental questions that should be considered before making a decision to dismiss Avens's claims of equal protection, due process, and freedom of speech violations. Dixon's handling of Keisha's case raises serious questions about his adherence to investigative standards. If this conduct represents standard practices in his office, it casts doubt on his competency and fitness for office. Alternatively, if it is not standard, then his actions in this case were clearly a departure from proper procedure, indicating unequal treatment and a violation of Avens's rights.

## Kelly's Equal Protection Violation

Dr. Kelly's actions similarly demonstrate unequal treatment and a failure to fulfill her statutory obligations under North Carolina law (N.C.G.S. §§ 130A-383 and 130A-385). Her failures in Keisha's case were not optional. The state of North Carolina said suspicious deaths must be reported to and reviewed by the ME. Therefore, unless Dr. Kelly habitually ignores these NC statutes, she did in fact treat the case of Keisha White differently than the way she typically handles cases regarding suspicious deaths and potential homicides. The same variation of questions asked above apply to Dr. Kelly as well.

Additionally, as stated earlier, **Dixon** said he **typically** utilizes Dr. Kelly in his homicide investigations as he claimed he could not use an independent ME as his expert witness during trial. The Court's assertion that Avens has not provided sufficient factual allegations to support her Equal Protection claim ignores the plain facts.

## ECU Health's Violation of Equal Protection

Just as what has been said regarding Kelly and Dixon, the same holds true for ECU Health – Does this defendant typically adhere to state legislature and other legal policies and requirements when handling suspicious deaths at their facility? Does ECU Health **typically** report suspicious deaths to non-local SBI agents, rather than to local law enforcement? Is it

**typical** for ECU Health to control (potential or otherwise) homicide investigations conducted by law enforcement? Does ECU Health **typically** interfere with the ME's office, control who the office is permitted to speak with, and control which deaths the ME should or should not investigate? These are only a few of the questions ECU Health should be required to answer.

If ECU Health answers "yes" to any of these questions, it would not only validate systemic misconduct but also expose a pattern of obstruction and disregard for state laws. Such admissions would indicate that ECU Health's actions are not isolated but part of a broader failure to uphold legal and ethical obligations.

Conversely, if ECU Health answers "no" to these questions, it confirms that the handling of Keisha's case was an anomaly and that Avens was treated differently from others similarly situated. Such disparate treatment underscores the violation of Avens's constitutional right to Equal Protection under the law.

**CLASS OF ONE (DE 87 p. 21)**

The Court's assertion that Avens's allegations are "conclusory" and insufficient under the class-of-one doctrine mischaracterizes the detailed factual allegations in her Amended Complaint. Unless the defendants can demonstrate that their actions followed any legal protocol or mandate, their conduct stands as a glaring example of differential treatment without rational basis. This is not speculation—it is a direct challenge to actions that defy professional and legal standards.

Generally speaking, it is not expected for a prosecutor to lie about evidence, withhold truthful information from witnesses, family members, and complainants, or possess evidence of criminal activity while simultaneously claiming no crime occurred. These actions are not just

departures from standards—they are outright contradictions of the prosecutor's obligations to justice, fairness, and transparency under the law.

Dixon's selective obstruction and misrepresentation lack any rational basis, making this a textbook class-of-one violation. Courts have long held that government officials cannot treat an individual differently from others similarly situated without a legitimate reason (*Village of Willowbrook v. Olech*, *528 U.S. 562 (2000)*). Dixon's actions were arbitrary and malicious, designed to block Avens's access to justice while allowing others to seek fair treatment.

Similarly, it is not expected that a hospital—arguably one of the safest places on earth—will cover up a patient's death resulting from criminal negligence or to falsify a decedent's death certificate. It is equally unfathomable for a medical facility to control the very entity (the medical examiner) responsible for determining cause and manner of death. Even if such influence is attempted, no one expects a licensed medical examiner to abandon their statutory duties and acquiesce to such interference.

The Court's failure to recognize these realities risks creating a dangerous precedent. If this case is dismissed based on the flawed reasoning presented, it could erode public trust in the very institutions tasked with upholding justice. The legal system cannot function if such actions are normalized or excused. This is not mere hyperbole—it is a foreseeable consequence of excusing misconduct and failing to hold government entities accountable for adhering to their legal and professional obligations.

**Purposeful Discrimination**

Purposeful discrimination, as required under the class-of-one doctrine, does not necessitate animosity based on a protected class but instead focuses on intentional and irrational differential treatment. See *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The defendants' actions demonstrate clear intent to deviate from standard practices without any rational basis. This is evident in their failure to follow established procedures for investigating suspicious deaths, their targeted obstruction of justice, and their active suppression of information crucial to the case. Such actions cannot be considered accidental or routine—they reflect deliberate choices that denied Avens the same level of justice and accountability afforded to others in similar circumstances.

If the defendants' conduct were truly standard, as the Court suggests, it would call into question the integrity of their entire operations and the validity of their handling of other cases. However, the irrational and deliberate nature of their deviations in this case strongly supports Avens's allegations of purposeful discrimination.

## FOURTEENTH AMENDMENT DUE PROCESS CLAIMS (DE 87 p. 22)

The Court's M&R relies heavily on cases such as *Graves-Bey v. City & County of San Francisco* and *Community for Creative Non-Violence v. Pierce* to assert that Plaintiff lacks standing to challenge the decision not to investigate or prosecute Linda Brixon and Elizabeth Everette. However, this analysis is flawed for several reasons. Avens's claim is not about compelling prosecution or investigation. It is about state actors engaging in affirmative misconduct that obstructed justice and deprived her of due process.

### The Court Misapplies *Graves-Bey* and Similar Cases

The Defendants' obstruction violated Avens's procedural due process rights by depriving her of a meaningful opportunity to be heard and to seek redress. Procedural due process requires that individuals be given notice and a fair opportunity to challenge state action (*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). By actively interfering with investigations, withholding critical information, and misrepresenting facts, Defendants deprived Avens of a legitimate

process to seek accountability. The Supreme Court has recognized that due process is violated when government actors affirmatively block access to justice (*Christopher v. Harbury*, 536 U.S. 403, 412-415 (2002)).

Additionally, the Court's reliance on *Graves-Bey* and *Community for Creative Non-Violence* is misplaced. Those cases involved plaintiffs who sought to compel the government to prosecute or investigate third parties, a request federal courts have consistently held lacks standing. However, Avens does not seek an order directing the prosecution of any individual. Instead, she challenges affirmative state misconduct—including deception, suppression of evidence, and obstruction—committed by government officials and state-aligned entities such as ECUH and Dr. Kelly.

Unlike the plaintiffs in Graves-Bey, who merely sought a prosecution, Avens was directly deprived of access to justice through a series of intentional acts by the DA's Office, ECUH, and Dr. Kelly that prevented her from obtaining critical information necessary for legal redress. This places her claim firmly within the scope of procedural and substantive due process violations.

### The State Did Not Simply "Decline to Investigate"—It Actively Interfered

The Court's recommendation assumes that Avens's due process claim is based solely on an alleged failure to thoroughly investigate or prosecute. However, Plaintiff's claim is not about inaction—it is about obstruction and manipulation by state actors. The DA's Office, ECUH, and Dr. Kelly engaged in **affirmative conduct** that directly impaired Plaintiff's ability to seek justice. For example:

- ECU Health withheld material information before mediation in 2016, which prevented Avens from making an informed decision regarding the settlement agreement. Similarly, they withheld access to relevant personnel during the November 2014 GPD and SBI investigation.

Then, they required Dr. Kelly and her entire office to do the same thing from 2022-2023—**withhold information, specifically, from Cynthia Avens.**

- Faris Dixon actively worked to obstruct justice. Everything he did to evade accountability and everything he failed to do to uphold justice was directly contrary to the duties and expectations of a prosecutor. The *Brady* decision was based on the concern that some prosecutors might withhold exculpatory evidence to win a case. However, the Supreme Court has not addressed cases where a prosecutor sabotages their own case to prevent prosecution despite clear evidence.

This case presents a new and alarming issue of prosecutorial misconduct and therefore should NOT be held to the same standards as previous cases that have not addressed this issue. The Court cannot rely on traditional prosecutorial discretion principles because those cases assume a prosecutor is exercising their authority in good faith. Here, the prosecutor did not merely fail to act—he actively worked against the pursuit of justice. This is an abuse of power that the Supreme Court has not yet addressed, and dismissing this case without consideration of these new implications would set a dangerous precedent."

The actions of the defendants constitute more than mere nonfeasance; they amount to misfeasance and malfeasance—affirmative acts that obstructed due process and Avens's ability to seek redress. Courts have long held that when the government or state-aligned entities actively interfere with a person's ability to access justice, a valid due process claim exists.

### The Right to Due *Process Extends Beyond Criminal Prosecution*

The Court incorrectly assumes that Avens's due process claims depend on the government's decision to prosecute. However, due process protections are not limited to

prosecutorial discretion—they extend to an individual's right to access the courts, obtain fair legal proceedings, and be free from state-imposed deprivations of liberty and property.

In this case, Avens was deprived of a fair opportunity to seek redress because of state deception and obstruction. Key legal precedents support the argument that due process violations occur when government actors:

- Withhold exculpatory or material evidence (*Brady v. Maryland*, 373 U.S. 83 (1963)).

- Interfere with legal redress or suppress evidence that would have altered the outcome of legal proceedings (*Christopher v. Harbury*, 536 U.S. 403 (2002)).

- Engage in affirmative actions that increase the risk of harm or obstruct due process (*DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989), which acknowledges the state's role in increasing harm through affirmative misconduct).

Here, Avens was denied access to key information that would have allowed her to pursue legal remedies. This directly undermines her procedural and substantive due process rights.

## The State-Created Danger Doctrine Applies

The state-created danger doctrine holds that when a government entity affirmatively places an individual in danger or obstructs justice, it can be liable for violating due process. Plaintiff's case aligns with this doctrine because:

- State actors actively prevented accountability for Brixon and Everette. While Brixon's employment was terminated, she still has the ability to reapply for her nursing licensure and re-enter the workforce as a registered nurse. However, Everette was never disciplined, bringing forth a relevant question: How many other medical records has Everette falsified to protect a healthcare entity or otherwise obfuscate a patient's true cause of death or injury?

- ECUH and the DA's Office created barriers that prevented Avens from pursuing legal recourse in both civil and criminal contexts.

- The deliberate failure to investigate and prosecute was not a passive omission but an active choice to protect white medical staff while blaming Avens for demanding fair treatment, and worse, blaming Keisha for her outcome.

**The Court's Reasoning Creates a Dangerous Precedent**

By accepting the Magistrate Judge's reasoning, this Court would establish a dangerous precedent that allows government actors to obstruct justice, suppress evidence, and selectively enforce accountability without consequence. This is not just about one failed investigation—it is about the right of individuals to seek justice when the state actively impedes it.

Dismissing this claim would signal to other government entities that they can manipulate investigative processes and mislead victims with impunity. The Due Process Clause guarantees certain procedural safeguards to prevent arbitrary or unfair actions by state actors.

Avens has demonstrated that Dixon and Kelly's deliberate failures violated these safeguards. Therefore, the Court should reject the M&R's recommendation for dismissal and allow Plaintiff's due process claims to proceed.

## SECTION 1981 CLAIM – ECUH'S DISCRIMINATORY INTERFERENCE WITH LEGAL REDRESS (DE 87 p. 24)

**ECUH's Discriminatory Animus is Plausibly Alleged**

The Court dismisses Avens's § 1981 claim by arguing that her allegations focus on ECUH's economic motivations and reputation concerns rather than explicit racial animus. However, **discrimination is rarely overt**—it is often intertwined with financial and institutional motives.

The Court is improperly dismissing circumstantial evidence—hospitals do not *admit* to racial bias, but their **patterns of action** reveal discrimination.

In *Jiminez v. Mary Washington College*, 57 F.3d 369 (4th Cir. 1995), the court held that once an entity accepts an individual (such as an employer hiring an employee), it assumes a duty to protect them from racial animus. Here, ECUH accepted Keisha White as a patient but failed to ensure she was treated without racial bias, then shielded her abuser from accountability. The protection of white personnel at the expense of Keisha and Avens demonstrates an invidious pattern of discrimination.

## ECUH Interfered with Avens's Right to "Make and Enforce Contracts"

The Court argues that death investigations are a government function and therefore not contractual in nature. However, § 1981 does not require a formal contract—it also protects the right to negotiate and enforce agreements, including those related to legal redress.

Avens sought to establish a legal process to hold ECUH accountable—ECUH obstructed that process by suppressing information, manipulating reports, and influencing the investigation.

Implied contractual relationships exist in wrongful death proceedings, settlements, and legal investigations—ECUH's interference prevented Avens from effectively engaging in this process.

By shielding white medical personnel and obstructing investigations, ECUH selectively enforced legal rights based on race.

## The Court's Interpretation of § 1981 is Too Narrow

The Court dismisses circumstantial evidence despite longstanding precedent that discrimination is rarely proven through direct evidence. In *Parrish v. Sollecito*, 253 F. Supp. 2d 713 (S.D.N.Y. 2003), the court recognized that circumstantial evidence and deviations from standard procedures can demonstrate discrimination. Dismissing this claim without discovery is

improper—circumstantial evidence, institutional protectionism, and procedural deviations must be fully examined.

Avens has plausibly alleged that ECUH engaged in racial discrimination by interfering with her ability to seek justice, shielding white personnel, and deviating from standard investigative and medical procedures. The Court cannot dismiss this claim based solely on the lack of explicit racial remarks when the pattern of discrimination is well-documented through actions and omissions. This claim warrants further proceedings and discovery, as premature dismissal would shield ECUH from accountability.

## CLAIM UNDER 42 U.S.C. § 1985 (DE 87 p. 26)

The Court's recommendation to dismiss Plaintiff's claim under 42 U.S.C. § 1985 is based on two flawed conclusions: (1) that Plaintiff failed to plausibly allege a conspiracy involving multiple actors and (2) that Plaintiff failed to demonstrate race-based discriminatory animus. The record, including submitted evidence that the Court has wholly ignored, directly contradicts these conclusions.

### The Court Incorrectly Concludes That No Conspiracy Existed

Under *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995), a claim under § 1985 requires the Plaintiff to demonstrate a conspiracy involving at least two individuals who have acted in concert to deprive the Plaintiff of their civil rights. The Court dismisses Plaintiff's allegations as conclusory without properly considering the substantial evidence demonstrating the existence of a conspiracy.

### The "Meeting of the Minds" and Coordination Between Defendants

Plaintiff has sufficiently alleged and provided evidence of a coordinated effort by ECU Health (ECUH), DA Dixon, Dr. Kelly, and law enforcement agencies to obstruct the investigation into

Keisha White's death and to shield white medical personnel from accountability. The following facts illustrate this coordinated effort:

In the SBI's improper early involvement after ECU Health purportedly filed a complaint with three non-local agents in May or June 2014. Rather than redirect ECU Health to local law enforcement, they maintained communications with Vicki Haddock, ECU Health's risk manager, and relayed information they received from Avens to Haddock. This was explained in Avens's pleadings, as well as at the Motions Hearing on October 8, 2024.

The district attorney's office falsely claimed that an SBI investigation had taken place as evidenced in an email from former GPD Chief Hassan Aden on September 13, 2014 (Exhibit 6). If an SBI investigation had occurred, the same agents would have been assigned to the November 2014 joint GPD/SBI investigation. Instead, an entirely different SBI agent was brought in, proving that no earlier SBI investigation existed. Avens submitted this email into evidence, yet the Court has ignored it.

The conspiracy extended into the joint GPD-SBI investigation in November 2014 when ECU Health controlled the scope of their investigation. Considering that these agencies are trained to comply with C.A.L.E.A. standards, their failure to interview witnesses, suspects, and Avens— who was both a witness and the complainant—could only occur with a meeting of the minds to ignore standard protocol.

ECU Health's ability to control both the ME's office and the ME, demonstrate a meeting of the minds. The same can be said for Dixon's failure to investigate properly, while making a charging decision based on a corrupt law enforcement investigation. Is such conduct standard in his office?

All of the above share the same common flaw – **Each of the entities named had the power and authority to override ECU Health's domination, yet none of them did.** The cumulative effect of these actions demonstrates a **clear "meeting of the minds"** between these actors. The fact that each agency and official deferred to ECUH's control rather than conducting independent investigations proves that this was not a series of isolated incidents, but a coordinated effort to suppress the truth.

**The Court Wrongly Dismisses the Presence of Racial Animus**

The Court erroneously concludes that Plaintiff has not demonstrated race-based discriminatory animus because ECUH's alleged motivation was to protect its financial interests and reputation. However, economic interests and racial discrimination are not mutually exclusive.

ECU Health shielded white medical staff (Brixon and Everette) from accountability of their actions. Yet, ECUH Health holds Avens accountable for actions they do not agree with even if their allegations are false. For example, claiming that the current action is barred by the 2016 wrongful death agreement when they introduced it in their motion to dismiss. They further asserted that Aven's amended complaint was "silent" regarding the agreement's consideration. When Avens presented the agreement to the Court as evidence that ECU Health had lied about its scope, they sought to have Avens strike it from the record before ultimately filing a motion to seal the record.

ECU health also lied when they claimed the stature of limitations had run when they knew their actions extended into 2023. These false allegations were made in their effort to hold Avens accountable for filing this civil lawsuit.

ECU Health further held Avens accountable for using the ME's office to prove Dixon lied about possessing a report that he did not have. This is not conclusory, because the next time Avens contacted the ME's office, she was told that the office worker was directed to explicitly direct Avens to ECU Health's risk management – a targeted act by ECU Health.

In the 2016 mediation, ECU Health coerced Avens to settle by threatening to use unproven theories about Keisha's condition against her, holding Keisha accountable for her outcome. Meanwhile, Linda Brixon and Elizabeth Everette remain protected from the judicial system due to ECU Health's failures and control over government authorities.

**Discriminatory Animus Does Not Have to Be the Sole Motive**

In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Supreme Court made clear that racial animus does not have to be the only motivation—only a substantial factor. Here, ECUH's financial interests were served by shielding white personnel from accountability, which directly harmed Avens.

The Court's reliance on *United Bhd. of Carpenters, Loc. 610 v. Scott, 463 U.S. 825 (1983)* is misplaced, as Avens does not argue that ECUH's actions were solely economic but rather that racial discrimination played a key role in how ECUH selectively protected white personnel while denying justice to a Black patient.

**The Court's Failure to Acknowledge Submitted Evidence**

It is apparent that the Court has failed to consider the numerous exhibits Avens submitted that directly contradict its conclusions. This includes letters, emails, recorded telephone call transcripts, NC general statutes, and a screenshot of the SBI's contact page indicating that reports out of their jurisdiction are to be filed with relevant local law enforcement agencies. This selective treatment of the record undermines the legitimacy of the Court's recommendation and

raises serious concerns about procedural fairness. The Court's reliance on flawed reasoning and its refusal to acknowledge key evidence renders the dismissal recommendation improper.

## CLAIM UNDER TITLE VI (DE 87 p. 26)

The Court's recommendation to dismiss Plaintiff's Title VI claim under the Civil Rights Act of 1964 is based on an erroneous conclusion that Avens failed to connect race to the discrimination she experienced at ECUH. However, the evidence and pleadings clearly demonstrate that ECUH's actions were racially motivated, as they provided preferential treatment to white medical staff while targeting Avens for punitive legal action.

### The Legal Standard for Title VI

Under 42 U.S.C. § 2000d, a plaintiff must show that: (1) the defendant receives federal financial assistance (which is undisputed in this case), and (2) the defendant engaged in intentional racial discrimination in the provision or denial of benefits or services.

The Court's conclusion that Avens did not adequately allege racial discrimination fails to acknowledge the clear evidence of disparate treatment and selective accountability that ECUH imposed on Avens and her daughter, Keisha White.

### ECUH's Selective Protection of White Medical Personnel and Targeting of a Black Mother

ECUH's discriminatory treatment of Avens and Keisha White compared to its white employees and patients constitutes intentional racial discrimination under Title VI. The following evidence clearly demonstrates that race was a determining factor in ECUH's actions:

1. ECU Health protected white medical personnel but punished avens for seeking justice. If ECUH's actions were not race-based, why did white staff receive protection while Avens, a Black mother, was actively punished?

2. ECU Health refused to report Brixon and Everette's misconduct, lied to the Board of Nursing (BON) about Brixon's conduct and prior disciplinary history while failing to report Everette at all, yet every time Avens took a step to seek accountability, ECU Health stepped in to close the door to each avenue, and are attempting to do the same thing here with this case.

3. ECU Health blamed a black patient for her own death while covering for white staff. This is not a new allegation. It is part of the coercion that occurred in the 2016 mediation. Though mediation is typically private, Avens believes it is absolutely necessary to document the coercion on the public record, as secrecy has been ECU Health's primary weapon in covering up the circumstances of Keisha's death for nearly eleven years.

To put it into perspective, one's conversations in private are assumed to remain private. Yet, if someone uses the privacy to reveal criminal conduct such as tax evasion or an armed robbery, authorities expect such activity to be reported. Everything is not meant to remain confidential, **especially** when criminal activity is involved.

**Disparate Treatment as Evidence of Intentional Discrimination**

The Court's reasoning ignores established legal precedent that recognizes disparate treatment as evidence of racial discrimination under Title VI. Direct racial slurs or explicit admissions of bias are not required to prove discrimination. Courts have long acknowledged that disparate treatment, favoritism toward one race, and suppression of another can establish intentional discrimination.

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977): Discrimination claims can be proven through patterns of decision-making that reflect racial bias.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): Discrimination may be inferred when a plaintiff is treated differently from similarly situated individuals of a different race without a legitimate reason.

*Alexander v. Sandoval*, 532 U.S. 275 (2001): Title VI prohibits intentional discrimination and allows claims based on policies or actions that result in racially discriminatory outcomes.

**The Court's Failure to Consider Submitted Evidence**

The Court failed to acknowledge multiple exhibits and evidence that clearly demonstrate ECUH's disparate treatment of Avens and her daughter compared to white individuals. This includes but is not limited to falsified medical records, documentation proving Brixon and Everette's misconduct, documentation showing ECUH's manipulation of the BON to protect white staff, and legal filings in this case demonstrating ECUH's retaliatory actions against Avens while shielding white employees from scrutiny.

By ignoring this evidence, the Court erroneously concludes that Avens did not plausibly allege racial discrimination under Title VI. The record tells a different story. The Court's conclusion that Avens did not adequately allege racial discrimination is fundamentally flawed. Dismissal at this stage would only serve to reinforce the very discrimination Title VI was designed to prevent.

The Court did not address Avens's Section 1983 claims against ECU Health. Avens can only assume this means she has sufficiently met the burden of demonstrating that ECU Health acted as a state actor. If the Court intended otherwise, it should provide reasoning rather than leaving the claim unresolved. Additionally, Avens objects to any potential dismissal based on reasoning not included in the M&R, as this would deny her a fair opportunity to respond.

## CONCLUSION

For the foregoing reasons, Avens objects to the Court's Memorandum and Recommendation and respectfully requests that her claims be allowed to proceed. Dismissing this case would not only ignore well-established legal precedent but would also embolden the very misconduct this Court is meant to guard against.

Respectfully submitted February 12, 2025.

/s/ Cynthia B. Avens
Cynthia B. Avens
303 Riverside Trail
Roanoke Rapids, NC 27870
Avens1@charter.net
252-203-7107
*Pro Se Litigant*

CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2025, the Plaintiff's Objection to DE 87 was shipped by overnight delivery by UPS to the U.S. District Court in Greenville, NC. Signature Required. Tracking # 1Z9H79KT2411065059. Upon docketing, the CM/ECF system will send electronic notification of such filing to the defendants' counsel:

Respectfully submitted 2/12/2025,

/s/ Cynthia B. Avens

Cynthia B. Avens

303 Riverside Trail

Roanoke Rapids, NC 27870

Avens1@charter.net

252-203-7107

*Pro Se Litigant*

Chris D. Agosto Carreiro
Special Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
ccarreiro@ncdoj.gov
Telephone: (919) 716-6874
Facsimile: (919) 716-6755
State Bar No. 45356
*Counsel for DA Dixon*

Jeremy D. Lindsley
Assistant Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
jlindsley@ncdoj.gov
Tel: 919-716-6920
Fax: 919-716-6764
NC State Bar No. 26235
*Counsel for Dr. Karen Kelly*

Daniel D. McClurg
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202
daniel.mcclurg@klgates.com
(704) 331-7400
(704) 353-3114
NC Bar #53768
*Counsel for Defendant Pitt County
Memorial Hospital, Inc.*

Terrence M. McKelvey
K&L Gates LLP
501 Commerce Street, Suite 1500
Nashville, Tennessee 37203
terrence.mckelvey@klgates.com
(615) 780-6700
(615) 780-6799
NC Bar #47940
*Counsel for Defendant Pitt County
Memorial Hospital, Inc.*

Elizabeth Curran O'Brien

Special Deputy Attorney General

N.C. State Bar No. 28885

North Carolina Department of Justice

Telephone: (919) 716-6800

Facsimile: (919) 716-6755

Email: eobrien@ncdoj.gov Attorney for Defendant Dixon